UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL TONY VELEZ,

                 Plaintiff,

v.

COLLADO, individually and official capacity as         9:22-CV-0362
Superintendent; S. DEVILYN-VARIN; JOHN and     (AMN/ML)
JANE DOE individually and their official capacity
as RN's; BODROGI, individually and their official
capacity as MD's; JOHN and JANE DOE
individually and their official capacity as MD's; and
MORLEY, individually and official capacity as MD,

                 Defendants.
_____

APPEARANCES:                                   OF COUNSEL:

Michael Tony Velez
   *Pro Se* Plaintiff
Clinton Correctional Facility
Post Office Box 2001
Dannemora, New York 12929

LETITIA A. JAMES                         MARK J. DOLAN, ESQ.
Attorney General for the State of New York       Assistant Attorney General
   Counsel for Defendants Collado, Devlin-Varin,
   Bodrogi, and Morley
The Capitol
Albany, New York 12224

MIROSLAV LOVRIC, United States Magistrate Judge

### REPORT and RECOMMENDATION

Currently before the Court, in this civil rights action filed by Michael Tony Velez ("Plaintiff") against Collado, S. Devlin-Varin,[1] John and Jane Doe (as RNs), Bodrogi, John and Jane Doe (as MDs), and Morley (collectively "Defendants"), is Defendants Collado, Devlin-Varin, Bodrogi, and Morley's (collectively "Named Defendants") motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6).  (Dkt. No. 19.)  For the reasons set forth below, I recommend that Named Defendants' motion be granted in part and denied in part.

## I.      RELEVANT BACKGROUND

### A.      Procedural History

On March 23, 2022, Plaintiff commenced this action by the filing of a Complaint, accompanied by a motion for leave to proceed *in forma pauperis* ("IFP") in the District Court for the Southern District of New York.  (Dkt. Nos. 1, 2.)  On March 29, 2022, Chief United States District Judge Laura Taylor Swain granted Plaintiff's IFP application.  (Dkt. No. 4.)  On April 12, 2022, Chief Judge Swain transferred this action to the District Court for the Northern District of New York.  (Dkt. No. 5.)

On July 22, 2022, Senior United States District Judge Lawrence E. Kahn reviewed Plaintiff's Complaint pursuant to 28 U.S.C. §§ 1915, 1915A.  (Dkt. No. 9.)  Judge Kahn ordered that a response was required to the following three claims: (1) a claim that Plaintiff's right to free exercise was violated by Defendant Collado pursuant to the First Amendment and 42 U.S.C. §

---

[1]      In Named Defendants' motion to dismiss (Dkt. No. 19, Attach. 1) counsel indicates that defendant referred to by Plaintiff as "S. Devilyn-Varin" is actually "S. Devlin-Varin."  As a result, the Clerk of the Court is directed to amend the docket sheet accordingly.  Any reference in the Complaint (Dkt. No. 1) to "S. Devilyn-Varin" shall be deemed to refer to "S. Devlin-Varin."

1983; (2) a claim of retaliation against Defendants Collado and Devlin-Varin pursuant to the First Amendment and 42 U.S.C. § 1983; and (3) a conditions-of-confinement claim against Defendants Devlin-Varin, Nurse John Doe, Nurse Jane Doe, Bodrogi, Morely, Dr. John Doe, and Dr. Jane Doe, in violation of the Eighth Amendment and 42 U.S.C. § 1983.  (*Id.*)  Judge Kahn dismissed all of the other claims included in the Complaint.  (*Id.*)

In lieu of an answer, Named Defendants filed the pending motion to dismiss for failure to state a claim upon which a relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6).  (Dkt. No. 19.)

### B.     The Complaint

Judge Kahn thoroughly outlined the allegations contained in the Complaint as they relate to Plaintiff's surviving clams.  (*See generally* Dkt. No. 9.)  For a complete summary of Plaintiff's claims and allegations, reference is made to Judge Kahn's Decision and Order.  (Dkt. No. 9 at 3-8.)

### C.     Parties' Briefing on Named Defendants' Motion to Dismiss

#### 1.     Named Defendants' Memorandum of Law

Generally, in support of their motion to dismiss, Named Defendants assert the following three arguments: (1) Plaintiff's First Amendment free exercise claim against Defendant Collado fails because the Complaint does not allege facts plausibly suggesting (a) Defendant Collado's personal involvement in any purported deprivation of Plaintiff's free exercise rights, and (b) that Plaintiff follows the Jewish faith, that attending Jewish services is required by any sincerely held belief he has, that Plaintiff has participated in Jewish services in the past, or that Plaintiff has had any past contact with the Rabbi for the facility; (2) Plaintiff's First Amendment retaliation claim against Defendants Collado and Devlin-Varin fails because the Complaint does not allege facts

plausibly suggesting (a) an adverse action, and (b) a causal connection between Plaintiff's protected conduct and the alleged adverse actions; and (3) Plaintiff's Eighth Amendment conditions of confinement claim against Defendants Devlin-Varin, Bodrogi, and Morley fails because placing an incarcerated person under observation for a potential TB infection is a reasonable response and thus, the Complaint does not allege facts plausibly suggesting the objective or subjective prongs of such a claim.  (*See generally* Dkt. No. 19, Attach. 1.)

### 2.    Plaintiff's Opposition

Generally, in opposition to Named Defendants' motion, Plaintiff argues that (1) Named Defendants' motion does not contain an affidavit or affirmation in support of the notice of motion, and thus should not be considered; (2) the facts of the Complaint are reiterated and Plaintiff does not "relinquish [his] constitutional right[s]"; and (3) Named Defendants seek to mislead the Court on the facts and merits of Plaintiff's constitutional claims and violated his rights to the practice of his Jewish faith.  (Dkt. No. 22.)

### 3.    Named Defendants' Reply Letter [2]

Generally, in their reply, Named Defendants argue that: (1) Plaintiff's opposition was filed with the Clerk of the Court three days after the deadline and request that their late reply be accepted based on a change in counsel for Named Defendants; and (2) Plaintiff's opposition contains no allegations or legal authority which overcome the dispositive arguments set forth by Named Defendants in their memorandum of law or otherwise would warrant a response.  (Dkt. No. 24.)

---

[2]    In the future, counsel is cautioned to comply with Local Rule 7.1(b)(1), which provides that "[a]ll memoranda of law shall contain a table of contents."

## II.     LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim.  *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 211, nn.15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate.  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (emphasis added).  In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal."  *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case).  On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of

what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at

212, n.17 (citing Supreme Court cases) (emphasis added).[3]

The Supreme Court has explained that such *fair notice* has the important purpose of

"enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision

on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases);

*Rusyniak v. Gensini,* 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing

Second Circuit cases).  For this reason, as one commentator has correctly observed, the "liberal"

notice pleading standard "has its limits."  2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d

ed. 2003).  For example, numerous Supreme Court and Second Circuit decisions exist holding

that a pleading has failed to meet the "liberal" notice pleading standard.  *Rusyniak,* 629 F. Supp.

2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129

S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an

appellate decision holding that a complaint had stated an actionable antitrust claim under 15

U.S.C. § 1.  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).  In doing so, the Court

"retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957),

that "a complaint should not be dismissed for failure to state a claim unless it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him

to relief." *Twombly*, 127 S. Ct. at 1968-69.  Rather than turn on the *conceivability* of an

actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an

actionable claim.  *Id*. at 1965-74.  The Court explained that, while this does not mean that a

---

[3]     *Accord, Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y.1995) (McAvoy, C.J.).

pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id*. at 1965.  More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true.  *Id*.

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "[D]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . .  [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 [internal quotation marks and citations omitted].  However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id*., it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949.  Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S. Ct. at 1949 (internal citations and alterations omitted).  Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

However, "in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (Sharpe, M.J.) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted).  The Second Circuit has opined that the court is obligated to "'make reasonable allowances to protect *pro se* litigants'" from inadvertently forfeiting legal rights merely because they lack a legal education.  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).  As a result, *Twombly* and *Iqbal* notwithstanding, the court must continue to "construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests."  *Weixel v. Bd. of Educ.*, 287 F.3d 139, 146 (2d Cir. 2002).

## III.   ANALYSIS

### A.   Whether Plaintiff Sufficiently Alleged a First Amendment Free Exercise Claim Against Defendant Collado

After carefully considering the matter, I answer this question in the negative for the reasons set forth below.

"Prisoners have long been understood to retain some measure of their rights under the Free Exercise Clause."  *Brandon v. Kinter*, 938 F.3d 21, 32 (2d Cir. 2019) (cleaned up).  To state a First Amendment free exercise claim upon which relief may be granted, an inmate "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."  *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014).[4]  "Determining whether a

---

[4]      It remains unclear whether the substantial burden requirement for proving a free exercise violation under the First Amendment remains good law.  In *Employment Division v. Smith*, 494 U.S. 872 (1990), the Supreme Court "took issue with the premise that courts can differentiate between substantial and insubstantial burdens."  *Ford v. McGinnis*, 352 F.3d 582, 582 (2d Cir. 2003) (citing *Smith*, 494 U.S. at 887).  Other circuits have disagreed over whether the substantial burden test continues to apply to free exercise claims.  *Compare Williams v. Morton*, 343 F.3d 212, 217 (3d Cri. 2003) (finding "no support for" defendants' argument that it is "a prerequisite

plaintiff's free exercise rights have been substantially burdened 'requires courts to distinguish important from unimportant religious beliefs, a task for which . . . courts are particularly ill-suited.'" *Brandon*, 938 F.3d at 32 (quoting *Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003)).  Therefore, courts in the Second Circuit should be "wary of making 'conclusory judgments about the unimportance of the religious practice to the adherent.'" *Id.* (quoting *Ford*, 352 F.3d at 593).  While certain "belief[s] or practice[s]" may be "so peripheral to the plaintiff's religion that any burden can be aptly characterized as constitutionally de minimis," *Ford*, 352 F.3d 593, establishing a substantial burden is "not a particularly onerous task," *McEachin v. McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004).  For instance, a "relatively small number of violative incidents" should "not prevent" a court "from finding that the prisoner's religious beliefs were substantially burdened." *Brandon*, 938 F.3d at 35.

As set forth by Named Defendants in their memorandum of law, the Complaint fails to allege facts plausibly suggesting that Plaintiff held any sincere religious beliefs.  Although the Second Circuit has made clear that "establishing a substantial burden is 'not a particularly onerous task,'" *Brandon*, 938 F.3d at 32 (quoting *McEachin*, 357 F.3d at 202), Plaintiff has entirely failed to allege that his religious beliefs are sincerely held.  *See Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988) ("Because [the plaintiff] has neither alleged nor submitted any proof that he sincerely holds to any religious belief that mandates the use of Tarot cards, we conclude that summary judgment was appropriate on the free exercise claim."); *Gambino v. Payne*, 12-CV-

---

for the inmate to establish that the challenged prison policy 'substantially burdens' his or her religious beliefs"), *with Levitan v. Ashcroft*, 281 F.3d 1313, 1320-21 (D.C. Cir. 2002) (requiring prisoners demonstrate that free exercise of religion be substantially burdened).  This Court proceeds on the assumption that the substantial burden requirement applies, in part because establishing a substantial burden is "not a particularly onerous task," *McEachin v. McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004).

0824, 2013 WL 1337319, at *8 (W.D.N.Y. Mar. 29, 2013) (noting that the "complaint is devoid

of any allegations that would establish that [the plaintiff] has a sincerely held religious belief").

Although the Complaint alleges that Plaintiff was "not allowed" to attend Jewish services (Dkt.

No. 2 at 33) and was "denied" Kosher meals (Dkt. No. 2 at 9), it does not allege that he

previously attended Jewish services, ate Kosher meals, or forewent eating non-Kosher meals.

*See cf. Ackridge v. Aramark Corr. Food Servs.*, 16-CV-6301, 2018 WL 1626175, at *18

(S.D.N.Y. Mar. 30, 2018) (citing *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999)) (holding

that although "Plaintiff has not explicitly plead[ed] that his religious beliefs are 'sincerely held,'

he has alleged that he listed his religious preference as Jewish, participated in the kosher meal

program when he was previously incarcerated, and chose not to eat the non-kosher food . . . . The

Second Circuit has found similar allegations sufficient to plea this element.").  As a result, I

recommend that Plaintiff's Free Exercise claim pursuant to the First Amendment against

Defendant Collado be dismissed for failure to state a claim upon which relief may be granted.[5]

> ### B.    Whether Plaintiff Alleged Facts Plausibly Suggesting a First Amendment Retaliation Claim Against Defendants Collado and Devlin-Varin

After carefully considering the matter, I answer this question in the affirmative.

To state a *prima facie* claim pursuant to 42 U.S.C. § 1983 for retaliatory conduct, a

plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was

---

[5]      To the extent that Named Defendants argue that the Complaint fails to allege the personal involvement of Defendant Collado, I find that argument unpersuasive.  (Dkt. No. 19, Attach. 1 at 7-8.)  The attachments to the Complaint allege that Defendant "Collado would not allow [Plaintiff] to attend any Jewish services and has refused to answer [his] grievance appeal related to this denial."  (Dkt. No. 2 at 33.)  Moreover, the attachments allege that Defendant Collado "would not allow [Plaintiff] or any other Jew in B-1 to attend Jewish services and she does not allow Shabos services and makes it clear she is C[]atholic, and they are the only ones she goes out of her way for."  (Dkt. No. 2 at 45.)  I find that these allegations plausibly suggest Defendant Collado's personal involvement.

protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action–in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

### 1.    Defendant Collado

Although Named Defendants' motion appears to challenge only the second and third elements of Plaintiff's retaliation claim, I find that the Complaint plausibly alleges the first element, that Plaintiff has engaged in protected activity.  The Complaint alleges that on January 1, 2020, Plaintiff suffered a medical emergency but refused medical treatment at an outside hospital.  (Dkt. No. 2 at 61-63.)  The right to refuse medical treatment is protected speech or conduct. *Simmons v. Lantz*, 04-CV-2180, 2007 WL 842008, at *2 (D. Conn. Mar. 12, 2007) (citing *Pabon v. Wright*, 459 F.3d 241, 246 (2d Cir. 2006)).

With respect to the adverse action element, the Complaint alleges that after Plaintiff refused to be transported to an outside hospital, a sergeant directed that Plaintiff's cell be searched and commanded the searching officers to "find something."  (Dkt. No. 2 at 61-67.)  The Complaint alleges that the officers fabricated charges from the cell search and Plaintiff was placed in keeplock for approximately thirty-three days.  (*Id.*)  "Confining a prisoner to keeplock is sufficient to establish an adverse action." *Gunn v. Malani*, 20-CV-2681, 2023 WL 2664805, at *7 (S.D.N.Y. Mar. 28, 2023) (citing *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (finding that a "sentence of three weeks in keeplock" constituted an adverse action); *Mack v. Hall*, 18-CV-0875, 2020 WL 5793438, at *8 (N.D.N.Y. July 27, 2020) (Hummel, M.J.) ("The

Second Circuit has held that being placed in keeplock or otherwise confined is an adverse action."), *report and recommendation adopted*, 2020 WL 5775205 (N.D.N.Y. Sept. 28, 2020) (Sharpe, J.); *Marshall v. Griffin*, 18-CV-6673, 2020 WL 1244367, at *6 (S.D.N.Y. Mar. 16, 2020) ("[i]t is plausible for keeplock confinement to constitute an adverse action for claims of retaliation.").

With respect to the third element, drawing all inferences in Plaintiff's favor, I find that he has satisfied the causation prong. To show causation, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 107 (2d Cir. 2000) (omitting internal quotation). Factors considered in evaluating whether causation existed include: "(1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Thomas v. DeCastro*, 14-CV-6409, 2019 WL 1428365, at *9 (S.D.N.Y. Mar. 29, 2019) (citation omitted).

The Complaint alleges that on February 3, 2020, Defendant Collado came to Plaintiff's keeplock cell and stated "we are done with you, your [sic] out." (Dkt. No. 2 at 33.) Plaintiff also alleges that before the incidents described in the Complaint, approximately five years had elapsed without receiving a misbehavior report. (Dkt. No. 2 at 5.) Further, the keeplock confinement followed close in time to Plaintiff engaging in the protected activity, which supports an inference of a causal connection.[6] *See Johnson v. Morton*, 21-CV-0986, 2022 WL 1556404 at

---

[6]      "Although there is significant case law to support the contention that temporal proximity alone is insufficient to survive a motion for summary judgment, the same is not true at the motion to dismiss stage." *Hendricks v. Mallozzi*, 20-CV-1035, 2022 WL 1129887, at *5 (N.D.N.Y. Jan. 14, 2022) (Lovric, M.J.) (citations omitted), *report and recommendation adopted by*, 2022 WL 856885 (N.D.N.Y. Mar. 23, 2022) (D'Agostino, J.). The undersigned rejects

*5 (S.D.N.Y. May 17, 2022) (citing *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009))

(holding that the "adverse action was taken against [the plaintiff] the same day he engaged in

constitutionally protected activity, which is sufficient for the Court to infer a causal

connection"); *see also Fabrizio v. Rielly*, 20-CV-0011, 2022 WL 18402299, at *10 (N.D.N.Y.

Dec. 15, 2022) (Lovric, M.J.) (quoting *Espinal*, 558 F.3d at 129) ("The Second Circuit has held

that the passage of 'only six months' is sufficient to support an inference of a causal

connection."), *report and recommendation adopted*, 2023 WL 356204 (N.D.N.Y. Jan. 23, 2023)

(Suddaby, J.).

As a result, I find that Plaintiff has alleged facts plausibly suggesting the elements for a

retaliation claim against Defendant Collado and recommend that Named Defendants' motion to

dismiss this claim be denied.

### 2.    Defendant Devlin-Varin

Again, Named Defendants do not appear to contest that Plaintiff sufficiently alleged that

he engaged in protected speech.  (*See generally* Dkt. No. 19.)  The Complaint alleges that

Plaintiff engaged in constitutionally protected speech by the filing of a grievance against

Defendant Devlin-Varin dated June 3, 2021.  (Dkt. No. 2 at 73); *see Davis v. Goord*, 320 F.3d at

352-53 ("[T]he filing of prison grievances is a constitutionally protected activity."); *Flood v.

Cappelli*, 18-CV-3897, 2019 WL 3778736, at *7 (S.D.N.Y. Aug. 2, 2019) (collecting cases)

(holding that the filing of a grievance is protected speech).

In addition, Plaintiff alleges that approximately sixty-eight days later, he was placed in

the SHU in retaliation for that grievance.  (Dkt. No. 2 at 6.)  Confining an incarcerated individual

---

Named Defendants' assertion that "[t]emporal proximity alone is insufficient to plead causation."
*Hendricks*, 2022 WL 1129887, at *5 (rejecting that contention and analyzing the case law upon
which Named Defendants' rest their argument).

in the SHU is an adverse action.  *See Johnson v. Morton*, 2022 WL 1556404, at *5 (finding that

the plaintiff sufficiently alleged an adverse action where he alleged that the defendant made a

false disciplinary report and placed him in the SHU); *Blount v. Apples*, 22-CV-0216, 2022 WL

1101547, at *8 (N.D.N.Y. Apr. 13, 2022) (Dancks, M.J.) (citing *Vidal v. Valentin*, 16-CV-5745,

2019 WL 3219442, at *8 (S.D.N.Y. July 17, 2019) ("Confinement in the SHU is an adverse

action."); *Smith v. Hash*, 04-CV-0074, 2006 WL 2806464, at *6 (N.D.N.Y. Sept. 28, 2006)

(Kahn, J.) (same)) (holding that placing the plaintiff in protective custody against his will was an

adverse action).

Moreover, as set forth above in Part III.B.1. of this Report-Recommendation, the close

temporal proximity between Plaintiff's grievance against Defendant Devlin-Varin on June 3,

2021, and her alleged placement of Plaintiff in the SHU on August 10, 2021, sufficiently alleges

a causal connection at this procedural posture.

As a result, I recommend that Named Defendants' motion to dismiss Plaintiff's

retaliation claim against Defendant Devlin-Varin be denied.

### C. Whether Plaintiff Has Sufficiently Alleged an Eighth Amendment Conditions of Confinement Claim Against Defendants Devlin-Varin, Bodrogi, and Morely

After carefully considering the matter, I answer this question in the affirmative.   I find

Named Defendants' argument that Plaintiff fails to allege facts plausibly suggesting the objective

and subjective elements of an Eighth Amendment claim, unpersuasive.  In support of this

argument, Named Defendants argue solely that placing Plaintiff under observation for a potential

TB infection was reasonable.  (Dkt. No. 19 at 14.)  Assuming *arguendo*, that the Court agreed

with Named Defendants' assertion, it still entirely ignores the conditions under which Plaintiff

alleges that he was required to live from August 2021 until October 2021.

As set forth in Judge Kahn's order dated July 22, 2022, Plaintiff alleged, *inter alia*, that he was placed in a filthy hospital room with dried blood in the toilet, black dirt all over the edge of the entire cell, denied the ability to send mail to family or friends, denied a change of clothes, denied shampoo, and denied deodorant.  (Dkt. No. 9 at 20 [citing Dkt. No. 2 at 17].)

The Second Circuit has "long recognized that unsanitary conditions in a prison cell can, in egregious circumstances, rise to the level of cruel and unusual punishment."  *Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013) (citing *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981) (noting that prisoners are entitled to, *inter alia*, sanitation)).  Moreover, "the failure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional violation."  *Walker*, 717 F.3d at 127 (citing *Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) ("[T]his court and other circuits have recognized that deprivation of toiletries, and especially toilet paper, can rise to the level of unconstitutional conditions of confinement . . . ."); *Atkins v. Cnty. of Orange*, 372 F. Supp. 2d 377, 406 (S.D.N.Y. 2005) ("The failure to regularly provide prisoners with . . . toilet articles including soap, razors, combs, toothpaste, toilet paper, access to a mirror and sanitary napkin for female prisoners constitutes a denial of personal hygiene and sanitary living conditions.")).  Further, "[a]vailability of hygienic materials is particularly important in the context of otherwise unsanitary living conditions."  *Walker*, 717 F.3d at 127 (citing *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1975)).

The allegations in the Complaint plausibly suggest that Plaintiff was deprived of an identifiable human need for safe and sanitary living conditions.  In addition, the allegations plausibly suggest a risk that was obvious or otherwise must have been known to Defendants Devlin-Varin, Bodrogi, and Morely.  As a result, I recommend that Named Defendants' motion to dismiss Plaintiff's conditions of confinement claim against them be denied.

**ACCORDINGLY**, it is hereby respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 2) be **DISMISSED** with respect to the free exercise claim against Defendant Collado, for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6); and it is further respectfully

**RECOMMENDED** that Named Defendants' motion to dismiss (Dkt. No. 19) be **GRANTED** to the extent that it sought dismissal of Plaintiff's free exercise claim against Defendant Collado because the Complaint failed to state a claim upon which relief may be granted, and **DENIED** to the extent that it sought dismissal of the Complaint with respect to Plaintiff's (1) retaliation claim against Defendants Collado and Devlin-Varin, and (2) conditions of confinement claim against Defendants Devlin-Varin, Bodrogi, and Morely; and it is further

**ORDERED** that the Clerk of the Court is directed to amend the docket such that Defendant "S. Devilyn-Varin" is changed to "S. Devlin-Varin"; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[7]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[8]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  28 U.S.C. § 636(b)(1) (Supp. 2013);

---

[7]     The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[8]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated:  May 30, 2023
          Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

KeyCite Overruling Risk - Negative Treatment

Overruling Risk  Darnell v. Pineiro,  2nd Cir.,  February 21, 2017

2013 WL 1337319

Only the Westlaw citation is currently available.

United States District Court,

W.D. New York.

David August GAMBINO, Plaintiff,

v.

Captain PAYNE, Sergeant Williams, James
R. Vontour, Keven M. Smith, Captain
Engert, and Sergeant Liwzinki, Defendants.

No. 12–CV–0824SC.

|

March 29, 2013.

**Attorneys and Law Firms**

David August Gambino, Youngstown, OH, pro se.

### ORDER

MICHAEL A. TELESCA, District Judge.

### INTRODUCTION

**\*1** Plaintiff, James August Gambino, currently awaiting sentencing in this Court following a plea, *United States v.* Gambino, 09–CR00372–RHA–JMM–1, and who is detained at the N.E.O.C.C. in Youngstown, Ohio, has filed this pro se action under 42 U.S.C. § 1983 seeking relief for actions or inaction he claims occurred while he was detained at the Niagara County Jail in 2012. Plaintiff also seeks permission to proceed *in forma pauperis* and has filed Prison Authorization (Docket No. 2 and 5). [1]

Plaintiff sets forth a number of claims related to his pre-trial detention at the Niagara County Jail, including a denial of his right to access to the courts, to file grievances and to freely practice his religion through the provision of edible kosher meals. He also alleges a denial of his right to privacy when he was required to shower in an area that exposed his lower body to others and a denial of access to dental and mental health services. (Docket No. 1, Complaint.) For the following reasons, some of plaintiff's claims are dismissed

with prejudice, pursuant to 28 U.S.C. § 1915(e) (2)(B) and 1915A, and the remaining claims will be dismissed with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B) and 1915A, unless plaintiff files an amended complaint as directed below.

### DISCUSSION

Because plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization with respect to this action, plaintiff is granted permission to proceed *in forma pauperis.* Sections 1915(e)(2)(B) and 1915A(a) of 28 U.S.C. require the Court to conduct an initial screening of this complaint. In evaluating the complaint, the Court must accept as true all of the factual allegations and must draw all inferences in plaintiff's favor. *See Larkin v. Savage,* 318 F.3d 138, 139 (2d Cir.2003) (per curiam); *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). While "a court is obliged to construe [*pro se* ] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004), even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon,* 360 F.3d 73 (2d Cir.2004). "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks and citation omitted)). Generally, the Court will afford a pro se plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas v. Dixon,* 480 F.3d 636, 639 (quoting *Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999) (*per curiam* )).

**\*2** Plaintiff brings this action pursuant to 42 U.S.C. § 1983. "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity

secured by the Constitution or laws of the United States." 🚩 *Whalen v. County of Fulton,* 126 F.3d 400, 405 (2d. Cir.1997) (citing 🚩 *Eagleston v. Guido,* 41 F.3d 865, 875–76 (2d Cir.1994)). Based on its evaluation of the complaint, the Court finds that some of plaintiff's claims must be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b) because they fail to state a claim upon which relief may be granted. In addition, the Court finds that the remainder of plaintiff's claims must be dismissed unless plaintiff files an amended complaint as directed below.

### A. PLAINTIFF'S CLAIMS

#### 1. First Claim

**Plaintiff alleges that defendant Captain Payne (1) intercepted and withheld documents that were sent to the service provided by the Jail to make copies of legal documents for inmates of the Jail, (2) did not allow plaintiff to report an incident of sexual conduct w hen he ordered his staff not to sign or accept the report and t hen had plaintiff transferred to the** Allegany County Jail in order "to disable [plaintiff's] efforts to report the misconduct[,]" and (3) lied about and refused to accept plaintiff s grievance related to his kosher food being tampered with. Plaintiff claims that as a result of Payne's "abuse of power," he was "subjected to abuses from many angles **that [plaintiff] feel [s] were motivated by religious** discrimination" and "[has] suffered tremendously and [his] **ability to defend [his] case has been overshadowed and dominated by [his] need to eat properly and defend [himself] against the daily attack against [his] religion, privacy and lack of medical** care." (Complaint, Attachment, Section A, First Claim, at 1.)

This claim, as liberally construed, 🚩 *Graham v. Henderson.* 89 F.3d 75, 79 (2d Cir.1996) ("the pleadings of a pro se plaintiff must be read liberally and should be interpreted to raise the strongest arguments that they could suggest") (internal quotations and citation omitted), can be parsed into three separate alleged violations of plaintiff's constitutional rights: (1) denial of access to the courts; (2) denial of right to submit grievances; and (3) denial of freedom to practice one's religion (free exercise claim).

*Access to Courts*

Plaintiff alleges that Payne intercepted documents he had sent to be copied thus interfering with his access to his legal work. This claims fails to state a claim upon which relief can be granted and must be dismissed with prejudice. *See* 🚩 *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (An opportunity to replead should be denied where "the problem with [plaintiff's] causes of action [are] substantive" such that "[b]etter pleading will not cure it. Repleading would thus be futile.") (citation omitted).

**\*3** In order to state an actionable denial of access to courts claim, plaintiff must make a showing that he has suffered, or will imminently suffer, actual harm; that is, that he was "hindered [in] his efforts to pursue a legal claim." 🚩 *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). *Accord* 🚩 *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987). Thus, plaintiff must show that he has suffered an actual injury traceable to the challenged conduct of prison officials. A plaintiff has not shown actual injury unless he shows that a "nonfrivolous legal claim had been frustrated or was being impeded" due to the actions of prison officials. *Lewis,* 518 U.S. at 351–52. Taking plaintiff's claim as true, he nevertheless "offers no facts to explain how [the interference with the copying of some documents] prejudiced his ability to seek redress from the judicial system." ⚠️ *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995); *see also Perez v. Metropolitan Correctional Center Warden,* 5 F.Supp.2d 208, 211–12 (S.D.N.Y.,1998) ("It is uncontested that plaintiff had counsel throughout every stage of his criminal proceedings. As such, plaintiff's access to the courts claim must fail. Plaintiff has no constitutional right to 'hybrid' representation-simultaneously pro se and by counsel.") (quoting ⚠️ *Faretta v. California.* 422 U.S. 806, 832, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)).

*Denial of Ability to File Grievances*

Plaintiff alleges that Payne refused to allow him to file grievances alleging sexual misconduct and tampering with his kosher food, and had him moved to another Jail in order to "disable" plaintiff's efforts to report the misconduct. To the extent plaintiff is alleging that Payne interfered with his ability to file a grievance or report, it must be dismissed because there is no constitutional right of access to an established inmate grievance program. ⚠️ *Davis v. Buffardi,* 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) ("[p]articipation in an inmate grievance process is not a

constitutionally protected right"); *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005) ("[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim"); *Cancel v. Goord,* 2001 WL 303713, at *3 (S.D.N.Y. Mar.29, 2001) ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983").

To the extent Payne's alleged interference with plaintiff's ability to file a grievance can be construed as a denial of access to the courts, it does not state a claim upon which relief can be granted "since under the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), a plaintiff whose access to the grievance process has been hindered or foiled by actions of prison officials are excused from the PLRA's exhaustion requirement and permitted to file suit without having completed that process." *White v. Clark,* 2012 WL 5877160, at * 8 (N.D.N.Y., Nov.20, 2012) (citing *Hemphill v. New York,* 380 F.3d 680, 686–91 (2d Cir.2004)).

**\*4** If the complaint is construed to allege that Payne violated plaintiff's constitutional rights by failing to allow or conduct an investigation into the alleged misconduct, that claim too must be dismissed because prisoners do not have a right to an investigation into grievances. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 341–42 (S.D.N.Y.2003); *see also* *DeShaney v. Winnebego Soc. Servs.,* 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (The Due Process Clause confers no right to governmental aid, even where that aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual); *Pine v. Seally,* 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011) ("the law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials") (citing *Bernstein v. New York,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008)).

Lastly, plaintiff's allegation that Payne had him transferred to another County Jail to "disable" any efforts to report the sexual misconduct can also be broadly construed to allege retaliation for exercising his First Amendment right to redress grievances. If so construed, however, this claim must be dismissed because it, at best, is wholly conclusory and speculative.

Prison officials may not retaliate against prisoners for exercising their constitutional rights. *Mount Healthy School District v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). To make out a § 1983 retaliation claim, a prisoner must show: (1) that he was engaged in constitutionally protected conduct; and (2) that the prison official's conduct was taken in retaliation for the prisoner's protected conduct. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). A finding of sufficient permissible reasons to justify state action is "readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority." *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (citation omitted). Moreover, courts recognize that retaliation claims by prisoners are "prone to abuse" since prisoners can claim retaliation for every decision they dislike. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("Because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoner's claims of retaliation with skepticism and particular care") (citing *Flaherty v. Couqhlin,* 713 F.2d 10, 13 (2d Cir.1983)); *see also* *Graham,* 89 F.3d at 79. Thus, "[a] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone [because i]n such a case, the prisoner has no factual basis for the claim." *Flaherty, supra.*

### Denial of Religious Practices

To the extent this claim is construed as separate and apart from plaintiff's claim that Payne denied him the ability to file a grievance or to investigate the food tampering grievance, the only allegation supporting this claim is that Payne denied and lied about the existence of plaintiff's grievance in relation to plaintiff's claim that his kosher food was being tampered with. (Complaint, Attachment, First Claim, ¶ 4, at 1.) Later in the complaint plaintiff alleges that his food was "mutilat[ed], smash [ed], shak [en] and contaminat [ed] with pubic hair ... and [there was] missing food, rotten fruit, soaked bread and visual[ly] tampered with food ... regardless of [plaintiff's] vocal requests to multiple officer[s] and sergeants." (*Id.,* Third Claim, ¶ 2, at 1.)

**\*5** First, there are no allegations that Payne was personally involved in the food tampering. *See* *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) ( " '[i]t is well settled ... that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' ") (quoting *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006)). Second, as addressed further below, these allegations are insufficient to allege a denial of plaintiff's First Amendment right to practice one's religion.

Plaintiff's allegations that his food was tampered with, while unpleasant, do not state a claim that his right to the free exercise of his religion was violated by Payne and thus must be dismissed, at least against Payne. As addressed below, however, plaintiff, will be allowed to file an amended complaint in relation to this religious exercise claim against individual(s) who were personally involved in this alleged denial.

Accordingly, the First Claim is dismissed with prejudice in its entirety. *See* *Cuoco,* 222 F.3d 99, 112.

### 2. Second Claim

Plaintiff alleges that defendant Sergeant Williams, "initiated and enforced the stripping of the ability to cover (with sheets) the areas of the showers that allow exposure of [his] naked lower abdominal area during bathing." (Complaint, Attachment, Second Claim, ¶ 1, at 1.) Plaintiff claims that the showers he was assigned were on the upper mezzanine and this gave others, including male and female Jail deputies, civilian workers and strangers and other male inmates, full view of his private body parts. (*Id.,* ¶ 2, at 1.)

While plaintiff also names Captain Engert, Sheriff Vontour and Undersheriff Smith as defendants on this claim there are no allegations against them in relation to this shower area and thus this claim as against them must be dismissed. *See* *Farrell,* 449 F.3d at 484 ("[i]t is well settled ... that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (citation omitted); *see also* *Monell v. New York City Department of Social Services,* 436 U.S. 658, 691–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (Plaintiff may not rely on the doctrine of *respondeat superior* to establish liability in a § 1983 action.)

The gravaman of plaintiff's claim, as broadly construed, is that the removal ("stripping") of sheets from the shower area by Williams exposed plaintiff's private (genital) area to others and thus violated his right to privacy. While prison inmates have diminished expectations of privacy, *e.g.,* *Hudson v. Palmer,* 468 U.S. 517, 524, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (inmates have no expectation of privacy in their prison cell), "[pretrial detainees] do retain a limited right to bodily privacy [,]" *Covino v. Patrissi,* 967 F.2d 73, 78 (2d Cir.1992).

In *Corr. Officers Benev. Ass'n of Rockland City v. Kralick,* 2011 WL 1236135 (S.D.N.Y. Mar.30, 2011), the district court, in addressing a union's claim that a County Jail's policy requiring that inmates in certain circumstances be guarded by corrections officers of the same sex was discriminatory, noted that recent cases in this Circuit and others addressing an inmate's right to privacy had "suggest[ed] that occasional, indirect or brief viewing of a naked prisoner by a guard of the opposite sex may be permissible, but that 'regular and close viewing' is prohibited". *Id.,* at \*11, n. 13 and 14 (citing cases). *See also* *Baker v. Welch,* 2003 WL 22901051, at \*20 (S.D.N.Y., Dec.10, 2003) (male parolee complained that a female parole officer watched him provide a urine sample; "the balance should be struck to allow incidental ... viewing but prohibit regular ... viewing."); *Miles v. Bell,* 621 F.Supp. 51, 67 (D.Conn.1985) ("Those cases which have found a violation of inmates' rights to privacy have looked to the frequency or regularity of such 'viewing.' As a general rule, courts have found a violation only in those cases in which guards regularly watch inmates of the opposite sex who are engaged in personal activities, such as undressing, using toilet facilities or showering....")

**\*6** Similarly, in *Rogers v. Clark,* 1996 WL 328218 (W.D.N.Y., June 11, 1996) (Elfvin, J.), a male pre-trial detainee at the Niagara County Jail brought a claim alleging that a female officer assigned to an area of the Jail where male inmates are housed had glanced at him as he was completing taking a shower thus violating his right to privacy. Judge Elvin granted summary judgment to defendants and dismissed the claim finding that

> Bashfulness is not a protectable fundamental right or liberty interest. Further, to the extent that a glance at

the unclothed body of a prisoner from a member of the opposite sex might be considered a search worthy of Fourth Amendment scrutiny, the incident was utterly harmless. The plaintiff has not provided a scintilla of evidence that it was *intentional, continuous* or *lengthy.* As such the facts presented do not rise to a constitutionally cognizable injury.... Such matters are better left to prison administrators or state tort law. In short, this Court will decline the opportunity to meddle in the administration of the Niagara County jail.

*Id.* at *1 (emphasis added).

The only allegation herein is that Williams "initiated and enforced" what appears to be the removal of curtains or sheets from part of the showers and that, as a result, plaintiff's genital area was exposed to others. There are no allegations that this was "intentional, continual or lengthy," *id.,* and thus this claim should be dismissed. Unlike some of plaintiff's other claims, however, this claim may be able to be cured through better pleading and, accordingly, plaintiff will be provided an opportunity to amend his complaint in relation to this claim against Williams *only.*

### 3. Third Claim

Plaintiff alleges that Sheriff Vontour, Undersheriff Smith, Captain Engert, Captain Payne, Sergeant Lewszinki, Sergeant Greenwald and Sergeant Williams "as top authoritative figures for [the] Niagara County Jail knowingly and willingly allowed the continuation ... [of] the purposeful harassment and torment from the kitchen staff." (Complaint, Attachment, Section A, Third Claim, ¶ 1, at 1.) He alleges that his kosher meals were mutilated, smashed, shaken and contaminated with pubic hair on a daily basis. There was missing food, rotten fruit, and soaked bread and this "visual tamperered [sic]" food was allowed to be served to him despite his "vocal requests" to numerous corrections officers and sergeants. He claims he was not provided with other food when his meals were tampered with and that he was forced to eat the food or go hungry. (*Id.,* ¶ 2, at 1.) He also claims that his "daily eating habits and there relationship and validity to Judaism, interrupted, intruded and undermined [his] ability to privately

[and] securely learn and practice my beliefs." (*Id.,* at ¶ 4, at 1). This all resulted, plaintiff claims, in him being forced to find sustenance outside the kosher diet provided at the Jail. He claims that he was subjected to this for months and that its purpose was to deter or punish him from practicing his faith.

**\*7** Initially, the Court notes that this claim must be dismissed because it is brought against the defendants in their roles as supervisory officials only. There are no allegations that any of the defendants named were personally involved in the alleged food tampering and interference with plaintiff's Kosher diet. *See* 🚩 *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995). Plaintiff's conclusory allegations that he made oral objections to unnamed officers and sergeants do not state a claim that the defendants were personally involved in the alleged denial of his right to practice his religion freely. *Id.;*[2] *Lewis v. Cunningham,* 483 Fed.Appx. 617, 2012 WL 1863980, at 1 (2d Cir. May 23, 2012) (Summary Order) ("[A] vague complaint is insufficient to permit a jury to find that a prison official's failure to act in response was deliberate indifference.") (citing 🚩 *Colon,* 58 F.3d at 873).

As to whether plaintiff states a First Amendment Free Exercise claim, the Court finds that it does not but that plaintiff will be provided the opportunity to file an amended complaint to attempt to state such a claim against those individuals who were personally involved in the alleged denial of his First Amendment rights, including but not limited to the ones named herein assuming he can allege factually that they were personally involved in the alleged constitutional violation.

A prisoner has a "clearly established" First Amendment right to "a diet consistent with his or her religious scruples...." 🏴 *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. Oct.17, 2007) (citing 🏴 *Kahane v. Carlson,* 527 F.2d 492 (2d Cir.1975); 🏴 *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." 🏴 *McEachin v. McGinnis,* 357 F.3d 197, 203 (2d Cir.2004); *see also* 🔶 *Johnson v. Guiffere,* 2007 WL 3046703, at *4 (N.D.N.Y., Oct.17, 2007).[3] "The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, and is subject to valid penological concerns,

including those relating to institutional security." *Johnson, 2007 WL 3046703, at \*4* (citing *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (collecting cases)).

In order to establish a First Amendment Free Exercise claim, it is the plaintiff's initial burden to establish that the alleged conduct substantially burdens his sincerely held religious beliefs. *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006); *King v. Bennett,* 2007 WL 1017102, at \*4 (W.D.N.Y. Mar.30, 2007).[4] Once this is established, the defendants bear the "relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these [articulated] concerns were irrational." *Salahuddin v. Goord,* 467 F.3d at 274–75 (internal quotation marks, citations & fn. omitted).

**\*8** "A substantial burden is one that 'pressures [plaintiff] to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith.' " *Sioleski v. McGrain,* 2012 WL 6052158, at \*1 (W.D.N.Y., December 05, 2012) (quoting *Brown v. Graham,* 2010 WL 6428251, at \*15 (N.D.N.Y. Mar.30, 2010)). The Court finds that plaintiff's allegations that kitchen staff tampered with his food in order to interfere with his Judaic religious beliefs are far too conclusory and speculative to state a claim under the First Amendment.

> [Federal Rule 8's pleading standard] does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion [s] devoid of further factual enhancement.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility w hen the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint

pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and citations omitted).

While the Second Circuit has cautioned the district courts not to "judge the significance of particular devotional obligations to an observant practitioner of faith," *McEachin,* 357 F.3d at 201, plaintiff's complaint is devoid of any allegations that would establish that he has a sincerely held religious belief and that the tampering with his food substantially burdened said belief. The Court recognizes that "detailed factual allegations," are not necessary, but that a complaint "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678. As pled, plaintiff's First Amendment Free Exercise claim is simply not plausible. In fact, plaintiff's own complaint infers that this food tampering by the kitchen staff was no more than general harassment, which is not actionable under § 1983.

Accordingly, plaintiff's First Amendment Free Exercise claim will be dismissed with prejudice unless plaintiff files an amended complaint as directed below.

### 4. Fourth and Fifth Claims

The Fourth and Fifth Claims are brought against Sheriff Vontour and Undersheriff Smith solely in their roles as supervisors responsible for the administration of the Jail. The Fourth and Fifth Claims allege that Vontour and Smith "holding full responsibility for actions and inactions" of the medical (Fourth) and mental health (Fifth) procedures at the Jail "failed to monitor and enforce appropriate procedural protocols that secure and ensure the inmates physical [Fourth] [and Mental Health (Fifth) ] well being." (Complaint, Attachment, Section 5A, Fourth Claim, ¶ 1, at 1, and Fifth Claim, ¶ 1 at 1.) Plaintiff claims that the medical staff ignored prior diagnosis and treatment for dental health issues that resulted in two tooth infections and caused the acceleration of "tooth enamel erosion" and "showed deliberate indifference" when the medical staff did not submit a referral nor make arrangements for outside treatment or transfer to a facility that could treat his teeth properly. (*Id.,* Fourth Claim, ¶ 2–6).)

**\*9** As to the mental health claims, plaintiff alleges that mental health staff discontinued counseling due to funding issues, despite knowing that he needed additional or specialized treatment, and that the staff's neglect caused him to suffer sleepless nights, hypertension, anxiety and suicidal thoughts and paranoia.

Initially, it is clear that the claims against Vontour and Smith are brought against them in their supervisory capacities only and therefore fail to state a claim upon which relief can be granted against them. Simply alleging that the Jail's medical and mental health staffs failed to provide adequate treatment for his dental and mental health needs is not sufficient to state a claim against Vontour and Smith. *See* Colon, 58 F.3d at 873–74. Accordingly, the claims against Vontour and Smith are dismissed without prejudice.

Plaintiff will, however, be provided the opportunity to amend the complaint to allege a claim of deliberate indifference to his dental and mental health needs under the Due Process Clause against those individuals who were personally involved in the alleged deliberate indifference.[5]

In order for an inmate to state a claim of constitutional deprivation with regard to his access to medical care during pre-trial detention, the inmate must demonstrate that his medical needs were objectively "sufficiently serious," and that the individual to be charged with the violation was aware of, and deliberately indifferent to, those needs. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Caiozzo, 581 F.3d at 69 (applying *Farmer* test to pre-trial inmates under the Fifth and Fourteenth Amendments). In order to show that an individual was deliberately indifferent to the plaintiff's serious medical needs, the plaintiff must show (1) that "[the individual] knew of a substantial risk of serious harm to [plaintiff's] health," and (2) that "[the individual] consciously disregarded that risk." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.1996).

The plaintiff's allegations in both the Fourth and Fifth Claims, even if brought against defendants personally involved in the alleged denial of adequate medical treatment, wholly fail to allege both a serious medical or mental health need and that the defendant(s) consciously disregarded the known risk of harm from the serious medical or mental health need. Plaintiff's amended complaint must therefore be brought against individuals personally involved in the alleged

constitutional deprivation(s) and allege factually that his dental and mental health needs were objectively "sufficiently serious," and that the defendant(s) sued was aware of, and deliberately indifferent to, those needs. *See* Farmer, 511 U.S. at 834.

### CONCLUSION

Because plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization, his request to proceed *in forma pauperis* is granted. For the reasons set forth above, the "First Claim" is dismissed with prejudice. In addition, the "Second," "Third," "Fourth" and "Fifth" Claims must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) unless plaintiff files an amended complaint which includes the necessary allegations as to each of those Claims as set forth above.

**\*10** Plaintiff is advised that an amended complaint is intended to *completely replace* the prior complaint in the action, and thus it "renders [any prior complaint] of no legal effect." *International Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir.1977), *cert. denied sub nom., Vesco & Co., Inc. v. International Controls Corp.,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758 (1978); *see also* Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994). Therefore, plaintiff's amended complaint must include all of the allegations against each of the defendants against whom the case is going forward so that the amended complaint may stand alone as the sole complaint in this action which the defendants must answer.

Plaintiff is forewarned that if he fails to file an amended complaint as directed, the complaint will be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B). Plaintiff is further forewarned that his right to pursue further relief in federal court at public expense will be greatly curtailed if he has three actions or appeals dismissed under the provisions of 28 U.S.C. § 1915(e)(2)(B). *See* 28 U.S.C. § 1915(g).

### ORDER

IT HEREBY IS ORDERED, that plaintiff's motion to proceed *in forma pauperis* (Docket Nos. 2) is granted, and his motion

for the appointment of counsel (Docket No. 3) is denied without prejudice;

FURTHER, that the First Claim is dismissed with prejudice;

FURTHER, that plaintiff is granted leave to file an amended complaint with respect to the Complaint's Second, Third, Fourth and Fifth Claims as directed above by **May 15, 2013;**

FURTHER, that the Clerk of the Court is directed to send to plaintiff with this order a copy of the original complaint, a blank § 1983 complaint form, and the instructions for preparing an amended complaint;

FURTHER, that in the event plaintiff fails to file an amended complaint as directed above by **May 15, 2013,** the complaint shall be dismissed with prejudice without further order of the Court;

FURTHER, that if plaintiff has not filed an amended complaint by **May 15, 2013,** the Clerk of the Court is directed to close this case as dismissed with prejudice; and

FURTHER, that in the event the complaint is dismissed because plaintiff has failed to file an amended complaint, the Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedcre v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1337319

---

**Footnotes**

1      Plaintiff also moves for the appointment of counsel. (Docket No. 3). A more fully developed record will be necessary before the Court can determine whether plaintiff's chances of success warrant the appointment of counsel. Therefore, plaintiff's motion is denied without prejudice to its renewal at such time as the existence of a potentially meritorious claim may be demonstrated. See *Hendricks v. Coughlin,* 114 F.3d 390, 392 (2d Cir.1997) (when determining whether to appoint counsel, the Court must first look to the "likelihood of merit" of the underlying dispute).

2      Supervisor liability under § 1983 can be shown in one or more of the following ways: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 874 (citation omitted).

3      The court notes that plaintiff relies solely on the First Amendment for the basis of this claim but that he may also wish to assert a claim under the Fourteenth's Amendment's Due Process Clause which requires that detainees be provided with nutritionally adequate meals. *See Liffiton v. Kiszewski,* 2010 WL 2869570, at *3–4 (W.D.N.Y., July 1, 2012) (Foshio, L., U.S.M.J.) (challenges to conditions of confinement by pre-trial detainees are assessed under the Fourteenth Amendment's Due Process Clause, not the Eighth

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Amendment's Cruel and Unusual Punishment Clause that applies to such claims brought by convicted state prisoners, to determine whether the alleged conditions "amount to punishment.") (quoting *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("[u]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.") (other citations omitted). However, a pretrial detainee alleging a denial of adequate food must show that the denial "resulted from the deliberate indifference of the [jail] officials." *Liffiton,* 2010 WL 2869570, at *3 (citing *Caiozzo v. Koreman,* 581 F.3d 63, 71, n. 4 (2d Cir.2009) (citing cases)).

Because plaintiff's complaint does not rely in any way on the Due Process Clause (or Eighth Amendment) and is emphatic that this claim is a religious-based claim, the Court will not construe it, at this time, as also arising under the Due Process Clause. Moreover, even if the Court were to construe it as such, plaintiff does not allege that the supervisory officials named as defendants were deliberately indifferent to his nutritional needs. Plaintiff may, however, if he so wishes, assert such a claim in his amended complaint.

4    "Noting in its decision in *Ford v. McGinnis* a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, the Second Circuit declined to resolve the issue, instead assuming continued applicability of the substantial burden test." 352 F.3d [at] 592–93 ... Recent cases from this and other courts suggest that the Second Circuit resolved this split in its decision in *Salahuddin v. Goord,* 467 F.3d 263 (2d Cir.2006) by subscribing to the substantial burden test." *Johnson,* 2007 WL 3046703, at *5, n. 7 (citing *Livingston v. Griffin,* 2007 WL 1500382, at *15 (N.D.N.Y. May 21, 2007); *King v. Bennett,* 2007 WL 1017102, at *4 (W.D.N.Y. Mar.30, 2007) (Schroeder, H., U.S.M.J.)). *See also Sioleski v. McGrain,* 2012 WL 6052158, at *1 (W.D.N.Y., December 05, 2012) ("[A] religious liberty claim requires the prisoner to demonstrate 'that the disputed conduct substantially burdens his sincerely held religious beliefs.' ") (quoting *Salahuddin v. Goord,* 467 F.3d at 274–75).

5    *See* n. 3, *supra. See also Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir., 2009) ("We reaffirm our position, stated in *Arroyo v. Schaefer,* 548 F.2d 47, 50 (2d Cir.1977), that the standard for analyzing a claim of deliberate indifference to the health or safety of a convicted prison inmate held in state custody as a violation of the right of the inmate to be free from cruel and unusual punishment under the Eighth Amendment is also applicable to claims brought by pretrial state detainees under the Due Process Clause of the Fourteenth Amendment.")

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    9

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Extend by  Currytto v. Doe,  D.Conn.,  May 9, 2019

2018 WL 1626175

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Ronald M. ACKRIDGE, Plaintiff,

v.

ARAMARK CORRECTIONAL FOOD SERVICES;

County of Westchester; Captain Roberts;

Sergeant Tosi; Chaplain Office, Defendants.

No. 16-CV-6301 (KMK)

|

Signed 03/30/2018

**Attorneys and Law Firms**

Ronald M. Ackridge, Carmel, NY, pro se.

Richard D. Lane, Esq., Marshall Dennehey Warner Coleman & Goggin, New York, NY, Counsel for Defendants Captain Roberts, Chaplain Office, Sergeant Tosi, and County of Westchester.

Joseph P. Wodarski, III, Esq., Bradley L. Wilson, Esq., Wilson Elser Moskowitz Edelman & Dicker LLP, Stamford, CT, Counsel for Defendant Aramark Correctional Services, LLC.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

**\*1** Pro se Plaintiff Ronald M. Ackridge ("Plaintiff") brought the instant Action against the County of Westchester ("Westchester County"), Captain Roberts, the Chaplain Office, Sergeant Tosi (together, "County Defendants"), and Aramark Correctional Food Services ("Aramark," and together with County Defendants, "Defendants") alleging violations of his constitutional and state law rights for denial of kosher meals and regular Jewish services. (See Am. Compl. (Dkt. No. 27).)[1] Specifically, Plaintiff brings federal claims under 🚩 42 U.S.C. § 1983 alleging Defendants violated his First, Fifth, Eighth, and Fourteenth Amendment rights; federal claims under the Religious Land Use and

Institutionalized Persons Act ("RLUIPA"), 🚩 42 U.S.C. §§ 2000cc-1, et seq.; state law claims under New York Civil Rights Law, 🚩 N.Y. Civ. Rights Law § 40-c; state law claims alleging violation of Article 1 § 3 of the New York State Constitution, N.Y. Const. art. I, § 3; state law claims under the Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"), N.Y. Comp. Codes R. & Regs. Tit. 9 §§ 7009.4, 7024.6 ("N.Y.C.R.R."); and state law claims for "[h]arassment, intentional infliction of emotional and mental stress, wanton disregard and indifference in wrongfully denying Plaintiff his customary religious kosher dietary meals and wrongfully and unlawfully denying Plaintiff his rights to attend and worship with [the] fellowship of Jewish Services." (See id.) Before the Court is County Defendants' Motion To Dismiss the Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "County Defendants Motion"), (see Notice of Motion (Dkt. No. 43); Cty. Defs.' Mem. of Law in Supp. of Mot. To. Dismiss ("Cty. Defs.' Mem.") (Dkt. No. 44)), and Aramark's Motion To Dismiss the Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b) (6) (the "Aramark Motion"), (see Notice of Motion (Dkt. No. 45); Def. Aramark's Mem. of Law in Supp. of Mot. To. Dismiss ("Def. Aramark's Mem.") (Dkt. No. 48)). For the following reasons, the Motions are granted in part and denied in part.

I. Background

A. Factual Background

**\*2** The following facts are drawn from the Amended Complaint and are taken as true for the purpose of resolving the instant Motions. At the time of the events described herein, Plaintiff was an inmate at Westchester County Department of Correction ("WCDOC"). (Am. Compl. ¶ 9.)

Plaintiff arrived at WCDOC on February 4, 2016, at approximately 8:27 p.m. (Id.) WCDOC "processed [Plaintiff] to be of the Jewish faith" and Plaintiff "filled out [a] religious diet request for [k]osher meals." (Id.) For 18 days, from his February 4, 2016 date of admission until dinner on February 23, 2016, Plaintiff did not receive kosher meals. (Id. ¶ 11.)[2] Plaintiff filed a grievance on February 22, 2016 requesting kosher meals "without further delay." (Am. Compl. Ex. D ("Feb. 22, 2016 Grievance").) On February 23, 2016, Sergeant Orness had Plaintiff approved to receive kosher

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 28 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

meals, and a kosher meal was delivered that day. (Am. Compl. Ex. E ("Feb. 29, 2016 Grievance Response").)

According to Plaintiff, "Aramark, the Chaplain Office, and [WC]DOC systemically [sic] and routinely practice discrim[in]atory acts against Jewish inmates/detaine[e]s [by] denying Jewish detainees their request for kosher meal[s]." (*Id.* ¶ 10.) Additionally "[WC]DOC and [Westchester] County [were] well aware of the fact that Aramark has in the past, systemically [sic] denied Jewish inmates/detainees their religious [k]osher dietary meals, [b]ecause Plaintiff ha[d] on other prior occasions had to file grievances[ ] before Aramark would provide Plaintiff with his religious [k]osher dietary meals." (*Id.* ¶ 12.) [3] Plaintiff alleges that "[WC]DOC took no steps to assure that incoming Jewish inmate/detainees receive their [k]osher dietary meals upon entry." (*Id.*) Instead, WCDOC "sys[y]temically and routinely ma[d]e Jewish detainees wait 3 to 6 weeks before providing them with [k]osher dietary meals." (*Id.*)

Plaintiff also alleges that he was denied "regular, weekly, Jewish services." (*Id.* ¶ 10.) Specifically, Plaintiff alleges he was permitted to attend only one Jewish religious service for Passover since his arrival at WCDOC on February 4, 2016, in violation of RLUIPA. (*Id.* ¶ 13.) According to Plaintiff, "[WC]DOC and [Westchester] County allow[ ] [the] Chaplain Office to disregard Jewish inmates/detainees rights to regular and/or weekly Jewish religious services." (*Id.*) Plaintiff made numerous requests and filed grievances regarding the lack of regular Jewish services. (*Id.*) Tosi denied Plaintiff's grievance, quoting § 7024.1(d) of the Minimum Standards, requiring that "equal status and protection shall be afforded all prisoners in the exercise of their religious beliefs, except when such exercise results in facility expenditures which are unreasonable or disproportionate to those extended to other prisoners for similar purposes." (Am. Compl. Ex. G ("Apr. 9, 2016 Grievance Response") (quoting 9 N.Y.C.R.R. § 7024.1(d)).) The response noted that WCDOC "does not house enough Jewish [i]nmates to warrant separate Jewish services," and that Rabbi Horowitz was instructed "to see to Plaintiff's religious needs." (*Id.*)

**\*3** Plaintiff alleges that WCDOC, Westchester County, Aramark, and the Chaplain Office "knowingly [and] with total disregard pursued a policy and custom of deliberate indifference[ ] of the rights, needs[,] and laws of Jewish detainees/inmates ... including Plaintiff, in its procedures for supervising and assuring that Jewish inmates/detainees are provided with religious [k]osher dietary meals and religious

Jewish services." (*Id.* ¶ 14.) And, WCDOC and Westchester County "failed to institute a bona fide procedure and policy in which [D]efendants investigated Aramark and [the] Chaplain Office for wrongful[ly] and unlawfully denying Jewish inmates/detainees their religious kosher dietary meals and Jewish [s]ervices." (*Id.* ¶ 15.) According to Plaintiff, Westchester County and WCDOC "act[ ] as [m]unicipal policymakers in the hiring, contracting, training[,] and supervision of [D]efendants Aramark and [the] Chaplains Office; and have pursued a policy and custom of deliberate indifference to the religious rights, laws[,] and practice[s] of Jewish detainees, including Plaintiff," and "knowingly violat[ed] Plaintiff's rights to observe, practice[,] and worship his religious belief." (*Id.* ¶ 26.)

Plaintiff requests a judgment that Defendants violated his rights under federal and state law. (*Id.* 6.) Plaintiff also seeks $5,000,000 in compensatory damages and $5,000,000 in punitive damages, as well as attorney's fees and litigation expenses. (*Id.*) [4]

### B. Procedural History

Plaintiff filed his initial Complaint on August 8, 2016 against Aramark Correctional Food Service, Westchester County Department of Correction, and Captain Roberts. (Compl. (Dkt. No. 2).) That same day, he filed a request to appear in forma pauperis, (Dkt. No. 1), which the Court granted, (Dkt. No. 5). [5] On September 7, 2016, the Court issued an Order of Service, directing service on the named Defendants. (Dkt. No. 8.) On September 13, 2016, Plaintiff sought leave to file an amended complaint. (Dkt. No. 11.) That same day, Plaintiff filed a copy of the proposed Amended Complaint and requested that the Court direct service of the proposed Amended Complaint. (Dkt. No. 12.) On September 19, 2016, Plaintiff wrote the Court asking that the Amended Complaint be accepted. (Dkt. No. 13.)

On October 14, 2016, Plaintiff filed a "Notice of Motion for Summary Judgment," (Dkt. No. 19), along with a memorandum of law, supporting exhibits, and statement of material facts, (Dkt. Nos. 20, 21). On October 19, 2016, Plaintiff filed a supplemental memorandum of law. (Dkt. No. 22.) Pursuant to a memo endorsement, on October 20, 2016, the Court denied the Motion for Summary Judgment without prejudice, as discovery had not yet been conducted, and for failure to follow the Court's individual practices before filing a motion. (Dkt. No. 23.) In response to the denial, Plaintiff wrote to the Court on October 25, 2016 asking that the case

Case 9:22-cv-00362-AMN-ML Document 30 Filed 05/30/23 Page 29 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

proceed. (Dkt. No. 24.) Pursuant to a memo endorsement, on October 27, 2016, the Court informed Plaintiff that a Rule 16 conference would be scheduled once service was complete. (Dkt. No. 25.)

On October 27, 2016, the Court granted Plaintiff leave to file the Amended Complaint pursuant to a Memo Endorsement. (Dkt. No. 26.) On October 31, 2016, the Amended Complained was docketed, alleging claims against Westchester County Department of Correction, Captain Roberts, the Chaplain Office, Sergeant Tosi, and Westchester County. (Dkt. No. 27.) On January 19, 2017, Plaintiff wrote the Court requesting a Rule 16 Conference and renewed his demand for summary judgment. (Dkt. No. 33.) The Court scheduled a conference for February 15, 2017. (Dkt. No. 34.) [6] County Defendants submitted a premotion letter on February 14, 2017, indicating the grounds on which County Defendants would move to dismiss. (Dkt. No. 40.) Aramark also submitted a premotion letter on February 14, 2017, indicating the grounds on which they would move to dismiss. (Dkt. No. 41.) The Court held a conference on February 15, 2017, and set a briefing schedule for the Motions to Dismiss. (Mot. Scheduling Order (Dkt. No. 42).)

**\*4** In accordance with the Scheduling Order, County Defendants filed their Motion To Dismiss and accompanying Memorandum of Law on March 15, 2016. (Dkt. No. 43; Cty. Defs.' Mem.) Defendant Aramark also filed their Motion to Dismiss and an accompanying Memorandum of Law, declaration, and affidavit on March 15, 2017. (Dkt. Nos. 45–47; Def. Aramark's Mem.) [7] On April 3, 2017, Plaintiff filed his Opposition to Defendants' Motions. (Pl.'s Opp. To Defs.' Mot. To Dismiss ("Pl.'s Opp.") (Dkt. No. 50).) On March 8, 2017, County Defendants and Defendant Aramark filed their respective Replies. (Cty. Defs.' Reply Mem. of Law in Supp. of Mot. To. Dismiss ("Cty. Defs.' Reply Mem.") (Dkt. No. 53); Def. Aramark's Reply Mem. of Law in Supp. of Mot. To. Dismiss ("Def Aramark's Reply Mem.") (Dkt. No. 52).) [8]

## II. Discussion

### A. Standard of Review

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alteration, and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also* *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations...." (internal quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we ... accept all factual allegations in the complaint as true...." (alteration and internal quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot.*

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 30 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

*Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing 📙 *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

**\*5** Where, as here, a plaintiff proceeds pro se, the Court must "construe[ ] [his complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal quotation marks omitted); *see also Farzan v. Wells Fargo Bank, N.A.*, No. 12-CV-1217, 2013 WL 6231615, at *12 (S.D.N.Y. Dec. 2, 2013) (same), *aff'd sub nom. Farzan v. Genesis 10*, 619 Fed.Appx. 15 (2d Cir. 2015). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." ⚠️ *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and internal quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." 📙 *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). However, when the complaint is pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[ ] either possessed or knew about and upon which [he or she] relied in bringing the suit," 📙 *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

### B. Analysis

County Defendants move to dismiss Plaintiff's Amended Complaint on several grounds: (1) that Plaintiff failed

to allege that his sincerely held religious beliefs were substantially burdened as is required to state a First Amendment claim; (2) that Plaintiff failed to allege the personal involvement of Roberts and Tosi; (3) that Roberts and Tosi cannot be sued in their official capacities; (4) that Plaintiff failed to allege a violation of the Establishment Clause, Fifth Amendment, Eighth Amendment, or Fourteenth Amendment; (5) that Plaintiff failed to allege the existence of any policy or practice that caused the alleged harms under 📙 *Monell v. Department of Social Services*, 436 U.S. 658 (1978); (6) that Plaintiff's RLUIPA claim fails because RLUIPA does not provide for monetary damages; (7) that the Court should decline to exercise supplemental jurisdiction over the state law claims; (8) that Plaintiff has failed to state a claim for violation of the New York Constitution; (9) that Plaintiff's claim under the Minimum Standards §§ 7009.4 and 7024.6 fails because the Minimum Standards do not provide a private right of action; (10) that Plaintiff's claims pursuant to 📙 New York Civil Rights Law 40-c fails because prisons are not covered by the statute; (11) that Plaintiff's claim for a declaratory judgment is moot; and (12) that Westchester County Department of Correction and the Chaplain Office are not entities subject to suit. (*See generally* Cty. Defs.' Mem.)

**\*6** Aramark also moves to dismiss Plaintiff's Amended Complaint on several grounds: (1) that Plaintiff failed to allege a custom or policy under which to find Aramark liable; (2) that Aramark was not acting in concert with or as a state actor and cannot be sued under 📙 § 1983; (3) that Plaintiff failed to exhaust administrative remedies as to Aramark; (4) that Plaintiff failed to allege that his sincerely religious beliefs were substantially burdened as is required to state a First Amendment claim; and (5) that Plaintiff's state law claims should be dismissed. (*See generally* Def. Aramark's Mem.)

Due to the significant overlap in the claims regarding the delay in receiving kosher meals against County Defendants and Aramark, the Court first determines whether Aramark was acting under the color of state law and can be sued under 📙 § 1983. Then, the Court addresses the claims against County Defendants and Aramark together where appropriate.

### 1. Aramark Acting Under Color of State Law

Aramark argues that Plaintiff's claims against it must be dismissed because it is not a state actor. (Def. Aramark's Mem.

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 31 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

7–9.) [9] To state a claim for any constitutional violation under § 1983, a plaintiff must allege that "a person acting under color of state law deprived him or her of a right secured by the Constitution or laws of the United States." *Oliveira v. Price Law Firm*, No. 14-CV-4475, 2014 WL 4088199, at *2 (S.D.N.Y. July 30, 2014); *see also* *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014) ("To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law."); *Schiff v. Suffolk Cty. Police Dep't*, No. 12-CV-1410, 2015 WL 1774704, at *5 (E.D.N.Y. Apr. 20, 2015) (same). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks omitted). "State action requires *both* an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, *and* that the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* (alteration and internal quotation marks omitted). Thus, in order to survive a motion to dismiss, "a plaintiff must allege he was injured by either a state actor or private party acting under the color of state law." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002).

Here, Plaintiff brings suit alleging constitutional violations against Aramark, a private entity. Therefore, the Court must assess whether Plaintiff has adequately alleged that he was injured by a private party acting under color of state law. In the Second Circuit, there are three circumstances under which a private entity is said to act under color of state law. The Second Circuit has described these circumstances as follows:

**\*7** For the purposes of [§] 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001)). "The fundamental question that underlies each of these tests is whether the challenged actions of the private actor are 'fairly attributable' to the state." *Watson v. Grady*, No. 09-CV-3055, 2015 WL 2168189, at *9 (S.D.N.Y. May 7, 2015) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)). Although Plaintiff has arguably offered little in terms of facts that bear upon the question directly, the Amended Complaint nonetheless includes sufficient allegations for the Court to find the presence of state action under either the close nexus or public function tests. Specifically, Plaintiff alleges that Defendant prepared meals for WCDOC, including kosher meals. (Am. Compl. ¶¶ 9–10, 12.) [10]

### a. Close Nexus Test

To satisfy a claim under the "close nexus" test, a plaintiff must allege "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (internal quotations omitted). In determining whether such a nexus exists, courts must "analyze whether the state can be fairly held responsible for private conduct by virtue of the ties between the state and private actor." *Pagan*, 2014 WL 982876, at *24 (internal quotation marks omitted); *see also* *Preston v. New York*, 223 F. Supp. 2d 452, 465 (S.D.N.Y. 2002) (same), *aff'd sub nom. Preston v. Quinn*, 87 Fed.Appx. 221 (2d Cir. 2004). Courts have found such a nexus where a private organization performs services that "flow[ ] directly from the obligations of the government entity and [are] performed under its supervision." *Pagan*, 2014 WL 982876, at *25; *see also* *West v. Atkins*, 487 U.S. 42, 54–55 (1988) (finding state action where a physician provided medical services to inmates pursuant to a contract with the state); *Wilson v. Phoenix House*, No. 10-CV-7364, 2011 WL 3273179, at *3 (S.D.N.Y. Aug. 1, 2011) (concluding that the defendant in-patient substance abuse treatment center was state actor under the close nexus test). Perhaps unsurprisingly, a number of courts have found that, where Aramark contracts with a prison to provide food to inmates, a sufficiently close

nexus exists. *See, e.g.,* 🚩 *Torres*, 2015 WL 9077472, at *4–6 (finding close nexus satisfied for First Amendment claims regarding Aramark's provision of Ramadan meals); *Best v. Aramark Corr. Servs., LLC*, No. 14-CV-243, 2014 WL 4980553, at *3 (S.D. Ind. Oct. 6, 2014) (applying close nexus test in context of the plaintiff's claim that Aramark "failed to provide him with constitutionally adequate meals" and concluding that it "[could not] hold that Aramark is not a state actor in these circumstances subject to liability under 🚩 § 1983"); 🚩⚠ *Pagan*, 2014 WL 982876, at *24 ("[T]here is a sufficiently close nexus between the County ... and Aramark's actions such that the conduct of Aramark is attributable to the state itself."); *Jubeh v. Dart*, No. 11-CV-3873, 2011 WL 6010267, at *2 (N.D. Ill. Nov. 29, 2011) ("Aramark has voluntarily assumed the function of providing nutritionally adequate food to inmates and may be subject to [§] 1983 liability if its conduct violated the inmate's constitutional right to adequate food."); *Jones v. Aramark Food Servs.*, No. 11-CV-15, 2011 WL 3203524, at *5 n.3 (D. N.J. July 27, 2011) (describing the close nexus test and concluding that "[t]he [c]omplaint appears to allege facts that Aramark ... may have been acting under color of state law, as required to state a 🚩 § 1983 claim"); *but see* 🚩 *James v. Correct Care Solutions*, No. 13-CV-19, 2013 WL 5730176, at *8–9 (S.D.N.Y. Oct. 21, 2013) (concluding Aramark was not a state actor where employed to provide food services at Westchester County Jail).

**\*8** Here, a sufficiently close nexus exists because it would be fair to hold the state responsible for the private conduct at issue by virtue of the ties between the WCDOC and Aramark. *See* 🚩 *Torres*, 2015 WL 9077472, at *4–6; 🚩⚠ *Pagan*, 2014 WL 982876, at *25. Aramark, apparently acting pursuant to a contract, prepared the kosher and non-kosher meals for the WCDOC. (*See* Am. Compl. ¶¶ 9–10, 12.) Moreover, jail personnel allegedly were prepared to field Plaintiff's complaints about the food. (*See* Jan. 29, 2016 Grievance Response.) Consequently, because the arrangement between the jail and Aramark allowed the jail, in effect, to shift one of its obligations to Aramark, the Court finds that the nexus between the two is sufficient to plausibly impute state action to Aramark.

### b. Public Function Test

Even if state action could not be found under the close nexus test, it would nonetheless exist due to the public function test. Under that test, the conduct of an otherwise private party will be treated as state action if it is "so clearly governmental in nature as to amount to a public function." 🚩 *Jordan v. Fed. Bureau of Prisons*, No. 09-CV-8561, 2013 WL 1143617, at *12 (S.D.N.Y. Mar. 19, 2013) (internal quotation marks omitted). "The mere fact that a private actor is paid by state funds, or is hired by a state actor, is insufficient to establish state action" under the public function test. *Emanuel v. Griffin*, No. 13-CV-1806, 2013 WL 5477505, at *5 (S.D.N.Y. Oct. 2, 2013). "The public function test as applied is quite stringent and under the doctrine an extraordinarily low number of ... functions have been held to be ... public." 🚩 *Doe v. Harrison*, 254 F. Supp. 2d 338, 343 (S.D.N.Y. 2003) (internal quotation marks omitted). Nevertheless, a number of courts to have considered the question have concluded that "[p]roviding food service ... to ... incarcerated people is one part of the government function of incarceration," thus rendering food service providers state actors for purpose of 🚩 § 1983 analysis. *McCullum v. City of Phila.*, No. 98-CV-5858, 1999 WL 493696, at *3 (E.D. Pa. July 13, 1999); *see also Sutton v. City of Phila.*, 21 F. Supp. 3d 474, 482 (E.D. Pa. 2014) (same); 🚩⚠ *Pagan*, 2014 WL 982876, at *24 (same). Indeed, many—although not all—courts to have considered the question have concluded that Aramark, when it feeds prisoners, is a state actor under the public function test. *See, e.g.,* 🚩 *Torres*, 2015 WL 9077472, at *6 (finding public function satisfied for First Amendment claims regarding Aramark's provision of Ramadan meals); 🚩⚠ *Pagan*, 2014 WL 982876, at *24 ("Aramark is serving a public function in providing daily meals to inmates."); *Smego v. Aramark Food Servs. Corp.*, No. 10-CV-3334, 2013 WL 1987262, at *6 (C.D. Ill. May 13, 2013) ("The Aramark [d]efendants are state actors because they have voluntarily assumed the obligation to fulfill an essential state function: feeding detainees in a state facility."); *Jubeh*, 2011 WL 6010267, at *2 (finding that a county "has a duty to provide nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to detainees' health and well being," and concluding Aramark was a state actor where that duty was outsourced to it (alterations and internal quotation marks omitted)); *but see* 🚩 *James*, 2013 WL 5730176, at *9 (noting the public function test but concluding that the complaint offered no basis to treat Aramark as a state actor).

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 33 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

Because providing food to inmates is a public function, *see* Torres, 2015 WL 9077472, at *6; Pagan, 2014 WL 982876, at *24, and because Plaintiff's Amended Complaint relates to the meals that Aramark, acting as the state's culinary surrogate, provided to the prisoners, (*see* Am. Compl. ¶¶ 9–10, 12), the Court concludes that Plaintiff has plausibly alleged that Aramark is a state actor for purposes of this case.

## 2. PLRA Exhaustion as to Aramark

**\*9** Aramark argues that Plaintiff failed to exhaust administrative remedies with respect to Aramark pursuant to the Prison Litigation Reform Act of 1995 ("PLRA"), (Def. Aramark's Mem. 9–10), which provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement applies to all personal incidents while in prison, Porter v. Nussle, 534 U.S. 516, 532 (2002) (holding exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes"); *see also* Johnson v. Killian, 680 F.3d 234, 238 (2d Cir. 2012) (same), including actions for monetary damages despite the fact that monetary damages are not available as an administrative remedy, Booth v. Churner, 532 U.S. 731, 741 (2001) (holding exhaustion is required "regardless of the relief offered through administrative procedures"). Moreover, the PLRA mandates " 'proper exhaustion'—that is, 'using all steps that the agency holds out, and doing so properly,' ... [which] entails ... 'completing the administrative review process in accordance with the applicable procedural rules.' " Amador v. Andrews, 655 F.3d 89, 96 (2d Cir. 2011) (alteration omitted) (quoting Woodford v. Ngo, 548 U.S. 81, 88, 90 (2006)); *see also* Jones v. Bock, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.").

The PLRA does, however, "contain[ ] its own, textual exception to mandatory exhaustion." Ross v. Blake, 136 S. Ct. 1850, 1858 (2016). The Supreme Court recently explained:

Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones. And that limitation on an inmate's duty to exhaust ... has real content.... [A]n inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of."

*Id.* at 1858–59 (quoting Booth, 532 U.S. at 737–38).

There are "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859. First, an "administrative procedure is unavailable when ... it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. These three circumstances "do not appear to be exhaustive," Williams v. Priatno, 829 F.3d 118, 123 n.2 (2d Cir. 2016), but they do "guide the Court's inquiry," Khudan v. Lee, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

A plaintiff need not plead that one of these three circumstances exists or that he did in fact exhaust her administrative remedies, because the "[f]ailure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement." Williams, 829 F.3d at 122. Defendants bear the burden of proving that Plaintiff failed to exhaust any available administrative remedies. *See* McCoy v. Goord, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003) ("[The] defendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity."); *see also* Williams, 829 F.3d at 122 ("[I]nmates are not required to specially plead or demonstrate exhaustion in their complaints." (internal quotation marks omitted)). Thus, a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted only if "nonexhaustion is clear from the face of the complaint."

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 34 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

*Lovick v. Schriro*, No. 12-CV-7419, 2014 WL 3778184, at *4 (S.D.N.Y. July 25, 2014) (alterations and internal quotation marks omitted); *see also Lee v. O'Harer*, No. 13-CV-1022, 2014 WL 7343997, at *3 (N.D.N.Y. Dec. 23, 2014) ("Dismissal under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face of the complaint and incorporated documents.");

*Sloane v. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) ("[B]y characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss." (internal quotation marks omitted)).

**\*10** While Aramark is correct that Plaintiff does not allege he commenced administrative remedies with respect to Aramark and that none of the grievances Plaintiff attached to his Amended Complaint references Aramark, at the motion to dismiss stage, Plaintiff "need not plead exhaustion with particularity." *McCoy v.*, 255 F. Supp. 2d at 248. Aramark has not met its burden of proof in demonstrating that Plaintiff failed to exhaust his administrative remedies merely by pointing to a lack of allegations of exhaustion or a lack of exhibits demonstrating exhaustion in the Amended Complaint. Accordingly, because non-exhaustion is not "clear from the face of the [Amended C]omplaint," *Lovick*, 2014 WL 3778184, at *4 (internal quotation marks omitted), the Court declines to grant Aramark's Motion on this ground.

### 3. *Monell* Claims

Westchester County and Aramark argue that the Amended Complaint should be dismissed for failure to allege a municipal policy, custom, or practice that caused the alleged constitutional violations. (Cty. Defs.' Mem. 15; Def. Aramark's Mem. 5–7.)

### a. Standard of Review

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."

*Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted).

Although, as discussed above, a private actor like Aramark may be treated as a state actor for purposes of a claim brought pursuant to § 1983, "[p]rivate employers are not liable under § 1983 for the constitutional torts of their employees unless the plaintiff proves that action pursuant to official policy of some nature caused a constitutional tort." *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990) (alterations, citations, and internal quotation marks omitted); *Mora v. Camden County*, No. 09-CV-4183, 2010 WL 2560680, at *10 (D. N.J. June 21, 2010) ("[I]n order for an entity such as Aramark to be liable under § 1983, [the p]laintiffs must show that the entity had a relevant policy or custom, and that the policy caused the constitutional violation"); *cf. Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing claim against municipal agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *adopted by* 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester Cty.*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Apr. 16, 2010) (dismissing claim against the county because the complaint did "not allege the existence of an unconstitutional custom or policy"), *adopted sub nom. Arnold v. Westchester Cty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010). In determining whether a private employer may be liable in a § 1983 claim, courts are guided by the principles

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 35 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

articulated in *Monell* and its progeny. *See* *Rojas*, 924 F.2d at 409 ("Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses."); *see also* *Gitter v. Target Corp.*, No. 14-CV-4460, 2015 WL 5710454, at *3 n.4 (S.D.N.Y. Sept. 29, 2015) ("The Second Circuit has extended *Monell*'s rationale to private businesses"); *Dilworth v. Goldberg*, No. 10-CV-2224, 2011 WL 3501869, at *24 (S.D.N.Y. July 28, 2011) ("[C]ase law has extended the *Monell* doctrine to private § 1983 defendants acting under color of state law." (alterations and internal quotation marks omitted)), *adopted by* 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011).

**\*11** A plaintiff may satisfy *Monell's* "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (describing methods of establishing *Monell* liability); *see also Ryan v. Cty. of Nassau*, No. 12-CV-5343, 2018 WL 354684, at *3 (E.D.N.Y. Jan. 10, 2018) ("In order for a municipality ... to be liable for deliberate indifference to medical needs under *Monell* ... the plaintiff must show that the action that caused the constitutional violation was undertaken pursuant to an official policy." (citation and internal quotation marks

omitted)). Moreover, a plaintiff also must establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See* *City of Okla. v. Tuttle*, 471 U.S. 808, 824 n. 8 (1985) ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue."); *Simms v. City of N.Y.*, 480 Fed.Appx. 627, 629 (2d Cir. 2012) (the plaintiff "must 'demonstrate that, through its deliberate conduct, the [entity] itself was the moving force behind the alleged injury.' " (internal quotation marks and alteration omitted)). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271 (S.D.N.Y. 2008); *see also* *Tuttle*, 471 U.S. at 823–24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." (plurality opinion)); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

At this stage, of course, Plaintiff need not prove these elements, but he must still plead them sufficiently to make out a plausible claim for relief. Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, *see* *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993), a complaint does not "suffice if it tenders naked assertion[s] devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (alteration in original) (internal quotation marks omitted). Thus, to survive the Motions, Plaintiff cannot merely allege the existence of a policy or custom but "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012).

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 36 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

#### b. Claims Against Westchester County

**\*12** Westchester County argues that the Amended Complaint should be dismissed for failure to allege a municipal policy, custom, or practice that caused the alleged constitutional violations. (Cty. Defs.' Mem. 15.) The Court agrees.

#### 1. Delay in Receiving Kosher Meals

Plaintiff has failed to plausibly allege that the delay in receiving kosher meals was the result of a policy, custom, or practice that violated Plaintiff's Free Exercise rights. There are at least two circumstances that courts have expressly identified as constituting a municipal policy: "where there is an officially promulgated policy as that term is generally understood," and "where a single act is taken by a municipal employee who, as a matter of [s]tate law, has final policymaking authority in the area in which the action was taken." *Newton*, 566 F. Supp. 2d at 271. "A municipal 'custom,' on the other hand, need not receive formal approval by the appropriate decisionmaker," *id.*, but "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law," *Kucharczyk v. Westchester County*, 95 F. Supp. 3d 529, 539 (S.D.N.Y. 2015) (internal quotation marks omitted). "To prevail on this theory of municipal liability, ... a plaintiff must prove that the custom at issue is permanent and well-settled," *Tieman*, 2015 WL 1379652, at \*16, which is to say, that it is "a longstanding practice or custom which constitutes the standard operating procedure of the local government entity," *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (internal quotation marks omitted). "Widespread means that [the unconstitutional acts in question] are common or prevalent throughout the [municipality]; well-settled means that the [unconstitutional acts in question] have achieved permanent, or close to permanent, status." *Davis v. City of New York*, 228 F. Supp. 2d 327, 346 (S.D.N.Y. 2002).

Here, Plaintiff alleges Westchester County "pursued a policy and custom of deliberate indifferences of the rights, needs[,] and laws of Jewish detainees/inmates." (Am. Compl. ¶ 14; *see also* ¶ 26 (same).) Plaintiff also alleges that WCDOC "systemically [sic] and routinely ... den[ies] Jewish detainees

their request[s] for kosher meal[s]," (Am. Compl. ¶ 10), and "sys[ ]temically and routinely make[s] Jewish detainees wait 3 to 6 weeks before providing them with [k]osher dietary meals," (*id.* ¶ 12.) Additionally, Plaintiff asserts that the "procedures for supervising and assuring that Jewish inmates/detainees are provided with religious [k]osher dietary meals" is insufficient, (*id.* ¶ 14), and WCDOC "took no steps to assure that incoming Jewish inmates/detainees receiv[d] their [k]osher dietary meals upon entry," (*id.* ¶ 12). Finally, Plaintiff alleges that Westchester County "was well aware of the fact that Aramark ... denied Jewish inmates/detainees" and took no "steps to prevent Aramark from deny[ing] giving Jewish inmates/detainees their [k]osher dietary meals, in a timely fashion, upon entry into [WC]DOC." (*Id.*)

Plaintiff neither cites nor describes any official municipal policy or practice, nor does he allege that any individual had official policymaking authority and took action pursuant to that authority. Additionally, the Complaint is devoid of *any* facts that support the existence of a tacit, widespread custom sufficient to sustain a claim for relief under *Monell*. "Conclusory allegations that there was such a policy or custom, without identifying or alleging supporting facts, is insufficient to state a claim." *Maynard v. City of New York*, No. 13-CV-3412, 2013 WL 6667681, at \*4 (S.D.N.Y. Dec. 17, 2013); *see also Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 124 (2d Cir. 1991) (reaffirming "that an allegation of municipal policy or custom would be insufficient if wholly conclusory"); *Guerrero v. City of New York*, No. 12-CV-2916, 2013 WL 673872, at \*2 (S.D.N.Y. Feb. 25, 2013) ("At the pleading stage, the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." (alteration and internal quotation marks omitted)); *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 300 (S.D.N.Y. 2009) (dismissing a *Monell* claim where the "plaintiffs fail[ed] to allege any facts showing that there is a [c]ity policy—unspoken or otherwise—that violates the Federal Constitution"); *cf. Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (holding that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").

**\*13** Aside from the eighteen days Plaintiff personally experienced without kosher food, (Am. Compl. ¶ 11), the Complaint fails to allege specific facts regarding Jewish

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 37 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

inmates being denied kosher meals. While the Complaint "details an incident that Plaintiff finds objectionable, it does not plead the existence of a municipal policy or custom." *Vasquez v. Vill. of Haverstraw*, No. 15-CV-8845, 2017 WL 4296791, at *6 (S.D.N.Y. Sept. 26, 2017); *see also* ⚑ *Pittman v. City of New York*, No. 14-CV-4140, 2014 WL 7399308, at *7 (E.D.N.Y. Dec. 30, 2014) ("A *Monell* claim cannot go forward based on conclusory claims regarding a single incident without more evidence that connects th[e] incident to a municipal policy or practice."); ⚑ *Gordon v. City of New York*, No. 10-CV-5148, 2012 WL 1068023, at *4 (E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where the plaintiff's "allegation [was] unsupported by anything other than the facts of what occurred in his particular case"). Accordingly, Plaintiff's claims against Westchester County alleging a policy or custom of denying kosher meals are dismissed.

### 2. Lack of Regular Jewish Services

Plaintiff has also failed to plausibly allege that the lack of regular Jewish services was the result of a policy, custom, or practice that violated Plaintiff's Free Exercise rights. (*See* Compl. ¶¶ 10, 13–15.) Plaintiff alleges that the decision not to hold regular Jewish services, as outlined in the April 9, 2016 response to his grievance, (April 9, 2016 Grievance Response), was unconstitutional, (Am. Compl. ¶ 10), and that Westchester County has "allow[ed the] Chaplain Office to disregard Jewish inmates/detainees[s] right to regular and/or weekly Jewish religious services," (*id.* ¶ 13). According to Plaintiff, Westchester County did not prevent the Chaplain Office from "wrongful[ly] and unlawfully denying Jewish inmates/detainees ... regular Jewish services." (*Id.* ¶ 15.) A municipality may be subject to ⚑ § 1983 liability for acts of its officials "who have final policymaking authority" in the area in which the action was taken." ⚑ *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (internal quotation marks omitted). However, Plaintiff fails to allege who made the decision to not hold regular Jewish services. Sergeant Tosi responded to Plaintiff's grievance, but Plaintiff does not suggest he was "a municipal employee who, as a matter of State law, has final policymaking authority in the area in which the action was taken." ⚑ *Newton*, 566 F. Supp. 2d at 271. And, to the extent the "Chaplain Office" was responsible for the decision, Plaintiff fails to allege the Chaplain Office is considered a policymaker under state law or to identify an

individual in the Chaplain Office with policymaking authority that was responsible for the decision. *See Pignone v. Vill. of Pelham Manor*, No. 10-CV-2589, 2014 WL 929805, at *4 (S.D.N.Y. Mar. 6, 2014) (noting that "[a] plaintiff bears the burden of establishing an official's status as a final policymaker with proof of the official's scope of employment and his role within the municipal or corporate organization"). Accordingly, Plaintiff's claims against Westchester County alleging a policy or custom of not holding regular Jewish services are dismissed.

### c. Claims Against Aramark

Apart from Aramark's arguments that it is not acting in concert with a state actor or a state actor such that *Monell* does not apply to its actions, (*see* Def. Aramark's Mem. 7–9), Aramark further argues that Plaintiff has failed to allege a causal link between the alleged ⚑ § 1983 violation and an alleged Aramark policy or custom sufficient to support a *Monell* claim, (*see id.* at 5–6).

The Amended Complaint asserts that Aramark "systemically [sic] and routinely practices discrim[in]atory acts against Jewish inmates/detaine[e]s in denying Jewish detainees their request[s] for kosher meal[s]," (Am. Compl. ¶ 10), and that "Aramark has in the past, systemically [sic] denied Jewish inmates/detainees their religious [k]osher dietary meals[,] [b]ecause ... Plaintiff ha[d] on other prior occasions had to file grievances, before Aramark would provide Plaintiff with his religious kosher dietary maels [sic]." (*Id.* ¶ 12.) Plaintiff does not allege the existence of an Aramark policy or custom under any of the prongs identified in ⚑ *Brandon*, 705 F. Supp. 2d at 276–77. In fact, the Amended Complaint indicates that WCDOC was responsible for Plaintiff's intake and religious registration process and that WCDOC policy determines what meals prisoners were served based on the information provided at registration. (Am. Compl. ¶ 9.) The Amended Complaint makes no allegation that Aramark was involved in ensuring Plaintiff was registered to receive the religious dietary accommodations he was constitutionally due or had any independent ability to give Plaintiff kosher meals if the prison has not yet approved him to receive them. Additionally, Plaintiff does not allege that Aramark even knew about Plaintiff's religious dietary restrictions and nonetheless failed to serve him kosher meals. These allegations are insufficient to allege that an Aramark policy was "the 'moving force'

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 38 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

behind a constitutional violation." Accordingly, Aramark's Motion is granted as to the 🚩 § 1983 claims.

#### 4. Personal Involvement of Tosi and Roberts [11]

**\*14** Tosi and Roberts argue that the Amended Complaint should be dismissed against them because they were not personally involved in the alleged Constitutional violations. (Cty. Defs.' Mem. 8–9.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under 🚩 § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation[;] (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;] (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;] (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations, italics, and internal quotation marks omitted). In other words, "because vicarious liability is inapplicable to ... 🚩 § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 🚩 *Iqbal*, 556 U.S. at 676. Therefore, Plaintiff must plausibly allege conduct by Roberts and Tosi that falls into one of the five categories identified above. *See Lebron v. Mrzyglod*,

No. 14-CV-10290, 2017 WL 365493, at \*4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

#### a. Roberts

Plaintiff has failed to plausibly allege Roberts' personal involvement in the alleged constitutional deprivations. The gravamen of the claims against Roberts is that he "denied Plaintiff's grievance about his failure to receive kosher meals for eighteen days." (Am. Compl. ¶ 16(e) (citing Feb. 29, 2016 Grievance Response.)) In reality, Roberts responded to Plaintiff's request on February 22, 2016 for a written decision regarding Plaintiff's grievance filed on February 15, 2016. ("Feb. 22, 2016 Grievance"). The written response stated that "[o]n February 23, 2016 Sgt. Omess contacted Father Paul Tolve [ ("Father Tolve") ] and had it approved for you to receive a kosher meal which was delivered later that day and continues to be delivered on a daily basis." (Feb. 29, 2016 Grievance Response.) Accordingly, because Plaintiff was approved for kosher meals and continued to receive kosher meals, the grievance was "accepted" and the "complaint rectified." (*Id.*) Thus, Plaintiff could not appeal the decision and the matter was deemed completed. (*Id.*) The Amended Complaint contains no allegations whatsoever that Roberts was involved in or somehow permitted Plaintiff to be denied kosher meals prior to his grievance being rectified, or that he even knew Plaintiff was denied kosher meals. To the extent Roberts was even informed of the violation through the February 15, 2016 grievance, Roberts did not "fail[ ] to remedy the wrong," 🚩 *Grullon*, 720 F.3d at 139 (internal quotation marks omitted),—rather, the February 22, 2016 grievance response indicates the wrong was remedied.

**\*15** Moreover, Roberts cannot be held personally liable for constitutional violations by others in WCDOC merely "because he was in a high position of authority in the prison system." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (affirming summary judgment ruling in favor of the Commissioner of the New York Department of Correctional Services); *see also Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (explaining that "a defendant in a 🚩 § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority" (alteration and internal quotation

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 39 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

marks omitted)). "Supervisory status, without more, is not sufficient to subject a defendant to [§] 1983 liability." *Fortunato v. Bernstein,* No. 12-CV-1630, 2015 WL 5813376, at *6 (S.D.N.Y. Sept. 1, 2015) (internal quotation marks omitted). Personal involvement "requires a showing of more than the linkage in the prison chain of command." *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003) (same).

Additionally, the Amended Complaint lacks any allegation that Roberts failed to intervene in the denial of kosher meals by failing to remedy a known wrong or "exhibit[ing] deliberate indifference" to Plaintiff's rights "by failing to act on information indicating that unconstitutional acts were occurring." *Grullon,* 720 F.3d at 139 (italics and internal quotation marks omitted). Nor does Plaintiff allege that Roberts personally was aware that WCDOC had a history of denying inmates kosher meals, such that the Court could reasonably infer that Roberts knew Plaintiff would be denied kosher meals. *See id.* at 139 (listing as categories of personal involvement when a defendant allows "a policy or custom" of unconstitutional practices to continue or when he "was grossly negligent in supervising subordinates who committed the wrongful acts") (internal quotation marks omitted). The Court therefore grants Roberts' Motion to Dismiss for lack of personal involvement.

#### b. Tosi

Plaintiff has plausibly alleged Tosi's personal involvement in the alleged constitutional deprivations. The gravamen of the claims against Tosi is that Tosi denied Plaintiff's grievance seeking separate Jewish services. (Am. Compl. ¶ 16(f) (citing Apr. 9, 2016 Grievance Response).) Relying on Minimum Standard § 7024.1(d), which provides that "equal status and protection shall be afforded all prisoners in the exercise of their religious beliefs, except when such exercise results in facility expenditures which are unreasonable or disproportionate to those extended to other prisoners for similar purpose," Tosi's grievance response states that "[t]he Westchester County Department of Correction does not house enough Jewish Inmates to warrant a separate Jewish service. The director of Pastoral Care Father Paul Tolve is aware of your issue and has instructed Rabbi Horowitz to see to your religious needs." (Apr. 9, 2016 Grievance Response).

The Second Circuit noted in dictum some years ago that it is "questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of." *McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir. 2004). Since then, "courts in t[he Second] Circuit are divided regarding whether review and denial of a grievance constitutes personal involvement in the underlying alleged unconstitutional act." *Burton v. Lynch,* 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009); *see also Thomas v. Calero,* 824 F. Supp. 2d 488, 507–08 (S.D.N.Y. 2011) (discussion division and collecting cases); *Garcia v. Watts,* No. 08-CV-7778, 2009 WL 2777085, at *15–16 (S.D.N.Y. Sept. 1, 2009) (same). [12] Other courts have typically considered three factors to determine whether a prison official was personally involved based on the denial of a grievance:

> ***16** The first factor was the distinction between simply affirming the denial of a grievance and review[ing] and respond[ing] to a prisoner's complaint by undertaking some kind of investigation ... Second, some courts drew a distinction between a *pro forma* denial of a grievance and a detailed and specific response to a grievance's allegations. Finally, some courts looked to whether the alleged constitutional violation complained of in a grievance [was] ongoing ... such that the supervisory official who reviews the grievance can remedy [it] directly, finding personal involvement only in cases dealing with ongoing violations.

*Thomas,* 824 F. Supp. 2d at 507 (internal quotation marks and citations omitted).

Here, Plaintiff has sufficiently alleged an "ongoing" constitutional violation regarding his lack of access to regular Jewish services at the time he filed the grievances. *See infra* Part II.B.5. And, Tosi, as the supervisory official who reviewed the grievance, could have remedied it directly. *Thomas,* 824 F. Supp. 2d at 507; *see also Young v.*

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 40 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

*Choinski*, 15 F. Supp.3d 172, 192 (D. Conn. 2014) (noting that "if the supervisory official is confronted with an ongoing constitutional violation and reviews a grievance or appeal regarding that violation, that official is "personally involved" if he or she can remedy the violation directly" (internal quotation marks omitted)); *Phillip v. Schriro*, No. 12-CV-8349, 2014 WL 4184816, at *5 (S.D.N.Y. Aug. 22, 2014) (contact from grievance committee to wardens regarding repeated denial of attendance at religious services sufficiently alleged ongoing violation defendant could remedy); *cf.* *Burton v. Lynch*, 664 F. Supp.2d 349, 363 (S.D.N.Y. 2009) (finding no ongoing violation for grievance regarding alleged beating that "relates to a past harm which has ceased"). Thus, the Court cannot say that Plaintiff's claim against Tosi fails as a matter of law. The Court therefore denies Tosi's Motion to Dismiss for lack of personal involvement.

### 5. Free Exercise Claims [13]

#### a. Standard of Review

Defendants argue that the Amended Complaint fails to state a Free Exercise claim under the First Amendment. (Cty. Defs.' Mem. 4–9; Def. Aramark's Mem. 10–11.) The Free Exercise Clause of the First Amendment is an "unflinching pledge to allow our citizenry to explore ... religious beliefs in accordance with the dictates of their conscience." *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause," *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003), which includes "a constitutional right to participate in congregate religious services," *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) (citing *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir.), *cert. denied*, 492 U.S. 909 (1989)); *see also* *Pugh v. Goord*, 571 F. Supp.2d 477, 511 (S.D.N.Y. 2008) (finding that prisoners "are entitled to a reasonable opportunity to worship").

**\*17** A prisoner's First Amendment rights, however, are "[b]alanced against ... the interests of prison officials charged with complex duties arising from the administration of the penal system." *Ford*, 352 F.3d at 588 (internal quotation marks omitted); *see also* *Benjamin v. Coughlin*, 905 F.2d 571, 579 (2d Cir. 1990) ("Prisoners have a right to receive diets consistent with their religious scruples," but "[c]ourts ... are reluctant to grant dietary requests where the cost is prohibitive, or the accommodation is administratively unfeasible." (citations and internal citations omitted). Accordingly, a prisoner's Free Exercise claims are "judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford*, 352 F.3d at 588 (internal quotation marks omitted).

"To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that the disputed conduct substantially burdened his sincerely held religious beliefs." *Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (internal quotation marks omitted); *see also* *Salahuddin v. Goord*, 467 F.3d 263, 274–45 (2d Cir. 2006) ("The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."). [14] "[A]n individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (internal quotation marks omitted). The relevant inquiry is not whether, as an objective matter, the belief is "accurate or logical." *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996).

"[A] substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* at 477 (alterations and internal quotation marks omitted); *Gilliam*, 2017 WL 476733, at *4 (same). The Second Circuit has further specified that "[t]he relevant question in determining whether [the plaintiff's] religious beliefs were substantially burdened is whether participation in the [religious activity], in particular, is considered central or important to [the plaintiff's religious] practice." *Ford*, 352 F.3d at 593–94. Once the plaintiff satisfies this burden, the defendants then "bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct," although "the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (alterations and internal quotation marks omitted). The burden then shifts back to the plaintiff "to show that these articulated concerns

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 41 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

were irrational." *Id.* (alteration and internal quotation marks omitted).

### b. Sincerely Held Beliefs

**\*18** County Defendants argue that Plaintiff has failed to allege that his beliefs are sincerely held. (County Defs.' Mem. 6.) Rather, Plaintiff has only alleged that he was "processed" as Jewish and requested regular Jewish religious services. (*Id.*) County Defendants argue the Amended Complaint has no allegations that Plaintiff's beliefs were sincerely held. (*Id.*) While Plaintiff has not explicitly plead that his religious beliefs are "sincerely held," he has alleged that he listed his religious preference as Jewish, (Am. Compl. ¶ 9), participated in the kosher meal program when he was previously incarcerated, (Pl.'s Opp. ¶¶ 5–6), and chose not to eat the non-kosher food and "los[t] unwanted weight and fe[lt] weak and tired." (Feb. 22, 2016 Grievance.) The Second Circuit has found similar allegations sufficient to plea this element. *See* Jackson v. Mann, 196 F.3d 316, 320 (2d Cir. 1999) (finding sufficient evidence to raise a genuine issue of material fact as to sincerity of religious beliefs where Plaintiff "submitted prison documentation that: (1) listed his religious preference as Jewish; (2) showed his participation in kosher meal programs in several other correctional facilities; and (3) showed that he had actually gone without food for several days to avoid eating non-kosher food. He also submitted an affidavit from his mother, in which she stated that she had raised [the plaintiff] according to the Jewish faith and dietary laws."). Construing Plaintiff's allegations liberally, the Court holds that he has sufficiently alleged that his religious beliefs are sincerely held at this stage of the proceedings to survive the Motions To Dismiss.

### c. Lack of Regular Jewish Services [15]

Defendant argues that "the legitimate penological interests pertaining to cost ... justified the lack of regular Jewish services at WCDOC." (Cty. Defs.' Mem. 7.) More specifically, County Defendants point out that in response to Plaintiff's grievance, Plaintiff was informed that WCDOC does not house enough Jewish inmates to warrant a separate Jewish service, and doing so would result in a cost that is unreasonable or disproportionate to those extended to other prisoners for similar purposes. (*Id.*)

While keeping prison operating costs down may be a "legitimate governmental objective," *see, e.g.*, Simmons v. Robinson, No. 07-CV-7383, 2010 WL 5538412, at \*10 (S.D.N.Y. Jan. 28, 2010) ("[I]t is well established that [the state] has a legitimate interest in cost-effectively meeting the religious dietary needs of multiple inmate groups."), *adopted*, 2011 WL 31066 (S.D.N.Y. Jan. 4, 2011), the record at this point does not allow a thorough review of the other relevant factors the Court must consider in determining whether there is a penological interest that justified the burden, such as "alternative means of [receiving Jewish services]; the impact on guards, inmates, and prison resources of accommodating [regular Jewish services]; and the existence of alternative means of facilitating [regular Jewish services] that have only a de minimis adverse effect on valid penological interests," Holland v. Goord, 758 F.3d 215, 222–23 (2d Cir. 2014) (quoting ⚠ Salahuddin, 467 F.3d at 274 (stating courts must consider these four factors in evaluating the legitimate penological interest)). [16] For example, based on the exhibits Plaintiff attaches to the Complaint, the instruction that Rabbi Horowitz "see to [Plaintiff's] religious needs" does not appear to have been an adequate "alternative means of exercising the burdened right." (Apr. 9, 2016 Grievance Response.) *Id.* Plaintiff wrote to Father Tolve on March 6, 2016 stating he had still "not been advised of any Jewish Services" despite having "written to Rabbi Horowitz." (Am. Compl. Ex. H ("Mar. 6, 2016 Letter").) On March 23, 2016, Plaintiff again wrote to Father Tolve stating he had "not heard anything" about Jewish services from him or Rabbi Horowitz. (Am. Compl. Ex. I ("Mar. 23, 2016 Letter").) On March 31, 2016, Plaintiff wrote to Rabbi Horowitz stating that he had now "written to both [him] and Father Tolve concerning Jewish services" and that "[n]o one ... called [him] for, or notified [him] ... in spite of [his] many request[s] for Jewish Services." (Am. Compl. Ex. J ("Mar. 31, 2016 Letter") (emphasis omitted).) On June 6, 2016, Plaintiff again wrote Rabbi Horowitz and Father Tolve stating that in mid-April, "Father [Tolve] told Plaintiff that the Rabbi would visit [him] on Tuesdays or Thursdays," but he had "not seen the Rabbi once since [his] incarceration at WCDOCS except for one Passover ceremony." (Am. Compl. Ex. K ("June 9, 2016 Letter").) Finally, on September 9, 2016, Plaintiff filed a grievance regarding the lack of Jewish services or ability to meet with the Rabbi. (Am. Compl. Ex. L ("Sept. 9, 2016 Grievance").) Thus, based on the allegations in the Amended Complaint, County Defendants have failed to identify a legitimate penological interest that would justify dismissing Plaintiff's Free Exercise Claim.

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 42 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

*See* Washington v. Chaboty, No. 09-CV-9199, 2011 WL 102714, at *10 (S.D.N.Y. Jan. 10, 2011) ("The Second Circuit has cautioned that evaluation of penological interests is a fact-intensive inquiry that is not ordinarily amenable to resolution on a motion to dismiss.") (citing Shakur v. Selsky, 391 F.3d 106, 115 (2d Cir. 2004)), *rev'd in part on other grounds sub nom.* Washington v. Gonyea, 538 Fed.Appx. 23 (2d Cir. 2013); Salahuddin, 993 F.2d at 309 (finding that "discovery could help determine whether use of a suitable room or the recreation yard could accommodate [the plaintiff's] right to congregate religious services and satisfy the government's security interests"). Therefore, this claim survives the Motions To Dismiss.

### 6. Establishment Clause Claims

**\*19** County Defendants argue the Plaintiff has failed to allege an Establishment Clause violation. (Cty. Defs.' Mem. 10.) "The Establishment Clause forbids 'excessive government entanglement with religion.'" Rweyemamu v. Cote, 520 F.3d 198, 208 (2d Cir. 2008) (quoting Lemon v. Kurtzman, 403 U.S. 602, 613 (1971)). The Supreme Court has repeatedly made clear that "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith, or tends to do so." Lee v. Weisman, 505 U.S. 577, 587 (1992) (alteration and internal quotation marks omitted). The "principle at the heart of the Establishment Clause" is that "government should not prefer one religion to another, or religion to irreligion." Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 703 (1994). Here, Plaintiff has not alleged that Defendants coerced him to support or participate in a particular religion or no religion. Plaintiff also does not allege that the state established a religion in WCDOC. *See, e.g.,* Jackson, 196 F.3d at 321 (dismissing Establishment Clause claim for lack of kosher meals because "it essentially restates [the plaintiff's] Free Exercise claim— that the prison officials unconstitutionally refused to provide him with a kosher diet ... This argument is more properly anchored in the Free Exercise Clause than the Establishment Clause."). The Court therefore grants County Defendants' Motion to Dismiss the Establishment Clause claim. [17]

### 7. Fifth Amendment Claims

County Defendants argue Plaintiff's Fifth Amendment claims should be dismissed, because the Fifth Amendment does not apply to claims against state actors. (Defs.' Mem. 11.) County Defendants are correct that "[t]he Fifth Amendment ... applies only to proceedings by the Federal Government." United States v. Ng, 699 F.2d 63, 69 (2d Cir. 1983) (internal quotation marks omitted). Accordingly, the Court grants County Defendants' Motion to Dismiss the Fifth Amendment claims. [18]

Were the Court to liberally construe Plaintiff's Fifth Amendment claims as a Fourth Amendment Due Process Claim, that too would fail. In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court held that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham, 490 U.S. at 395); *see also* Medeiros v. O'Connell, 150 F.3d 164, 169 (2d Cir. 1998) (same). Here, Plaintiff's claims are covered by the First and Eighth Amendments. Accordingly, any Fourteenth Amendment Due Process Claim, to the extent one has been pled, is dismissed.

### 8. Eighth Amendment Claims

Defendants argue that Plaintiff has failed to state an Eighth Amendment claim for cruel or unusual punishment. [19] (Defs.' Mem. 11–13.) The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. It is axiomatic that "[t]he conditions of a prisoner's confinement can give rise to an Eighth Amendment violation." Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (per curium). "[T]he Eighth Amendment requires that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Little v. Mun. Corp., 51 F. Supp. 3d 473, 489 (S.D.N.Y. 2014) (alterations and internal

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 43 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

quotations omitted). "Although the Constitution does not require 'comfortable' prison conditions, the conditions of confinement may not 'involve the wanton and unnecessary infliction of pain.' " *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). To state an Eighth Amendment claim relating to conditions of confinement, Plaintiff must plausibly allege "both an objective element—that the prison officials' transgression was 'sufficiently serious'—and a [mens rea prong]—that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or safety.' " *Phelps*, 308 F.3d at 185 (italics omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). [20]

**\*20** "To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d at 125. "Thus, prison officials violate the Constitution when they deprive an inmate of his basic human needs such as food, clothing, medical care, and safe and sanitary living conditions." *Id.* (internal quotation marks omitted). "[T]here is no static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (alteration and internal quotation marks omitted). The Court must consider the "severity and duration, on a case-by-case basis." *Darnell*, 849 F.3d at 30. Moreover, conditions of confinement may be aggregated to rise to the level of a constitutional violation, but "only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (noting that "low cell temperature at night combined with a failure to issue blankets" may establish an Eighth Amendment violation).

Plaintiff has failed to plead that the conditions he faced—both the denial of kosher meals and religious services—alone or in combination, "pose[d] an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d at 125. Plaintiff chose not to eat the non-kosher meals provided to him. (Feb. 22, 2016 Grievance.) However, "[h]e has not been denied the meals by ... [D]efendants. While ... [P]laintiff's allegations regarding preparation of the meals and compliance

with Jewish dietary law are relevant to concerns under the First Amendment and RLUIPA," addressed elsewhere in this opinion, "the allegations do not suggest that the meals were not nutritionally adequate or were dangerous to [P]laintiff's health." *Hayes v. Bruno*, 171 F. Supp. 3d 22, 34 (D. Conn. 2016), *reconsideration denied,* No. 14-CV-1203, 2016 WL 10545502 (D. Conn. Dec. 22, 2016); *see also Ward,* 2009 WL 102928, at \*7 ("In this case, [the plaintiff] has failed to establish an Eighth Amendment claim based upon denial of kosher meals during his transport ... he has neither proven the existence of imminent danger to his health and well-being nor an actual injury ... Additionally, when [the plaintiff] brought the situation to an officer's attention, the officer ... attempted to remedy the problem." (footnote and citation omitted)). And, lack of access to religious services is not a sufficiently serious denial of a "basic human need" and did not expose Plaintiff to sufficiently serious risk of harm. *See Walker*, 717 F.3d at 125 (describing "basic human needs" as "food, clothing, medical care, and safe and sanitary living conditions"); *see also Seymore v. Dep't of Corr. Servs.,* No. 11-CV-2254, 2014 WL 641428, at \*3 (S.D.N.Y. Feb. 18, 2014) ("[T]he Second Circuit ... has explained that because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a conditions-of-confinement claim." (alteration and internal quotation marks omitted)). Thus, Plaintiff fails allege a sufficiently serious deprivation required to state an Eighth Amendment claim. *See Jones v. Smith,* No. 09-CV-1058, 2015 WL 5750136, at \*1–2 (N.D.N.Y. Sept. 30, 2015) (denial of hot, low sodium kosher meals does not violate Eighth Amendment); *see also Modlenaar v. Liberatore,* No. 07-CV-6012, 2009 WL 2179661, at \*5 (W.D.N.Y. July 22, 2009) (denial of kosher food for six days does not violate the Eighth Amendment) (citing cases). Accordingly, the Court grants County Defendants' Motion to Dismiss the Eighth Amendment claims. [21]

## 9. Equal Protection Claims

County Defendants argue Plaintiff's Equal Protection claim should be dismissed because the Amended Complaint does not allege discriminatory intent. (Defs.' Mem. 13–15.) "The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner." *Allen v. Cuomo,* 100 F.3d 253, 260 (2d Cir. 1996). In other words, "the Equal

Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (internal quotation marks and emphasis omitted); *see also Bailey v. Town of Evans*, 443 F. Supp.2d 427, 430 (W.D.N.Y. 2006) (same). To state a violation of the Equal Protection Clause, a plaintiff must allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005); *see also Barrow v. Van Buren*, No. 12-CV-1268, 2015 WL 417084, at *22 (N.D.N.Y. Jan. 30, 2015) (same); *Nash v. McGinnis*, 585 F. Supp. 2d 455, 462 (W.D.N.Y. 2008) ("In order to plead a facially valid equal protection claim ... [a] plaintiff must allege: (1) that he has been treated differently from similarly-situated inmates, and (2) that the discrimination is based upon a constitutionally impermissible basis, such as race, religion, national origin, or some other protected right.").

**\*21** Plaintiff claims that Defendants systematically discriminated against him (and other Jewish inmates) by denying him kosher meals for eighteen days and limiting the amount of Jewish services. (Am. Comp. ¶¶ 8, 11–12.) The deficiency in Plaintiff's equal protection claim is that it "does not allege that [Plaintiff] was treated differently from *any* identified individuals, let alone individuals who he claims were similarly situated to him in any respect," and "is completely devoid of any reference to 'similarly situated' or 'substantially similar' individuals." *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 434 (S.D.N.Y. 2013); *see also id.* at 433 (dismissing the plaintiff's equal protection claim under theories of selective enforcement and class of one where the plaintiff "simply" alleged that the defendants "singled out [the] plaintiff, in part, because of his exercise of constitutional rights" (internal quotation marks omitted)); *Butler v. Bridgehampton Fire Dist.*, No. 14-CV-1429, 2015 WL 1396442, at *5 (E.D.N.Y. Mar. 25, 2015) (dismissing the plaintiff's equal protection claim under the selective enforcement and class of one theories because the complaint "only discusse[d] the harmful actions [the defendants] took with respect to [the] [p]laintiff, but there [was] no discussion whatsoever of any similarities between [the] [p]laintiff and others"). Indeed, Plaintiff does not identify any particular inmates with religious dietary needs who were treated better than Jewish inmates seeking kosher meals. And, Plaintiff does not allege that inmates of other particular religious affiliations with the same population size as Jewish inmates were provided regular or weekly religious services. *See Jackson*, 196 F.3d at 321 (dismissing claim "because [the plaintiff] presented no evidence whatsoever that he was treated differently from similarly situated members of other religions"). "The absence of comparators is fatal to this claim and, therefore, Plaintiff's equal protection claim is dismissed." *Gilliam*, 2017 WL 476733, at *8.

Additionally, Plaintiff does not sufficiently allege that the denial of kosher meals and regular Jewish services was the "result of intentional or purposeful discrimination." *Phillips*, 408 F.3d at 129. "Proof that discriminatory intent was a motivating factor is required to show a violation of the Equal Protection Clause." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 438 (2d Cir. 2009). Plaintiff alleges "the Chaplain Office, and [WC]DOC systemically [sic] and routinely practice discrim[in]atory acts against Jewish inmates/detaine[e]s [by] denying Jewish detainees their request for kosher meal[s]." (Compl. ¶ 10.) This type of conclusory allegation is insufficient to state a claim. *Collins v. Sovereign Bank*, 482 F. Supp. 2d 235, 240 (D. Conn. 2007) ("Conclusory allegations of discrimination, without evidentiary support or allegations of particularized incidents and absent allegations of discriminatory intent, do not state a valid claim and so cannot withstand a motion to dismiss." (alteration and internal quotation marks omitted)). Moreover, the fact that County Defendant rectified Plaintiff's lack of kosher meals upon receiving his grievance suggests a lack of any such intent. (Feb. 29, 2016 Grievance Response.) And, Plaintiff also does not offer any factual allegations that County Defendants acted with discriminatory intent in denying him regular or weekly Jewish religious services. As is clear from responses to his grievances attached to the Amended Complaint, regular or weekly Jewish religious services were not provided because the number of Jewish inmates in WCDOC was insufficient to justify the cost of a separate Jewish services. (Apr. 9, 2016 Grievance Response.) This belies Plaintiff's claim that the dearth of Jewish religious services was the result of intentional or purposeful discrimination. Accordingly, the Court grants County Defendants' Motion to Dismiss the Fourteenth Amendment claims. [22]

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 45 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

#### 10. RULIPA Claims

County Defendants seek dismissal of Plaintiff's allegations pursuant to RLUIPA because RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities. (*See* Cty. Defs.' Mem. 16.) RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005). "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland,* 758 F.3d at 224 (citing *Washington,* 731 F.3d at 145–46); *see also* *Keitt v. Hawk,* No. 13-CV-850, 2015 WL 1246058, at *11 (N.D.N.Y. Jan. 8, 2015) (same). Instead, a plaintiff may only seek injunctive relief. *See* *Holland,* 758 F.3d at 224; *see also* *Fortress Bible Church v. Feiner,* 734 F. Supp. 2d 409, 520 (S.D.N.Y. 2010) ("It is readily apparent that injunctive relief constitutes appropriate relief under RLUIPA." (internal quotation marks omitted)). Because Plaintiff only seeks money damages under RLUIPA, this claim is dismissed. [23] *See* *Gilliam,* 2017 WL 476733, at *7 (dismissing claim for monetary damages under RLUIPA). [24]

#### 11. Claims for Declaratory Relief

 **\*22**  To the extent Plaintiff seeks declaratory relief, any claim for such relief is moot. (*See* Compl. 6.) Plaintiff was released from WCDOC custody sometime after the filing of the Complaint. (*See* Dkt. Nos. 14, 18, 54 (notifying the Court of Plaintiff's change of address from WCDOC).) "Where a prisoner has been *released* from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot." *Pugh,* 571 F. Supp. 2d at 489; *Salahuddin,* 467 F.3d at 272 ("[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."); *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir. 1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."); *McAlpine v. Thompson,* 187 F.3d 1213, 1217–18 (10th Cir. 1999) (noting that eight other "circuit[s

that have] consider[ed] the issue ha[ve] decided that release to parole moots a claim regarding prison conditions and regulations" and so holding (italics omitted)); *Pugh,* 571 F. Supp. 2d at 490 (denying injunctive and declaratory relief for former inmate's RLUIPA claims as moot). [25] Accordingly, Plaintiff's claim for injunctive and declaratory relief is moot.

#### 12. State Law Claims

Defendants contend that the Court should decline to exercise jurisdiction over the state law claims if the federal claims are dismissed, or in the alternative, that the state law claims lack merits. (*See* Cty Defs.' Mem. 17–19; Def. Aramark's Mem. 12–13.) Because the Court has not dismissed all of federal claims, the Court maintains supplemental jurisdiction over the state law claims and turns to the merits.

#### a. New York Constitutional Claims

County Defendants argue that Plaintiff's Free Exercise Claim under Article I § 3 of the New York Constitution should be dismissed on the same grounds as the First Amendment Free Exercise Claim. (Cty. Defs.' Mem. 17.) While "the issue of identicality between federal and New York State constitutional protection [is] an open one," *New Creation Fellowship of Buffalo v. Town of Cheektowaga, N.Y.,* No. 99-CV-460, 2004 WL 1498190, at *79 (W.D.N.Y. July 2, 2004), *aff'd sub nom.* 164 Fed.Appx. 5 (2d Cir. 2005), there is significant overlap between the two claims.

Pursuant to Article I § 3 of the New York Constitution, "[t]he free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind." N.Y. Const. art. I, § 3. "This free exercise right has expressly been extended to those incarcerated in New York correctional facilities by section 610 of the Correction Law." *Rivera v. Smith,* 472 N.E.2d 1015, 1019–20 (N.Y. 1984) (citing N.Y. Correct. Law § 610). "Notwithstanding the importance of this right, it does not prevent the imposition of reasonable restrictions by prison officials, but rather such restrictions must be weighed against the institutional needs and objectives being promoted." *Id.* "The nature of a correctional facility, where confinement and order are necessary, is such that inmates cannot be afforded free exercise rights as broad

as those enjoyed outside the prison setting." *Id.* Thus, in evaluating a claim under Article I § 3 of the New York Constitution, the Court must balance "the interest of the individual right of religious worship against the interest of the State which is sought to be enforced." *People ex rel. DeMauro v. Gavin,* 706 N.E.2d 738, 739 (N.Y. 1998).

For the same reasons the Court found the allegations sufficient to state a violation of Plaintiff's Free Exercise rights for the delay in receipt of kosher meals and lack of regular Jewish religious services, the Court finds Plaintiff has alleged a violation of Article I § 3 of the New York Constitution. However, at this stage in the proceeding, for the same reasons as the federal claims, the Court cannot properly balance Plaintiffs "interests of ... religious worship against the interest of" Westchester County. *Gavin,* 706 N.E.2d at 739. What "institutional needs and objectives [are] being promoted," *Rivera,* 472 N.E.2d at 1020, by the restrictions Plaintiff complains of are open questions that can be discussed at a later date in a motion for summary judgment. Thus, County Defendants' Motion is denied as to this claim. [26]

#### b. Minimum Standards §§ 7009.4 and 7024.6 Claims

**\*23** Defendants argue that Minimum Standards §§ 7009.4 and 7024.6 do not provide a private right of action. 9 N.Y.C.R.R. §§ 7009.4 & 7024.6 (Cty. Defs.' Mem. 19; Def. Aramark's Mem. 11–12.) They are right. *See generally Powlowski v. Wullich,* 479 N.Y.S.2d 89, 95 (App. Div. 1984) ("Because of the limitations on the power of the judiciary in such matters ... enforcement of [the minimum] standards is a matter for the Commission of Corrections or others in the executive branch of government and not for the courts.") (citing *Jones v. Beame,* 380 N.E.2d 277, 279 (N.Y. 1978)). Thus, the Court grants County Defendants' and Aramark's Motions to Dismiss these claims.

#### c. New York Civil Rights Law § 40-c Claims

County Defendants argue that Plaintiff's reference to New York Civil Rights Law § 40-c fails to state a claim for relief under the statute. (Cty. Defs.' Mem. 19.) The Court agrees that jails and prisons are not defined as "places of public accommodation" or "amusement" under the statute. N.Y. Civ.

Rights Law § 40. Thus, the Court grants County Defendants' Motions to Dismiss this claim. [27]

#### d. Intentional Infliction of Emotional Distress Claims

Defendant Aramark argues that Plaintiff fails to state a claim for intentional infliction of emotional distress. (Def. Aramark's Mem. 11.) "The state-law tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of N.Y.,* 78 F.3d 787, 790 (2d Cir. 1996). Plaintiff has not alleged any of these elements in the Amended Complaint, and thus, the Court grants Defendant Aramark's Motions to Dismiss this claim. [28]

### III. Conclusion

For the foregoing reasons, as to Westchester County, the Motion to Dismiss the Amended Complaint is granted as to all the claims.

As to the claims against Roberts in his official and individual capacity, the Motion to Dismiss the Amended Complaint is granted as to all the claims.

As to the claims against Tosi in his individual capacity, the Motion to Dismiss the Amended Complaint is granted as to the First Amendment Establishment Clause, Fifth Amendment, Eighth Amendment, and Fourteenth Amendment claims; RLUIPA claims; state law claims pursuant to Minimum Standards §§ 7009.4 and 7024.6; state law claims pursuant to New York Civil Rights Law 40-c; and state law claims for intentional infliction of emotional distress. Tosi's Motion to Dismiss the Amended Complaint is denied as to the First Amendment Free Exercise Claim.

As to the claims against Aramark, the Motion to Dismiss the Amended Complaint is granted as to the First Amendment Free Exercise Clause, First Amendment Establishment Clause, Fifth Amendment, Eighth Amendment, and Fourteenth Amendment claims; RLUIPA claims; state law claims pursuant to Minimum Standards §§ 7009.4 and 7024.6; state law claims pursuant to New York Civil

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 47 of 198

Rights Law 40-c; and state law claims for intentional infliction of emotional distress. Aramrak's Motion to Dismiss the Amended Complaint is denied as to the New York Constitutional claims.

However, because this is the first adjudication of Plaintiff's claims on the merits, the dismissals are without prejudice. Should Plaintiff choose to file a Second Amended Complaint, he must do so within 30 days of this Opinion. Plaintiff should include within that Second Amended Complaint any changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. The Second Amended Complaint will replace, not supplement, the Amended Complaint. The Second Amended Complaint must contain all of the claims and factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual allegations contained in supplemental letters, declarations, or memoranda. If Plaintiff fails to abide by the 30-day deadline, this Action may be dismissed with prejudice.

**\*24** The Clerk of the Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 43, 45.)

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1626175

## Footnotes

1    Plaintiff's initial pleading named Westchester County Department of Correction as a Defendant. (*See* Compl. 1 (Dkt. No. 2).) Pursuant to an Order issued September 7, 2017, Westchester County was substituted for Westchester County Department of Correction. (*See* Dkt. No. 8).

Plaintiff also sued the "Chaplain Office." (Am. Compl. 1.) The Chaplain Office is an administrative arm of the County of Westchester. As such, it does "not have a legal identity separate and apart from the municipality, and cannot sue or be sued." *Carroll v. City of Mount Vernon,* 707 F. Supp. 2d 449, 450 n.2 (S.D.N.Y. 2010) (quoting *Warner v. Vill. of Goshen Police Dep't,* 256 F. Supp. 2d 171, 175–76 (S.D.N.Y. 2003)). Plaintiff's claims against the Chaplain Office must therefore be dismissed. In light of Plaintiff's pro se status and clear intention to assert claims against the County of Westchester, the Court construes the Complaint as asserting claims against the County of Westchester, and directs the Clerk of Court to amend the caption of this Action to replace the Chaplain Office with the County of Westchester.

Plaintiff also sued "Aramark Correctional Food Service." (Am. Compl.) However, Aramark points out this was in error and the proper defendant is "Aramark Correctional Services, LLC." (Def. Aramark's Mem. 1.) The Clerk of the Court is instructed to update the caption accordingly.

2    Occasional words and phrases in Plaintiff's Amended Complaint are written in all capital letters or in parenthesis. Here and elsewhere, when quoting such words and phrases, this Opinion reverts to conventional capitalization for ease of readability.

3    Plaintiff attaches various grievances and letters sent regarding these issues to the Amended Complaint. (*See* Compl. Ex. D–L.)

4    The Court denies Plaintiff's request for attorney's fees, because "a pro se litigant who is not a lawyer is not entitled to attorney's fees." *Kay v. Ehrler,* 499 U.S. 432, 435 (1991) (italics omitted).

5    On August 16, 2016, August 30, 2016, and September 9, 2016, Plaintiff wrote the Court asking about the status of his case. (Dkt. Nos. 4, 6, 10.)

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 48 of 198

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

6    On January 26, 2017, Counsel for Aramark informed the Court that Aramark had not yet been served, but that Counsel was willing to accept service on behalf of Aramark in the interest of expediting the matter. (Dkt. No. 36.)

7    On March 24, 2017, Plaintiff filed an application requesting the Court appoint pro bono counsel. (Dkt. No. 49.) On April 26, 2017, the Court denied the request without prejudice. (Dkt. No. 51.)

8    On July 11, 2017 and August 3, 2017, Plaintiff wrote the Court inquiring about the status of his case and requesting that the case be heard for settlement or placed on the trial calendar. (Dkt. Nos. 57–58.) The Court informed Plaintiff that the Court would decide the pending motions in due course and that settlement or trial, if necessary, would be addressed following decision on these motions. (Dkt. No. 59.)

9    The Court notes that Aramark does not cite any case law when arguing that the test for whether a private entity is a state actor has not been satisfied as to Aramark. (Def. Aramark's Mem. 8–9.) This is problematic for Aramark in light of the Court's decision in *Torres v. Aramark Food*, No. 14-CV-7498, 2015 WL 9077472 (S.D.N.Y. Dec. 16, 2015), holding that Aramark is a state actor when providing food to inmates in a state prison. *Id.* at *4–6.

10    Aramark includes with its Motion To Dismiss the agreement between Aramark and Westchester County to provide food services, a document that is outside the Amended Complaint. (Decl. of Joseph Wodarski, Esq. Ex. A (Dkt. No. 46).) As the agreement is not "appended to the complaint or incorporated in the complaint by reference," it is inappropriate for consideration on a motion to dismiss. *Leonard*, 199 F.3d at 107.

11    Plaintiff sues Roberts and Tosi in their official and individual capacities. Section 1983 claims against municipal employees sued in their official capacity are treated as claims against the municipality itself. *See* *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (claim against a municipal employee in his official capacity is deemed brought against the municipality itself). "[W]hen the defendant ... [is an] individual sued in his official capacity ... the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004). The Court addressed Westchester County's *Monell* liability above. *See supra* Part II.B.3.b.

12    Oddly, County Defendants rely on *Joseph v. Fischer*, No. 08-CV-2824, 2009 WL 3321011, at *18 (S.D.N.Y. Oct. 8, 2009) (holding after "*Iqbal*, a government official's act of affirming the denial of a grievance that alleges the deprivation of a constitutional right, without more, is insufficient to establish that the defendant was personally involved in depriving plaintiff of that right"), without even acknowledging the clear divide among the district courts in the Second Circuit on this question.

13    Because the Court has dismissed Westchester County, Aramark, and Roberts, the only Defendants alleged to be responsible for the lack of Kosher meals, the Court only addresses the Free Exercise claim regarding the lack of Jewish services.

14    The Second Circuit has acknowledged that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014); *see also* *Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. 2016) ("Assuming" but not deciding "that the substantial burden requirement applies.") The Second Circuit chose not to confront this question —or rather, not to alter the previous assumption that the substantial burden test is a threshold question. *Holland*, 758 F.3d at 220. This Court has already chosen to follow the analysis in *Holland* and thus will

proceed under the assumption that the substantial burden test is still valid. *See Gilliam v. Baez*, No. 15-CV-6631, 2017 WL 476733, at *4 n.5 (S.D.N.Y. Feb. 2, 2017).

15    Aramark is only responsible for providing prison meal services, and Plaintiff does not allege Aramark was in any way involved in the lack of regular Jewish services at WCDOC. (Def. Aramark's Mem. 3 n.2.) Thus, to the extent Plaintiff alleges a First Amendment Free Exercise claim against Aramark regarding the lack of regular Jewish services, that claim is dismissed.

16    Courts in other circuits have dismissed Free Exercise claims alleging a lack of regular religious services for every religion. *See, e.g.,* *Smith v. Kyler*, 295 Fed.Appx. 479, 481–82 (3d Cir. 2008) (holding that the First Amendment was not violated by a prison policy that only provided chaplains for "the largest major faith groups" and prohibited "group worship in the absence of an approved, volunteer [f]aith [g]roup [l]eader," because the prison "ha[d] a legitimate interest in managing limited financial resources and in maintaining prison security," and the plaintiff "ha[d] alternative means of practicing his religion," including "maintain[ing] religious books and materials in [his] cell[ ]" and "elect[ing] to have a Personal Religious Advisor worship with [him]").

17    To the extent Plaintiff alleges an Establishment Clause claim against Aramark, that claim is dismissed for the same reason.

18    To the extent Plaintiff alleges a Fifth Amendment claim against Aramark, that claim is dismissed for the same reason.

19    County Defendants note that it is unclear from the Complaint whether Plaintiff was a pre-trial detainee or convicted prisoner while incarcerated at WCDOC. (Cty. Defs.' Mem. 11.) The Second Circuit recently held that deliberate indifference claims under the Due Process Clause of the Fourteenth Amendment are analyzed differently than the same claims under the Eighth Amendment. *See* *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). However, the Second Circuit limited its holding to pretrial detainees, who "have not been convicted of a crime and thus may not be punished in any manner." *Id.* at 29 (internal quotation marks omitted); *see also* *id.* at 33–34 (relying on the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), which analyzed excessive force claims by pretrial detainees under the Fourteenth Amendment); *McCray v. Lee*, No. 16-CV-1730, 2017 WL 2275024, at *4 n.1 (S.D.N.Y. May 24, 2017) ("The status of a plaintiff as either a convicted prisoner or pretrial detainee dictates whether his conditions of confinement are analyzed under the Eighth or Fourteenth Amendment.... While the decision in *Darnell* sets forth a new analysis for claims brought by pretrial detainees, the analysis under the Eighth Amendment remains intact." (citations omitted)). Because the Court finds Plaintiff has failed to satisfy the objective prong, which is evaluated the same way under both the Eighth Amendment and Fourteenth Amendment, *Darnell*, 849 F.3d at 30, the Court need not resolve Plaintiff's status at this juncture. However, because the information is likely to become relevant at a later date, the Parties are hereby ordered to inform the Court by no later than April 30, 2018 whether Plaintiff was a convicted prisoner or a pretrial detainee at WCDOC on February 4, 2016.

20    In *Darnell*, the Second Circuit indicated that this prong should be referred to the "mens rea prong," rather than the "subjective prong," to prevent confusion. *See* *Darnell*, 849 F.3d at 29 (italics omitted).

21    To the extent Plaintiff alleges an Eighth Amendment claim against Aramark, that claim is dismissed for the same reasons.

22    To the extent Plaintiff alleges a Fourteenth Amendment claim against Aramark, that claim is dismissed for the same reasons.

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00362-AMN-ML  Document 30  Filed 05/30/23  Page 50 of 198

23    To the extend Plaintiff is invoking RLUIPA to obtain injunctive relief against Defendants, it is denied for the reasons discussed below.

24    To the extent Plaintiff alleges a RLUIPA claim against Aramark, that claim is dismissed for the same reason.

25    As of December 26, 2017, Plaintiff appears to be incarcerated at Putnam County Correction Facility. (*See* Dkt. No. 60.) Even if Plaintiff is incarcerated, his claims regarding his time at WCDOC are nonetheless still moot as he is incarcerated at a different facility. *See* 🚩⚠️ *Salahuddin*, 467 F.3d at 272 ("[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.").

26    Aramark does not argue the New York Constitutional claim against it fails on the merits or explain how the Court should evaluate Aramark's private entity statutes in regards to the claim. The Court declines to sua sponte resolve this issue without briefing, and thus, will not dismiss that claim at this time. Aramark is free to address the applicability of the New York State Constitution to claims against it as a private entity and the merits of the claim in any subsequently filed motions.

27    To the extent Plaintiff alleges a claim pursuant to 🚩 New York Civil Rights Law § 40-c against Aramark, that claim is dismissed for the same reason.

28    To the extent Plaintiff alleges a claim of intentional infliction of emotional distress against County Defendants, that claim is dismissed for the same reason.

---

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   24

2003 WL 22299359

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Troy GARRETT, Plaintiff,

v.

Edward REYNOLDS, Superintendent, Mohawk Corr.

Facility; James A. Mance, Deputy Superintendent of

Programs; John O'Reilly, [1] Deputy Superintendent;

J. Burge, First Deputy; M. Maher, DSS; R.

Centore, Correctional Officer, Defendants.

No. Civ.9:99CV2065NAMGLS.

|

Oct. 7, 2003.

**Attorneys and Law Firms**

Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York, Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

*REPORT-RECOMMENDATION*

SHARPE, Magistrate J.

I. *Introduction* [2]

**\*1**  Plaintiff, *pro se* Troy Garrett filed an action under 42 U.S.C. § 1983 claiming that the defendants violated his civil rights when they retaliated against him for his activities as an IGRC representative by subjecting him to verbal harassment, physical abuse and subsequently, a transfer. Garrett also claims that the supervisory defendants failed to properly investigate his complaints and failed to train/supervise their employees. This court recommends denying the motion for summary judgment in part and granting it in part.

II. *Procedural History*

On July 13, 2001, Garrett filed an amended complaint against the defendants claiming that they violated his civil rights

under the First, Sixth Eighth, and Fourteenth Amendments. [3] On September 28, 2001, the defendants filed a motion for summary judgment. On January 18, 2002, this court issued an order informing Garrett of his obligation to file a response and extended his time to respond for thirty days. On April 24, 2002, this court granted an additional sixty days to respond to the defendants' motion. Despite having been given multiple opportunities to respond, Garrett has failed to file a response.

III. *Facts* [4]

On June 17, 1999, Garrett filed a grievance against Officer Kelley for verbal harassment. [5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [6] to the Mid-State Correctional Facility.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept

the properly supported facts contained in the defendants'
7.1 Statement (*Dkt. No. 49* ) as true for purposes of this
motion. [7] With this standard in mind, the court now turns to
the sufficiency of Garrett's claims.

B. *Eleventh Amendment*
In Garrett's complaint, he raises claims against the defendants
in their official and individual capacity. The Eleventh
Amendment provides that: "[t]he judicial power of the United
States shall not be construed to extend to any suit in law
or equity, commenced or prosecuted against one of the
United States by Citizens of another State, or by Citizens
or Subjects of any Foreign State." U.S. Const. Amend.
XI. Although the Amendment does not specifically prohibit
suits against a state by its own citizens, the Supreme Court
has consistently applied that immunity to such cases. *See*
*Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing
*Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)).
Moreover, it is well established that Eleventh Amendment
immunity applies not only when a state is named defendant,
but when liability must be paid from state coffers. *See*
*New York City Health & Hosp. Corp. v. Perales,* 50 F.3d
129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at
665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL
156764, at *2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants
in their official and individual capacities. Since the Eleventh
Amendment bars official capacity claims against these state
officers, this court recommends dismissal of Garrett's claims
against the defendants in their official capacity.

C. *Retaliation*
In this case, Garrett claims that during the course of his
appointment as an IGRC representative, he has been subjected
to repeated acts of harassment, both verbal and physical,
threatened with physical assaults, placed into disciplinary
confinement in the SHU, and transferred. [8] The Second
Circuit has held that retaliation against a prisoner for pursuing
a grievance is actionable under § 1983. *Graham v.*
*Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the
Second Circuit has recognized both the near inevitability of
decisions and actions by prison officials to which prisoners
will take exception and the ease with which claims of
retaliation may be fabricated. Thus, prisoners' claims of

retaliation are examined with skepticism and particular care.
*See* *Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

In order for a plaintiff to prevail on a First Amendment
retaliation claim, a plaintiff must advance non-conclusory
allegations establishing: (1) that the speech or conduct at
issue was protected; (2) that the defendant took adverse
action against the plaintiff; and, (3) that there was a causal
connection between the protected speech and the adverse
action. *See Dawes v. Walker,* [9] 239 F.3d 489, 492 (2d
Cir.2001) (citation omitted) *overruled on other grounds,*
*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If
Garrett makes these showings, DOCS may evade liability if it
demonstrates that it would have disciplined or transferred him
" 'even in the absence of the protected conduct." ' ' *Bennett*
*v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

An inmate has a constitutional right to be protected
from retaliation based upon his activities as an IGRC
representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170
(W.D.N.Y.1996). However, a claim brought under " 42
U.S.C. § 1983 is not designed to rectify harassment or
verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129
(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)).
Ordinarily, a claim for verbal harassment is not actionable
under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,*
994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal
harassment or profanity alone, unaccompanied by an injury
no matter how inappropriate, unprofessional, or reprehensible
it might seem, does not constitute the violation of any
federally protected right and therefore is not actionable
under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at
474.

In this case, Garrett claims that defendant Centore harassed
him for his activities as an IGRC representative. Garrett also
claims that he was removed as an IGRC representative when
he was transferred. In addition, Garrett claims that defendants
Reynolds, Mance, Burger and Maher failed to properly
investigate his allegations against Centore. Garrett claims that
these defendants failed to properly investigate his claims in
retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and
Mance recalled IGRC passes for one day in order to interfere

with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU. [10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred. [11]

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged deprivation of rights. *Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d

Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Garrett v. Reynolds, Not Reported in F.Supp.2d (2003)

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 22299359

## Footnotes

1   In this case, the defendants maintain and the docket confirms that defendant John O'Reilly has never been served. Service must be made upon a defendant within 120 days of filing the complaint or any claims against that defendant will be dismissed. See Fed.R.Civ.P. 4(m). The original complaint, which named O'Reilly, was filed on November 26, 1999, and the amended complaint was filed on July 13, 2001. However, O'Reilly was never served. Since this defendant has never been served, this court lacks jurisdiction over him, and this court recommends the dismissal of this defendant.

2   This matter was referred to the undersigned for a Report-Recommendation by the Hon. Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

3   Although Garrett claims to be raising violations under the Sixth, Eighth, and Fourteenth Amendments, the only viable claim based on this court's interpretation of the complaint is under the First Amendment for retaliation.

4   The facts are taken from the defendants' statement of undisputed material facts since Garrett failed to file a response.

5   Not a party in this suit.

6   The defendants suggest that Garrett has failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

7   The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

8   This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

9   Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

10  However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

11  The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 842008

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

David SIMMONS, Plaintiff,

v.

Theresa LANTZ, et al., Defendants.

No. 3:04–CV–2180 (RNC).

|

March 12, 2007.

**Attorneys and Law Firms**

David Simmons, Brooklyn, CT, pro se.

Robert F. Vacchelli, Attorney General's Office, Hartford, CT, for Defendants.

*RULING AND ORDER*

ROBERT N. CHATIGNY, United States District Judge.

**\*1** Plaintiff, a Connecticut inmate proceeding *pro se* and in *forma pauperis,* brings this action pursuant to 42 U.S.C. § 1983 against employees of the Department of Correction alleging violations of his federal rights. Defendants have filed a motion to dismiss and plaintiff has filed a motion for leave to file a third amended complaint. For the reasons that follow, the motion for leave to amend is granted and the motion to dismiss is granted in part and denied in part.

I. *Motion for Leave to Amend [Doc. # 28]*

The plaintiff seeks leave to file a third amended complaint to identify defendant "Nurse Scott" as Nurse L. Sklarz. Leave to amend a complaint is "freely given when justice so requires." Fed.R.Civ.P. 15(a). Under this rule, leave is freely given in the absence of undue delay or undue prejudice to the opposing party. *See Foman v. Davis,* 371 U.S. 178, 182 (1962).

The proposed amendment does not add or modify any factual allegations in the complaint. Instead, it seeks to clarify the identity of one of the defendants, "Nurse Scott." The proposed amendment will not delay the litigation or prejudice the defendants, and there is no evidence that it is made in bad faith. The motion is therefore granted.

II. *Motion to Dismiss [Doc. # 20]*

The following allegations in the second amended complaint are assumed to be true for present purposes. [1] In November 2004, and again in February 2005, Dr. Pilli and Nurse Sklarz placed the plaintiff in an observation room because he refused to take a shot of Insulin. This was done despite plaintiff's repeated statements that he suffered strong adverse effects from Insulin. In each instance, he was held in the observation room against his will for seven to ten days, and deprived of food for three days.

On April 10, 2005, Lieutenant Atkins placed the plaintiff in segregation after he complained about Nurse Sklarz. Later that day, Correctional Officer Chevalier confiscated some items of plaintiff's personal property. Commissioner Lantz and Warden Strange ignored plaintiff's requests for the return of his property, and Officer Chevalier subsequently gave the plaintiff a false disciplinary report. Plaintiff was then transferred to another facility, ostensibly on the basis of Chevalier's disciplinary report, which Lantz and Strange knew to be false.

On being transferred, plaintiff was placed in a cell with another inmate. Between May 16 and June 8, 2005, he complained to Captain Frey on three occasions that he felt unsafe with his cellmate. On June 8, plaintiff's cellmate assaulted him, causing injuries to plaintiff's face, left thumb, left ankle and torso.

Based on these allegations, plaintiff claims that the defendants are liable to him for: (1) deprivation of property under the Fourteenth Amendment; (2) unlawful seizure under the Fourth Amendment; (3) violation of his right to refuse medical treatment under the Fourteenth Amendment; (4) retaliation under the First and Fourteenth Amendment; and (5) failure to protect under the Eighth Amendment. [2]

**\*2** The defendants move to dismiss on the following grounds: (1) the Eleventh Amendment bars claims for money damages against the defendants in their official capacities; (2) the plaintiff has failed to state a claim upon which relief may be granted; (3) the plaintiff has failed to allege personal involvement on the part of defendants of Antico, Lantz and Strange; and (4) the defendants are shielded from liability by qualified immunity.

A. *Eleventh Amendment*

The Eleventh Amendment prohibits suits for money damages against states or state actors in their official capacities. *See* *Kentucky v. Graham,* 473 U.S. 159, 169 (1985). Section 1983 does not override a state's Eleventh Amendment immunity, *see* *Quern v. Jordan,* 440 U.S. 332, 345 (1979), and Connecticut has not otherwise waived its immunity to this suit. Accordingly, the motion to dismiss is granted as to the claims for money damages against the defendants in their official capacities.

### B. *Legal Sufficiency*

#### 1. *Deprivation of Property*

The motion to dismiss is granted as to the property claim. "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). Connecticut provides an adequate remedy for the kind of deprivation the plaintiff describes, *see* Conn. Gen.Stat. § 4–141 *et seq.* (2007), and plaintiff does not claim that this remedy is unavailable to him.

#### 2. *Unlawful Seizure and Unwanted Medical Treatment*

The motion to dismiss the claims relating to plaintiff's placement in observation after he refused to take Insulin are denied. The Fourth Amendment protects an individual from involuntary transfer to and confinement in a medical facility unless he is dangerous to himself or others. *See* *Green v. City of New York,* 465 F.3d 65, 83 (2d Cir.2006); *Glass v. Mayas,* 984 F.2d 55, 58 (2d Cir.1993). And a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment, which survives incarceration. *See* *Washington v. Harper,* 494 U.S. 210, 221–22 (1990); *Pabon v. Wright,* 459 F.3d 241, 249 (2d Cir.2006). Defendants contend that dismissal is proper because plaintiff's refusal to take Insulin endangered himself, and his claim is based on nothing more than disagreement with his health care providers concerning the proper treatment for his condition. At this stage of the case, however, it is not clear beyond doubt that plaintiff can prove no set of facts consistent with his allegations that would entitle him to relief.

#### 3. *Retaliation*

The motion to dismiss the retaliation claims is denied. To state a claim for retaliation, plaintiff must make non-conclusory allegations showing that he was subjected to adverse action because he engaged in protected speech or conduct. *See* *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Complaints are protected conduct, *cf.* *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996), as is the exercise of the right to refuse medical treatment, *cf.* *Pabon,* 459 F.3d at 246. Retaliatory conduct is adverse if it "would deter a similarly situated individual of ordinary firmness" from the exercise of his constitutional rights. *Pidlypchak,* 389 F.3d at 381(internal quotations omitted). Plaintiff's retaliatory transfer to and confinement in a medical facility while being deprived of meals sufficiently states an adverse action.

*See* *Morales v. Mackalm,* 278 F.3d 126, 131–32 (2d Cir.2002)(finding transfer to psychiatric facility sufficient on motion to dismiss to constitute adverse action under a retaliation analysis), *abrogated on other grounds by* *Porter v. Nussle,* 534 U .S. 516 (2002). And the filing of a false disciplinary report resulting in institutional transfer may constitute adverse action. *See* *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003).

#### 4. *Failure to Protect*

**\*3** The motion to dismiss the failure to protect claim is denied. To establish a constitutional violation, plaintiff must show that he was "incarcerated under conditions posing a substantial risk of serious harm," and that prison officials showed "deliberate indifference" to his safety. *See* *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). A prison official possesses culpable intent to support a claim of deliberate indifference if he "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. New York City Dep't Of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). Plaintiff alleges that he informed Captain Frey on three occasions before June 8, 2005, that he felt threatened by his cellmate, but Captain Frey refused to move him to another cell. This is sufficient to withstand the motion to dismiss.

### C. *Personal Involvement*

### 1. Defendant Antico

The motion to dismiss the action against defendant Antico is granted. Plaintiff has failed to allege any acts or omissions on the part of this defendant and thus has failed to adequately allege his personal involvement in any of the alleged wrongs.

*See* *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006).

### 2. Defendants Lantz and Strange

The motion to dismiss the action as to defendants Lantz and Strange is granted in part. Plaintiff alleges that he asked these defendants to arrange for return of his personal property, which he claimed had been stolen by defendant Chevalier. According to the plaintiff, they ignored his requests, then transferred him to another facility based on a disciplinary report issued by Chevalier, which they knew to be false. As discussed earlier, these allegations are sufficient to state a claim for retaliation. However, plaintiff's allegations do not support a claim against these defendants with regard to any of the other alleged wrongs. With regard to those matters, there is no allegation that either of these defendants was grossly negligent or deliberately indifferent, nor any allegation of an "affirmative causal link between [their] inaction and [his] injury" as required to support a theory of supervisory liability.

*Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

### D. Qualified Immunity

The motion to dismiss based on qualified immunity is denied. "[A] qualified immunity defense can be presented in a Rule 12(b)(6) motion, but ... the defense faces a formidable hurdle when advanced on such a motion and is usually not successful." *Field Day, LLC v. County of Suffolk,* 463 F.3d 167, 191–92 (2d Cir.2006)(internal quotations omitted). This case is no exception. Defendants have not shown that, accepting plaintiff's allegations as true, their conduct must be deemed objectively reasonable.

### III. Conclusion

Accordingly, the motion for leave to amended [doc. # 28] is hereby granted, and the motion to dismiss [doc. # 20] is granted in part and denied in part.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 842008

---

### Footnotes

1    Because plaintiff's motion for leave to amend has been granted, the second amended complaint's allegations regarding Nurse Scott are construed as referring to Nurse Sklarz.

2    Generously construed to state all claims that they suggest, plaintiff's allegations also appear to be sufficient to state a claim for deprivation of food under the Eighth Amendment. *See* *Phelps v. Kapnolas,* 308 F.3d 180, 185–86 (2d Cir.2002).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2664805
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darrell GUNN, Plaintiff,

v.

Correction Officer T. MALANI, Defendant.

No. 20-CV-2681 (KMK)
|
Signed March 28, 2023

**Attorneys and Law Firms**

Darrell Gunn, Ossining, NY, Pro Se Plaintiff.

Ian Ramage, Esq., New York State Office of the Attorney General, New York, NY, Counsel for Defendant.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

**\*1** Darrell Gunn ("Plaintiff"), proceeding pro se, brings this Amended Complaint, pursuant to 42 U.S.C. § 1983, against Correction Officer Thomas Milani ("Defendant"), alleging that Defendant violated Plaintiff's rights and caused him injury when Defendant lost Plaintiff's property and caused him to miss a law library callout and court deadlines. (*See* Am. Compl. (Dkt. No. 28).) [1] Before the Court is Defendant's Motion to Dismiss the Amended Complaint (the "Motion"), filed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and 42 U.S.C. § 1997e(e). (*See* Not. of Mot. (Dkt. No. 34).) For the following reasons, the Motion is granted in part and denied in part.

I. Background

A. Factual Allegations
The following facts are drawn from Plaintiff's Amended Complaint and are assumed true for the purpose of resolving the instant Motion.

The events giving rise to this Action took place while Plaintiff was incarcerated at Green Haven Correctional Facility ("Green Haven"). (Am. Compl. at 2.)

On June 1, 2017, Plaintiff was transferring his property from one cell to another during a cell move. (*Id.* ¶ 1.) An unnamed prison guard said to Plaintiff, "[P]lace your property in your cell after the count. I understand you're cleaning and sanitizing your cell." (*Id.* ¶ 2.) Plaintiff placed five bags of property in front of his cell "[a]t [the] prison guard's direction." (*Id.*) Defendant then said to Plaintiff, "[Y]ou write grievances! I'm going to take your property! Unless you can give me a good reason why I should give it back by the time I'm done taking it. It's a fire hazard! You were told to put it in your cell." (*Id.* ¶ 4.) Plaintiff alleges that Defendant "negligently and carelessly lo[st] [P]laintiff[']s property and damage[ed] the property." (*Id.* ¶ 3.) [2] Shortly thereafter, Defendant allegedly placed Plaintiff on keep lock, stating, "[Y]ou write grievances! You are keeplocked!" (*Id.* ¶ 5.)

Plaintiff claims that Defendant took these actions in retaliation for Plaintiff filing a grievance against other officers concerning the loss of a package on May 25, 2017 and for Plaintiff's practice of "filing ... grievances against ... prison guards and prison staff...." (*Id.* ¶¶ 8, 18, 28.) However, Defendant "was not implicated in any prior grievances" he had filed. (*Id.* ¶ 18.)

**\*2** While on keep lock, Plaintiff "miss[ed] his law library callout [sic] ..." (*id.* ¶ 17), which caused him to be "take[n] off the [law library] rotation[,] [r]esulting in months [of delay] to receive another law library callout," (*id.* ¶ 15). Because of the missed library callouts, Plaintiff failed to meet deadlines in federal and state court cases. (*Id.* ¶¶ 13–14, 29–30.)

Plaintiff "used the prisoner grievance procedure at Green Haven ... to try and solve the problem." (*Id.* ¶ 23.) "On June 29, 2017[,] [P]laintiff ... presented the facts relating to this [C]omplaint." (*Id.*) "On July 5, 2017[,] [P]laintiff ... [again] presented the facts relating to this [C]omplaint." (*Id.* ¶ 24.) On August 11, 2017, Plaintiff was sent a response stating that both grievances had been denied. (*Id.* ¶¶ 23–24.) On August 18, 2017, Plaintiff "appealed the denial of the grievance #GH-86981-17 consolidated." (*Id.* ¶¶ 23–24.) [3] The Amended Complaint does not contain any allegations related to the resolution of his appeal, but Plaintiff alleges that during the appeal Defendant "denie[d] being unprofessional [or] confiscating or damaging [Plaintiff's] property or confining him to cell at any time." (*Id.* ¶ 9.) Additionally, Plaintiff claims that the "Inmate Grievance Program System" is "rigged." (*Id.* ¶ 12.)

As a result of these events, Plaintiff suffered "undue incredible hardships," including "worrying, loss of appetite, high levels of stress, agony, anxiety, anger, degradation, depression, dehumanization, paranoia, injustice, hopelessness, [and] despair." (*Id.* at ¶ 32.)

### B. Plaintiff's Causes of Action

Plaintiff lists several causes of action in his Amended Complaint, which alleges violations of the "First Amendment, Fifth Amendment, and Fourteenth Amendment" to the U.S. Constitution. (*See id.* ¶¶ 25, 31.) The Court construes them as follows. First, Plaintiff alleges that Defendant lost and damaged his property, an incident which he was unable to resolve through the filing of a grievance. (*Id.* ¶¶ 1–5, 7–11.) Second, Plaintiff alleges that Defendant violated his right of access to the courts by denying Plaintiff's scheduled law library callout and causing Plaintiff to lose his spot in the law library rotation, which resulted in Plaintiff missing two court deadlines. (*Id.* ¶¶ 13–17, 29–30.) Third, Plaintiff alleges that Defendant retaliated against him for filing grievances by losing or damaging his property, placing him on keep lock, and denying his law library callout. (*Id.* ¶¶ 8, 18, 28.)

Plaintiff demands a jury trial and seeks compensatory damages of $55,000, punitive damages of $100,000, as well as Plaintiff's costs in this Action. (*Id.* ¶¶ 29–32.) Plaintiff also requests that the Court "permanently enjoin defendants [sic][,] their assistants[,] successors[,] and persons acting in concert [or] cooperation with them from further violating" his "rights [and] privileges and the Constitution of the United States." (*Id.* at 17.)

### C. Procedural History

The Court summarized the procedural background of this Action in its November 23, 2021 Opinion dismissing Plaintiff's Complaint. (*See* Op. & Order (Dkt. No. 27).) The Court assumes familiarity with this history and reviews only subsequent proceedings.

Plaintiff filed his Amended Complaint on December 27, 2021. (*See* Am. Compl.) On March 14, 2022, after requesting and receiving a single extension (*see* Dkt. Nos. 29, 30), Defendant filed his Motion to Dismiss and accompanying papers, (*see* Not. of Mot.; Def.'s Mem.). On May 3, 2022, Defendant submitted a letter requesting that the Court consider the Motion to Dismiss fully submitted because Plaintiff had failed to submit an opposition or request an extension before the

deadline to respond. (*See* Letter from Ian Ramage, Esq. to Court (May 3, 2022) 1 (Dkt. No. 36).) The Court granted this request on May 4, 2022. (*See* Dkt. No. 37.)

## II. Discussion

### A. Standard of Review

**\*3** "The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.' " *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at \*2 (D. Conn. June 3, 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003).

### 1. Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (citation and quotation marks omitted). "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation and quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question").

The Second Circuit has explained that a challenge to subject-matter jurisdiction pursuant to Rule 12(b)(1) may be facial or fact-based. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). When a defendant raises a facial challenge to standing based solely on the complaint and the documents attached to it, "the plaintiff has no evidentiary burden" and a court must determine whether the plaintiff asserting standing "alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Id.* (alterations omitted) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)). In making such a determination, a court must accept as true all allegations in the complaint and draw all inferences in the

plaintiff's favor. *Id.* at 57. However, where a Rule 12(b)(1) motion is fact-based and a defendant proffers evidence outside the pleadings, a plaintiff must either come forward with controverting evidence or rest on the pleadings if the evidence offered by the defendant is immaterial. *See Katz v. Donna Karan Co., LLC*, 872 F.3d 114, 119 (2d Cir. 2017). If the extrinsic evidence presented by the defendant is material and controverted, the Court must make findings of fact in aid of its decision as to standing. *See Carter*, 822 F.3d at 57.

## 2. Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks

a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*4**  "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same). However, when the complaint is from a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at \*4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at \*4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a defendant's] request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at \*2 (E.D.N.Y. Sept. 19, 2013), "documents either in [the plaintiff's] possession or of which [the] plaintiff[ ] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted), and "[plaintiff's] opposition memorandum," *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at \*1 n.2 (S.D.N.Y. Nov. 17, 1997).

Where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [the plaintiff's] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (citation omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y.

2013) (citation and quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and citation omitted)).

B. Analysis

1. Loss of Property

Plaintiff asserts a claim against Defendant for loss and damage of property. (Am. Compl. ¶¶ 3, 6, 9.) However, "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of ... the Fourteenth Amendment if a meaningful post[-] deprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470, at *13 (S.D.N.Y. Sept. 29, 2014) (same), *appeal dismissed*, No. 14-3839 (2d Cir. Jan. 8, 2015). In fact, "the state's action is not complete until and unless it provides or refuses to provide a suitable post[-]deprivation remedy." *Acevedo*, 2014 WL 5015470, at *13 (quoting *Hudson*, 468 U.S. at 533). In applying this doctrine, "the Second Circuit has determined that 'New York in fact affords an adequate post-deprivation remedy in the form of, inter alia, a Court of Claims action.' " *Id.* (italics omitted) (quoting *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001)); *see also Malik v. City of New York*, No. 11-CV-6062, 2012 WL 3345317, at *11 (S.D.N.Y. Aug. 15, 2012) ("New York provides such an adequate post-deprivation remedy in the form of state law causes of action for negligence, replevin, and conversion." (collecting cases)), *adopted by* 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012). "District courts thus routinely dismiss claims by inmates who assert that they were deprived of property by corrections officers in New York." *Haywood v. Annucci*, No. 18-CV-10913, 2020 WL 5751530, at *7 (S.D.N.Y. Sept. 25, 2020) (quotation marks omitted); *see also Davis v. Collado*, No. 16-CV-7139, 2018 WL 4757966, at *16 (S.D.N.Y. Sept. 30, 2018) (collecting cases); *JCG v. Ercole*, No. 11-CV-6844, 2014 WL 1630815, at *32 (S.D.N.Y. Apr. 24, 2014) (dismissing an inmate's deprivation of property claim because "the existence of an adequate post-deprivation state remedy precludes a due process claim under § 1983" (citations omitted)), *adopted by* 2014 WL 2769120 (S.D.N.Y. June 18, 2014); *Green v. Niles*, No.

11-CV-1349, 2012 WL 987473, at *6 (S.D.N.Y. Mar. 23, 2012) (dismissing an inmate's claim because "a prison's loss of an inmate['s] property ... will not support a due process claim redressable under § 1983 if adequate state post-deprivation remedies are available" (citation and quotation marks omitted)).

**\*5** Here, the Amended Complaint includes the allegation that Defendant "confiscated, damaged, and destroyed" Plaintiff's property. (Am. Compl. ¶ 6.) Plaintiff cannot sustain a § 1983 claim based on the deprivation of his personal property alone. *See Franco v. Kelly*, 854 F.2d 584, 588 (2d Cir. 1988) (noting that the "mere deprivation of personal property would not rise to the level of a constitutional injury") (citation omitted). This claim is therefore dismissed.

2. Denial of Access to Law Library and the Courts

It is axiomatic that prisoners "have a constitutional right of access to the courts," *Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004) (quotation marks omitted), and that pro se inmates have a right to assistance in the form of "adequate law libraries or adequate assistance from persons trained in the law," *Bounds v. Smith*, 430 U.S. 817, 828 (1977). However, impairment of an inmate's "litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Pollack v. Holanchock*, No. 10-CV-2402, 2012 WL 1646893, at *2 (S.D.N.Y. May 10, 2012) (quotation marks omitted); *see also Razzoli v. Exec. Office of U.S. Marshals*, No. 10-CV-4269, 2010 WL 5051083, at *3 (E.D.N.Y. Dec. 2, 2010) (noting that "the Constitution does not require unlimited and unsupervised access to a law library at the demand of a prisoner," and that "[p]rison officials may impose reasonable restrictions on the use of a prison law library") (collecting cases); *Jermosen v. Coughlin*, No. 89-CV-1866, 1995 WL 144155, at *5 (S.D.N.Y. Mar. 30, 1995) ("[I]nterferences that merely delay an inmate's ability to work on a pending cause of action or to communicate with the courts do not violate this constitutional right.").

"To establish a constitutional violation based on denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in an actual injury to the plaintiff." *Bellezza v. Holland*, 730 F. Supp. 2d 311, 314 (S.D.N.Y. 2010) (quotation

marks omitted); *see also* *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997) ("In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, i.e., took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." (alterations, italics, citations, and quotation marks omitted)). For example, a plaintiff could show that he "has been unable to file a complaint or has had a complaint dismissed for failure to observe a technicality" as a result of the actions of the defendant. *Benjamin v. Fraser*, 264 F.3d 175, 184 (2d Cir. 2001); *see also* *Little v. Mun. Corp., City of New York*, No. 12-CV-5851, 2017 WL 1184326, at *9 (S.D.N.Y. Mar. 29, 2017).

Here, Plaintiff alleges that Defendant caused him to miss a scheduled library callout and be taken off the law library rotation, which resulted in Plaintiff missing two court deadlines. (Am. Compl. ¶¶ 13–16.) Specifically, Plaintiff claims that he "missed [a] ... deadline for ...*Gunn v. Annuci, et al.*[,] No. 19-CV-10039." (*Id.* ¶ 30 (italics added).) Plaintiff also states that he "missed [a] 90[-]day New York State Court of Claim deadline to file [a] notice of intention in *Darrell Gunn v. State of New York*, Motion Number M-95057." (*Id.* ¶ 29 (italics added).)

As to the federal case, the Court takes judicial notice of the fact that the first two digits of a federal case index number represent the year of filing, so the case Plaintiff references, index number "19-CV-10039," was not filed until 2019, at least 18 months *after* the events that give rise to Plaintiff's claims. (*Id.* at ¶ 30.) *See* *Tasaka v. Bayview Loan Servicing, LLC*, No. 17-CV-7235, 2021 WL 84232, at *1 (E.D.N.Y. Jan. 11, 2021) (taking judicial notice of information related to an index number). Plaintiff alleges that his federal case was "ultimately dismissed as untimely," but it is unclear if the dismissal was related to the deadline that Plaintiff claims to have missed. (Compl. ¶ 30.) The Court finds that it is implausible that either the missed deadline or dismissal were in any way related to Defendant's alleged conduct, which occurred at least a year and a half before Plaintiff's federal case was even filed. Thus, Plaintiff has failed to allege actual injury in prosecuting the federal case, and he lacks standing to assert a denial of access claim. *See* *Lewis v. Westchester Cty.*, No. 18-CV-04086, 2020 WL 5535374, at *7 (S.D.N.Y. Sept. 14, 2020) (dismissing denial of access to the courts claim where plaintiff's allegations were "sparse, conclusory and fail[ed] to allege any injury"); *Odom v. Poirier*, No. 99-CV-4933, 2004 WL 2884409, at *9 (S.D.N.Y. Dec. 10, 2004)

(dismissing denial of access claim where the plaintiff failed to "sufficiently allege how [the defendants'] conduct materially prejudiced any existing legal action."); *Gill v. Pact Org.*, No. 95-CV-4510, 1997 WL 539948, at *5 (S.D.N.Y. Aug. 28, 1997) (dismissing denial of access claim where the plaintiff "[did] not show[ ] that he sustained a dismissal of, or suffered any prejudice to, a lawsuit").

**\*6** As to the Court of Claims case, Plaintiff alleges missing the 90-day deadline resulted in the "NYS Court of Claims refus[ing] to allow [P]laintiff to late file a claim." (Am. Compl. ¶ 16.) Drawing all inferences in his favor, Plaintiff has sufficiently alleged that he suffered an injury as a result of Defendant's actions as he was "unable to file a [claim]" as a result of his missing the deadline to file his notice of intention. *Benjamin*, 264 F.3d at 184. However, Plaintiff's claim fails because he has not plausibly alleged that Defendant's actions were "deliberate and malicious." *Bellezza*, 730 F. Supp. 2d at 314. Plaintiff alleges that Defendant took his property and placed him in keep lock for writing grievances, not for initiating or pursuing his claims in court. (Am. Compl. ¶¶ 4–5.) Even drawing all inferences in his favor, Plaintiff's allegations do not suggest that Defendant was aware of Plaintiff's Court of Claims case or placed him in keep lock in order to prevent him from meeting a filing deadline that may have been months in the future. Thus, Plaintiff has not sufficiently alleged that Defendant's actions were deliberate and malicious, and his claim is dismissed. *See* *Amaker v. Lee*, No. 13-CV-5292, 2019 WL 1978612, at *13 (S.D.N.Y. May 3, 2019) (dismissing access to courts claim in part because plaintiff failed "to identify deliberate and malicious conduct" by defendants); *Richardson v. Dep't of Corr. of N.Y.S.*, No. 10-CV-6137, 2011 WL 4091491, at *6 (S.D.N.Y. Sept. 13, 2011) (dismissing access to courts claim where plaintiff "failed to sufficiently plead that there was any malice" in defendants' actions).

### 3. Retaliation

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Perkins v. Perez*, No. 17-CV-1341, 2019 WL 1244495, at *13 (S.D.N.Y. Mar. 18, 2019) (citation omitted). To state a First Amendment claim of retaliation, an inmate must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the [inmate],

and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation, alteration, and quotation marks omitted).

"[T]he filing of prison grievances is ... constitutionally protected." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003); *see also Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996); *Franco*, 854 F.2d at 590. Indeed, "[i]t is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *10 (S.D.N.Y. Sept. 28, 2018) (quotation marks and citation omitted); *see also Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *4 (S.D.N.Y. July 16, 2013) (same); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 367 & n.21 (S.D.N.Y. 2011) (same; collecting cases).

Here, Plaintiff claims that Defendant lost and damaged Plaintiff's property and placed him on keep lock—thereby causing him to miss his scheduled evening library callout, which in turn caused him to miss a court deadline—in retaliation for filing grievances. (*See* Am. Compl. ¶¶ 13–17.) Plaintiff therefore meets the first prong of the test.

An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis*, 320 F.3d at 353 (citation omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." *Id.* (citation, alterations, and quotation marks omitted omitted). "[B]ecause virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed that district courts must "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015); *see also Graham*, 89 F.3d at 79 ("Retaliation claims by prisoners are prone to abuse since prisoners can claim

retaliation for every decision they dislike.") (citation and quotation marks omitted). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations" and not stated in "wholly conclusory terms." *Dolan*, 794 F.3d at 295 (citation and quotation marks omitted); *Tutora v. Gessner*, No. 17-CV-9517, 2019 WL 1382812, at *6 (S.D.N.Y. Mar. 27, 2019) (same).

**\*7** At this stage, Plaintiff's claims are sufficiently detailed to find he was the subject of adverse action. Plaintiff has alleged that prior to the incident he had filed grievances, going back as far as 2014 (Am. Compl ¶¶ 7, 8, 28), but states that Defendant was not implicated in any of them, (*id.* ¶ 18). Plaintiff has also alleged that while he "was transferring his property from one cell to another during [a] cell move," (*id.* ¶ 1), Defendant "los[t]" and "damage[ed]" Plaintiff's property, (*id.* ¶ 3). The Amended Complaint also alleges that Defendant stated, "[Y]ou write grievances! I'm going to take your property!", (*id.* ¶ 4), and "[Y]ou write grievances. You are keep locked!", (*id.* ¶ 5). Confining a prisoner to keeplock is sufficient to establish an adverse action. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir 2004) (finding "sentence of three weeks in keeplock" constituted adverse action); *Mack v. Hall*, No. 18-CV-875, 2020 WL 5793438, at *8 (N.D.N.Y. July 27, 2020), *report and recommendation adopted*, No. 18-CV-875, 2020 WL 5775205 (N.D.N.Y. Sept. 28, 2020) ("The Second Circuit has held that being placed in keeplock or otherwise confined is an adverse action.") (citing *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004)); *Marshall v. Griffin*, No. 18-CV-6673, 2020 WL 1244367, at *6 (S.D.N.Y. Mar. 16, 2020) (same).

Drawing all inferences in Plaintiff's favor, he has also satisfied the causation prong. In order to show causation, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 107 (2d Cir. 2000) (omitting internal quotation). Factors considered in evaluating whether causation existed include: "(1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Thomas v. DeCastro*, No. 14-CV-6409, 2019 WL 1428365, at *9 (S.D.N.Y. Mar. 29, 2019) (citation omitted).

Here, the Court finds that Plaintiff's allegations, liberally construed, provide the specificity necessary to satisfy the causation factors as articulated in *Thomas*. Plaintiff has alleged that he filed a grievance related to a package withheld by other corrections officers on May 25, 2017, a week before his interaction with Defendant. (Am. Compl ¶ 8.) Plaintiff also claims that, prior to the incident, he had a "good ... disciplinary record." (*Id.* ¶ 20.) Plaintiff has alleged that during the incident Defendant stated, "[Y]ou write grievances. I'm going to take your property!", (*id.* ¶ 4), and "[Y]ou write grievances. You are keep locked!", (*id.* ¶ 5). Defendant's statements that Plaintiff's grievances were the reason for his disciplinary actions, along with Plaintiff's allegation that he had recently filed a grievance against other officers, are sufficient to support an inference of causation. *See Burgess v. Banasike*, No. 19-CV-6617, 2022 WL 13740744, at *5 (W.D.N.Y. Oct. 24, 2022) (explaining that "[w]hile as a general matter, it is difficult to establish one defendant's retaliation for complaints against other correctional officers, this general rule may not apply where there are indications of a retaliatory purpose—i.e., that the officer's conduct was meant to penalize the plaintiff for bringing past grievances, and to dissuade future grievances") (alterations and internal quotation marks omitted); *Moreau v. Ellsworth*, No. 20-CV-124, 2021 WL 3813172, at *11 (N.D.N.Y. July 15, 2021) (holding that "while a plaintiff who 'alleges retaliatory adverse action by one officer for a grievance filed against another officer ... faces a heightened burden of establishing a causal connection,' this does not necessarily bar a retaliation claim where there are indications of 'a retaliatory purpose' ") (quoting *Vincent v. Sitnewski*, 117 F. Supp. 3d 329, 338-39 (S.D.N.Y. 2015)), *adopted*, No. 20-CV-124, 2021 WL 3793772 (N.D.N.Y. Aug. 26, 2021); *Kotler v. Boley*, No. 21-1630, 2022 WL 4589678, at *2 (2d Cir. Sept. 30, 2022) (summary order) (noting that "causation may be established even if a prisoner's protected conduct was not directed at the defendant").[4] Courts in this District have held that a delay of a week between the protected activity and that occurrence of an adverse action is insufficient to undermine an inference of causation. *See, e.g., Arriaga v. Gage*, No. 16-CV-1628, 2018 WL 1750320, at *10 (S.D.N.Y. Apr. 6, 2018) (finding plaintiff adequately pled causation when six days elapsed between the protected activity and defendant's adverse action).

**\*8** The Court notes that this is an especially close case because several of Plaintiff's allegations cut against finding that Plaintiff has adequately pled causation. Plaintiff has failed to allege that he and Defendant had a pre-existing

relationship. (*See generally* Am. Compl.) Plaintiff had also never filed a grievance against Defendant before the incident, (*id.* ¶ 18.), and there is no reason to believe that Defendant was personally aware of the May 25th grievance that Plaintiff references, as Defendant was not implicated in that grievance, (*id.* ¶ 8). Additionally, although it is unclear from his allegations whether a hearing was held, Plaintiff does not appear to have been vindicated on his claims, as the two grievances he filed related to this incident were denied. (*Id.* ¶¶ 23–24.) However, because the Court must view the facts in the light most favorable to Plaintiff, the Court finds that his allegations are sufficient to raise an inference that Defendant acted in retaliation for Plaintiff's filing of a grievance the week before the incident against other officers. *See, e.g., Davis*, 320 F.3d at 354 (holding that plaintiff stated a retaliation claim against prison officials who allegedly took adverse action against him, even though his protected conduct was a lawsuit against officials at a different prison filed a short time earlier).

## 4. Official Capacity

Defendant argues that "[t]o the extent that Plaintiff ... bring[s] claims against Defendant in his official capacity, those claims should ... be dismissed on Eleventh Amendment grounds." (Def.'s Mem. 16.) The Court agrees.

"[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity...." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009). New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983. *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977); *Dubarry v. Capra*, No. 21-CV-5487, 2021 WL 3604756, at *1 (S.D.N.Y. Aug. 13, 2021). "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Gollomp*, 568 F. 3d at 366. The Eleventh Amendment therefore also bars the claims for damages against the individual Defendant in his official capacity. *See Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to

invoke the Eleventh Amendment immunity belonging to the state.") (citing 🚩 *Kentucky v. Graham,* 473 U.S. 159, 166–67 (1985), *aff'd,* 589 F. App'x 28 (2d Cir. 2015)); *Leon v. Rockland Psychiatric Ctr.,* 232 F. Supp. 3d 420, 436 (S.D.N.Y. 2017); *Perciballi v. New York,* No. 09-CV-6933, 2010 WL 3958731, at *4 (S.D.N.Y. Sept. 28, 2010). Thus, all claims filed against Defendant in his official capacity are dismissed.

## 5. Qualified Immunity

Defendant also argues that he "is entitled to qualified immunity." (Def.'s Mem. 16.) "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 🚩 *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quotation marks omitted). Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." 🚩 *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir. 2001) (quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable officer in Defendant's position would have believed his or her conduct would violate the asserted constitutional right. *See* 🚩 *Pearson,* 555 U.S. at 236 (overruling 🚩 *Saucier v. Katz,* 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." 🚩 *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (second alteration in original) (citations and quotation marks omitted). Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear

to a reasonable official." 🚩 *Id.* at 665 (citations and quotation marks omitted). Otherwise stated, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." 🚩 *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir. 2011).

**\*9** Given that "qualified immunity is not only a defense to liability, but also provides immunity from suit," a court should resolve a "defendant's entitlement to qualified immunity ... 'at the earliest possible stage in litigation.' " 🚩 *Lynch v. Ackley,* 811 F.3d 569, 576 (2d Cir. 2016) (quoting 🚩 *Pearson,* 555 U.S. at 231–32). "[U]sually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion," but "a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if 'the facts supporting the defense appear on the face of the complaint.' " 🚩 *McKenna v. Wright,* 386 F.3d 432, 435–36 (2d Cir. 2004). As a result, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept [that] ... the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." 🚩 *Id.* at 436 (quotation marks omitted).

Here, Defendant argues that he is entitled to qualified immunity because "Plaintiff has not alleged facts sufficient to show that Defendant violated Plaintiff's constitutional rights and, by definition, has not alleged the violation of a right that was clearly established at the time of the alleged incident." (Def.'s Mem. 17.) However, because the Court has found that Plaintiff has stated a retaliation claim, Defendant is not entitled to qualified immunity. Courts have long recognized, well before the time of Plaintiff's allegations, that inmates have a constitutional right to seek redress of grievances without suffering retaliation. *See* 🚩 *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir. 1988) (holding that plaintiff stated a retaliation claim where plaintiff alleged prison officials intentionally filed false disciplinary charges against him in retaliation for participating in state investigation into inmate abuse); 🚩⚠ *Baskerville v. Blott,* 224 F. Supp. 2d 723, 737–38 (S.D.N.Y. 2002) (finding no qualified immunity for retaliation claim because right to file grievances without retaliation is well-established); *Wells v. Wade,* 36 F. Supp.

2d 154, 160 (S.D.N.Y. 1999) (same). Defendant has offered no argument that his conduct was objectively reasonable. Accordingly, Defendant is not entitled to qualified immunity on Plaintiff's retaliation claim at this early stage in the litigation.

### 6. Physical Injury Bar

Defendant next argues that § 1997e(e) of the Prison Litigation Reform Act ("PLRA") bars Plaintiff's claims because he "alleges no physical injuries ..., only various mental or emotional injuries." (Def.'s Mem. 18.) Section 1997e(e) of the PLRA states: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Although "[b]y its terms, [ § 1997e(e)] does not limit the prisoner's right to request injunctive or declaratory relief," Thompson v. Carter, 284 F.3d 411, 418 (2d Cir. 2002), the Second Circuit has held that "[§] 1997e(e) applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury." Id. at 417. See also Clay v. Lee, No. 13-CV-7662, 2017 WL 436041, at *8 (S.D.N.Y. Jan. 30, 2017) (same); Dillon v. City of New York, No. 12-CV-7113, 2013 WL 6978959, at *2 (S.D.N.Y. Nov. 18, 2013) (same). Indeed, "[c]ourts have consistently held that [§] 1997e(e) bars prisoner civil rights suits seeking damages for constitutional violations where the inmate-plaintiff suffers only emotional and mental injury." Cox v. Malone, 199 F. Supp. 2d 135, 139 (S.D.N.Y. 2002), aff'd, 56 F. App'x 43 (2d Cir. 2003); accord Greene v. Dep't of Corr., No. 10-CV-5344, 2012 WL 694031, at *3 (S.D.N.Y. Mar. 5, 2012) ("Cases asserting emotional harm, unaccompanied by a claim of physical harm, are routinely dismissed [under § 1997(e)].").  "Additionally, while 'physical injury' is not statutorily defined, the injury an inmate alleges must be more than de minimis to meet the requirements of the PLRA." Dillon, 2013 WL 6978959, at *2 (citing Liner v. Goord, 196 F.3d 132, 135 (2d Cir. 1999)). "To recover punitive or nominal damages, however, a prisoner need not allege that he has sustained a physical injury." Edwards v. Horn, No. 10-CV-6194, 2012 WL

760172, at *22 (S.D.N.Y. Mar. 8, 2012) (citing Thompson v. Carter, 284 F.3d 411, 418 (2d Cir. 2002)).

**\*10** Here, Plaintiff alleges various emotional and mental injuries. Specifically, Plaintiff alleges that he suffered "undue incredible hardships," including "worrying, loss of appetite, [a] high level of stress, agony, anxiety, anger, degradation, depression, dehumanization, paranoia, injustice, hopelessness [sic], [and] despair." (Am. Compl. ¶ 32.) Plaintiff has made no mention of any physical injury related to Defendant's actions. [5] While this failure to allege physical injury would ordinarily bar Plaintiff's request for damages, Plaintiff's sole surviving claim is that Defendant violated his First Amendment rights by retaliating against him for filing grievances. Courts in this District have held that "a First Amendment deprivation presents a cognizable injury standing alone and the PLRA 'does not bar a separate award of damages to compensate the plaintiff for the First Amendment violation in and of itself.' " Lipton v. Cnty. of Orange, NY, 315 F. Supp. 2d 434, 457 (S.D.N.Y. 2004) (quoting Ford v. McGinnis, 198 F. Supp. 2d 363, 366 (S.D.N.Y. 2001)); Rosado v. Herard, No. 12-CV-8943, 2013 WL 6170631, at *10 (S.D.N.Y. Nov. 25, 2013), report and recommendation adopted as modified, No. 12-CV-8943, 2014 WL 1303513 (S.D.N.Y. Mar. 25, 2014) ("[T]he PLRA's physical injury requirement does not bar an award of compensatory damages for First Amendment violations.") (citation omitted); Malik v. City of New York, No. 11-CV-6062, 2012 WL 3345317, at *17 (S.D.N.Y. Aug. 15, 2012), report and recommendation adopted, No. 11-CV-6062, 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012) (holding that plaintiff's "retaliation claims allege deprivations of personal rights under the First Amendment which do not fall under the PLRA's physical injury requirement for compensatory damages."); cf. Kerman v. City of N.Y., 374 F.3d 93, 125 (2d Cir. 2004) ("The damages recoverable for [plaintiff's Fourth Amendment claims] are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering."). Additionally, the PLRA's physical injury bar does not apply to Plaintiff's claim for punitive damages. See Edwards, 2012 WL 760172, at *22 (explaining that "[t]o recover punitive ... damages, ... a prisoner need not allege that he has sustained a physical injury") (citations omitted).

Thus, Plaintiff's claims for compensatory and punitive damages are not barred under the PLRA.

### 7. Injunctive Relief

Plaintiff has requested that the Court "permanently enjoin defendants [sic][,] their assistants[,] successors[,] and persons acting in concert [or] cooperation with them from further violating" his "rights [and] privileges and the Constitution of the United States." (Am. Compl. at 17.) Because the issue of standing goes to this Court's jurisdiction, the Court *sua sponte* raises the issue of whether Defendant has standing to request the injunctive relief he seeks. *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte.*").

"Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111–12 (1983)). "Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that [he] is likely to be harmed again in the future in a similar way." *Id.*; *see also Johnson v. Padin*, No. 20-CV-637, 2020 WL 4818363, at *6 (D. Conn. Aug. 16, 2020) ("To obtain prospective injunctive relief, whether preliminary or permanent, a plaintiff 'cannot rely on past injury[,] but must show a likelihood that she will be harmed in the future.'") (ellipses omitted) (quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)); *Kelly v. N.Y. State Civ. Serv. Comm'n*, No. 14-CV-716, 2015 WL 861744, at *4 n.4 (S.D.N.Y. Jan. 26, 2015) (same); *see also Pungitore v. Barbera*, 506 F. App'x 40, 41 (2d Cir. 2012) (summary order) ("[W]hen seeking prospective injunctive relief, the plaintiff must prove the likelihood of *future* or *continuing* harm."); *Krull v. Oey*, No. 19-CV-142, 2019 WL 1207963, at *10 (N.D.N.Y. Mar. 14, 2019) (same).

**\*11** Here, Plaintiff seeks an injunction against Defendant "from further violating" his "rights [and] privileges" under the U.S. Constitution (Am. Compl. at 17), but he fails to allege in his Amended Complaint "a likelihood of either future harm or continuing harm," *Krull*, 2019 WL 1207963, at *10. All of

Plaintiff's allegations relate to the single incident of retaliation he allegedly experienced in June 2017. (*See* Am. Compl. at 2.) He does not allege that he has experienced any other acts of retaliation nor does he allege that he expects future acts of retaliation to occur. (*See generally id.*) Because Plaintiff has solely "rel[ied] on past injury," without "show[ing] a likelihood that he ... will be injured in the future," the Court may not grant his claim for prospective injunctive relief.

*DeShawn*, 156 F.3d at 344; *see also Tobin v. Touchette*, No. 19-CV-213, 2020 WL 6828013, at *4 (D. Vt. July 15, 2020), *report and recommendation adopted sub nom. Tobin v. Baker*, No. 19-CV-213, 2020 WL 4932279 (D. Vt. Aug. 21, 2020) (finding prisoner lacked standing to seek injunctive relief because he had failed to allege that medication shortages had or would recur); *Patterson v. Patterson*, No. 16-CV-844, 2019 WL 1284346, at *6 (W.D.N.Y. Mar. 20, 2019) ("Plaintiff fails to allege an ongoing violation or threat of future enforcement of federal law that would entitle him to injunctive relief."); *Caruso v. Zugibe*, No. 14-CV-9185, 2015 WL 5459862, at *6 (S.D.N.Y. June 22, 2015) (denying claim for prospective injunctive relief because, "even if [the] defendants [had] violated [the] plaintiff's rights in the past as she allege[d]," the plaintiff "ha[d] not plausibly alleged a sufficient likelihood that she [would] again be wronged in a similar way." (citation, quotation marks, and brackets omitted)).

### 8. Revocation of Plaintiff's *In Forma Pauperis* Status

The Court has granted Plaintiff *in forma pauperis* ("IFP") status. (Dkt. No. 6.) Defendant argues that Plaintiff's IFP status should be revoked because Plaintiff has amassed "three strikes" and is thus barred from proceeding IFP by the PLRA. (Def.'s Mem. 19–20.)

The IFP statute, 28 U.S.C. § 1915, was "designed to ensure that indigent litigants have meaningful access to the federal courts" and accordingly, waives the pre-payment of filing fees for qualifying prisoners of limited financial means." *Neitzke v. Williams*, 490 U.S. 319, 324 (1989). "However, concerned by the resulting rise of an 'outsize share of [prisoner] filings' and a 'flood of non[-]meritorious claims,' Congress enacted the PLRA in 1996 in order to curb abuses of the IFP privilege and ensure 'fewer and better prisoner suits.' " *Jones v. Moorjani*, No. 13-CV-2247, 2013 WL 6569703, at *3 (S.D.N.Y. Dec. 13, 2013) (quoting *Jones v. Bock*, 549 U.S. 199, 203 (2007)), *adopted by* 2014 WL 351628 (S.D.N.Y. Jan.

31, 2014); *see also* Tafari v. Hues, 473 F.3d 440, 443 (2d Cir. 2007) (explaining that the PLRA was "designed to stem the tide of egregiously meritless lawsuits"). Toward that end, the PLRA contains a "three strikes" provision which states:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g); *see also* Coleman v. Tollefson, 135 S. Ct. 1759, 1762 (2015) ("Among [the] reforms [is] the three strikes rule....." (internal quotation marks omitted)). The plain language of the statute requires the Court to examine the circumstances at the time an action is filed to determine whether the litigant is barred under the provision. Thus, an action that is dismissed after a plaintiff has filed a case does not count as a strike in the newly filed case. *See* Dixon v. Fishkill Corr. Fac., No. 17-CV-1123, 2019 WL 2866489, at *7-8 (S.D.N.Y. July 2, 2019); Justice v. Merchant, No. 12-CV-5103, 2012 WL 6061000, at *1 (E.D.N.Y. Dec. 5, 2012).

There is an exception to the three strikes rule where a prisoner is "under imminent danger of serious physical injury," 28 U.S.C. § 1915(g), and such imminent danger "exist[ed] at the time the complaint [was] filed," Malik v. McGinnis, 293 F.3d 559, 563 (2d Cir. 2002); *see also* Akassy v. Hardy, 887 F.3d 91, 96 (2d Cir. 2018) (same). Further, the Second Circuit has held that the complaint "must reveal a nexus between the imminent danger it alleges and the claims it asserts." Pettus v. Morgenthau, 554 F.3d 293, 298 (2d Cir. 2009). Thus, a court must "consider (1) whether the imminent danger of serious physical injury ... allege[d] is fairly traceable to

unlawful conduct asserted in the complaint and (2) whether a favorable judicial outcome would redress that injury." Id. at 298–99.

**\*12** Defendant cites to three cases where Plaintiff's claims have been dismissed for failure to state a claim: (1) Gunn v. Jane Doe, No. 19-CV-10383, 2020 WL 353240 (S.D.N.Y. Jan. 17, 2020); (2) Gunn v. McNeil, et al., 19-CV-11821, 2020 WL 7647422 (S.D.N.Y. Dec. 23, 2020); (3) Gunn v. Bentivegna, 20-CV-2440, 2020 WL 2571015 (S.D.N.Y. May 19, 2020). (Def.'s Mem. 20.) *See* 28 U.S.C. § 1915(g) (listing dismissals for "fail[ure] to state a claim upon which relief may be granted" as qualifying strikes); *see also* Welch v. Galie, 207 F.3d 130, 132 (2d Cir. 2000) (per curiam) (same).

On review, the Court finds that Defendant's argument fails because the dismissals in *McNeil* and *Bentivegna* were issued only after Plaintiff filed this action on March 30, 2020. (*See* Compl. (Dkt. No. 2).) Thus, Defendant's request that Plaintiff's IFP status be revoked is denied.

### III. Conclusion

For the foregoing reasons, the Court denies Defendant's Motion To Dismiss with respect to the First Amendment retaliation claim. The Court grants Defendant's Motion with respect to the lost property and access to courts claims. As this is the Court's second adjudication of Plaintiff's claims on the merits, these claims are dismissed with prejudice. *See* Wheeler v. Slanovec, No. 16-CV-9065, 2019 WL 2994193, at *8 (S.D.N.Y. July 9, 2019) (dismissing claims with prejudice after "the second adjudication ... on the merits"). The Court also denies Plaintiff's request for injunctive relief and denies Defendant's requests to eliminate monetary damages because Plaintiff has not alleged physical injury and to revoke Plaintiff's IFP status. The Court will hold a status conference in this matter on May 1, 2023 at 11:00 AM.

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 2664805

## Footnotes

1    Plaintiff has brought suit against Defendant "T. Malani," (*see generally* Am. Compl.) but Defendant has indicated that the proper spelling of his name is "Milani." (*See* Mem. of Law in Supp. of Mot. To Dismiss ("Def.'s Mem.") 7 (Dkt. No. 35).)

2    Plaintiff also alleges that within 24 hours of arriving at Green Haven, Plaintiff was "set-up with a weapon ... by brazen correction officers." (Am. Compl. ¶ 21.) According to Plaintiff, "[t]he paperwork [related to this incident] was destroyed" by Defendant. (*Id.*) However, Plaintiff does not provide any indication that he suffered any Constitutional deprivation as a result of either the alleged "set-up" or the destruction of the paperwork, so the Court will not further address these allegations.

3    The subjects of Plaintiff's other grievances that were consolidated into grievance #GH-86981-17 are not clear from the Complaint.

4    Plaintiff also claims that the grievance review process is "rigged" because Plaintiff was not allowed to call a witness he wanted to testify on his behalf. (Am. Compl. ¶¶ 10–12.) However, violations of prison grievance procedures do not give rise a cognizable ⚑ § 1983 claim because inmate grievance procedures are not required by the Constitution. *See Richard v. Fischer*, 38 F.3d 340, 361 (W.D.N.Y. 2014) (noting that incarcerated persons do not have a constitutional right of access to prison grievance processes); *see also* ⚑ *Cancel v. Goord*, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (same).

5    Plaintiff alleges he suffered physical injury "from prison guards['] assault on [him] as a mental health prisoner on June 5, 2017 at Down State [C]orrectional [F]acility." (Am. Compl. ¶ 22.) However, Plaintiff does not allege that Defendant played any part in causing the injuries, and it is implausible that Defendant would have been involved, as he was employed at Green Haven, not Downstate, Correctional Facility.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5793438
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Charles **MACK**, Plaintiff,
v.
Barry **HALL**, et. al., Defendants.

No. 9:
18
-
CV
-
0875
(GLS/CFH)
|
Signed 07/27/**2020**

**Attorneys and Law Firms**

CHARLES **MACK**, 50-45 Newtown Road, Apt. 1A, Woodside, New York 11377, Plaintiff pro se.

STEINBERG, SYMER & PLATT, LLP, JONATHAN E. SYMER, ESQ., 27 Garden Street, Poughkeepsie, New York 12601, Attorney for defendants, **Hall** and Jayasena, BROOME COUNTY ATTORNEY'S OFFICE, JENNIFER L. SUWAK, ESQ., Broome County Office Building, 60 Hawley Street, P.O. Box 1766, Binghamton, New York 13902-1766, Attorney for defendant Dewing.

**REPORT-RECOMMENDATION AND ORDER** [1]

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Charles **Mack** ("**Mack**" or "Plaintiff"), who was, at all relevant times, in the custody of Broome County Correctional Facility ("Broome C.F."), brings this action pursuant to ⚑ 42 U.S.C. § 1983 against Defendants Nurse Barry **Hall** ("**Hall**"), Nurse Jessica Jayasena ("Jayasena"), and Correction Officer Sarah Dewing ("Dewing") for violations of his constitutional rights. See Dkt. No. 10 ("Am. Compl."). Presently before the Court are Defendants' motions for summary judgment. See Dkt. Nos. 34 and 35. **Mack** opposed the motions and Defendants replied. See Dkt. Nos. 38, 39, and 40. For the following reasons, it is recommended that Defendants' motions for summary judgment be granted.

## I. BACKGROUND

### A. Facts [2]

At the relevant time, **Mack** was incarcerated at Broome C.F. from January 12, 2018, through April 9, 2018. See Dkt. No. 34-7 at 65. [3] Upon arrival at Broome C.F., **Mack** reported a history of Type II Diabetes Mellitus and denied any history of heart disease. See Dkt. No. 34-7 at 76; Dkt. No. 35-6 at 6. **Mack** told the intake nurse that he was not treating his diabetes, "only checked [his] blood sugar when [he was] not feeling well," and managed his diabetes with his diet. Dkt. No. 34-7 at 76. **Mack** was placed in general population in the E-Pod. See id. at 79.

On March 12, 2018, at 3:00 p.m., **Mack** told an officer that he was experiencing "heart problems and pain." Dkt. No. 34-7 at 83. The parties offer conflicting accounts of what transpired next. **Mack** claims that defendant Jayasena arrived at his cell shortly thereafter. See id. at 84. **Mack** alleges that he had a conversation with Jayasena and told her that he was "having complications with my diabetes because [he was] urinating all day[.]" Id. at 85. **Mack** also claims that he told Jayasena that he felt like he was having a heart attack and that his vision was blurry. See id. **Mack** asserts that, in response to his complaints, Jayasena told him to submit a sick call slip. See Dkt. No. 34-7 at 85-86. Conversely, Jayasena claims that she did not have any conversation with **Mack** on March 12, 2018. See Dkt. No. 35-10 at ¶ 4. At 4:00 p.m., **Mack** submitted a sick call slip and stated, "peed 15 time to[ ]day and getting littie [sic] pain I [sic] my heart." Dkt. No. 35-6 at 32; see Dkt. No. 34-7 at 92-93, 95-97. Jayasena picked up **Mack's** sick call slip from the dropbox at 4:00 p.m., delivered it to the triage nurse, and claims that was the extent of her involvement with **Mack** that day. See Dkt. No. 35-10 at ¶ 4. At 4:30 p.m., **Mack** declined sick call. See Dkt. No. 34-7 at 99; Dkt. No. 35-6 at 71.

**\*2** On March 13, 2018, **Mack** received a letter from "medical" stating, "[w]e cannot understand what you are requesting - what is your symptom?" Dkt. No. 35-6 at 33; see Dkt. No. 34-7 at 97-98. On March 14, 2018, **Mack** submitted a sick call slip and stated, "my suger [sic] is hi [sic]." Dkt. No. 35-6 at 31; Dkt. No. 34-7 at 98. On March 16, 2018, **Mack** was evaluated by a nurse. See Dkt. No. 34-7 at 103; Dkt. No. 35-6 at 18-22. [4] **Mack's** blood sugar was elevated

to 400 and, as a result, he was placed in a medical cell so that his blood sugar could be monitored, and a course of insulin was administered. See id. at 103, 106-07; Dkt. No. 35-8 at ¶ 15. On March 17, 2018, **Mack** was evaluated by Dr. Butt, a physician and the Medical Director at Broome C.F. [5] See Dkt. No. 34-7 at 106. Because **Mack's** blood sugar normalized, he returned to E-Pod. See id. at 106-07.

On March 23, 2018, **Mack** went to medical for a routine blood sugar test and was told by a nurse that his blood sugar level was elevated. See Dkt. No. 34-7 at 23-26. **Mack** returned to E-Pod, where he walked around, exercised, and tried to bring his sugar level down. See id. **Mack** testified that, after he returned from medical, he encountered **Hall**, who told plaintiff to "wait for the doctor" in "medical segregation" and, using expletives, stated "I don't care if you put in grievances against me." [6] Dkt. No. 34-7 at 27, 108. **Hall** tested **Mack's** blood sugar level and placed **Mack** in Administrative Segregation, for two days. See Amen. Compl. at 7; Dkt. No. 34-7 at 20, 27-28, 110; Dkt. No. 35-9 at ¶ 3. From March 23, 2018, through March 25, 2018, **Mack's** blood sugar level was monitored. See Dkt. No. 34-7 at 109-110. On March 25, 2018, **Mack** was cleared to return to the E-Pod. See id. at 111.

On March 27, 2018, **Mack** filed a grievance (2018-03-006) related to his medical treatment. See Dkt. No. 34-7 at 30, 108. In the grievance, **Mack** described the incidents that occurred on March 12, 2018, and March 23, 2018, involving Jayasena and **Hall**. See Dkt. No. 1 at 8-10. On March 29, 2018, **Mack** went to medical for blood testing and to receive insulin. See Dkt. No. 34-7 at 32-33. Jayasena administered the insulin in the medical waiting room while defendant Dewing was present. [7] See id. **Mack** refused to accept six units of insulin, as prescribed by Dr. Butt, and said that he would "take" two units. Id. at 35. Jayasena refused **Mack's** request and advised that **Mack** was required to take six units of insulin pursuant to Dr. Butt's orders. See id.; Dkt. No. 35-10 at ¶¶ 6, 7. **Mack** was told to remain in the waiting room while Jayasena contacted Dr. Butt. See Dkt. No. 34-7 at 112-113. While he waited in medical, **Mack** witnessed Dewing and Jayasena conversing inside an office, but he could not hear their discussion. See id. at 35-36. Jayasena claims that she contacted Dr. Butt to inform him that **Mack** refused to take his prescribed medication. See Dkt. No. 35-10 at ¶ 7. Dr. Butt avers that he directed Jayasena to confine **Mack** to the medical department. See Dkt. No. 35-8 at ¶ 21. Jayasena claims that she relayed Dr. Butt's instructions to Dewing. See Dkt. No. 34-2 at ¶ 3; Dkt. No. 35-10 at ¶ 7. While the parties dispute the facts surrounding **Mack's** transfer to the

medical cell, the record indicates that, at 11:30 a.m., Dewing completed an Administrative Segregation Order and called "rovers" to escort **Mack** to Administrative Segregation in the medical unit. [8] Dkt. No. 34-2 at ¶ 4; Dkt. No. 34-6 at 3; Dkt. No. 34-7 at 37.

**\*3** An Incident Report was prepared and included the following narrative:

> On 3/29/2018 at approximately 1130 hours, Nurse Jessica Jayasena informed me that per Dr. Butt[,] Inmate Charles **Mack** is to live in Medical 2 to be evaluated. During the 1100 hours chemstrips, Inmate **Mack** refused to take his 6 units of insulin and would only accept 2 units. Inmate Mach [sic] refused to live in Medical 2. I then called for a couple of rovers to respond to Medical 2 to assist me with the situation. Officer Johnson and Officer Tyner responded and escorted Inmate **Mack** into Medical 2 cell #11. No further incident.

Dkt. No. 38 at 4.

On March 29, 2018, Dewing issued a Notice of Infraction charging **Mack** with refusing an order, conduct that disrupts the safety of the facility, and planning to commit a violation. See Dkt. No. 38 at 5. Dewing also completed a second Administrative Segregation Order that stated, [t]his inmate must be placed in Administrative Segregation in SHU [...] because: [t]he inmate is awaiting a hearing for violation of facility rules and is a danger to the safety and welfare of other persons in the facility, or to its orderly or secure operation." Dkt. No. 34-6 at 4.

On March 31, 2018, Dr. Butt examined **Mack** and released him from medical segregation. See Dkt. No. 35-8 at ¶ 23; Dkt. No. 34-7 at 91, 113-115. On March 31, 2018, **Mack** was transferred to the E-Pod in the Special Housing Unit ("SHU"), where he remained until April 6, 2018. [9] See Dkt. No. 34-2 at ¶ 5; Dkt. No. 34-7 at 37, 92, 118. On April 6, 2018, **Mack** was transferred to state prison and thus, the disciplinary hearing related to the March 29, 2018 incident, which was scheduled

for April 19, 2018, was waived. See Dkt. No. 34-7 at 30-31; Dkt. No. 38 at 5. **Mack** did not file a grievance related to the March 29, 2018 incident. See Dkt. No. 34-7 at 44.

### B. Procedural History

In June 2018, **Mack** commenced this action. See Dkt. No. 1. In September 2018, **Mack** filed an Amended Complaint with a supplement. See Dkt. Nos. 10 and 11. Upon review of the Amended Complaint, the Court directed **Hall**, Jayasena, and Dewing to respond to retaliation claims and Jayasena to respond to medical indifference claims. See Dkt. No. 12. Defendants filed Answers to the Amended Complaint, Dkt. Nos. 22, 23, 30, and on April 10, 2019, **Mack** appeared at a deposition. See Dkt. No. 34-7.

On September 13, 2019, Dewing filed the within motion pursuant to Fed. R. Civ. P. 56 seeking judgment as a matter of law with respect to **Mack's** claims. See Dkt. Nos. 34, 39 (reply in support). On September 14, 2019, **Hall** and Jayasena filed a motion pursuant to Fed. R. Civ. P. 56 seeking judgment as a matter of law with respect to **Mack's** claims. See Dkt. Nos. 35, 40 (reply in support). **Mack** opposed the motions. See Dkt. No. 39.

## II. DISCUSSION

**Mack** contends that Defendants retaliated against him in violation of his First Amendment rights and that Jayasena was deliberately indifferent to his medical needs in violation of his constitutional rights. See generally Am. Compl. Dewing contends that **Mack** failed to exhaust his administrative remedies and further, that the First Amendment retaliation claim lacks merit.[10] See generally Dkt. No. 34-9. Alternatively, Dewing argues that she is entitled to qualified immunity.[11] See id. **Hall** and Jayasena also argue that they are entitled to judgment as a matter of law on the retaliation claims and further contend that **Mack** cannot establish a deliberate indifference claim related to his medical treatment. See generally Dkt. No. 35-12.

### A. Legal Standards

#### 1. Motion for Summary Judgment

**\*4** Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of showing the absence of a genuine dispute of material fact by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. Celotex, 477 U.S. at 322, 106 S.Ct. 2548; see FED. R. CIV. P. 56(c). A fact is material if it "might affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505.

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Id. at 248, 250, 106 S.Ct. 2505; see Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp. (Motors Holding Div.), 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)). Furthermore, "mere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (brackets omitted) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.

See 🔖 Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law.

🔖 Id. (internal quotation marks, citations, and footnote omitted); see also 🔖 Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### 2. N.D.N.Y. Local Rule 7.1(a)(3)

In support of the motions, Defendants filed Statements of Material Facts. See Dkt. Nos. 34-8, 35-11. Local Rule 7.1(a)(3) requires a party moving for summary judgment to file and serve a Statement of Material Facts. See N.D.N.Y. L.R. 7.1(a)(3). "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." Id. The opposing party is required to file a response to the Statement of Material facts "admitting and/or denying each of the movant's assertions in matching numbered paragraphs." Id. "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." Id. (emphasis omitted).

**\*5** Defendants argue that because **Mack** failed to submit any response to their Statements of Material Facts, the facts set forth in the Statements of Material Facts must be deemed admitted. See Dkt. Nos. 39-2 at 4-9 and 40-1 at 5-6. The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute." 🔖 Prestopnik v. Whelan, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (internal quotation marks and citation

omitted). Although Defendants argue, and the Local Rules provide, that the Court shall deem admitted any facts the nonmoving party fails to "specifically controvert," pro se plaintiffs are afforded special solicitude in this District and within the Second Circuit. N.D.N.Y. L.R. 7.1(a)(3); see subsection II.A.1, supra. Accordingly, in deference to **Mack's** pro se status, the Court will independently review the record when evaluating Defendants' motions for summary judgment, and "treat [plaintiff's] opposition as a response to" Defendants' Statement of Material Facts. Johnson v. Lew, No. 1:13-CV-1072 (GTS/CFH), 2017 **WL** 3822047, at *2 (N.D.N.Y. Aug. 30, 2017) ("Out of special solicitude to [the p]laintiff as a pro se civil rights litigant, however, the Court will treat his opposition as a response to [the d]efendant's Rule 7.1 Statement, carefully reviewing it for any record-supported disputation of [the d]efendant's Rule 7.1 Statement." (footnote omitted)); see Perry v. Ogdensburg Corr. Facility, No. 9:10-CV-1033 (LEK/TWD), 2016 **WL** 3004658, at *1 (N.D.N.Y. May 24, 2016) (determining that "although [the p]laintiff failed to respond to the statement of material facts filed by [the d]efendants as required under Local Rule 7.1(a)(3), the Court would invoke its discretion to review the entire record when evaluating the parties' respective [m]otions for summary judgment.").

### B. Exhaustion

Dewing argues that **Mack's** retaliation claims against her must be dismissed because **Mack** failed to exhaust his administrative remedies through available grievance procedures. See Dkt. No. 34-9 at 10-11.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See 🚩 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under 🔖 section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Cucchiara v. Dumont, No. 9:18-CV-0182 (GLS/CFH), 2019 **WL** 2516605, at *4 (N.D.N.Y. Apr. 26, 2019) (quoting 🔖 Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)); see also Baez v.

Parks, No. 02-CV-5821 (PKC/DF), 2004 **WL** 1052779, at *5 (S.D.N.Y. May 11, 2004) ("[T]he PLRA's strict exhaustion requirement does indeed apply in actions brought by pretrial detainees."). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages.

See Porter, 534 U.S. at 524, 122 S.Ct. 983. "To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated." Cuadrado v. Brueault, No. 9:14-CV-1293 (DNH/CFH), 2015 **WL** 1606178, at *3 (N.D.N.Y. Apr. 8, 2015); see Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (internal quotation marks and citation omitted). Previously, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, in Ross v. Blake, the Supreme Court held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, —— U.S. ——, 136 S. Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the special circumstances exception previously promulgated by the Second Circuit in Hemphill is no longer consistent with the statutory requirements of the PLRA. See Williams v. Correction Officer Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

*6 However, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, —— U.S. ——, 136 S. Ct. at 1858, 195 L.Ed.2d 117. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any

relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860. "The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action." McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 **WL** 8894737, at *2 (N.D.N.Y. Dec. 18, 2017) (citation omitted).

**1. Did Plaintiff Exhaust his Administrative Remedies**

In support of the motion for summary judgment, Defendants provided an Affidavit from James R. Borchardt ("Borchardt"), the Inmate Grievance Officer for Broome C.F. See Dkt. No. 34-4. Borchardt avers that an inmate would initiate the grievance process at Broome C.F. by requesting a grievance from the Inmate Grievance Officer. See id. 34-4 at ¶ 4. The Inmate Grievance Officer conducted daily tours to take grievances from inmates. See id. Borchardt reviewed the inmate grievance records and found "no record of a grievance by Plaintiff, Charles **Mack**, regarding the incident on March 29, 2018[.]" Id. at ¶ 6. With her Memorandum of Law in Reply, Dewing submitted an Affidavit from Paul Carlson, the Captain for Broome C.F., attesting to facts related to **Mack's** knowledge of the grievance process at Broome C.F. See Dkt. No. 39. Because the affidavit is new evidence, and **Mack** was not provided with an opportunity to respond to the evidence in a sur-reply, the Court will not consider the affidavit. See Connecticut Indem. Co. v. QBC Trucking, Inc., No. 03 CIV. 4257, 2005 **WL** 1427424, at *2 (S.D.N.Y. June 20, 2005) (citation omitted). **Mack** however, does not dispute the fact that a grievance process existed at Broome C.F. Moreover, his actions demonstrate that he was aware of the process. During the deposition, **Mack** testified that he spoke with a grievance officer on March 12, 2018, and that he filed a grievance on March 27, 2018. See Dkt. No. 34-7 at 44-45. Additionally, in March 2018, **Mack** submitted three forms entitled "Request For Inmate/Supervisor Consultation" asking to see the grievance officer and for a "grievance sheet for medical." Dkt. No. 11 at 4. **Mack** also admits that he did not file a grievance against Dewing. See Dkt. No. 34-7 at 43-44.

**Mack** does not dispute that he failed to exhaust his administrative remedies related to any claims arising from the March 29, 2018 incident with Dewing and failed to respond to Defendant's motion related to his failure to exhaust retaliation claims against her. Therefore, Defendant has met her burden of showing that **Mack** failed to exhaust his administrative remedies with respect to the retaliation claims asserted against Dewing. As a result, the Court must assess whether administrative remedies were available to **Mack**.

### 2. Availability of Administrative Remedies

Administrative remedies may be unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross, —— U.S. ——, 136 S. Ct. at 1860, 195 L.Ed.2d 117.

**Mack** alleges that the grievance procedure was not available to him because "[t]he Grievance Officer at the time in March[,] [t]old me it[']s the same incident and he told me he [was] not going to give me a new grievance sheet." Dkt. No. 38 at 2. **Mack** did not provide a physical description or the name of the grievance officer. See Dkt. No. 34-7 at 45. Even assuming that a grievance officer denied **Mack's** request for a grievance form, the lack of access to a grievance form does not render the grievance process unavailable. See Ceparano v. Cty. of Suffolk, No. 10-CV-2030 (SJF/AKT), 2013 WL 6576817, at *5 (E.D.N.Y. Dec. 13, 2013) ("[E]ven if [the] plaintiff was unable to obtain official grievance forms, New York law permits the filing of grievances on any plain piece of paper."); see also 7 N.Y.C.R.R. § 701.5(a)(1) ("If this [grievance] form is not readily available, a complaint may be submitted on plain paper."). In fact, the evidence establishes that **Mack** had the opportunity to file a grievance on a plain piece of paper and clearly understood that the option was available. In support of his claim, **Mack** provided copies of three slips entitled "Requests for Inmate/Supervisor Consultation," which he claims to have submitted in March 2018. Dkt. No. 11 at 4. In **Mack's** March 25, 2018 request, **Mack** asked, "[t]he grievance officer to send me a grievance sheet or I'm going to make one[.]" Id.

**\*7** Thus, the Court finds that there is no genuine dispute of fact that administrative remedies were available. Accordingly, as exhaustion is a prerequisite to filing an action in federal court, it is recommended that Dewing's motion for summary judgment, on this ground, be granted.

### C. Retaliation Claims

In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: that "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and (3) ... there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context ... adverse action" is "defined ... objectively[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." Id. With respect to the third element of the test, although " '[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (quoting Espinal, 558 F.3d at 129).

"Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." Brooks v. Rock, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *18 (N.D.N.Y. March 28, 2014) (citation omitted); see Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." (italics omitted)).

"[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (internal

quotation marks and citations omitted). Accordingly, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). Thus, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." Green v. Phillips, No. 04-CV-10202 (TPG), 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (citing Brown v. Middaugh, 41 F. Supp. 2d 172, 191 (N.D.N.Y. 1999) (additional citation omitted)). Consequently, a plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. See id.; see also Williams v. Goord, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial.") (internal quotation marks and citation omitted)). Allegations, although specific, "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." Smith v. Woods, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006) (internal quotation marks, citations, and footnote omitted).

### 1. Claim Against Hall

*8 Mack alleges that Hall placed him in Administrative Segregation on March 23, 2018 in retaliation for grievances. See Am. Compl. at 5.

### a. Protected Conduct

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. The Second Circuit has concluded that use of the prison grievance system constitutes a protected activity. See Gill, 389 F.3d at 384. Hall does not dispute that Mack engaged in protected conduct when he filed Grievance No. 2018-03-006. However, Hall argues that the grievance was filed after the March 23, 2018 incident and thus, does not support a retaliation claim against Hall. See Dkt. No. 40-1 at 8. While the record supports that conclusion,

Hall did not address Mack's claim that he also engaged in protected conduct prior to the alleged adverse action. As noted supra, from March 23, 2018, until March 25, 2018, Mack filed three Requests for Inmate/Supervisor Consultations in an attempt to "put[ ] in a [g]rievance" about the medical staff. Am. Compl. at 5; see Dkt. No. 11 at 4. In each request, dated March 22, 2018, March 23, 2018, and March 25, 2018, Mack asked to see the Grievance Officer to obtain a "grievance sheet for medical." Dkt. No. 11 at 4.

Because requesting a grievance constitutes protected activity, see Gill, 389 F.3d at 384, the Court is unable to conclude, as a matter of law, that Mack did not engage in protected conduct prior to March 27, 2018.

### b. Adverse Action

With respect to the second prong of the retaliation analysis, Hall argues that Mack's two-day confinement in a medical cell did not constitute an "adverse action." Dkt. No. 35-12 at 10-11; Dkt. No. 40 at 7-8. Hall does not cite to any supporting caselaw and, based upon the record, the Court disagrees. The Second Circuit has held that being placed in keeplock or otherwise confined is an adverse action. See Gill, 389 F.3d at 384; see also Marshall v. Griffin, No. 18-CV-6673 (KMK), 2020 WL 1244367, at *6 (S.D.N.Y. Mar. 16, 2020) (declining to conclude, as a matter of law, that the plaintiff's allegation that he was placed in confinement for six days in retaliation for filing a grievance was a de minimis act that did not constitute an adverse action).

While Hall avers that he did not have the authority to confine Mack for disciplinary reasons and describes Mack's confinement as being "placed in the Medical Unit at BCCF," see Dkt. No. 35-9 at ¶ 3, the record includes an "Administrative Segregation Order," signed by Hall, with the notation "MED". Amen. Compl. at 7. Setting aside the semantics and differing definitions of the confinement, the evidence establishes that, while Mack was confined from March 23, 2018, until March 25, 2018, he did not have access to a telephone, television, he could not interact with other inmates, and he had to "stay in one place." Dkt. No. 34-7 at 28, 91.

As Hall has moved for summary judgment and thus, bears the burden of establishing that no issue of fact exists as to whether Mack's confinement was an adverse action, the undersigned

concludes that Defendant has not met that burden. See Celotex, 447 U.S. at 322, 100 S.Ct. 2204. **Mack** testified that he when encountered **Hall** in the medical unit on March 23, 2018, for a re-check of his blood sugar, **Hall** told him, with expletives, "I don't care if you put in grievances against me. We don't care." Dkt. No. 34-7 at 27, 108. Given the statements that **Mack** attributes to **Hall**, arguably there is a genuine issue of fact with respect to whether **Mack's** confinement was an adverse action. See Gill, 389 F.3d at 384; Marshall, **2020 WL** 1244367, at *6.

### c. Causal Connection

**\*9** The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (internal quotation marks and citation omitted). A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 139 (2d Cir. 2003)).

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citation omitted).

As discussed supra, **Mack** testified that **Hall** referred to **Mack's** attempts to file grievances before **Mack** was ordered into Administrative Segregation. See Dkt. No. 34-7 at 27, 108. **Hall** provided an Affidavit in support of the motion and does

not describe his interaction with **Mack** in the same manner. See Dkt. No. 35-9.

A determination of whether **Hall** was aware that **Mack** attempted to file grievances or complained about the medical staff prior to his decision to place **Mack** in Administrative Segregation, involves an issue of credibility that is inappropriate to be decided for purposes of this motion. See Yoselovsky v. Assoc. Press, 917 F. Supp. 2d 262, 272 (S.D.N.Y. 2013) (holding that "[a]ssessments of credibility, choosing between conflicting versions of events, and the weighing of evidence are matters for the jury, not for the [c]ourt," to decide on a motion for summary judgment.). The statements attributed to **Hall**, if true, strongly suggest that he was motivated by retaliatory intent and, thus present genuine issues of material fact concerning the nexus element of the retaliation test, which preclude the entry of summary judgment in connection with the retaliation claim. See Roland v. McMonagle, No. 12-CV-6331 (JPO), 2015 **WL** 5918179, at *6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation where the plaintiff presented evidence that the defendants were aware of the complaints and mocked him for filing grievances during the attack).

### d. Confinement Absent Protected Conduct

**Hall** argues that, even assuming the evidence creates a material question of fact as to whether he had retaliatory intent, he would have made the same decision to place **Mack** in the Administrative Segregation even in the absence of the protected conduct, as **Mack's** "placement and maintenance in the medical unit was medically warranted and appropriate" Dkt. No. 35-12 at 11.

"The plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (citation omitted). "[T]he defendant[ ] must show by a preponderance of the evidence that they would have disciplined the plaintiff even in the absence of the protected conduct. Id. (internal quotation marks and citation omitted). "If the defendant does so, then the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation].' " Dillion v. Suffolk County Dept. of

Health Servs., 917 F. Supp. 2d 196, 204 (E.D.N.Y. 2013) (quoting Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 221 (2d Cir. 2004)). "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where [courts] have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998) (quoting Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994)).

**\*10** **Hall** maintains that **Mack** was placed in "medically appropriate" confinement because his blood sugar levels fluctuated throughout the day between 303 and 109. Dkt. No. 35-9 at ¶ 3; Dkt. No. 35-12 at 11. **Hall** avers that while **Mack** was confined, his blood glucose levels and food intake were monitored, insulin was administered, and medication was added to his regimen. See Dkt. No. 35-9 at ¶¶ 3-4. **Mack** was released after two days of confinement because his diabetes was under "good control" and he agreed to comply with medications and blood glucose evaluations. Id. at ¶ 5.

Because **Hall** proffered a legitimate, non-retaliatory reason for placing **Mack** in Administrative Segregation, to avoid summary judgment, **Mack** must bring forward some evidence of pretext. See Gill v. Calescibetta, No. 9:00-CV-1553 (GTS/DEP), 2009 WL 890661, at \*9 (N.D.N.Y. Mar. 31, 2009) ("Once [a legitimate non-discriminatory] reason [for taking adverse action] has been cited [by the defendant], the burden of production reverts to the plaintiff, who retains the ultimate burden of establishing both pretext and that retaliation was a motivating factor in the determination, by a preponderance of evidence.").

In this regard, **Mack** testified that his blood sugar level was significantly higher earlier in the day, when the medical staff sent him back to E-Pod. See Dkt. No. 34-7 at 27. Thus, **Mack** argues that **Hall's** actions were retaliatory because **Mack's** low blood sugar level did not warrant segregation. See Amen. Compl. at 1, 5.

First, the court notes that the record before the Court does not support **Mack's** conclusions related to his blood sugar levels. See Dkt. No. 35-9 at ¶ 3 (**Hall** avers that **Mack's** blood glucose level was 303 when he was placed in the Medical Unit, having been 109 on earlier testing that day). Second, even assuming the truth of **Mack's** statements related to his blood sugar level, without more this fact does not create an

issue of fact related to pretext. **Mack** admits that the notation "MED" on the Administrative Segregation Order indicates that he was placed in segregation for medical purposes. Amen. Compl. at 7; Dkt. No. 34-7 at 20. Finally, **Mack** does not deny that his blood sugar levels were unstable and uncontrolled and, in fact, concedes that he was concerned. Significantly, **Mack** testified that he reported to the medical staff at 12:35 p.m. on March 23, 2018, that he didn't feel well due to high blood sugar and asked the medical staff for "an IV." Dkt. No. 34-7 at 109; see Dkt. No. 35-6 at 54-55. **Mack** testified that when his blood sugar was initially checked on March 23, 2018, it was between 350 and 375. Dkt. No. 34-7 at 27-28, 110. **Mack** claims that returned to E-Pod and tried to "bring down [his] sugar," and when **Hall** retested **Mack's** blood sugar level, it was between 130 or 140. Id.

**Mack's** conclusory assertion that **Hall** acted with retaliatory intent is further undermined by the fact that **Mack's** confinement was brief and that he was discharged after two days when testing revealed that his diabetes was controlled and **Mack** consented to comply with medications and continued testing. See Dkt. No. 35-9 at ¶ 5; see Hughes v. Butt, No. 9:17-CV-1151 (DNH/ML), 2019 WL 6970794, at \*18 (N.D.N.Y. Sept. 17, 2019) (reasoning that the plaintiff's admission that his blood sugar was unstable and unmanaged supported the defendant's legitimate, non-retaliatory reason for transferring the plaintiff to the medical unit); see also Ramsey v. Squires, 879 F. Supp. 270, 279 (W.D.N.Y.) (finding the plaintiff's pretext argument related to his segregation conclusory, "particularly in view of the clear evidence that [the] plaintiff's privileges were gradually restored" after evaluations), aff'd, 71 F.3d 405 (2d Cir. 1995).

**\*11** The Court also notes that, in opposition to the motion for summary judgment, **Mack** presented arguments pertaining only to Jayasena and Dewing. See generally Dkt. No. 38. In light of **Mack's** failure to present any argument in opposition to **Hall's** motion, and because **Mack** has failed to present competent, admissible evidence which would allow a juror to conclude that **Hall's** reasons are pretextual, the Court recommends granting **Hall's** motion for summary judgment and dismissal of the retaliation claims.

See Feacher v. Intercontinental Hotels Grp., 563 F. Supp. 2d 389, 399 (N.D.N.Y. 2008) ("The failure to oppose a motion for summary judgment on a certain claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion.") (internal citation omitted) (citing N.D.N.Y. L.R. 7.1(b)(3) ('Where a properly filed motion is unopposed and

the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.")).

### 2. Claims Against Jayasena and Dewing [12]

**Mack** claims that Jayasena and Dewing retaliated against him when they placed him in Administrative Segregation on March 29, 2018. See Am. Compl. at 1. **Mack** also contends that Dewing retaliated against him when she issued an Incident Report resulting in his confinement in E-Pod. See Dkt. No. 34-7 at 118.

#### a. Protected Conduct

As discussed supra, **Mack** engaged in protected conduct with the filing of a grievance on March 27, 2018. While Jayasena argues that Grievance No. 2018-03-006, "was not submitted at the time of the March 29, 2018 occurrence[,]" Dkt. No. 40-1 at 9, the record evidence does not support that conclusion. **Mack** filed the grievance on March 27, 2018, two days before the subject incident, complaining about medical treatment involving Jayasena. Thus, **Mack** has satisfied the first prong of the First Amendment retaliation analysis.

#### b. Adverse Action

Defendants argue, as **Hall** did, that **Mack's** two-day confinement in a medical cell can not be construed as an adverse action. See Dkt. No. 35-12 at 14. For the reasons set forth in subsection II(C)(1)(b), supra, the Court finds no merit in that argument.

To the extent that Jayasena argues that she was not personally involved in the decision to place **Mack** in Administrative Segregation because she was simply following Dr. Butt's orders, the Court does not agree. See Dkt. No. 35-12 at 13. Jayasena concedes that she provided medical treatment to **Mack** and that she engaged in a verbal dispute with **Mack** regarding his prescribed treatment. See Dkt. No. 35-10 at ¶¶ 6-7. Jayasena also claims that she contacted Dr. Butt to discuss **Mack's** treatment, relayed Dr. Butt's orders to

Dewing, and Dewing, acting upon Jayasena's directive, called rovers to escort **Mack** to Administrative Segregation. See Dkt. No. 34-2 at ¶¶ 3-4; Dkt. No. 35-10 at ¶ 7. Based upon the record evidence before the Court, a triable issue of fact exists regarding Jayasena's personal involvement in the decision to transfer **Mack** to Administrative Segregation.

The Court further notes that **Mack's** subsequent confinement in the SHU satisfies the second prong of the retaliation analysis, as against Dewing. Based upon Dewing's incident report, **Mack** was transferred to the SHU on March 31, 2018 and remained there until April 6, 2018. See Dkt. No. 34-7 at 91-92, 114-115. This confinement qualifies as an adverse action. [13] See Gill, 389 F.3d at 383 (holding that the imposition of SHU housing would objectively deter a similarly situated individual of ordinary firmness from exercising constitutional rights).

#### c. Causal Connection

With respect to the third prong of the retaliation analysis, **Mack** claims that Jayasena and Dewing retaliated against him on March 29, 2018 because he filed a grievance against Jayasena on March 27, 2018. See Dkt. No. 34-7 at 36. While "temporal proximity, ... alone, is insufficient to defeat summary judgment," Williams v. King, 763 F. App'x 36, 38-39 (2d Cir. 2019) (summary order), in this instance Jayasena does not dispute **Mack's** claim that she was aware of that he had filed a grievance related to his medical treatment. See generally Dkt. No. 35-10. Accordingly, the Court cannot conclude, as a matter of law, that **Mack** failed to establish a causal connection between his March 27, 2018 grievance and Jayasena's action.

**\*12** A different conclusion is reached however, with respect to the causal connection between the grievance and Dewing's actions. **Mack** draws the conclusion that Dewing was aware of the grievance because he saw Jayasena and Dewing "talking inside the [medical] office" after **Mack** refused to take six units of insulin. Dkt. No. 34-7 at 35. **Mack** surmises that Jessica was telling Sarah that he put in a grievance against her because he saw the defendants "huddled up" in the office, looking at him. Id. at 41. As further support for his conclusion, he testified that, within "three, four minutes" after the conversation, the rovers arrived to escort him to the medical cell. Id. at 38.

However, **Mack** concedes that he was in the lobby while the conversation took place and that he could see Jayasena and Dewing in the office, but did not specifically hear Jayasena tell Dewing about the grievance. Dkt. No. 34-7 at 42. **Mack** testified:

> Q. Are you maintaining your testimony that you never heard Nurse Jessica tell Sarah Dewing about a grievance.
>
> A. No. I want to say that she - - I ain't hear her say it. How she was looking at me, how they were both looking at me. She was telling them about it.
>
> Q. So you never heard her say it - -
>
> A. Never.
>
> Q. You're just saying because the way they were look at you?
>
> A. Yes. Exactly.

Id.

Dewing avers that she was not aware that **Mack** had filed a grievance when she called the rovers. See Dkt. No. 34-2 at ¶ 7.

"As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." Burroughs v. Mitchell, 325 F. Supp. 3d 248, 282 (N.D.N.Y. 2018) (internal quotation marks and citation omitted); see Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing a retaliation claim against a correction officer where the only alleged basis for retaliation was a complaint written against another officer). In this case, the record lacks facts that would allow the Court to draw the "legitimate inference" that Dewing retaliated against **Mack** based on his grievance filed against Jayasena. Espinal, 558 F.3d at 130; see Wright, 554 F.3d at 274; Burroughs, 325 F. Supp. 3d at 282. **Mack** has offered nothing more than speculation without corroborating evidence from any other witnesses. **Mack** did not proffer any evidence to contradict Dewing's sworn statement that she was unaware that **Mack** filed a grievance when she called the rovers. Indeed, **Mack** concedes that he never had any contact, arguments, or misunderstandings with Dewing prior to March 29, 2018. See Dkt. No. 34-7 at 43-44. **Mack's** conclusory assertions are insufficient to create a triable issue of fact as to the third element of a retaliation claim against Dewing. Accordingly,

the retaliation claim cannot survive Dewing's motion for summary judgment.

#### d. Confinement Absent Protected Conduct

#### i. Administrative Segregation

Defendants argue that, even assuming the evidence creates a material question of fact as to whether they had retaliatory intent, they would have made the same decision to place **Mack** in the medical unit cell even in the absence of the protected conduct. See Dkt. No. 34-9 at 9; Dkt. No. 39-2 at 6.

Jayasena claims that, at 11:00 a.m. on March 29, 2018, **Mack's** blood sugar level was 211. See Dkt. No. 35-6 at 54; Dkt. No. 35-10 at ¶ 6. Jayasena avers that based upon "Dr. Butt's order for a sliding scale of insulin," **Mack** required "6 units of insulin" but "only wanted to take 2 units of insulin and adamantly requested that I modify Dr. Butt's order." Dkt. No. 35-10 at ¶ 6. Jayasena asked **Mack** to sit in the waiting room while she telephoned Dr. Butt. See Dkt. No. 35-6 at 54; Dkt. No. 35-10 at ¶ 7. Dr. Butt asked Jayasena to retain **Mack** in the medical unit, and Jayasena asked Dewing "to do so." Dkt. No. 34-2 at ¶ 3; see Dkt. No. 35-10 at ¶ 7. The medical record contains a Progress Note, prepared by Jayasena on March 29, 2018 at 12:14 p.m., that supports Jayasena's version of the events that transpired. See Dkt. No. 35-6 at 54.

  *13 In support of the motion for summary judgment, Defendants also submitted the Affirmation of Dr. Butt. See Dkt. No. 35-8. Dr. Butt states that, upon being informed by Jayasena that **Mack** refused to take the prescribed dose of insulin, he directed Jayasena to maintain **Mack** in the medical department, "solely so his diabetic regimen could be addressed after a followup examination by me[.]" Id. at ¶ 21. Dr. Butt further notes that while **Mack** was housed in the medical unit, his glucose and dietary intake were monitored. See id. at ¶ 22. On March 31, 2018, Dr. Butt re-evaluated **Mack** and found that his glucose levels were improved and ordered him released. See id. at ¶ 23.

Because Defendants established a legitimate, non-retaliatory reason for placing **Mack** in Administrative Segregation, **Mack** must bring forward some evidence of pretext. While **Mack** admits that he refused to take the prescribed dosage of insulin, see Dkt. No. 34-7 at 34-37, he attempted to justify his decision and explained that, on March 27, 2018, "[Jayasena] gave me too much insulin. My blood sugar was so low that

when I was inside a cell, that it's like I couldn't - - I couldn't really help myself. My blood sugar was so low[.]" Id. at 34-35. **Mack** claims that he was "shakin [sic] in my jail cell all nite [sic]." Dkt. No. 38 at 2.

**Mack's** conclusory allegations are unsupported by competent evidence. The medical record lacks any evidence suggesting that **Mack** reacted negatively to the administration of insulin by Jayasena on March 27, 2018. Indeed, **Mack** filed a grievance against Jayasena on March 27, 2018, and failed to include any complaints related to an adverse reaction to insulin. See Dkt. No. 1 at 8-10. The medical record also indicates that **Mack** was not always compliant with his medical regimen. Indeed, a notation on March 26, 2018 indicates, "Inmate Refused 4 units Humalog." Dkt. No. 35-6 at 60.

Thus, **Mack** has not established that the proffered reasons for placing him in a medical cell were done as pretext for retaliation. See Smith v. Deckelbaum, No. 97-CV-1265 (JSM), 2000 **WL** 1855128, at *4 (S.D.N.Y. Dec. 19, 2000) (holding that, "[a]lthough [the plaintiff's evidence] c[ould] lead to an inference of pretext, the Second Circuit Court of Appeals has indicated that a plaintiff must submit more than circumstantial evidence of retaliation in order to survive a motion for summary judgment." (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995))). Accordingly, the Court recommends that Jayasena and Dewing be granted summary judgment on the retaliation claims related to **Mack's** confinement in Administrative Segregation.

### ii. SHU Confinement

Dewing presents the same argument and claims that she would have issued the Incident Report absent **Mack's** protected conduct. See Dkt. No. 34-9 at 9; Dkt. No. 39-2 at 6. Dewing asserts that she issued an Incident Report because **Mack** became "upset" and "angry" when he was asked to move to a cell in Medical II for a further evaluation of his medical needs. Dkt. No. 34-2 at ¶ 3. This description of **Mack's** behavior is supported by Jayasena and the medical record. See Dkt. No. 35-6 at 53; Dkt. No. 35-10 at ¶ 7. Dewing claims that she only summoned the rovers when **Mack** refused her repeated requests to cooperate with orders. See Dkt. No. 34-2 at ¶ 4.

While **Mack** disputes Defendant's characterization of his behavior as argumentative, see Dkt. No. 34-7 at 113, he

admits that he refused to take the prescribed medication because "they didn't really know how to take care of diabetes." Id. at 117. **Mack** also concedes that "five or six" rovers were called to "force" him into the medical cell. Id. at 39-40. This testimony supports Dewing's claim that she was compelled to summon the rovers because **Mack** refused to go to voluntary confinement in the medical cell. Accordingly, **Mack** has not established, with competent, admissible evidence, that the Incident Report would not have been written "absent his protected speech." See Chavis v. Goord, 333 F. App'x 641, 644 (2d Cir. 2009) (summary order) (affirming dismissal of retaliation claim where the appellant did not dispute that he had disobeyed orders, which was, in part, the basis for the misbehavior reports) (citation omitted); see also Vega v. Artus, 610 F. Supp. 2d 185, 207 (N.D.N.Y. 2009) (concluding that the defendant would have issued the misbehavior report even in the absence of the protected conduct and dismissing the plaintiff's retaliation claim based on the issuance of a misbehavior report alleging that the plaintiff had lost state-issued gloves where the plaintiff admitted that he lost the gloves).

**\*14** The record before the Court, even when construed most favorably towards **Mack**, lacks evidence undermining Dewing's legitimate, non-retaliatory reason for issuing an Incident Report and Notice of Infraction. Accordingly, the Court recommends granting this portion of Defendant's motion for summary judgment. See Chavis, 333 F. App'x at 644; Vega v. Artus, 610 F. Supp. 2d at 207.

### D. Qualified Immunity

Dewing argues that even if **Mack's** retaliation claim against her is substantiated, she is nevertheless entitled to qualified immunity. See Dkt. No. 34-9 at 12-13. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available to bar a plaintiff's suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929

F.2d 922, 925 (2d Cir.1991). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, **Mack** has not established a constitutional violation to satisfy the first prong of the qualified immunity test. See Part II(c), supra. Because there is no constitutional violation, the undersigned does not reach whether **Mack's** constitutional rights were clearly established at the time of the alleged violation. See Aiken, 236 F. Supp. 2d at 230. Accordingly, it is recommended that Defendant's motion on this ground be granted.

### E. Deliberate Medical Indifference Claims

Construing the Amended Complaint liberally, **Mack** contends that Jayasena was deliberately indifferent to his serious medical needs on March 12, 2018. See generally Am. Compl. Because the record does not clearly indicate whether **Mack** was incarcerated at Broome C.F. as a pretrial detainee or a convicted prisoner, his claims will be analyzed under the Eighth and Fourteenth Amendment. See Dkt. No. 12 at 5, n. 5.

"The Eighth Amendment forbids the infliction of 'cruel and unusual punishments' on those convicted of crimes, which includes punishments that 'involve the unnecessary and wanton infliction of pain.' " Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)); see U.S. CONST. AMEND. VIII. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). An Eighth Amendment claim for medical indifference, has two necessary components, one objective and the other subjective. See Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996). The objective component requires the plaintiff to demonstrate that his alleged medical need is "sufficiently serious." Hathaway, 37 F.3d at 66 (internal quotation marks and citation omitted). The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind." Id.

*15 For an inmate to state a cognizable claim of deliberate indifference, he "must make a threshold showing of serious illness or injury." Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003). Deprivation of medical treatment is "sufficiently serious" if the injury or illness is one where there is "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway, 37 F.3d at 66 (internal citation omitted). "Determining whether a deprivation is an objectively serious deprivation entails two inquiries." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). First, the Court must determine "whether the prisoner was actually deprived of adequate medical care." Id. "Prison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is reasonable." Jones v. Westchester Cnty. Dep't of Corrs., 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (internal quotation marks and citation omitted). However, a prison official may be held liable "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Second, the Court must determine "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Salahuddin, 467 F.3d at 280.

> [I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the

seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

📁⚠️ Id. (quotation marks and citations omitted).

Where a delay in medical treatment is alleged, "it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious.' " 📁 Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (quoting 📁 Chance, 143 F.3d at 702); see 📁 ⚠️ Salahuddin, 467 F.3d at 280. A delay in medical treatment must be interpreted in the "context of the seriousness of the medical need,[14] deciding whether the delay worsened the medical condition, and considering the reason for delay." 📁 Smith, 316 F.3d at 186 (internal quotation marks and citation omitted).

As to the subjective component, a prison official acts with a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 📁 Farmer, 511 U.S. at 837, 114 S.Ct. 1970. "Deliberate indifference is a mental state equivalent to subjective recklessness" which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." 📁 ⚠️ Salahuddin, 467 F.3d at 280 (citations omitted). A defendant "may introduce proof that he or she knew the

underlying facts, but believed that the risk to which the facts gave rise was 'insubstantial or non-existent.' " 📁 Wright v. Genovese, 694 F. Supp. 2d 137, 154 (N.D.N.Y. 2010) (quoting 📁 Farmer, 511 U.S. at 844, 114 S.Ct. 1970). Therefore, "the defendant's belief that his conduct posed no risk of serious harm 'need not be sound so long as it is sincere,' and 'even if objectively unreasonable, a defendant's mental state may be nonculpable.' " 📁 Id. at 154-55 (quoting ⚠️ Salahuddin, 467 F.3d at 281).

**\*16** Assuming Mack was a pretrial detainee at the time of the alleged incident, his deliberate indifference claims are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. See 📁 Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted). The Second Circuit in 📁 Darnell reasoned that,

[u]nlike a violation of the Cruel and Unusual Punishments Clause [of the Eighth Amendment], an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm.

📁 Id. Such a claim is typically analyzed under a two-pronged standard. First, the pretrial detainee must satisfy the "objective prong showing that the challenged conditions were sufficiently serious to constitute objective deprivations of" constitutional rights. 📁 Id. The objective prong of the deliberate indifference claim is the same as a convicted prisoner under the Eighth Amendment. See 📁 id. at 30. As to the subjective prong, a pretrial detainee must demonstrate that "an official does not act in a deliberately indifferent manner toward an arrestee unless the official 'acted *intentionally* to impose the alleged condition, *or recklessly* failed to act with reasonable care to mitigate the risk that the condition posed

to the pretrial detainee even though the defendant-official *knew, or should have known,* that the condition posed an excessive risk to health or safety.' " Bruno v. City of Schenectady, 727 F. App'x 717, 720 (2d Cir. 2018) (summary order) (quoting Darnell, 849 F.3d at 35).

**Mack** claims that Jayasena was deliberately indifferent to his serious medical needs on March 12, 2018. See Dkt. No. 38 at 3. **Mack** alleges that he told Jayasena he felt like he was "going to have a heart attack" and complained that he was "urinating a lot." Amen. Compl. at 1, 3. In response, Jayasena refused to provide "emergency" treatment and directed **Mack** to file a sick call slip. Id. at 1; Dkt. No. 38 at 3. Jayasena argues that **Mack** did not suffer from a serious medical need and further, that he failed to proffer evidence that Jayasena was deliberately indifferent to his medical needs. See Dkt. No. 35-12 at 22-23; Dkt. No. 40-1 at 10-11.

### 1. First Prong: Objective Component

### a. Adequacy of Care

To satisfy the objective component of this Eighth Amendment claim, **Mack** must prove that he was deprived of adequate medical care on March 12, 2018. "[T]o state a [claim for deliberate indifference to a serious medical condition], [a p]laintiff must plausibly allege that '[ ]objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities.' " Martinez v. Aycock-West, 164 F. Supp. 3d 502, 510 (S.D.N.Y. 2016) (citing Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)). **Mack** alleges in his Amended Complaint that, on March 12, 2018, at 3:00 p.m., he told Jayasena "face to face" that he was "dehydrated and urinating a lot and [had] pain in [his] heart[.]" Am. Compl. at 3; see Dkt. No. 34-7 at 100. **Mack** testified that he told Jayasena that he was "having complications with my diabetes" including blurry vision. Dkt. No. 34-7 at 85. **Mack** also testified that he asked to go to the hospital and Jayasena responded, "we don't do that ... you ain't going to the hospital" and "put in a sick call sheet[.]" Id. at 86; see Am. Compl. at 3. While Jayasena contends that the conversation did not occur, it is undisputed that, at 4:00 p.m., **Mack** submitted a sick call slip complaining, "peed 15 time to day and getting little [sic] pain in my heart." Dkt. No. 35-6 at 32. The record also establishes that, at 4:30 p.m. on March 12, 2018, **Mack** "declined" a sick

call visit. Id. at 71. **Mack** explained that he refused the visit because it was in response to a previously submitted sick call slip for a laxative:

> **\*17** Q. So it's your interpretation that you declined to go to sick call that you signed an hour and a half after you met Jessica with the complaint of the heart pain and the frequent urination and blurry vision, that sick call slip is you refusing to go to medical for something that you didn't go to earlier that day?
>
> A. Yeah.

Dkt. No. 34-7 at 101-103.

The next day, **Mack** received a note from "medical" in response to his March 12, 2018 sick call request. Dkt. No. 34-7 at 94. The note communicated, "[w]e cannot understand what you are requesting. What is your symptom?" Dkt. No. 35-6 at 33; see Dkt. No. 34-7 at 94, 98. Accordingly, on March 14, 2018, **Mack** submitted another sick call slip complaining, "[m]y sugar is hi [sic]." Dkt. No. 35-6 at 31. The medical records indicate that **Mack** was evaluated in the medical unit on March 15, 2018. Dkt. No. 35-6 at 18-22. At that time, **Mack's** blood sugar was monitored and a course of insulin was prescribed. See id. at 21. **Mack's** blood sugar was thereafter monitored before breakfast, lunch, and dinner. See id.; see Dkt. No. 34-7 at 103.

Jayasena contradicts **Mack's** account of events and denies engaging in any conversation with **Mack** on March 12, 2018. See Dkt. No. 35-10 at ¶ 4. Rather, Jayasena avers that, at that time, her "sole role ... was to pick up sick call slips from each correctional pod and give the requests to the evening Nurse for triage." Id. With respect to **Mack** and the March 12, 2018 incident, Jayasena claims that she picked up a sick call slip, written by **Mack**, from the dropbox at 4:00 p.m. See id.; Dkt. No. 35-6 at 32.

Even assuming **Mack's** version of events to be true, **Mack** has not provided evidence from which a fact-finder could reasonably conclude that Jayasena's conduct constituted an actual deprivation of adequate medical care. See Salahuddin, 467 F.3d at 279. **Mack** offers no evidence to support a conclusion that he was experiencing a condition requiring immediate emergency attention or that he was experiencing severe symptoms that were visible to Jayasena. Indeed, during **Mack's** initial medical evaluation in January 2018, **Mack** denied any history of heart disease.

See Dkt. No. 34-7 at 76; Dkt. No. 35-6 at 6. As a prison official's duty is only to provide reasonable care, **Mack** fails to demonstrate how Jayasena's response was other than reasonable care or a deprivation of adequate medical care. See ⚑ Farmer, 511 U.S. at 847, 114 S.Ct. 1970; ⚑⚠ Salahuddin, 467 F.3d at 279. As **Mack** provides no proof that his "condition pos[ed] a substantial risk of serious harm" or proof that he was experiencing distress and that it was visible to Jayasena, there is nothing to indicate that defendant failed to provide reasonable care. ⚑ Farmer, 511 U.S. at 834, 114 S.Ct. 1970; see Darnell, 849 F.3d at 35. Thus, it is clear from the record that Jayasena did not deprive plaintiff of adequate medical care.

The Court notes that **Mack's** medical intake form indicates a history of diabetes. See Dkt. No. 35-6 at 3. To the extent that **Mack** suggests that Jayasena knew, or should have known, he had diabetes, **Mack** provides no proof that his alleged distress on March 12, 2018, stemmed from diabetes or that he requested treatment for diabetes from Jayasena. Indeed, there is no evidence that **Mack** complained about his diabetes or any symptoms related to his diabetes to medical staff prior to March 12, 2018. See Dkt. No. 35-6 at 32-43. **Mack** testified that, upon arrival at Broome C.F. on January 12, 2018, he advised the medical staff that he was managing his diabetes and that he hadn't taken insulin in one to two years. See Dkt. No. 34-7 at 76-77. **Mack's** blood sugar was tested the same day and he was told that the result was "normal." ⚑ Id. at 78-79. The sick call slips submitted from January 20, 2018, until March 12, 2018 contain complaints related to dental issues, dry skin, a head cold, and requests for laxatives, but do not reference or mention of high blood sugar. See Dkt. No. 35-6 at 32-43.

### b. Sufficiently Serious

**\*18** Even if **Mack** had established a denial of adequate medical care, he has failed to show that the denial was "sufficiently serious" because he has not demonstrate "how the offending conduct [wa]s inadequate and what harm, if any, the inadequacy has caused or will likely cause [him]." ⚑⚠ Salahuddin, 467 F.3d at 280. **Mack** offers no proof that he suffered serious harm from Jayasena's failure to assist him in obtaining immediate medical care. See Allen v. Ford, 880 F. Supp. 2d 407, 411 (W.D.N.Y. 2012) ("An inmate's mere disagreement over the proper treatment for his injuries

does not create a constitutional claim."). Between March 15, 2018, and March 17, 2018, **Mack** was evaluated by a nurse practitioner, Dr. Mahmood Butt, the Medical Director at Broome C.F., received insulin, and began a routine of having his blood checked before each meal. See Dkt. No. 34-7 at 106; Dkt. No. 35-8 at ¶¶ 3, 16, 17, 18. **Mack** has produced no evidence to demonstrate that he suffered a sufficiently serious harm from not obtaining immediate medical attention on March 12, 2018. See ⚑ Smith, 316 F.3d at 187 (explaining that a serious medical need "exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." (internal quotation marks and citations omitted)). Thus, Jayasena's conduct in relation to **Mack's** medical condition does not constitute a "sufficiently serious" inadequacy in medical care. ⚑⚠ Salahuddin, 467 F.3d at 280.

Additionally, there is no evidence to support **Mack's** allegations of the severity of his symptoms. Even though **Mack** claims that he was in distress, the medical staff notes demonstrate that at 4:30 P.M., an hour and a half after he allegedly conveyed an "emergency" medical issue to Jayasena, **Mack** declined sick call. Dkt. No. 36-5 at 71. Further, there is no notation of heart pain or frequent urination during the sick call visit on March 14, 2018. Id. at 31. There is also no evidence that **Mack** was experiencing these particular symptoms at the time he requested medical attention from Jayasena. **Mack's** mere complaint to Defendant does not demonstrate these conditions were actually present because **Mack** did not testify to exhibiting any symptoms that would lead Jayasena to conclude that he was suffering from a medical emergency or in serious distress. See Dkt. No. 34-7 at 84-85. Indeed, **Mack** has presented no evidence beyond his own self-serving statements to indicate that, at the time he spoke with Defendant, **Mack** was experiencing emergency symptoms. See ⚑ Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) ("To defeat summary judgment, ... nonmoving parties ... may not rely on conclusory allegations or unsubstantiated speculation. At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful.") (internal quotation marks and citations omitted); see also Cole v. Artuz, No. 93-CV-5981 (WHP/JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) ("Where a litigant is *pro se*, his pleadings should be read liberally and interpreted to raise the strongest arguments that they suggest .... Nevertheless, ... pro se party's bald assertion, unsupported by evidence, is not sufficient to overcome a

motion for summary judgment." (internal quotation marks and citations omitted)). The record indicates that at sick call two days later, **Mack** complained only of high blood sugar, and the medical staff noted "[f]asting chemstrip scheduled for 3/15/18 @ 0600." Dkt. No. 35-6 at 31. Without medical evidence to support **Mack's** claims of more serious symptoms, his self-serving assertions of distress, the presence of heart pain and frequent urination are insufficient to prove a "sufficiently serious" medical need. See Salahuddin, 467 F.3d at 280; see Cole, 1999 WL 983876, at *3. Thus, **Mack** has failed to prove that Defendant's failure to take steps beyond telling him to submit a sick call slip constituted a sufficiently serious deprivation of medical care under the objective prong.

Reading the Amended Complaint liberally, insofar as **Mack** may be arguing that the delay between when he spoke to Jayasena and when he was seen by medical personnel amounts to a sufficiently serious inadequacy, he fails to provide any evidence demonstrating that the delay was "sufficiently serious." Salahuddin, 467 F.3d at 280. The medical entries from March 14, 2018 through March 17, 2018 reflect that **Mack** was treated and that he was in no apparent distress. See Dkt. No. 36-5 at 13-15, 31, 46, 47, 52, 53, 55. **Mack** offers no proof that Jayasena knew of and disregarded the severity of his diabetes when Jayasena acknowledged his request for medical attention and told him to submit a sick call slip or that his symptoms became more severe between his request for immediate medical attention and his examination on March 15, 2018.

## 2. Second Prong: Subjective Component

**\*19** Even if **Mack** demonstrated sufficiently serious deprivation, he fails to demonstrate how Jayasena acted with culpable intent or recklessly failed to act with reasonable care when she declined **Mack's** request for emergency medical attention in violation of either the Eighth or Fourteenth Amendment.

As discussed above, despite **Mack's** complaints, there is no evidence that **Mack** was suffering from visible distress. **Mack** alleges in his Amended Complaint that, when he asked Jayasena for emergency care, she refused and directed him to submit a sick call slip. See Am. Compl. at 3. Yet in his deposition, **Mack** admits that he was offered, and declined sick call an hour and a half after he requested "emergency"

medical attention. Dkt. No. 34-7 at 84. While **Mack** claims that the subject sick call visit pertained to complaints "about going to the bathroom" and that he "went to the bathroom already ... and [didn't] have to get there for no [sic] laxative," id. at 102, this belies his deliberate indifference claim. There is nothing to indicate that Jayasena knew, or should have known, that **Mack's** condition posed an excessive risk to his health. See Darnell, 849 F.3d at 35. Thus, there is nothing to indicate that Jayasena acted intentionally or recklessly failed to act with reasonable care in response to **Mack's** request for medical treatment. See Darnell, 849 F.3d at 35; Salahuddin, 467 F.3d at 280. Therefore, **Mack** has failed to raise a material question of fact whether Jayasena knew of and disregarded an excessive risk to **Mack's** health or safety. Accordingly, **Mack** has not demonstrated that Jayasena was deliberately indifferent to a serious medical condition, and it is recommended that Defendant's motion on this ground be granted.

## IV. CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED** that Dewing's motion for summary judgment (Dkt. No. 34) be **GRANTED** on the grounds that Plaintiff failed to exhaust his administrative remedies. Alternatively, if reached, Dewing's motion for summary judgment should be **GRANTED** as to Plaintiff's First Amendment retaliation claims. Alternatively, if reached, Dewing's motion for summary judgment on the issue of qualified immunity should be **GRANTED**; and it is further

**RECOMMENDED** that **Hall's** and Jayasena's motion for summary judgment (Dkt. No. 35) be **GRANTED**; and it is further

**ORDERED** that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN**

**FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 🚩 Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing 🚩 Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 🚩 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**All Citations**

Slip Copy, 2020 WL 5793438

## Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 🚩 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    The parties provided exhibits with their submissions, without objection or challenges to the authenticity of any documents. Therefore, to the extent that the "facts" asserted by the parties are supported by the record, the undersigned will consider the facts and relevant exhibits/documents in the context of the within motion.

See 🚩 Daniel v. Unum Provident Corp., 261 Fed. App'x 316, 319 (2d Cir. 2008) (summary order) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party" (citation omitted)). In light of the procedural posture of the case, the following recitation of the facts is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the non-moving party. See 🚩 Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003).

3    Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

4    Although **Mack** testified at deposition that a nurse evaluated him on March 15, 2018, the medical records indicate that this evaluation was performed on March 16, 2018. See Dkt. No. 35-6 at 18-22.

5    Dr. Butt is not a defendant in this action.

6    **Hall** provided an Affidavit in support of the motion for summary judgment and confirms that he interacted with **Mack** on March 23, 2018. **Hall** did not specifically confirm or deny **Mack's** account of their verbal exchange. See generally Dkt. No. 35-9.

7    **Mack** had no contact with Dewing prior to March 29, 2018. See Dkt. No. 34-7 at 43.

8    Dewing claims that **Mack** was irate and yelled when she ask him to move to the medical cell. See Dkt. No. 34-2 at ¶ 4. **Mack** claims that he was not argumentative. See Dkt. No. 34-7 at 37.

9    **Mack** had no contact with Dewing after March 29, 2018. Dkt. No. 34-7 at 116.

10    In the Answer, Dewing pleaded, among other things, the affirmative defense that **Mack** failed to exhaust his administrative remedies. See Dkt. No. 30 at ¶ 20.

11    The Court did not construe the Amended Complaint as asserting a cognizable Fourteenth Amendment due process claim or a claim against Defendants, in their official capacities. See generally, Dkt. No. 12. While Dewing sets forth arguments in her motion related to these issues, see Dkt. No. 34-9 at 5-7, 14-15, the Court will not engage in a discussion or analysis of claims that did not survive the Court's sua sponte initial review.

12    For the sake of completeness, the Court will address the merits of the retaliation claim against Dewing.

13    **Mack** does not suggest, and the record does not support the conclusion that Jayasena was involved in **Mack's** transfer to the SHU. <u>See</u> Dkt. No. 34-3; Dkt. No. 35-10 at ¶ 7.

14    "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.' " ⚑ ⚠ Salahuddin, 467 F.3d at 280 (quoting ⚑ Chance, 143 F.3d at 702).

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5775205
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Charles MACK, Plaintiff,
v.
Barry HALL et al., Defendants.

9:18-cv-875 (GLS/CFH)
|
Signed 09/28/2020

**Attorneys and Law Firms**

Charles Mack, Woodside, NY, pro se.

Jonathan E. Symer, Steinberg, Symer & Platt, LLP, Poughkeepsie, NY, for Defendants Barry Hall, Jessica Jayasena.

Jennifer L. Church, Broome County Attorney's Office, Binghamton, NY, for Defendant Sarah deWing.

**SUMMARY ORDER**

Gary L. Sharpe, U.S. District Judge

 **\*1** On July 27, 2020, Magistrate Judge Christian F. Hummel issued a Report-Recommendation and Order (R&R), which recommends that the motions for summary judgment of defendants Sarah deWing, Barry Hall, and Jessica Jayasena be granted. (Dkt. No. 43.) Pending before the court are plaintiff *pro se* Charles Mack's objections to the R&R. (Dkt. No. 47.)

Only specific objections warrant de novo review. *See Almonte v. N.Y. State Div. of Parole*, No. Civ. 904CV484, 2006 WL 149049, at *3-5 (N.D.N.Y. Jan. 18, 2006). Objections that are general, conclusory, frivolous, or a mere reiteration of an argument already made to the Magistrate Judge trigger only clear error review. *See id.* at *4-5.

Mack's objections fail to address any of the findings made by Judge Hummel. Rather, Mack merely reiterates arguments already presented to, and rejected by, Judge Hummel. (*See*

*generally* Dkt. Nos. 38, 47.) Given that Mack's arguments are devoid of any specific objections to the substance of Judge Hummel's analysis, they trigger review for clear error only, *see Almonte*, 2006 WL 149049, at *5-6, of which the court finds none. Accordingly, the R&R, (Dkt. No. 43), is adopted in its entirety.

Additionally, to the extent that Mack attempts to request a video from the e-pod camera as well as a copy of the e-pod log book for March 12, 2020, and subpoena an e-pod officer as well as a "grievance officer[, and] his wife in medical staff," (Dkt. No. 47 at 4), such requests are denied. *See Kuchma v. City of Utica*, No. 6:19-CV-0766, 2020 WL 967168, at *3 (N.D.N.Y. Feb. 28, 2020) ("[E]ven if such evidence were material, its introduction during the objection phase of the report-recommendation procedure would frustrate the purpose of the Federal Magistrate Act of 1968."). Indeed, the opportunity to make such a motion has long since passed, (Dkt. No. 24), and, in light of the disposition of this case, is moot.

Accordingly, it is hereby

**ORDERED** that the Report-Recommendation and Order (Dkt. No. 43) is **ADOPTED** in its entirety; and it is further

**ORDERED** that deWing's motion for summary judgment (Dkt. No. 34) is **GRANTED**; and it is further

**ORDERED** that Hall's and Jayasena's motion for summary judgment (Dkt. No. 35) is **GRANTED**; and it is further

**ORDERED** that the amended complaint, (Dkt. No. 10), is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 5775205

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1244367
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Steven MARSHALL, Plaintiff,

v.

Thomas GRIFFIN, et al., Defendants.

No. 18-CV-6673 (KMK)
|
Signed 03/12/2020
|
Filed 03/16/2020

**Attorneys and Law Firms**

Steven Marshall, Napanoch, NY, Pro se Plaintiff.

Jennifer R. Gashi, Esq., State of New York Office of the
Attorney General, White Plains, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

**\*1** Plaintiff Steven Marshall ("Plaintiff"), currently
incarcerated at Eastern Correctional Facility, brings this
pro se Action, pursuant to 🔖 42 U.S.C. § 1983, against
Defendants regarding incidents that occurred at Green Haven
Correctional Facility ("Green Haven"). [1] (*See generally*
Am. Compl. (Dkt. No. 45).) Before the Court is Moving
Defendants' Motion To Partially Dismiss the Amended
Complaint (the "Motion") pursuant to Federal Rule of Civil
Procedure 12(b)(6). (*See* Not. of Mot. (Dkt. No. 51).) [2] For
the following reasons, the Motion is granted.

I. Background

A. Factual Background

The following facts are drawn from Plaintiff's Amended
Complaint and are taken as true for the purpose of resolving
the Motion.

Plaintiff was incarcerated at Green Haven at all relevant
times. (Am. Compl. ¶ 5.) On October 12, 2015, Plaintiff
began submitting grievances complaining of "ongoing acts

of abuse, harassment, retaliation, and threats" from a subset
of correction staff he refers to as the "Beat Down/Goon
Squad." (*Id.* ¶ 28.) In that grievance, Plaintiff complained
that a security officer had bragged to Plaintiff that there
was "a new fucking regime" in place and that he could
"crack [Plaintiff's] fucking head wide open with [his] fucking
stick and murder [him]" if he wanted to. (*Id.* ¶ 30.) The
grievance was logged in the Inmate Grievance Program
("IGP") on October 22, 2015. (*Id.* ¶ 32.) Plaintiff alleges
that Defendant Griffin responded on December 3, 2015,
finding claims of this misconduct and the existence of the
"Beat Down/Goon Squad" "unsubstantiated." (*Id.* ¶ 33.) On
March 30, 2016, Plaintiff received a decision from the Central
Office Review Committee ("CORC") "denying" Plaintiff's
"requested actions" from his initial grievance. (*Id.* ¶ 36.)

On April 1 and 6, 2016, Griffin allegedly responded to other
grievances filed by Plaintiff, which pertained to unauthorized
interference with Plaintiff's "inmate prison account" and
obstruction of Plaintiff's "rights to seek redress" of his various
grievances. (*Id.* ¶¶ 37–38.) It is unclear from the Amended
Complaint what exactly Griffin's determinations were on
these grievances. (*See id.* ¶¶ 37–38.) According to Plaintiff,
by April 25, 2016, he had over 11 grievances pending in Green
Haven's IGP. (*Id.* ¶ 39.)

**\*2** On April 25, 2016, Plaintiff was allegedly attacked
by Defendants Garcia and Germano. (*Id.* ¶ 40.) According
to Plaintiff, he had returned to his housing block, the "E-
Block," after eating his breakfast, when he encountered
Garcia, who was blocking the entrance to the housing block's
front doorway. (*Id.* ¶¶ 41–42.) Garcia instructed Plaintiff to
wait downstairs on the housing block's "lower tier level flats
area." (*Id.* ¶ 42.) Plaintiff was allegedly complying with all
of Garcia's instructions when Plaintiff noticed that Germano
was also in the area and gave a "type of head nod" to
Garcia. (*Id.* ¶¶ 43–44.) Garcia then gave Plaintiff a "Direct-
Order" to face the wall and put his hands on it. (*Id.* ¶ 47.)
Plaintiff did so. (*Id.* ¶ 48.) Garcia stood behind Plaintiff and
allegedly removed Plaintiff's religious head covering. (*Id.* ¶
49.) Plaintiff then felt someone place a plastic bag over his
head from behind him. (*Id.* ¶ 51.) Garcia grabbed Plaintiff
and put him in a choke hold while Plaintiff attempted to
take the plastic bag off his head. (*Id.* ¶¶ 52–53.) Meanwhile,
Germano restrained Plaintiff's left arm to prevent Plaintiff
from being able to take the plastic bag off. (*Id.* ¶ 53.) Garcia
also yelled at Plaintiff, commenting that he "like[d] filing
lawsuits and grievances against staff" and using racial slurs.
(*Id.* ¶¶ 54, 56–57.) Plaintiff passed out, and when he woke up,

he saw Garcia standing above him. (*Id.* ¶ 58.) Plaintiff saw "at least two other" unidentified correction officers standing nearby, all of whom had their batons out in a "threatening fighting stance." (*Id.* ¶ 60.) At this point, Plaintiff realized that someone had placed his religious covering underneath his pants, partially inside his anus. (*Id.* ¶¶ 61–62.) The correction officers laughed at him and continued to call him names until Plaintiff managed to leave and return to his housing block. (*Id.* ¶¶ 66–74.) Although Plaintiff was too fearful to file a grievance about the incident immediately after it occurred, Plaintiff did write to New York Governor Andrew Cuomo, then-President Barack Obama, and other elected officials and advocacy groups about the incident. (*Id.* ¶¶ 74, 76–78.) Plaintiff came to learn that Garcia and Germano were allegedly members of the "Beat Down/Goon Squad," a subset of correction officers that repeatedly abused inmates at Green Haven. (*Id.* ¶ 75.)

On May 4, 2016, Plaintiff told his mental health counselor about the purported sexual assault. (*Id.* ¶ 81.) The mental health counselor reported it, in accordance with the Prison Rape Elimination Act ("PREA"), and subsequently, Plaintiff was taken to Green Haven's clinic to be interviewed. (*Id.* ¶¶ 81–82.) Plaintiff told the medical provider about the incident but felt intimidated by the presence of certain correction staff who allegedly stood inside the medical examination room, all with their batons drawn, refusing to provide Plaintiff with any privacy. (*Id.* ¶ 83.) Plaintiff was fearful that these staff members could be part of the "Beat Down/Goon Squad." (*Id.* ¶ 84.) Plaintiff alleges that, following this interview, he was taken back to his housing location in E-Block and placed in a 72-hour confinement in retaliation for complaining about the purported sexual assault. (*Id.* ¶ 86.) On May 5, 2016, Plaintiff wrote to Wilkins complaining of this retaliatory period of "keeplock confinement." (*Id.* ¶ 87.)

Plaintiff alleges that, on May 6, 2016, Defendant Freeman appeared outside Plaintiff's assigned cell. (*Id.* ¶¶ 89, 91.) Freeman directed Plaintiff to come to the front of his cell, and Plaintiff obeyed. (*Id.* ¶¶ 92–93.) Freeman then reached in through the bars and punched Plaintiff in the face, causing Plaintiff to bleed from his lower lip. (*Id.* ¶ 94.) Plaintiff retreated to the back of his cell, and Freeman walked away. (*Id.* ¶¶ 97–98.)

On May 7, 2016, Plaintiff was released from his period of retaliatory confinement. (*Id.* ¶ 99.) On May 9, Plaintiff met with a physician to complain of right shoulder pain that he continued to experience from the assault allegedly perpetrated

by Garcia and Germano. (*Id.* ¶ 100.) Plaintiff underwent some medical examinations on May 11. (*Id.* ¶ 103.) Plaintiff alleges that, following these examinations, he was once again placed in keeplock confinement. (*Id.* ¶ 105.) Although the Amended Complaint is unclear, Plaintiff appears to allege that he was placed in confinement because he refused to make any alterations to his PREA complaint against Garcia and Germano "at the direction[ ] of ... Wilkins and Primley." (*Id.*) However, Plaintiff also alleges that it was an unidentified sergeant who brought Plaintiff down to the clinic to try to coerce him to make these changes. (*Id.*)

Plaintiff alleges that he continued to experience abuse and harassment in the E-Block. (*Id.* ¶¶ 107–09.) On May 12, 2016, Plaintiff filed another grievance addressed to Wilkins, complaining of the second period of retaliatory confinement that he experienced. (*Id.* ¶ 110.) Plaintiff also submitted more grievances regarding Garcia, Germano, and Freeman's conduct. (*Id.* ¶ 111.) According to Plaintiff, Wilkins continued to ignore these grievances. (*Id.* ¶ 113.)

Plaintiff alleges additional instances of purportedly retaliatory threats and encounters with certain Defendants. For example, Plaintiff alleges that on May 17, 2016, Garcia and another unidentified security officer "confronted" Plaintiff when he had left his housing block to attend a mandatory "callout appointment." (*Id.* ¶ 114.) Garcia threatened to "get even" with Plaintiff for filing the grievance against him. (*Id.* ¶ 115.) On June 1, 2016, Garcia and another unidentified officer strip-searched Plaintiff in the corridor, forcing Plaintiff to strip down to his underwear when Plaintiff was attempting to enter his housing block after receiving medication. (*Id.* ¶ 116.)

**\*3** On June 14, 2016, Plaintiff was interviewed by Melville regarding the various incidents of which Plaintiff had been complaining, including the purported sexual assault perpetrated by Garcia and Germano. (*Id.* ¶¶ 118, 120.) Plaintiff claims that, although Melville knew they were within earshot of other correction staff, he conducted the interview outside of the housing block. (*Id.* ¶ 119.) Plaintiff asked Melville to assign him to a different housing block because he had continued to suffer incidents of harassment and abuse. (*Id.* ¶¶ 121–22.) Plaintiff alleges that, after this interview, he continued to suffer harassment and abuse, but does not specify what these incidents were. (*See id.* ¶¶ 124–25.)

On July 11, 2016, Melville allegedly returned to speak to Plaintiff again and once again conducted Plaintiff's interview within earshot of other correction staff. (*Id.* ¶ 126.) Melville

asked Plaintiff to stop making formal grievances regarding his staff members and informed Plaintiff that he would consider moving Plaintiff out of the E-block. (*Id.* ¶¶ 130–31.) Two days later, on July 13, 2016, Plaintiff was relocated to the "A-Block" on the "Westside" of Green Haven. (*Id.* ¶¶ 132–33.)

Plaintiff claims that his new cell contained a broken sink that constantly leaked water, which affected his ability to sleep, his appetite, and his mental health. (*Id.* ¶ 134.) Plaintiff avers that his mental health continued to deteriorate. (*Id.* ¶¶ 135–36.)

On September 27, 2016, Plaintiff was placed in pre-hearing disciplinary confinement on a charge of leaving his hot pot plugged into his cell's outlet, creating a fire hazard. (*Id.* ¶ 137.) Plaintiff avers that these charges were false and retaliatory. (*Id.*) Plaintiff avers that harassment continued, but does not specify any particular incidents. (*Id.* ¶ 138.) In October 2016, Murphy was designated as the hearing officer ("H.O.") in charge of Plaintiff's disciplinary hearing. (*Id.* ¶ 139.) Plaintiff believed that Murphy was retaliating against him for filing grievances about his colleagues by placing him in pre-disciplinary confinement for an excessive period of time, and Plaintiff subsequently began filing grievances about Murphy's conduct. (*Id.* ¶ 140.) On October 13, 2016, Plaintiff was moved out of A-Block and returned to the E-Block, where he was previously located. (*Id.* ¶ 141.) Plaintiff was allegedly confronted by Germano and forced to "lock into" a cell which was covered with black soot. (*Id.* ¶ 142.) Plaintiff filed more grievances about his purportedly retaliatory transfer back to the E-Block. (*Id.* ¶¶ 143–46.)

On October 18, 2016, Wilkins responded to Plaintiff's grievances, noting that there was no evidence of retaliation. (*Id.* ¶ 147.) On October 21, 2016, Plaintiff was moved out of the E-Block after apparently experiencing a panic attack and was relocated to the G-Block. (*Id.* ¶¶ 148–49.) Plaintiff avers that on October 31, he told Griffin about the ongoing retaliation he was experiencing for filing his PREA complaint against Garcia and Germano. (*Id.* ¶ 149.) Griffin allegedly responded that he was "well aware" of Plaintiff's complaints. (*Id.* ¶ 150.) On November 1, 2016, after approximately 36 days, Plaintiff was released from his pre-disciplinary confinement and returned to the A-Block. (*Id.* ¶¶ 152–53.)

Plaintiff's disciplinary hearing began on November 16, 2016. (*Id.* ¶ 156.) During this hearing, Plaintiff allegedly introduced "documentary evidentiary proof" that his hot pot had been confiscated and destroyed on May 23, 2016, and that it would therefore have been impossible for Plaintiff to possess a hot

pot during the time in which he was charged with creating a fire in his cell. (*Id.* ¶ 159.) Plaintiff avers that Murphy then "flew off into a violent and uncontrollable rage," berating Plaintiff. (*Id.* ¶ 160.) Murphy allegedly called Plaintiff a "big fucking cry baby," and mocked him for complaining about sexual assault. (*Id.* ¶ 161.) Murphy directed Plaintiff to face the wall and then used his baton to beat Plaintiff's buttocks and legs, injuring Plaintiff's testicles. (*Id.* ¶¶ 164–66.) Plaintiff was then returned to his housing cell. (*Id.* ¶ 167.) On November 17, Plaintiff filed grievances about Murphy's conduct. (*Id.* ¶¶ 168–69.)

**\*4** Plaintiff also claims that Moving Defendants had conspired to alter and obstruct Plaintiff's grievances about Garcia and Germano. (*Id.* ¶ 172.) Plaintiff claims that Primley attempted to persuade Plaintiff and his medical provider to alter notations in Plaintiff's medical chart from early May 2016 pertaining to Plaintiff's examination following the alleged assault perpetrated by Garcia and Germano. (*Id.* ¶¶ 174–75.) Plaintiff alleges that, after further coercion from Primley, he did alter his statements to medical staff to say that Garcia and Germano merely conducted a pat frisk, which obstructed his ability to successfully use the prison grievance system. (*Id.* ¶¶ 176–78.) Plaintiff also claims that Moving Defendants were aware of his later grievances about Murphy's conduct and refused to take any action. (*Id.* ¶¶ 180–82.) Plaintiff claims that he continued to suffer unspecified acts of harassment and retaliation at Green Haven. (*Id.* ¶¶ 183–84.)

Based on the foregoing, Plaintiff seeks damages for ongoing physical pain, psychological and emotional suffering, and certain personal losses. (*Id.* ¶ 195.) Plaintiff seeks compensatory and punitive monetary damages from all Defendants. (*Id.* ¶ 224.) Although the Amended Complaint alleges multiple counts against various Defendants, the only ones at issue in this Motion are Counts Five and Six, which contend that Moving Defendants conspired to and did violate Plaintiff's rights under the First, Eighth, and Fourteenth Amendments. (*Id.* ¶¶ 216–23.)

### B. Procedural Background

Plaintiff filed his initial Complaint on July 24, 2018 against Defendants and other former defendants who have since been terminated. (*See* Compl. (Dkt. No. 1).) Plaintiff's request to proceed in forma pauperis ("IFP") was granted on July 26, 2018. (*See* Dkt. No. 4.) On February 5, 2019, Defendants filed a Motion To Dismiss the Complaint. (*See* Dkt. No. 37.) However, instead of opposing that Motion To

Dismiss, Plaintiff filed the Amended Complaint. (*See* Am. Compl.) The Amended Complaint omitted several individuals previously named as defendants. (*See id.*) Plaintiff attached a letter to the Amended Complaint specifically noting that he intended to remove them from the Action. (*Id.* at ECF 58.) Accordingly, the Court terminated those individuals from the Action. (*See* Dkt. No. 50.) [3] On June 7, 2019, after receiving a Pre-Motion Letter from Moving Defendants, the Court set a briefing schedule for the instant Motion. (*See* Dkt. No. 47.)

Moving Defendants filed their opening papers on July 31, 2019. (*See* Not. of Mot.; Moving Defs.' Mem.) Plaintiff filed an Opposition on October 15, 2019. (*See* Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 57).) Moving Defendants did not file a reply. The Court deems the Motion fully submitted.

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task

that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*5** In considering the Motion, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[ ] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the Court must "construe[ ] [his complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint." *Alsaifullah*, 2013 WL 3972514, at \*4 n.3 (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at \*4

n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents either in [the] plaintiff[']s possession or of which [the] plaintiff[ ] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted).

### B. Analysis

Moving Defendants seek dismissal of the Amended Complaint on grounds that Plaintiff fails to state a First Amendment retaliation claim, that Plaintiff fails to state a conspiracy claim, that any verbal threats or harassment attributed to Moving Defendants do not rise to a constitutional violation, that Plaintiff fails to state an Eighth Amendment failure-to-protect claim as to any Moving Defendant, that Plaintiff's claim of obstruction of the grievance process is not constitutionally cognizable, that Plaintiff fails to plausibly allege personal involvement of any Moving Defendant, and that all Moving Defendants are entitled to qualified immunity. (*See generally* Moving Defs.' Mem.) The last argument, however, merely restates the case law on qualified immunity and perfunctorily argues that it protects Moving Defendants. Accordingly, the Court need not and does not consider this argument at this time. *See Moore v. Westchester County*, No. 18-CV-7782, 2019 WL 3889859, at *2 n.2 (S.D.N.Y. Aug. 19, 2019) (refusing to do the same); *Thatcher v. New York State Dep't of Corr. & Cmty. Supervision*, No. 16-CV-2310, 2018 WL 5791973, at *6 n.5 (S.D.N.Y. Nov. 5, 2018) (same and further noting that the defendants may raise it again later in the litigation). The Court addresses the other arguments as needed.

### 1. First Amendment Retaliation Claim

**\*6** "Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006) (citing, inter alia, *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)). To state a First Amendment retaliation claim, Plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that ... [D]efendant took adverse

action against ... [P]laintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation, alteration, and quotation marks omitted); *see also Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (same). "[B]ecause virtually any adverse action taken against a prisoner by a prison official[—]even those otherwise not rising to the level of a constitutional violation[—]can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (citation and quotation marks omitted)). Moving Defendants argue that Plaintiff's time in keeplock confinement was not the type of adverse action required for retaliation claims and that, even if it was, Plaintiff fails to plausibly allege the causal connection between the confinement and Moving Defendants. (*See* Moving Defs.' Mem. 6–9.)

An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation and quotation marks omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." *Id.* (citation, quotation marks, and alterations omitted). "[T]he test, however, is not whether [the] plaintiff himself was chilled (if that were the standard, no plaintiff likely would prevail, for the very commencement of a lawsuit could be used by [the] defendants to argue that the plaintiff was not chilled)." *Id.* at 354 (citation, alterations, and quotation marks omitted). It is plausible for keeplock confinement to constitute an adverse action for claims of retaliation. *See Lashley v. Wakefield*, 367 F. Supp. 2d 461, 467 (W.D.N.Y. 2005) (determining that twenty days of keeplock confinement constituted an adverse action) (collecting cases).

Plaintiff appears to allege that he was placed in a 72-hour period of confinement on May 4, 2016, after he told

his mental health counselor about Garcia and Germano's purported sexual assault, which triggered a PREA report. (*See* Am. Compl. ¶¶ 79, 83, 86–87.) He was released from this "first" period of confinement on May 7, 2016. (*Id.* ¶ 99.) Although Moving Defendants assume that there was only one alleged 72-hour period of retaliatory confinement, (*see* Moving Defs.' Mem. 8), Plaintiff goes on to allege that on May 11, 2016, he was placed in a second 72-hour period of confinement after he underwent an x-ray for his right shoulder, (Am. Compl. ¶¶ 104–05). [4] Assuming all of Plaintiff's allegations are true, Plaintiff appears to allege a total of six days in confinement as retaliation for filing grievances and pursuing medical care resulting from Garcia and Germano's purported assault. "[Moving] Defendants notably do not cite any caselaw for the proposition that being placed in confinement for six days cannot constitute an adverse action, and indeed they cannot because the Second Circuit and lower courts therein have found that being placed in keeplock or being otherwise confined is indeed an adverse action." *Flood v. Cappelli*, No. 18-CV-3897, 2019 WL 3778736, at \*7 (S.D.N.Y. Aug. 12, 2019) (citations omitted);

*see also* 📁 *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (holding that placing plaintiff in keeplock for three weeks was an adverse action); *Lugo v. Van Orden*, No. 07-CV-879, 2008 WL 2884923, at \*4–5 (S.D.N.Y. July 23, 2008) (stating that the holding of *Gill* was not that confinement *must* have lasted for *weeks* and pointing out that "less" adverse action, such as being moved to a different housing unit, have been held to be sufficient to state a claim for retaliation);

📁 *Keesh v. Goord*, No. 04-CV-271, 2007 WL 2903682, at \*10 (W.D.N.Y. Oct. 1, 2007) (holding that placing plaintiff in keeplock for one day during which he may have missed meals constituted an adverse action). The Court cannot conclude as a matter of law that this is a de minimis act that does not constitute an adverse action that would not "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." 📁 *Davis*, 320 F.3d at 353 (citation and quotation marks omitted).

**\*7** However, the Court does agree with Moving Defendants that Plaintiff has failed to plausibly connect any retaliatory confinement to individual Moving Defendants. 📁 Section 1983 plaintiffs must plausibly allege a "causal connection" between the protected conduct and the adverse action. *Garcia v. Watts*, No. 08-CV-7778, 2009 WL 2777085, at \*11–12 (S.D.N.Y. Sept. 1, 2009); *see also* 📍 *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001) (holding that

the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action" (citation, alteration, and quotation marks omitted)). To meet this burden, Plaintiff must allege facts suggesting that the protected conduct was a " 'substantial or motivating factor' in the prison officials' decision to take action against [him]." ⚠️ *Smith v. Christopher*, No. 06-CV-1196, 2008 WL 4283519, at \*10 (N.D.N.Y. Sept. 18, 2008) (citing, inter alia,

📁 *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see also Van Dunk v. Brower*, No. 11-CV-4564, 2013 WL 5970172, at \*8 (S.D.N.Y. Nov. 7, 2013) ("The element of intent [in a First Amendment retaliation claim] requires an assessment of what evidence, if any, demonstrates that Defendants' conduct 'was motivated by or substantially caused by [Plaintiff's] exercise of free speech.' " (second alteration in original) (ultimately quoting

📁 *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994))); 📁 *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 371 (S.D.N.Y. 2011) (same); *cf. Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (reinstating retaliation claim in part because there was evidence of "retaliatory animus" where plaintiff alleged that officers confronted him directly about his practice of filing grievances before they issued the allegedly false misbehavior report against him).

To begin, Plaintiff does not allege who assigned Plaintiff to confinement. For the first 72-hour period, Plaintiff simply alleges that he was taken to confinement after speaking to a medical provider; the only named individual connected to this event is a Sergeant Neil Yando ("Yando"), who is not a defendant in this Action. (*See* Am. Compl. ¶¶ 82–87.) For the second 72-hour period, Plaintiff alleges he was brought to confinement by an unidentified sergeant after Plaintiff refused to change any details in his PREA report against Garcia and Germano. (*Id.* ¶ 105.) Although Plaintiff claims that he wrote to Wilkins to *complain* about the first period of confinement, (*id.* ¶ 87), and that Primley was somehow behind the effort to get Plaintiff to change his PREA medical report, (*id.* ¶ 105), Plaintiff does not allege that Wilkins or Primley took any steps to facilitate either period of confinement. Griffin and Melville do not appear anywhere in these particular allegations at all. (*See generally id.*) Moreover, any alleged causation is even more tenuous under the circumstances alleged here because no grievance was filed against any Moving Defendant at the time of Plaintiff's allegedly retaliatory confinement, and "[a]s a general matter, it is difficult to establish one defendant's retaliation for

complaints against another defendant." *Hare v. Hayden,* No. 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright,* 554 F.3d at 274). Plaintiff appears to assume that Moving Defendants would retaliate on behalf of Plaintiff's grievances filed against Garcia and Germano, but other than alleging that they are all DOCCS employees of varying seniority at Green Haven, there is simply no plausible connection between *Moving Defendants* and Plaintiff's initial grievances. Accordingly, the retaliation claims against Moving Defendants are dismissed.

*See* *Bryant v. Goord,* No. 99-CV-9442, 2002 WL 553556, at *2 (S.D.N.Y. Apr. 12, 2002) ("The grievances that Plaintiff filed prior to the [confinement] at issue here did not involve any [Moving] Defendants, therefore, there is no basis to assume that [Moving] Defendants [facilitated confinement] against Plaintiff to retaliate for his filing grievances against other correction[ ] officers."); *see also* *Ortiz v. Russo,* No. 13-CV-5317, 2015 WL 1427247, at *11 (S.D.N.Y. Mar. 27, 2015) (dismissing retaliation claims where the plaintiff failed to allege "any facts that would support a finding that" certain correction officers "were personally motivated" by a "grievance they have no apparent connection with") (collecting cases); *Roseboro v. Gillespie,* 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (dismissing retaliation claim where the plaintiff "failed to provide any basis to believe that [the defendant] retaliated for a grievance that she was not personally named in") (collecting cases).

### 2. Eighth Amendment Failure-to-Protect Claim

**\*8** The Eighth Amendment, which prohibits cruel and unusual punishment, requires prison officials to "take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y.C. Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir. 1996) (citation omitted); *see also* *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (same). "Prison officials are liable ... for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety." *Price v. Oropallo,* No. 13-CV-563, 2014 WL 4146276, at *4 (N.D.N.Y. Aug. 19, 2014) (citation omitted). To satisfy the deliberate indifference standard, a plaintiff must show that (1) "he is incarcerated under conditions posing a substantial risk of serious harm," and (2) "the defendant prison officials possessed sufficient culpable intent." *Hayes,* 84 F.3d at 620 (citing *Farmer,* 511 U.S. at 834). The first prong is objective and requires that prison officials provide inmates with "basic human needs, one of which is 'reasonable safety.' " *Helling v. McKinney,* 509 U.S. 25, 30, 33 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 200 (1989)). "The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry." *Hayes,* 84 F.3d at 620. In particular, "a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm[,] and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.* (citation omitted).

As the Supreme Court has made clear, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837; *see also* *Price,* 2014 WL 4146276, at *8 (explaining that to establish deliberate indifference, "a plaintiff must prove that the defendant official actually knew of and disregarded an excessive risk of harm to the plaintiff's safety" (citation omitted)). A defendant's knowledge can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Farmer,* 511 U.S. at 842; *see also* *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir. 2013) ("Evidence that a risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." (citation and quotation marks omitted)).

It is unclear on what grounds Plaintiff intends to assert a failure-to-protect claim against Moving Defendants. Regardless, here, "it is unnecessary to decide whether [Plaintiff] has satisfied the objective prong of *Farmer* because he has failed to satisfy the subjective prong" as to any Moving Defendant. *Parris v. N.Y. State Dep't Corr. Servs.,* 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013) (citation and footnote omitted). That is, Plaintiff fails to allege that any Moving Defendant "knew of and disregarded a particular risk to his safety." *Id.* (citation omitted). To the extent Plaintiff seeks to allege that Moving Defendants must have known about the existence of the so-called "Beat Down/Goon Squad" simply because they hold supervisory positions, such claims are dismissed. Simply holding a supervisory position at a correctional facility is insufficient to create personal involvement in any specific constitutional violation. *See*

🚩 *Banks v. Annucci*, 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2014) ("Where a defendant is a supervisory official, a mere 'linkage' to the unlawful conduct through the 'chain of command' (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct." (citations omitted)); *see also* 🚩 *Lara-Grimaldi v. County of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *11 (S.D.N.Y. Mar. 29, 2018) (dismissing a defendant for lack of personal involvement because, among other reasons, the complaint did not allege that the defendant "interacted with ... any of the [prison] employees responsible for" the allegedly unconstitutional act); ⚠️*Samuels v. Fischer*, 168 F. Supp. 3d 625, 636–37 (S.D.N.Y. 2016) (holding that conclusory allegations that a defendant had knowledge of an allegedly unconstitutional act are insufficient to show personal involvement and collecting cases).

**\*9** Nothing in the Amended Complaint alleges that any Moving Defendant "ha[d] knowledge" that Garcia and Germano would attack Plaintiff in April 2016, that Freeman would attack Plaintiff in May 2016, or that Murphy would attack Plaintiff during his disciplinary hearing. 🚩 *Hayes*, 84 F.3d at 620. Melville interviewed Plaintiff regarding Garcia and Germano's alleged attack *after* it had already happened. (Am. Compl. ¶ 119.) And Plaintiff does not allege that, during that interview, he gave Melville any reason to know that Murphy would later attack Plaintiff during the disciplinary hearing. [5] Although Plaintiff does allege that he told Melville that he feared further abuse and harassment if he remained in E-Block, (*id.* ¶ 128), Plaintiff was moved to A-Block two days after his second interview with Melville, (*id.* ¶ 132). Melville, therefore, did not "disregard[ ]" Plaintiff's concerns about his safety; in fact, he took action to try to remove Plaintiff from these purported threats. 🚩 *Price*, 2014 WL 4146276, at *8. [6] Similarly, Plaintiff's grievances to Wilkins are alleged to be about his unnecessary confinement prior to Plaintiff's disciplinary hearing, (Am. Compl. ¶ 113), and not about any foreseeable risk of substantial harm that Wilkins subsequently ignored.

To the extent Plaintiff seeks to hold Griffin responsible for investigating and dismissing as "unsubstantiated" Plaintiff's general concern about rumors of the "Beat Down/Goon Squad," (Am. Compl. ¶¶ 32–33), these allegations do not sufficiently allege a failure to protect claim. Generally, "an inmate's communications about generalized safety concerns or vague concerns of future assault by unknown individuals

are insufficient to provide knowledge that the inmate is subject to a substantial risk of serious harm." *Anselmo v. Kirkpatrick*, No. 19-CV-0350, 2019 WL 2137469, at *4 (N.D.N.Y. May 16, 2019) (citations and quotation marks omitted); *see also Johnson v. Schiff*, No. 17-CV-8000, 2019 WL 4688542, at *17 (S.D.N.Y. Sept. 26, 2019) (same). Rather, a failure-to-protect claim requires the plaintiff "allege[ ] that he informed [the prison official] about a specific fear of assault and [was] then assaulted." *Tubbs v. Venettozzi*, No. 19-CV-126, 2019 WL 2610942, at *5 (N.D.N.Y. June 26, 2019) (citation and quotation marks omitted); *see also Velez v. City of New York*, No. 17-CV-9871, 2019 WL 3495642, at *4 (S.D.N.Y. Aug. 1, 2019) ("Those cases which have found officers potentially liable for failing to prevent an attack involved clear and specific threats against an inmate." (collecting cases)).

It is possible for a plaintiff to "state a claim for deliberate indifference based on a failure to protect him against a general risk of harm to *all* inmates at the facility." *Parris*, 947 F. Supp. 2d at 363 (emphasis added). However, "[t]o do so, a plaintiff must allege that the defendants knew of a history of prior ... attacks similar to the one suffered by the plaintiff and that the measures they should have taken in response to such prior attacks would have prevented the attack on the plaintiff." *Id.* (citation omitted). As mentioned above, no such allegations exist here. At most, Plaintiff filed a grievance about certain vague, aggressive, threatening statements he heard an unnamed correction officer make regarding a "new fucking regime." (Am. Compl. ¶ 30.) However, Plaintiff does not allege that he informed Griffin or any other Moving Defendant about attacks similar to the ones he experienced. "Therefore, [Plaintiff] has failed to allege sufficient facts to state a claim that [Moving Defendants] were deliberately indifferent in failing to protect him against a general risk of harm." *Parris*, 947 F. Supp. 2d at 363–64 (citation omitted); *see also Blandon v. Aitchison*, No. 17-CV-65, 2019 WL 1206370, at *7 (S.D.N.Y. Mar. 14, 2019) ("[I]n order to find that a plaintiff has sufficiently pled a claim for deliberate indifference based on a failure to protect him against a general risk of harm to all inmates, courts typically require specific allegations of a pattern of analogous [officer]-on-inmate attacks that would make the attack suffered by the plaintiff foreseeable." (collecting cases)). Accordingly, any failure to protect claim against Moving Defendants is dismissed.

3. Fourteenth Amendment Claim

**\*10** It is unclear whether, by invoking the Fourteenth Amendment in Counts Five and Six, Plaintiff intended to assert due process claims against Moving Defendants. For the sake of completeness, however, the Court addresses whether such a claim would be legally cognizable. The Court construes Plaintiff's allegations to suggest that Plaintiff claims his constitutional rights were impeded by efforts to force Plaintiff to change the medical information he provided to caretakers regarding Garcia and Germano's alleged attack on Plaintiff. (*See* Am. Compl. ¶¶ 105, 173–78.) According to Plaintiff, because of Primley's repeated insistence that Plaintiff change his medical records regarding the attack, Plaintiff amended his medical records to say that Garcia and Germano had merely conducted a pat frisk. (*Id.* ¶ 176.) This presumably hurt Plaintiff's credibility and spoiled evidence that would have been helpful in investigating Plaintiff's grievances about the incident. However, even if assumed true and sufficiently pled, such allegations do not state a claim for a violation of Plaintiff's constitutional rights.

"It is well-established that inmates do not have a protected liberty interest in the processing of their prison grievances." *Crichlow v. Fischer*, No. 15-CV-6252, 2017 WL 920753, at \*7 (W.D.N.Y. Mar. 7, 2017) (citation omitted); *see also Corley v. City of New York*, No. 14-CV-3202, 2017 WL 4357662, at \*7 (S.D.N.Y. Sept. 28, 2017) ("[The p]laintiff did not have a liberty interest to access the [prison] grievance program that would provide a basis for a constitutional due process claim here." (citations omitted)); *Njasang Nji v. Heath*, No. 13-CV-200, 2013 WL 6250298, at \*6 (S.D.N.Y. Dec. 2, 2013) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." (citation and quotation marks omitted)); *Mimms v. Carr*, No. 09-CV-5740, 2011 WL 2360059, at \*10 (E.D.N.Y. June 9, 2011), ("It is well-established that prison grievance procedures do not create a due-process-protected liberty interest." (citations omitted)), *aff'd*, 548 F. App'x 29 (2d Cir. 2013); *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment." (citations omitted)). "Rather, in the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is the course taken by [P]laintiff here: directly petitioning the government for redress of his claims." *Harris v. Westchester Cty. Dep't of Corrs.*, No. 06-CV-2011, 2008 WL 953616, at \*5 (S.D.N.Y. Apr. 3, 2008) (collecting cases). Consequently, "courts regularly dismiss claims brought to remedy alleged violations of inmate grievance procedures." *Martinez v. Schriro*, No. 14-CV-3965, 2017 WL 87049, at \*3 (S.D.N.Y. Jan. 9, 2017) (citation, alteration, and quotation marks omitted). Accordingly, any due process claim against Moving Defendants based on purported interference with the grievance process is also dismissed.

### 4. Conspiracy Claim

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citation omitted); *see also Corsini v. Brodsky*, 731 F. App'x 15, 19 (2d Cir. 2018) (same) (citing *Ciambriello v. County of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002)). Plaintiff has failed to satisfy this standard.

Plaintiff repeatedly refers to a "conspiracy" between various Defendants throughout his Amended Complaint. (*See generally* Am. Compl.) But other than the fact that Moving Defendants all work at Green Haven, Plaintiff alleges no facts to support an inference that Moving Defendants were acting in concert in furtherance of a conspiracy to violate Plaintiff's constitutional rights. [7] This is plainly insufficient to state a § 1983 conspiracy claim. *See Ciambriello*, 292 F.3d at 325 ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed...." (citation and quotation marks omitted)); *Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at \*12 (S.D.N.Y. Aug. 28, 2017) (dismissing a § 1983 conspiracy claim because the complaint did not "provide even circumstantial allegations that the alleged conspiracy existed, much less any details as to the extent of the alleged agreement or how [the] [d]efendants collectively carried it out" (citation omitted)); *Scalpi v. Town of E. Fishkill*, No. 14-CV-2126, 2016 WL 858925, at \*5 (S.D.N.Y. Feb. 29, 2016) ("Allegations of a conspiracy to violate civil rights must be pleaded with specificity, and an otherwise invalid § 1983 claim cannot survive a motion to dismiss

merely by mentioning the word 'conspiracy.' " (citation, alterations, and quotation marks omitted)); 🚩 *Zahrey v. City of New York*, No. 98-CV-4546, 2009 WL 1024261, at *11 (S.D.N.Y. Apr. 15, 2009) (dismissing conspiracy claim where the plaintiff "provide[d] no evidence, absent the fact that the [i]ndividual [d]efendants worked together, that ... an agreement existed" (citations omitted)). [8]

### III. Conclusion

**\*11**  For the foregoing reasons, Moving Defendants' Motion To Partially Dismiss the Amended Complaint is granted. Because this is the first adjudication of Plaintiff's dismissed claims, the dismissal is without prejudice. If Plaintiff wishes to file a second amended complaint, Plaintiff must do so within 30 days of the date of this Opinion & Order. Plaintiff should include within that second amended complaint all changes to correct the deficiencies identified in this Opinion & Order that Plaintiff wishes the Court to consider. Plaintiff is advised that the second amended complaint will *replace*, not supplement, the Amended Complaint. The second amended complaint must contain *all* of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his dismissed claims may be dismissed with prejudice. The Action will then proceed on the remaining claims, i.e., the ones that were not addressed in the instant Motion.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 1244367

### Footnotes

1    "Defendants" refers to former Superintendent of Green Haven Thomas Griffin ("Griffin"), former Deputy Superintendent for Security Thomas Wilkins ("Wilkins"), correction Captain Thomas Melville ("Melville"), correction Lieutenant Shawn J. Murphy ("Murphy"), correction Lieutenant William J. Primley ("Primley"), correction officer ("C.O.") Joseph C. Garcia ("Garcia"), C.O. Thomas A. Germano, Jr. ("Germano"), and C.O. Warren C. Freeman ("Freeman"). (*See* Dkt.; Am. Compl.)

2    "Moving Defendants" refers to Defendants Griffin, Wilkins, Melville, and Primley. The Motion does not seek dismissal of claims against Defendants Germano, Garcia, Freeman, and Murphy. Moving Defendants seek dismissal of only Counts Five and Six from the Amended Complaint. (*See* Moving Defs.' Mem. of Law in Supp. of Mot. ("Moving Defs.' Mem.") 1 n.1 (Dkt. No. 52).)

3    As noted in Plaintiff's letter, these individuals included Anthony J. Annucci ("Annucci"), James Ferro ("Ferro"), Vernon Fonda ("Fonda"), Patrick Griffin ("P. Griffin"), and Robert Johanemen ("Johanemen"). (*See* Am. Compl. ECF 58; Dkt. No. 50.)

4    There was also a third period of allegedly retaliatory confinement of 36 days prior to Plaintiff's disciplinary hearing. (Am. Compl. ¶ 152.) However, Plaintiff attributes this particular form of retaliation to Murphy, who does not join in the instant Motion, and the Court does not consider this confinement as part of the claims against Moving Defendants. (*See id.* ¶¶ 140, 152.)

5    In any event, based on Plaintiff's allegations, Murphy spontaneously "flew off into a violent and uncontrollable rage" during the disciplinary hearing. (Am. Compl. ¶ 160.) "Courts routinely deny deliberate indifference claims based upon surprise attacks" such as this one. 🚩 *Zimmerman v. Macomber*, No. 95-CV-0882, 2001 WL 946383, at *5 (S.D.N.Y. Aug. 21, 2001) (citations omitted).

6    Furthermore, other than the specifically articulated alleged attacks by Garcia, Germano, Freeman, and Murphy, Plaintiff's general claims of continued abuse and harassment are conclusory and insufficiently pled.

Plaintiff does not allege what kind of abuse or harassment he suffered or who was involved or that he articulated more specific concerns to Melville. (*See, e.g.*, Am. Compl. ¶¶ 125, 128, 133.) Moreover, even if Plaintiff had specifically noted instances of verbal abuse to Melville, general verbal threats and harassment, without more, are not constitutional violations cognizable under ⚑ § 1983. *See* ⚑ *Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998)* ("[V]erbal harassment or profanity alone, unaccompanied by any injury[,] no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under ⚑ 42 U.S.C. § 1983." (quotation marks omitted) (collecting cases)). Therefore, Melville still would not have been put on notice of an impending, substantial risk of serious harm to Plaintiff.

7    Although the Court takes no position on the sufficiency of Plaintiff's other allegations at this time, the Court notes the contrast between Plaintiff's generic allegations of a conspiracy between Moving Defendants with, for example, the specific allegations that Garcia and Germano engaged in communication with each other through body language before they both attacked Plaintiff. (*See* Am. Compl. ¶¶ 44, 46, 51–53.)

8    Moreover, even assuming that there was a conspiracy to do *something*, at most Plaintiff appears to allege that Moving Defendants conspired to stifle and obstruct Plaintiff's use of the IGP, which, as discussed above, does not underlie a legally cognizable constitutional claim. *See supra* Section II.B.3. A requirement of a ⚑ § 1983 conspiracy is that the defendants conspired to "inflict an *unconstitutional* injury," not simply any injury at all. ⚑ *Pangburn, 200 F.3d at 72* (emphasis added) (citation omitted).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   11

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 102 of 198

Thomas v. DeCastro, Not Reported in Fed. Supp. (2019)

2019 WL 1428365
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Bernard THOMAS, Plaintiff,

v.

Lieutenant DECASTRO, et al., Defendants.

No. 14-CV-6409 (KMK)
|
Signed 03/29/2019

**Attorneys and Law Firms**

Bernard Thomas, New York, NY, Pro Se Plaintiff.

Kristin R. Vogel, Esq., New York State Office of the Attorney
General, New York, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT
JUDGE

**\*1** Bernard Thomas ("Plaintiff") brings this pro se Action,

pursuant to 🚩42 U.S.C. § 1983, against Lieutenant John
DeCastro ("DeCastro"), Deputy Superintendent of Security
Timothy Humphrey ("Humphrey"), Deputy Superintendent
for Programs Jean King ("King"), Lieutenant Steven
Katz ("Katz"), Correction Officer Damian Velez ("Velez"),
Brenda Clark ("Clark"), Imam Samuel Encarnacion
("Encarnacion"), and Director of Special Housing Albert
Prack ("Prack") (collectively, "Defendants").[1] Plaintiff
alleges that, while incarcerated at Woodbourne Correctional
Facility ("Woodbourne"), Defendants violated his rights
under the First and Fourteenth Amendments by issuing him
false misbehavior reports and subsequently subjecting him
to retaliatory disciplinary hearings. (See Am. Compl. (Dkt.
No. 70).) On March 13, 2018, the Court issued an Opinion &
Order (the "Opinion") granting an earlier motion to dismiss
filed by Defendants. (See Opinion (Dkt. No. 59).) Before
the Court is Defendants' Motion To Dismiss the Amended
Complaint pursuant to Federal Rule of Civil Procedure 12(b)
(6) (the "Motion"). (Not. of Mot. (Dkt. No. 74).) For the
reasons described herein, Defendants' Motion is granted in
part and denied in part.

I. Background

A. Factual History

The following facts are drawn from Plaintiff's Amended
Complaint and attached exhibits and are taken as true for the
purpose of resolving the instant Motion.

1. Plaintiff's Relationship with DeCastro

While at Woodbourne, Plaintiff was elected to be an
inmate representative on the Inmate Grievance Resolution
Committee (the "IGRC"), a position he held for about
five years. (Id. at 11–12, 35, 40, 44, 54.)[2] During this
time, Plaintiff had numerous interactions and disagreements
with DeCastro, a lieutenant, regarding "false grievances that
[were] filed against DeCastro," causing DeCastro to have a
"personal vendetta" against him. (Id.) In particular, Plaintiff
alleges that DeCastro "use[d] to threaten [him]" by saying that
Plaintiff was "on the 'burn,' meaning watch [your] back," (id.
at 12), and by authorizing "unwarrant[ed] cell searches," (id.
at 35).

2. First Misbehavior Report and First Disciplinary Hearing

On April 22, 2012, Velez, a correction officer, issued
Plaintiff a misbehavior report (the "First Report") claiming
that Plaintiff had violated certain disciplinary rules against
creating a disturbance, interfering with employees, refusing a
direct order, and moving in the facility contrary to procedure.
(Am. Compl. 11, 18–19, 21.) Plaintiff alleges that the First
Report was false, (id. at 11), and that it was "inadequate"
because it was "not clear what the charges were," (id.). The
next day, DeCastro "reviewed" the First Report. (Id.) Plaintiff
alleges that, given his history with DeCastro, he "changed
the status" of the First Report, thereby denying Plaintiff
adequate notice of the charges against him as required under
7 N.Y.C.R.R. § 251-3. (Id. at 12–16, 21.)

**\*2** A disciplinary hearing regarding the First Report was
held on May 1, 2012 (the "First Hearing"), at which
Humphrey served as the presiding officer. (Id. at 13, 21,
23.) Given the alleged notice problems, Humphrey was
"suppo[sed] to adjourn the hearing to give ... Plaintiff an
opportunity to prepare for his defense." (Id. at 13.) Yet,
Humphrey failed to rectify the error, thereby "prejudic[ing]"

Plaintiff's ability to present a defense. (*Id.* at 13–14.) Humphrey found Plaintiff guilty of three charges and sentenced him to 45 days in keeplock and loss of other privileges, including the loss of recreation, packages, commissary, and access to the telephone. (*Id.* at 14, 21.) Plaintiff appealed Humphrey's decision to Prack, the Director of Special Housing, but Prack allegedly "rubber-stamped" the decision and denied the appeal. (*Id.* at 14, 23.) Plaintiff ultimately served 10 days of his 45-day sentence. (*Id.* at 21.)

### 3. Second Misbehavior Report and Second Disciplinary Hearing

Plaintiff alleges that DeCastro and Clark, a senior mail clerk, "conspired" to intentionally interfere with and open Plaintiff's outgoing and incoming "privileged" and "legal" correspondence outside of his presence. (*Id.* at 24, 26–27.) DeCastro then issued Plaintiff a false and retaliatory misbehavior report (the "Second Report"), charging him with violating rules on correspondence, smuggling, and property damage. (*See id.* at 25, 30, 32.) [3] Plaintiff alleges that DeCastro issued the Second Report to "cover their actions" and to get Plaintiff "fired" from his IGRC position and transferred to another facility. (*Id.* at 25, 35.)

A disciplinary hearing regarding the Second Report was held between April 4 and 8, 2013 (the "Second Hearing"), at which King, a lieutenant, served as the presiding officer. (*Id.* at 32.) Plaintiff was found guilty of the charges and sentenced to three months of keeplock and lost privileges. (*Id.*) Moreover, King removed Plaintiff from his IGRC position. (*Id.* at 32, 54.) Plaintiff appealed, and Prack reversed King's decision on July 2, 2013. (*Id.* at 25–26, 34.) In Plaintiff's view, the reversal "shows [that he] was telling the truth" and that DeCastro and Clark were "lying." (*Id.* at 26, 37.)

Plaintiff further alleges that King, in removing Plaintiff from his position as an IGRC representative, did not comply with DOCCS Directive 4040, which, according to Plaintiff, prohibits an IGRC representative from being removed from his position without a prior hearing. (*Id.* at 49–50.) In particular, Plaintiff alleges that, because the Second Hearing addressed an issue unrelated to his IGRC position, it did not satisfy the requirements of the directive. (*Id.*)

### 4. Third Misbehavior Report and Third Disciplinary Hearing

On April 24, 2013, Plaintiff sought to speak to Encarnacion, the Imam at Woodbourne, because he was having "mental issues" and wanted to discuss "serious family matters." (*Id.* at 37–38, 70.) Encarnacion came to visit Plaintiff that same day, where he proceeded to yell at Plaintiff. (*Id.*) Plaintiff thereafter received an allegedly false and retaliatory misbehavior report (the "Third Report"), charging him with making threats to Encarnacion. (*Id.* at 38, 78.) Plaintiff alleges that Encarnacion retaliated against him because he thought that Muslims at Woodbourne had "flipped/sold him out and got him locked out" of the facility. (*Id.* at 70–71.) Plaintiff further alleges that DeCastro, who "was reviewing all [Plaintiff's] misbehavior reports" and was seeking to make sure future misbehavior reports did not get reversed like the Second Report, had Encarnacion issue the Third Report. (*Id.* at 38–39, 71.)

A disciplinary hearing regarding the Third Report was held between April 29 and May 7, 2013 (the "Third Hearing"), at which King served as the presiding officer. (*Id.* at 78.) Plaintiff alleges that King was biased and prejudiced against him and that there was no evidence that he threatened Encarnacion. (*Id.* at 39, 72.) King found Plaintiff guilty and sentenced him to 60 days in the special housing unit ("SHU"). (*Id.* at 72, 78.) Plaintiff appealed, and the appeal was affirmed by Venettozzi. (*Id.*)

**\*3** Plaintiff further alleges that on May 8, 2013, Katz, a lieutenant, forged and rewrote King's decision following the Third Hearing decision without authority. (*Id.* at 73.) Katz allegedly corrected King's decision by having Plaintiff's confinement in SHU commence immediately, rather than having it start following the completion of Plaintiff's keeplock sentence. (*Id.* at 73–75.) Plaintiff claims that this confusion regarding his sentences resulted in him spending extra days in SHU. (*Id.*)

### B. Procedural History

Plaintiff filed his initial Complaint and attached exhibits on August 5, 2014. (Dkt. No. 2.) The Court granted Plaintiff's IFP request on November 18, 2014. (Dkt. No. 4.) On March 7, 2017, Defendants filed a letter requesting permission to file an initial motion to dismiss. (Dkt. No. 39.) The Court set a

briefing schedule, (Dkt. No. 40), and the Parties thereafter briefed the motion. (Dkt. Nos. 46, 47, 54, 55, 56.)

On March 13, 2018, the Court issued an Opinion granting Defendants' initial motion. (Opinion (Dkt. No. 59).) The Court dismissed the Complaint without prejudice and directed Plaintiff to file an amended complaint correcting the deficiencies identified. (*Id.* at 33.)

On May 15, 2018, Plaintiff filed the instant Amended Complaint. (Dkt. No. 70.) On May 29, 2018, Defendants filed a letter seeking a motion in anticipation of moving to dismiss. (Dkt. No. 71.) Plaintiff filed a letter in opposition. (Dkt. No. 72.) On June 11, 2018, the Court set a briefing schedule. (Dkt. No. 73.) Defendants filed the instant Motion To Dismiss and accompanying papers on July 11, 2018. (Not. of Mot.; Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 75).) On August 14, 2018, Plaintiff filed his response in opposition to the Motion. (Pl.'s Resp. to Defs.' Mot. ("Pl.'s Mem.") (Dkt. No. 77).) On August 23, 2018, Defendants filed a reply. (Reply Mem. of Law in Supp. of Mot. ("Defs.' Reply") (Dkt. No. 78).)

## II. Discussion

Defendants move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on grounds that it fails to correct the deficiencies identified in the Court's prior Opinion. (Defs.' Mem. 1.) In particular, Defendants argue that Plaintiff fails to state a due process claim, fails to state a First Amendment retaliation or access-to-courts claim, and fails to state a conspiracy claim. (*Id.* at 8–15.) In addition, Defendants argue that they are entitled to qualified immunity on Plaintiff's retaliation claim. (*Id.* at 16–17.) The Court addresses each argument separately to the extent necessary.

### A. Standard of Review

The Supreme Court has held that, while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an adorned, the-

defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.; see also Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2) ) ); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*4** In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations...." (quotation marks omitted) ). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.,* 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir. 2012) ). Where, as here, a plaintiff proceeds pro se, the "complaint[ ] must be construed liberally and interpreted to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.,* 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro

se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted) ).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including, as relevant here, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted).

### B. Analysis

#### 1. Procedural Due Process Claims

A prison inmate "has the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). "[T]o present a [procedural] due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (citation and quotation marks omitted). "The appropriate process depends on the balancing of three factors: (1) 'the private interest that will be affected by the official action;' (2) 'the risk of erroneous deprivation of such interest through the procedures used;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *Panzella v. Sposato*, 863 F.3d 210, 218 (2d Cir. 2017) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) ).

The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings. *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing procedural protections inmates are to receive when subject to significant disciplinary punishment). However, "[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995) ). The Second Circuit has explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying *Sandin*'s atypical and significant hardship test." *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003) (citation and quotation marks omitted). The duration of disciplinary confinement, however, is "not the only relevant factor," and the Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). Indeed, "[t]he conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of atypical and severe hardship," and, therefore, courts should consider "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions." *Id.* (citations and quotation marks omitted).

**\*5** As a guidepost to determining whether due process protections are required in the prison context, the Second Circuit has instructed that, "[w]here the plaintiff was confined for an intermediate duration — between 101 and 305 days — development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citation and quotation marks omitted); *see also Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *5 (S.D.N.Y. Feb. 17, 2015) (same). Moreover, "although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, [the Second Circuit has] explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65 (citations omitted). Indeed, "[a]bsent a detailed factual record, courts typically

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 106 of 198

Thomas v. DeCastro, Not Reported in Fed. Supp. (2019)

affirm dismissals of due process claims where the period of time spent in SHU was short — *e.g.*, thirty days — and there was no indication of unusual conditions." *Houston v. Cotter*, 7 F. Supp. 3d 283, 298 (E.D.N.Y. 2014) (citing *Palmer*, 364 F.3d at 66).

Regarding the process an inmate is due, a disciplinary hearing comports with due process requirements where an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted). "In the context of prison disciplinary hearings, the Second Circuit has said that its 'conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say, with ... utter certainty ..., how he would assess evidence he has not yet seen.' " *Rahman v. Acevedo*, No. 08-CV-4368, 2011 WL 6028212, at *7 (S.D.N.Y. Dec. 5, 2011) (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990) ).

Applying these principles, to make out a due process claim related to his confinements in keeplock and SHU, Plaintiff must plausibly allege (1) that there was a deprivation of a protected liberty interest and (2) that such deprivation was the result of the procedural defects. *See Ortiz*, 380 F.3d at 654. Here, as with the initial Complaint, (*see* Opinion 14–17), the first element of Plaintiff's due process claim has not been met as to any of the disciplinary actions. Following the First Report and First Hearing, Plaintiff was sentenced to 45 days in keeplock, although he served only 10 days, with the remaining time suspended. (Am. Compl. 14, 21, 23.) Following the Second Report and Second Hearing, Plaintiff was sentenced to 90 days in keeplock, but served only 30 days, with the remaining time suspended. (*Id.* at 32.) And following the Third Report and Third Hearing, Plaintiff was sentenced to, and served, 60 days in the SHU. (*Id.* at 72, 78.) [4] Because each of Plaintiff's separate segregated confinements was fewer than 101 days, they do not implicate Plaintiff's liberty interest absent a showing that Plaintiff suffered an "atypical and significant hardship." *Palmer*, 364 F.3d at 65. Plaintiff has failed, as he did previously, to show that he suffered any atypical and significant hardship. [5] The Amended Complaint is devoid of *any* allegations regarding the conditions of his keeplock or SHU confinement. The only

details provided by Plaintiff regarding this period are that he was deprived of access to recreation, telephone, packages, and commissary. (Am. Compl. 21, 32, 78.) While the Second Circuit has declined to "delineate the precise contours of 'normal' SHU confinement ... it is sufficient to note that, ordinarily, SHU prisoners are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Ortiz*, 380 F.3d at 655 (citation omitted). Plaintiff makes no allegations that he was kept in keeplock or SHU for longer than the typical period, or that he was denied exercise, adequate showers, or was generally subjected to any conditions that were "more onerous than usual," *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (citation omitted), and in fact makes no allegations about the conditions of his keeplock beyond the withholding of privileges as described, *see Branch v. Goord*, No. 05-CV-6495, 2006 WL 2807168, at *4 (S.D.N.Y. Sept. 28, 2006) ("Plaintiff's privileges were withheld during confinement, but lost privileges do not constitute an atypical and significant hardship because they are within the expected parameters of the sentence imposed by a court of law." (citation and quotation marks omitted) ).

**\*6** Therefore, because Plaintiff has not shown that his confinement "impose[d] [an] atypical and significant hardship on [him] in relation to the ordinary incidents of prison life," *Hanrahan*, 331 F.3d at 97 (quoting *Sandin*, 515 U.S. at 484), Plaintiff has "failed to demonstrate a liberty interest entitling [him] to due process," *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 511 (S.D.N.Y. 2012). Accordingly, the Court grants the Motion To Dismiss Plaintiff's due process claims as to all Defendants. *See Gaines v. City of New York*, No. 14-CV-6403, 2016 WL 951580, at *3 (S.D.N.Y. Mar. 9, 2016) (dismissing procedural due process claim where the plaintiff did "not allege any facts regarding the conditions of his confinement to suggest that it imposed 'atypical and significant hardship' "); *Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470, at *15 (S.D.N.Y. Sept. 29, 2014) (collecting cases and noting that courts "have dismissed claims in which [the] plaintiffs alleged spending between forty and fifty days in punitive segregation or faced other comparable discipline" where, "in the absence of some allegation that the conditions of keeplock or SHU confinement were in some way unusual," there is no "violation of a protected liberty interest" (quotation marks omitted) ); *O'Diah v. Artus*, No. 10-CV-6705, 2013 WL 1681834, at *2–3 (W.D.N.Y. Apr. 17, 2013) (dismissing

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 107 of 198

Thomas v. DeCastro, Not Reported in Fed. Supp. (2019)

case where the plaintiff, confined for 111 days, "failed to allege facts showing that the conditions of his confinement, combined with the duration of his confinement, created an atypical and significant hardship" (quotation marks omitted) ); *Edwards v. Horn*, No. 10-CV-6194, 2012 WL 760172, at *10 (S.D.N.Y. Mar. 8, 2012) (explaining that "[s]everal courts have concluded that, absent unusual conditions, 30 days of segregation is not an atypical or significant hardship under *Sandin*" (collecting cases) ); *Torres v. Logan*, No. 10-CV-6951, 2011 WL 1811003, at *4 (S.D.N.Y. May 11, 2011) (dismissing the plaintiff's due process claim where he alleged that he was confined for "a little over two-thirds of the 90 days sentence," because the plaintiff "fail[ed] to allege any facts regarding the conditions of his confinement, including whether they were abnormal or unusual" (alteration and quotation marks omitted) ), *adopted by* 2011 WL 3894386 (S.D.N.Y. June 13, 2011). [6]

### 2. Access to Courts Claim

"To state a claim for denial of access to the courts — in this case due to interference with legal mail — a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citation, alteration, and quotation marks omitted). "[A] plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in *actual injury* to the plaintiff such as the dismissal of an otherwise meritorious legal claim." *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (emphasis added) (citing *Lewis v. Casey*, 518 U.S. 343, 351 (1996) ). Actual injury includes "claims that systemic official action frustrates a plaintiff ... in preparing and filing suits at the present time," and "claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Christopher v. Harbury*, 536 U.S. 403, 413–14 (2002) (collecting examples within each category). "A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Amaker v. Haponik*, No. 98-CV-2663, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999).

**\*7** Here, Plaintiff alleges that DeCastro and Clark "conspired" to interfere with and open Plaintiff's outgoing and incoming "privileged correspondence" outside of his presence. (Am. Compl. 24, 26–27.) Even assuming Defendants "alleged conduct was deliberate and malicious," *Cancel*, 2001 WL 303713, at *4, Plaintiff makes no showing of actual injury. "Mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Davis*, 320 F.3d at 352 (citation and quotation marks omitted). Plaintiff does not allege that he was prevented (or even delayed) from making legal filings. As before, (*see* Opinion 27), there is no indication that any Defendant "obstruct[ed] [Plaintiff's] legitimate efforts to seek judicial redress" or otherwise prejudiced Plaintiff's legal actions. *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 397 (2d Cir. 2008) (citation and quotation marks omitted); *see also* *Christopher*, 536 U.S. at 413 (noting right-of-access concerns are implicated when "systemic official action frustrates a plaintiff ... in preparing and filing suits at the present time"). Accordingly, Plaintiff's access-to-courts claim is dismissed. *See Tutora v. Gessner*, No. 17-CV-9517, 2019 WL 1382812, at *5 (S.D.N.Y. Mar. 27, 2019) (collecting cases for the proposition that an access-to-courts claim must be dismissed where no showing of actual injury is made). [7]

### 3. Conspiracy Claim

Plaintiff alleges that DeCastro and Clark "conspired" to violate his constitutional rights when they opened his mail and issued him a false misbehavior report. (Am. Compl. 24, 26–27.) As the Court earlier held, (*see* Opinion 28), any conspiracy claim is properly brought under 42 U.S.C. § 1985. Under that provision, Plaintiff must make "a showing of class-based invidiously discriminatory animus" on the part of the conspiring parties, *Hickey v. City of N.Y.*, No. 01-CV-6506, 2004 WL 2724079, at *22 (S.D.N.Y. Nov. 29, 2004) (citing *Kush v. Rutledge*, 460 U.S. 719, 726 (1983) ), *aff'd*, 173 F. App'x 893 (2d Cir. 2006), as well as provide "some factual basis supporting a meeting of the minds, such that [the] defendants entered into an agreement, express or tacit, to achieve the unlawful end," *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (citation and quotation marks omitted). The Amended Complaint does

not allege any "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind [Defendants'] action[s]." 🚩 *Turkmen v. Hasty*, 789 F.3d 218, 262 (2d Cir. 2015) (citing 🚩 *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) ), *rev'd in part, vacated in part on other grounds*, 🚩 137 S. Ct. 1843 (2017). Nor does it provide any specific facts to plausibly suggest that DeCastro and Clark "entered into an agreement, express or tacit, to achieve [an] unlawful end." 🚩 *Webb*, 340 F.3d at 110. Instead, Plaintiff merely states that DeCastro and Clark "conspired," acted "intentional[ly] and with malice," and acted "in a plot, [with] agreement and meeting of the minds," to tamper with Plaintiff's mail. (Am. Compl. 24–25.) These wholly conclusory allegations are insufficient. *See Lastra v. Barnes & Noble Bookstore*, No. 11-CV-2173, 2012 WL 12876, at *7 (S.D.N.Y. Jan. 3, 2012) (noting that "[u]nsubstantiated, conclusory, vague[,] or general allegations of a conspiracy" are insufficient to state a claim under 🚩 § 1985 (citation omitted) ), *aff'd*, 523 F. App'x 32 (2d Cir. 2013); *Van Dunk v. St. Lawrence*, 604 F. Supp. 2d 654, 663 (S.D.N.Y. 2009) ("[C]laims of conspiracy that are vague and provide no basis in fact must be dismissed." (quotation marks omitted) ). Accordingly, Plaintiff's 🚩 § 1985 conspiracy claim is dismissed.

### 4. First Amendment Retaliation Claims

#### a. Applicable Law

**\*8** To state a First Amendment claim of retaliation, an inmate must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the [inmate], and (3) that there was a causal connection between the protected conduct and the adverse action." 🚩 *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation, alteration, and quotation marks omitted). An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." 🚩 *Davis*, 320 F.3d at 353 (citation omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens."

*Id.* (citation, alterations, and quotation marks omitted). "[B]ecause virtually any adverse action taken against a prisoner by a prison official — even those otherwise not rising to the level of a constitutional violation — can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed that district courts must "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms." *Id.* (citation and quotation marks omitted).

#### b. DeCastro

Plaintiff alleges that DeCastro has a "personal vendetta" against him deriving from Plaintiff's position as an IGRC inmate representative and their IGRC-related interactions, and that because of this vendetta, DeCastro "changed the status" of the First Report authored by Velez, authored the Second Report himself, and encouraged Encarnacion to file the Third Report. (Am. Compl. 11–12, 35, 40, 44, 54.)

As an initial matter, as the Court previously held, (*see* Opinion 22), to the extent Plaintiff alleges that the roots of DeCastro's retaliation are found in Plaintiff's IGRC position, such conduct, liberally construed, constitutes protected activity. *See Dolan*, 794 F.3d at 295 (holding that "retaliation against a prisoner for filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body ... violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments" (quotation marks omitted) ); *see also Dolan v. Connolly*, No. 13-CV-5726, 2017 WL 825311, at *5 n.10 (S.D.N.Y. Mar. 2, 2017) (collecting cases for the proposition that "advocacy on behalf of an [inmate grievance body] is constitutionally protected").

The next question is whether the Amended Complaint alleges adverse action. The only adverse action alleged with respect to DeCastro are the three misbehavior reports. As to the First and Third Reports, however, they were not issued by DeCastro; rather, the First Report was issued by Velez and the Third Report by Encarnacion. (Am. Compl. 11, 18–19, 21, 38, 78.) Plaintiff alleges that DeCastro "reviewed" and "changed the status" of the First Report, (*id.* at 11–13), yet, as indicated by the documents attached to the Amended Complaint,

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 109 of 198

Thomas v. DeCastro, Not Reported in Fed. Supp. (2019)

DeCastro appears to have been involved only to the extent that he provided Plaintiff with a copy of report on April 23, 2013, (*id.* at 21–22). Put differently, the Amended Complaint does not allege facts plausibly indicating that DeCastro falsified the First Report; indeed, Plaintiff repeatedly limits his complaint with regard to the First Report to the allegations that it was "inadequate/not clear what the charges [were]," that it did not follow procedures on notice," and that he was "denied ... a clear [and] [adequate] copy" of the report. (*Id.* at 11–12.) Similarly, Plaintiff alleges that DeCastro encouraged Encarnacion to file the Third Report, (*id.* at 38–39, 71), yet, this statement is wholly conclusory and thus insufficient. *See* 🚩 *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) ("[C]onclusory allegations of a 🚩 § 1983 conspiracy are insufficient." (citation and quotation marks omitted) ); *Aho v. Anthony*, 782 F. Supp.2d 4, 7 (D. Conn. 2011) (dismissing claim where "[t]he only allegation with respect to the defendants' personal involvement is that" they were "acting in concert" with each other); *Malcolm v. Honeoye Falls–Lima Educ. Ass'n*, 678 F. Supp. 2d 100, 107 (W.D.N.Y. 2010) ("[A] complaint containing only conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." (quoting *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) ) ).

**\*9** However, as to the Second Report, Plaintiff alleges that it was authored by DeCastro and, critically, that it was ultimately "reversed" on administrative appeal following the Second Hearing. (Am. Compl. 24–25, 30, 32, 34; Pl.'s Mem. 21.) In Plaintiff's view, the reversal constitutes proof that DeCastro was lying and that the report was therefore false and retaliatory. (Am. Compl. 26–28; Pl.'s Mem. 25 ("It is a fact when a misbehavior report get[s] vindicated it shows the Defendants deliberately and ... maliciously interfered and lied.").) Defendants argue in response that "Plaintiff does not allege the basis for the reversal, which may have had nothing to do with the truth of the allegations in the [Second Report]." (Defs.' Mem. 16 n.4.) That is true, yet, liberally construed, that the Second Report was reversed on appeal does tend to support Plaintiff's allegation that the alleged adverse action was "unjustified" and "unwarranted." 🚩 *Bennett v. Goord*, 343 F.3d 133, 138–39 (2d Cir. 2003) (denying summary judgment on retaliation claim where the plaintiff adduced evidence that, inter alia, numerous misbehavior reports were reversed on administrative appeal); *see also Nunez v. Donahue*, No. 12-CV-1071, 2015 WL 13744630, at \*11 (N.D.N.Y. Nov. 23, 2015) ("The fact

that a misbehavior report was administratively reversed and expunged supports a plaintiff's allegations that the misbehavior report was false and retaliatory." (citation omitted) ), *adopted by* 2016 WL 29616 (N.D.N.Y. Jan. 4, 2016). This is not a case where other allegations in the Amended Complaint cut against the conclusion that the Second Report was falsified or unsubstantiated. *Cf. Crenshaw v. Korbar*, No. 09-CV-6167, 2013 WL 1681833, at \*2 (W.D.N.Y. Apr. 17, 2013) (dismissing retaliation claim because, "[a]lthough the disposition of guilty was ultimately reversed, the record shows that [the defendant] had a reasonable basis for the charges, and [the] plaintiff ... presented no evidence to suggest that she had any particular motive to retaliate against him"). Therefore, Plaintiff has sufficiently stated adverse action with respect to the Second Report. *See* 🚩 *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (holding that "the filing of false misbehavior reports" that result in sentences such as "three weeks in keeplock ... would deter a prisoner of ordinary firmness from vindicating his or her constitutional rights" and thus constitutes adverse action).

The final question is whether Plaintiff has sufficiently alleged a plausible causal connection between the adverse action (the Second Report) and the protected activity (Plaintiff's position as an inmate IGRC representative). In considering whether a causal connection exists, "a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." 🚩 *Barnes v. Harling*, —— F. Supp. 3d ——, 2019 WL 1319479, at \*15 (W.D.N.Y. Mar. 19, 2019) (citation and quotation marks omitted); *see also Vogelfang*, 889 F. Supp. 2d at 517 (describing causation factors); *Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 414 (D. Conn. Mar. 1, 2016) ("With regard to false misbehavior reports, the types of evidence required to establish a causal connection between the plaintiff's protected conduct and the alleged retaliation include temporal proximity, prior good discipline, a finding of not guilty at the disciplinary hearing[,] and statements from the defendants regarding their motives." (citation and alterations omitted) ), *aff'd*, 720 F. App'x (2d Cir. 2018).

Here, Plaintiff alleges that he served as an inmate representative on the IGRC for a "little over five years." (Am. Compl. 11, 35, 40.) He alleges that, over this period, he had

Thomas v. DeCastro, Not Reported in Fed. Supp. (2019)

numerous interactions and disagreements with DeCastro in connection with that position, including certain "grievance hearings" against DeCastro which led to "adverse findings" against him. (*Id.* at 35, 40.) This allegedly caused DeCastro to "threaten" Plaintiff by saying that Plaintiff was "on the 'burn,' meaning watch [your] back." (*Id.* at 12.) Further, DeCastro would "harass[ ]" and "threat[en]" Plaintiff and the other IGRC inmate representatives by authorizing "unwarrant[ed] cell searches." (*Id.* at 12, 35.) In sum, Plaintiff alleges, DeCastro had a longstanding "personal vendetta" against him, which led him to issue the false (and ultimately reversed) Second Report. (*Id.* at 11, 40.) These allegations, which were not in the initial Complaint, (*see* Opinion 22–24), are sufficient to plausibly allege that Plaintiff's position on the IGRC, and the attendant negative interactions he had with DeCastro, were "a substantial or motivating factor" in DeCastro's conduct. *Hanner v. Westchester County*, No. 16-CV-7610, 2019 WL 1299462, at *8 (S.D.N.Y. Mar. 21, 2019) (quoting *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) ). As such, this case is different from those in which plaintiffs have offered only conclusory allegations to establish a causal nexus. *See Vogelfang*, 889 F. Supp. 2d at 517 (holding that "repeatedly assert[ing] that [the plaintiff's] perceived mistreatment is a result of retaliatory animus on the part of the defendants," without "any specific and detailed factual allegations to support that assertion," is insufficient to establish a causal connection (quoting *Friedl v. City of New York*, 210 F.3d 79, 85–86 (2d Cir. 2000) ) ); *Bouknight v. Shaw*, No. 08-CV-5187, 2009 WL 969932, at *6 (S.D.N.Y. Apr. 6, 2009) (finding plaintiff's allegation that the defendant "wrote me up for revenge" is "mere speculation" and therefore insufficient to plausibly establish "the requisite causal connection").

**\*10**  To be sure, Plaintiff does not have a "reasonable expectation of privacy in his or her prison cell," and, accordingly, the search of his cell, "even [if done] for retaliatory reasons, ... does not implicate a constitutional right." *Battice v. Phillip*, No. 04-CV-669, 2006 WL 2190565, at *7 (E.D.N.Y. Aug. 2, 2006) (collecting cases); *see also Harnage v. Brighthaupt*, No. 12-CV-1521, 2016 WL 10100763, at *6 (D. Conn. June 3, 2016) (holding that "even if [the plaintiff] could demonstrate a retaliatory motive for the search, his claim would be legally insufficient" to "support a First Amendment retaliation claim"), *aff'd*, 720 F. App'x 79 (2d Cir. 2018). Yet, even if "a cell search alone is not actionable," courts have held that, when "combined ... with other wrongful conduct," such allegations may be

sufficient to state a claim. *Stewart v. Richardson*, No. 15-CV-9034, 2016 WL 7441708, at *5 (S.D.N.Y. Dec. 27, 2016) (collecting cases). Further, as Defendants point out, (Defs.' Mem. 15–16), Plaintiff does not provide specific details (beyond stating that he had been an IGRC representative for about five years) as to when, exactly, he had his "numerous" IGRC-related disagreements with DeCastro, when DeCastro allegedly threatened him that he was "on the burn," or when the "adverse findings" were made against DeCastro. Yet, construed liberally, the Amended Complaint suggests that Plaintiff had an ongoing relationship with DeCastro through their IGRC-related interactions. Thus, although temporal proximity does not clearly weigh in favor of a finding of causal connection, it does not clearly weigh against it, either. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (noting that a court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases").

In sum, construing the Amended Complaint to raise the strongest arguments it plausibly suggests, *see Sykes*, 723 F.3d at 403, the Court concludes that the alleged combination of DeCastro's threatening comments to Plaintiff, his unauthorized cell searches, and the "adverse findings" against him, over the course of an ongoing contentious relationship with Plaintiff, are sufficient to suggest retaliatory animus and, therefore, to establish a causal connection between the Second Report and Plaintiff's protected conduct. (Am. Compl. 11–12, 35, 40.) Therefore, Plaintiff states a prima facie retaliation claim against DeCastro. Accordingly, the Court denies the Motion To Dismiss Plaintiff's retaliation claim against DeCastro.[8]

#### c. Velez and Encarnacion

Separate from his allegations against DeCastro, Plaintiff alleges that Velez retaliated against him in authoring the First Report and that Encarnacion did the same in authoring the Third Report. (Am. Compl. 11, 35, 38.) Yet, even assuming these misbehavior reports constitute adverse action with respect to the authoring Defendant, Plaintiff fails to allege a plausible causal connection between the authoring Defendant and Plaintiff's protected conduct as an IGRC representative. Unlike with DeCastro, Plaintiff does not allege that he had any ongoing relationship or repeated interactions with Velez or Encarnacion. Indeed, the Amended Complaint does not appear even to allege that these Defendants knew that Plaintiff

was on the IGRC. Thus, no allegations plausibly suggest that Velez or Encarnacion had any motivation to retaliate against Plaintiff or otherwise were causally connected to Plaintiff's protected conduct. *See Mateo v. Dawn*, No. 14-CV-2620, 2016 WL 5478431, at *8 (S.D.N.Y. Sept. 28, 2016) (holding a plaintiff's failure to allege any knowledge of the protected conduct results in a "fail[ure] to establish a plausible causal connection" for the purposes of a retaliation claim). Moreover, that the First and Third Reports were, unlike DeCastro's Second Report, affirmed on appeal, (Am. Compl. 14, 23, 72), tends to suggest that they were not, in fact, retaliatory. *See Brown v. Goord*, No. 04-CV-785, 2007 WL 607396, at *15 (N.D.N.Y. Feb. 20, 2007) ("[The plaintiff] has adduced no evidence that either of those two misbehavior reports were false. Indeed, the record evidence — which establishes that the misbehavior reports led to disciplinary convictions that were affirmed on appeal — is to the contrary." (footnotes omitted) ). Therefore, in the absence of "specific and detailed factual allegations" of a causal connection between the First and Third Reports and Plaintiff's protected conduct, *Dolan*, 794 F.3d at 295, Plaintiff's retaliation claims against Velez and Encarnacion fail.

## 5. Qualified Immunity

**\*11** "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and quotation marks omitted). In determining whether a right is clearly established, the "inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* at 244 (citation and quotation marks omitted). "In the Second Circuit, 'a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.' " *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 702 (S.D.N.Y. 2011) (quoting *Luna*, 356 F.3d at 490).

Defendants argue that they are entitled to qualified immunity on Plaintiff's First Amendment retaliation claims because it was not clearly established, at the time Defendants' alleged

retaliation occurred in 2012 and 2013, that Plaintiff's position as an inmate representative on the IGRC constituted protected conduct. (Defs.' Mem. 16–18.) In support, Defendants rely on the Second Circuit's 2015 decision in *Dolan v. Connolly* ("*Dolan I*") for the proposition that it had "not held *specifically* that a prisoner engages in constitutionally protected conduct by carrying out the duties of a member of an [inmate grievance body]." *Dolan I*, 794 F.3d at 295 (emphasis added). Therefore, in Defendants' view, it was only in 2015 — at least two years after the alleged conduct in this case — "that retaliation against a prisoner for filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body" violated a clearly established right. *Id.*

This reliance is misplaced. As an initial matter, a right does not become clearly established only when there is "specific authority directly on point"; rather, a right becomes clearly established where "the circuit's decisions 'clearly foreshadow' a particular ruling on the issue." *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997) (citation omitted). Thus, the Second Circuit's statement in *Dolan I* that it had not "specifically" decided the issue is not dispositive. More fundamentally, it was "clearly foreshadowed" at the time of the alleged conduct here that Plaintiff's IGRC position was protected conduct. As the one district court to have applied *Dolan I* to the question of qualified immunity stated:

> In *Dolan* [*I*] itself, the Second Circuit observed that it was "well established that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." Further, the [Second Circuit] found "no sufficient basis to distinguish a prisoner's conduct in filing a grievance on his own behalf and the filing or voicing, as a member of a prisoner grievance body, of grievances on behalf of other prisoners." Thus, the [Second Circuit] concluded that "[the plaintiff's] alleged actions as an [inmate grievance] representative are similar, if not identical, to the grievance-related activity already established as constitutionally protected conduct."

*Dolan*, 2017 WL 825311, at *4 ("*Dolan II*") (citations and some quotation marks omitted). This analysis is persuasive. Relevant here, in 1996, the Second Circuit considered a case in which the plaintiff, an inmate, provided IGRC representatives investigating a particular grievance the names of five inmates who "would be willing to represent the other prisoners in the grievance process." *Graham v. Henderson*,

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 112 of 198

Thomas v. DeCastro, Not Reported in Fed. Supp. (2019)

89 F.3d 75, 77 (2d Cir. 1996). The plaintiff was thereafter issued an allegedly false and retaliatory misbehavior report by a correction officer. *Id.* at 78. The Second Circuit held that the plaintiff's "filing of a grievance and attempt to find inmates to represent ... grievants" was protected conduct that implicated the "right to petition government" — "in both judicial *and* administrative forums" — "for the redress of grievances guaranteed by the First and Fourteenth Amendments." *Id.* at 80. Further, in 2004, the Second Circuit considered a case in which the plaintiff, an inmate, filed grievances against prison officials and was thereafter issued allegedly retaliatory misbehavior reports. *See Gill, 389 F.3d at 380*. The Second Circuit broadly held that "use of the prison grievance system" constitutes protected activity. *Id.* at 384. Reading these cases together, as did the district court in *Dolan II, 2017 WL 825311, at *5*, it can fairly be said that, by 2004, it was clearly foreshadowed that an inmate's participation in a prison's grievance committee squarely implicates his right to petition the government. Put differently, at the time the alleged retaliation in this case occurred, in 2012 and 2013, it was clearly established that Plaintiff's IGRC position "[fell] within the type of First Amendment advocacy to which prisoners had a clearly established right." *Dolan II, 2017 WL 825311, at *5*.

**\*12** Qualified immunity is an affirmative defense on which Defendants bear the burden of proof. *See Lore v. City of Syracuse, 670 F.3d 127, 149 (2d Cir. 2012)* (citation omitted). For qualified immunity to bar suit at the motion to dismiss stage, "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004)* (citations and quotation marks omitted). Defendants fail to satisfy their burden at this stage, particularly given that they do not, beyond describing *Dolan I* and citing to *Dolan II*, engage with the contrary analysis presented in *Dolan II.* (*See* Defs.' Mem. 17.) Accordingly, the Court declines to grant Defendants qualified immunity against money damages on Plaintiff's First Amendment free exercise claim.

### III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part. All Defendants and claims except for Plaintiff's First Amendment retaliation claim against DeCastro are dismissed. Dismissal is with prejudice. [9]

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 74), and to mail a copy of this Opinion to Plaintiff.

The Court will hold a status conference on May 3, 2019, at 2:00 p.m.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1428365

---

## Footnotes

1    The Amended Complaint does not name or refer to three Defendants — Correction Officer J. LaChance, Deputy Superintendent of Administration Jeffrey Lindstrand, and Director Donald Venettozzi — who were named in the original Complaint. Accordingly, all claims against these Defendants are dismissed.

2    Plaintiff's filings do not use consistent page numbering. For ease of reference, the Court cites to the ECF-generated page numbers stamped at the top of each page.

3    The misbehavior report states that Plaintiff marked an outgoing letter as legal mail when it in fact was addressed to an ex-inmate and contained no legal documents. (Am. Compl. 30.)

Thomas v. DeCastro, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00362-AMN-ML    Document 30    Filed 05/30/23    Page 113 of 198

4      Plaintiff additionally alleges that Katz's rewriting of King's decision on the Third Report caused him to spend
       additional days in SHU than he otherwise would have. (Am. Compl. 73–75.) It is not clear how much extra
       time Plaintiff served, but Plaintiff alleges he was ultimately released on August 30, 2013. (*Id.*)

5      Indeed, as Defendants point out, a substantial portion of Plaintiff's due process allegations in the Amended
       Complaint appear on "the identical type-written document" used "in his original Complaint," (Defs.' Mem. 8),
       and previously held insufficient by the Court, (Opinion 14–17).

6      To the extent the Amended Complaint alleges, as did the initial Complaint, that Plaintiff's removal from his
       IGRC position without being afforded the process provided for in DOCCS regulations constitutes a procedural
       due process violation, (Am. Compl. 49–50), that claim fails. The Court previously held that it "is unaware of
       any cases finding that there is a protected liberty interest in serving as an IGRC representative; indeed other
       courts within the Second Circuit have found to the contrary." (Opinion 17–18 (collecting cases).) The Court
       further held that, even assuming a liberty interest in an IGRC position exists, Defendants would be entitled to
       qualified immunity because "the failure to inform Plaintiff of the possible *punishments* he was subject to ... has
       not been clearly established by either the Supreme Court or the Second Circuit" and because "[n]o Supreme
       Court or Second Circuit case involving a prisoner's removal from the IGRC has held that due process rights
       adhere to such removal." (*Id.* at 18–20.)

7      For the same reasons, any claim based on mail tampering must be dismissed. *See Mendez v. Quiros*, No.
       16-CV-2097, 2017 WL 374462, at *2 (D. Conn. Jan. 25, 2017) (dismissing mail tampering claim where the
       plaintiff did "not allege ... that he suffered any injury or prejudice as a result of the opening of the mail outside of
       his presence and the withholding of the documents"); *Leniart v. Murphy*, No. 11-CV-1635, 2016 WL 1273166,
       at *13 (D. Conn. Mar. 31, 2016) (dismissing mail tampering claim where the plaintiff did "not claim that [his]
       mail ... was censored or confiscated, only that it was read").

8      Defendants argue that, in any event, they are entitled to qualified immunity on Plaintiff's retaliation claim. The
       Court considers, and rejects, this argument *infra* II.B.5.

9      Even pro se plaintiffs are not entitled to amend a complaint if the complaint "contains substantive problems
       such that an amended pleading would be futile." *Lastra*, 2012 WL 12876, at *9. Here, Plaintiff "has already
       had two bites at the apple, and they have proven fruitless." 🚩 *Melvin v. County of Westchester*, No. 14-
       CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (citation, alterations, and quotation marks
       omitted); *see also Al-Qadaffi v. Servs. for the Underserved (SUS)*, No. 13-CV-8193, 2015 WL 585801, at *8
       (S.D.N.Y. Jan. 30, 2015) (denying leave to amend where the plaintiff "has already had one chance to amend
       his [c]omplaint, and there is still no indication that a valid claim might be stated if given a second chance"),
       *aff'd*, 632 F. App'x 31 (2d Cir. 2016). The Court finds that further amendment on these claims would be futile.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1556404
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Chad S. JOHNSON, Plaintiff,

v.

Superintendent Robert MORTON; Edward Burnett,
Deputy of Security; Sergeant S. Petrie; Lt. Calvitti
(sued herein as Kailvetti); Correction Officer D.
Allen; Correction Officer Mason Hamilton; Correction
Officer Travis Small; Correction Officer James Makel;
and Correction Officer Raymond Ortiz, Defendants.

21 CV 986 (VB)
|
Signed 05/16/2022
|
Filed 05/17/2022

**Attorneys and Law Firms**

Chad S. Johnson, Napanoch, NY, Pro Se.

John Roach Doran, New York State Office of the Attorney
General, New York, NY, for Defendants Sergeant S. Petrie, Lt.
Kailvetti, Corr. Officer D. Allen, Edward Burnett, Correction
Officer Mason Hamilton, Correction Officer Travis Small,
Correction Officer James Makel, Robert Morton, Correction
Officer Raymond Ortiz.

**OPINION AND ORDER**

Briccetti, United States District Judge:

**\*1** Plaintiff Chad S. Johnson, proceeding pro se and in forma
pauperis, brings this Section 1983 action against defendants
Superintendent Robert Morton ("Superintendent Morton"),
Deputy of Security Edward Burnett ("Deputy Burnett"),
Sergeant S. Petrie ("Sgt. Petrie"), Lt. Calvitti,[1] Correction
Officer D. Allen ("C.O. Allen"), Correction Officer Mason
Hamilton ("C.O. Hamilton"), Correction Officer Travis Small
("C.O. Small"), Correction Officer James Makel ("C.O.
Makel"), and Correction Officer Raymond Ortiz ("C.O.
Ortiz"). Plaintiff contends that, when he was incarcerated
at Downstate Correctional Facility ("Downstate"), he was
forced by defendants to sell illegal drugs to other inmates and
was punished when he stopped selling them.

Now pending is defendants' motion to dismiss the amended
complaint. (Doc. #38).

Plaintiff did not oppose the motion, despite having been
granted multiple extensions of time to do so. (Docs. ##42–
43).

For the reasons set forth below, the motion is GRANTED IN
PART and DENIED IN PART.

The Court has subject-matter jurisdiction pursuant to 28
U.S.C. § 1331.

**BACKGROUND**

For the purpose of ruling on the motion to dismiss, the Court
accepts as true all well-pleaded factual allegations in the
amended complaint and draws all reasonable inferences in
plaintiff's favor, as summarized below.

During the complained-of events, plaintiff was incarcerated
at Downstate, located in Fishkill, New York. (Doc. #29 ("Am.
Compl.") at ECF 6).[2]

Plaintiff alleges that, "[s]ometime in 2019," C.O. Hamilton
planted contraband in plaintiff's cell at Sgt. Petrie's direction,
and plaintiff was then placed in keeplock. (Am. Compl. at
ECF 8).

Plaintiff alleges his disciplinary hearing was conducted two
days later by Lt. Calvitti. (Am. Compl. at ECF 8). According
to plaintiff, Lt. Calvitti explained to him before the hearing
began that "someone called on [plaintiff's] behalf" and
plaintiff would be given time served. (Id.). Lt. Calvitti then
allegedly told plaintiff what to say on the record. (Id.).

Plaintiff alleges that, after the disciplinary hearing, Sgt. Petrie
gave plaintiff a cell phone and drugs and warned plaintiff
that, if he did not cooperate, Sgt. Petrie would "set [him] up
again" and send plaintiff "further up north." (Am. Compl. at
ECF 8). According to plaintiff, Sgt. Petrie directed plaintiff to
sell drugs and remit the proceeds to him in Bitcoin using the
provided cellphone. (See id. at ECF 8–9).

Plaintiff alleges that "[s]ometime towards the end of 2020,"
C.O. Allen informed plaintiff he knew about what Sgt.
Petrie "[wa]s forcing [plaintiff] to do." (Am. Compl. at ECF
9). Plaintiff contends that, sometime thereafter, C.O. Allen

informed plaintiff he was going to smuggle heroin into the facility and plaintiff "was going to sell it for him." (Id.). According to plaintiff, another inmate subsequently died of a heroin overdose in October 2020. (Id.).

**\*2** Plaintiff alleges he stopped selling drugs for Sgt. Petrie and C.O. Allen in January 2021, after making recordings of the officers directing him to do so and preserving those recordings in emails. (Am. Compl. at ECF 10–11). According to plaintiff, on January 9, 2021, he observed Sgt. Petrie and C.O. Allen having "a heated discussion," after which Sgt. Petrie visited his cell and asked plaintiff why he had stopped remitting proceeds from the drug sales. (Id. at ECF 11). When plaintiff informed Sgt. Petrie he no longer wished to do anything illegal, Sgt. Petrie moved him to the Special Housing Unit ("SHU") and ticketed him for possessing a cellphone. (Id.). Plaintiff further alleges Sgt. Petrie admitted at plaintiff's subsequent disciplinary hearing that he set plaintiff up. (Id. at ECF 12).

Plaintiff alleges that he was subsequently moved from Downstate, and C.O. Small, Makel, and Ortiz intentionally destroyed his legal papers. (Am. Compl. at ECF 11–12).

## DISCUSSION

### I. Standard of Review

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under "the two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).[3] First, a plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

The Court must liberally construe submissions of pro se litigants and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (collecting cases). Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges civil rights violations. Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). "Even in a pro se case, however, ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010). Nor may the Court "invent factual allegations" a plaintiff has not pleaded. Id.

### II. Lack of Personal Involvement

Superintendent Morton, Deputy Burnett, Lt. Calvitti, C.O. Hamilton, C.O. Makel, C.O. Ortiz, and C.O. Small argue plaintiff has not alleged facts sufficient to show they were personally involved in the alleged constitutional violations.

The Court agrees with respect to Superintendent Morton and Deputy Burnett only.

To state a claim under Section 1983, a plaintiff must allege facts showing a defendant's direct and personal involvement in the alleged constitutional deprivation. See Spavone v. N.Y.S. Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). Further, a defendant may not be held liable under Section 1983 solely because that defendant employs or supervises a person who violated the plaintiff's rights. See Tangreti v. Bachmann, 983 F.3d 609, 619–20 (2d Cir. 2020).

**\*3** Here, plaintiff alleges his constitutional rights were violated when he was forced to sell drugs in prison for Sgt. Petrie and C.O. Allen and was penalized when he stopped doing so. However, plaintiff does not allege any facts to

suggest Superintendent Morton or Deputy Burnett knew or should have known about this alleged scheme. Plaintiff contends these defendants should have known about it "in light of other incidents where inmates had cell phones that could have only been brought in by correctional staff" (Am. Compl. at ECF 13), but, even taking this allegation as true, it does not suggest that either Superintendent Morton or Deputy Burnett knew plaintiff had been given a cellphone, much less that they knew plaintiff was given a cellphone to facilitate drug sales for correction officers.

Accordingly, plaintiff's claims against Superintendent Morton and Deputy Burnett must be dismissed for lack of personal involvement.

III. Failure to Protect

The Court liberally construes plaintiff's allegation that defendants conspired to force him to sell drugs as a failure-to-protect claim; that is, that defendants violated their Eighth Amendment responsibility to guarantee his safety by forcing plaintiff to participate in such a scheme. See, e.g., Cooks v. Guterrez, 2011 WL 832469, at *3 (S.D. Tex. Mar. 3, 2011) (pro se plaintiff stated failure-to-protect claim against prison officials who "condone[d]" and "assist[ed]" drug smuggling in facility where plaintiff was incarcerated). [4]

A. Legal Standard

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Courts have construed the Eighth Amendment to "require[ ] prison officials to take reasonable measures to guarantee the safety of inmates in their custody." Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996). For example, the Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994).

To state a failure-to-protect claim, a prisoner must plausibly allege an objective component and a subjective component. See Hayes v. N.Y.C. Dep't of Corr., 84 F.3d at 620.

To plead the objective component, a plaintiff must plausibly allege a prison official's conduct was sufficiently serious, meaning the conduct "pose[d] an unreasonable risk of serious

damage to his health." Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017).

To plead the subjective component, a plaintiff must plausibly allege a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes v. N.Y.C. Dep't of Corr., 84 F.3d at 620. "Evidence that a risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013).

B. Application

Here, plaintiff plausibly alleges a failure-to-protect claim against Sgt. Petrie and C.O. Allen.

First, plaintiff plausibly alleges Sgt. Petrie and C.O. Allen's conduct posed an unreasonable risk to his safety. Taking plaintiff's allegations as true, Sgt. Petrie and C.O. Allen forced plaintiff to sell illegal drugs to other inmates. Selling illegal drugs in prison to other inmates presents obvious and unreasonable dangers to plaintiff.

Second, plaintiff plausibly alleges Sgt. Petrie and C.O. Allen acted with requisite culpability. According to plaintiff, Sgt. Petrie and C.O. Allen personally supplied him with drugs and directed him to sell those drugs to other inmates, meaning they were personally aware of the substantial risk to plaintiff's safety. Cf. Lane v. Philbin, 2017 WL 4228888, at *8 (M.D. Ga. Sept. 22, 2017) (plaintiff stated failure-to-protect claim against corrections officer who, among other things, cooperated with inmates to smuggle contraband into the facility).

**\*4** The Court recognizes that in the majority of cases concerning illegal drugs smuggled into prison, courts have rejected failure-to-protect claims brought by inmates "absent facts suggesting that the risk of exposure to drugs was greater inside the facility than outside of the facility." Kern v. St. Charles County, 2022 WL 1262507, at *6 (E.D. Mo. Apr. 28, 2022) (collecting cases). For example, in Nunez v. Salamack, 1989 WL 74940, at *1 (S.D.N.Y. June 26, 1989), the court dismissed plaintiff's claims that drug use inside Edgecombe Correctional Facility interfered with his recovery and thus constituted cruel and unusual punishment, reasoning that plaintiff failed to "allege that the risk of exposure to

drugs, and the deleterious effects of such exposure, were greater inside than outside Edgecombe." Here, in contrast, plaintiff plausibly alleges his exposure to drugs was greater inside Downstate than outside Downstate. That is, plaintiff alleges defendants used their positions as correction officers to force plaintiff to sell illegal drugs to other inmates in the facility, a situation that simply would not exist outside prison.

Accordingly, plaintiff's failure-to-protect claim against Sgt. Petrie and C.O. Allen may proceed.

IV. Retaliation

Liberally construed, plaintiff attempts to assert Sgt. Petrie retaliated against him for refusing to continue to sell drugs by placing him in the SHU.

A. Legal Standard

To state a First Amendment retaliation claim, "a plaintiff must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Dolan v. Connolly, 794 F.3d 290, 294 (2d Cir. 2015).

With respect to the first element, a prisoner engages in constitutionally protected activity when he challenges prison conditions by filing a complaint, grievance, or civil-rights lawsuit. See Dolan v. Connolly, 794 F.3d at 294. In certain circumstances, "a prisoner's oral complaint may constitute protected speech." White v. Westchester County, 2018 WL 6726555, at *16 (S.D.N.Y. Dec. 21, 2018) (collecting cases). For example, a prisoner's "clear, specific statement to [an officer]—that he would file a grievance ... if [the officer] did not stop harassing him—is protected speech." Id.

With respect to the second element, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003).

With respect to the third element, "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009).

However, courts "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." Dolan v. Connolly, 794 F.3d at 295. Accordingly, to survive a motion to dismiss, a prisoner asserting a retaliation claim must not rest on "wholly conclusory" allegations, but rather must allege "specific and detailed" supporting facts. Id.

B. Application

Here, plaintiff plausibly alleges a retaliation claim against Sgt. Petrie.

First, although it is a close question, the Court concludes plaintiff plausibly alleges he engaged in constitutionally protected activity when he told Sgt. Petrie he would no longer sell drugs for him.

Plaintiff alleges he told Sgt. Petrie he "no longer" wanted to "do anything illegal" and asked Sgt. Petrie "to leave [him] alone." (Am. Compl. at ECF 11). But plaintiff's allegations also suggest that, at the time of this conversation, plaintiff was preparing to take further action against Sgt. Petrie and C.O. Allen; for example, plaintiff alleges he made recordings of his conversations with C.O. Allen and preserved them in emails. (Id. at ECF 10). Thus, affording plaintiff special solicitude as a pro se litigant alleging civil rights violations, the Court infers plaintiff could have made a "clear, specific statement" to Sgt. Petrie that he was going to file a grievance or this lawsuit regarding the drug-dealing scheme, and thus that plaintiff has plausibly alleged he engaged in constitutionally protected speech. White v. Westchester County, 2018 WL 6726555, at *16. Sgt. Petrie may, however, renew his arguments on this point either at summary judgment following the close of discovery or at trial.

*5 Second, plaintiff also plausibly alleges the other two elements of a retaliation claim. Plaintiff alleges Sgt. Petrie took adverse action against him by making a false disciplinary report and placing him in the SHU. See, e.g., Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004) (plaintiff plausibly alleged adverse action element of retaliation claim based on the "filing of false misbehavior reports" and "three weeks in keeplock"). Moreover, plaintiff alleges this adverse action was taken against him the same day he engaged in constitutionally protected activity, which is sufficient for the

Court to infer a causal connection. See Espinal v. Goord, 558 F.3d at 129 (six-month gap between protected activity and retaliation sufficient to allege a causal connection).

Accordingly, plaintiff's retaliation claim against Sgt. Petrie may proceed.

V. Conspiracy

Liberally construed, plaintiff attempts to assert a conspiracy claim against Sgt. Petrie, C.O. Allen, Lt. Calvitti, and C.O. Hamilton.

A. Legal Standard

To state a Section 1983 conspiracy claim, a plaintiff must plausibly allege: "(1) an agreement between two or more state actors ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999).

To survive a motion to dismiss, a plaintiff must make something more than "conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights." Ciambriello v. County of Nassau, 292 F.3d 307, 324–25 (2d Cir. 2002). However, "a plaintiff is not required to list the place and date of defendants' meetings and the summary of their conversations when he pleads conspiracy, the pleadings must present facts tending to show agreement and concerted action." Concepcion v. City of New York, 2008 WL 2020363, at *3 (S.D.N.Y. May 7, 2008).

Moreover, "under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together." Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008). However, "[a]n exception to the doctrine exists where a plaintiff alleges facts that tend to show the defendants were pursuing personal interests wholly separate and apart from the entity." Harris v. City of Newburgh, 2017 WL 4334141, at *8 (S.D.N.Y. Sept. 27, 2017).

B. Application

Here, plaintiff plausibly alleges a conspiracy claim against Sgt. Petrie, C.O. Allen, and C.O. Hamilton, but not against Lt. Calvitti.

With respect to Sgt. Petrie, C.O. Allen, and C.O. Hamilton, although plaintiff "does not allege specifically" these defendants "agreed to join a conspiracy," plaintiff's "allegations that the officers worked in tandem ... permits a plausible inference that they formed at least an implicit agreement." Iverson v. Surber, 2014 WL 12908065, at *6 (S.D.N.Y. Mar. 19, 2014). Plaintiff alleges (i) C.O. Hamilton planted contraband in plaintiff's cell at Sgt. Petrie's direction, which laid the groundwork for Sgt. Petrie to force plaintiff to sell drugs for him; (ii) C.O. Allen told plaintiff he was aware Sgt. Petrie was supplying plaintiff with drugs, and then personally started supplying plaintiff with drugs; and (iii) after plaintiff ceased remitting drug proceeds to Sgt. Petrie and C.O. Allen, plaintiff observed them having "a heated discussion," after which Sgt. Petrie visited his cell to question him about why he stopped doing so, and then moved plaintiff to the SHU. (Am. Compl. at ECF 11). These allegations are specific and plausible enough for the Court to infer these defendants agreed to inflict an unconstitutional injury on plaintiff. See, e.g., Pangburn v. Culbertson, 200 F.3d at 72.

*6 Plaintiff does not, however, adequately allege a conspiracy claim against Lt. Calvitti. Plaintiff alleges Lt. Calvitti presided over plaintiff's disciplinary hearing after C.O. Hamilton planted contraband in plaintiff's cell, which plaintiff suggests was part of the ultimate scheme to convince plaintiff to sell drugs for Sgt. Petrie and C.O. Allen. But plaintiff does not allege any facts to suggest Lt. Calvitti had any kind of implicit or explicit agreement with the other defendants to smuggle drugs into Downstate. Thus, plaintiff has failed to state a conspiracy claim against Lt. Calvitti. See, e.g., Kernan v. N.Y.S. Dep't of Fin. Servs., 712 F. App'x 61, 66 (2d Cir. 2017) (summary order).

Lastly, plaintiff's claims are not barred by the intracorporate conspiracy doctrine. Plaintiff alleges defendants conspired to smuggle illegal drugs into Downstate for profit, which is plainly outside the scope of "the normal course of their corporate duties." Harris v. City of Newburgh, 2017 WL 4334141, at *8. Thus, the intracorporate conspiracy doctrine does not apply.

Accordingly, plaintiff's conspiracy claim against Sgt. Petrie, C.O. Allen, and C.O. Hamilton (but not Lt. Calvitti) may proceed.

## VI. Due Process

Liberally construed, plaintiff contends his due-process rights were violated when (i) he was placed in keeplock for two days after C.O. Hamilton planted contraband in his cell; (ii) Lt. Calvitti manipulated the disciplinary hearing that followed; and (iii) plaintiff was placed in the SHU by Sgt. Petrie after refusing to continue to sell drugs.

### A. Legal Standard

To state a due-process claim, a plaintiff must allege: (i) "he possessed a liberty interest"; and (ii) defendants "deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001). That is, even if a plaintiff plausibly alleges he "did not receive the process that was due, he cannot succeed on his claims if he fails to establish a protected liberty interest." Taylor v. Rodriguez, 238 F.3d 188, 194 (2d Cir. 2001).

A prisoner's liberty interest is "implicated" by prison discipline "if it imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." J.S. v. T'Kach, 714 F.3d 99, 106 (2d Cir. 2013).

In general, "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009) (per curiam).

### B. Application

Here, plaintiff does not plausibly allege a liberty interest implicated by these three incidents.

First, with respect to being placed in keeplock for two days after C.O. Hamilton planted contraband in his cell in 2019, plaintiff does not allege the conditions of two-day keeplock were "more onerous than usual." Thus, he has not "allege[d] the existence of a liberty interest warranting due process protection" potentially implicated by this incident. Jones v. Tompkins, 715 F. App'x 101, 102 (2d Cir. 2018) (summary order).

Second, with respect to Lt. Calvitti's conduct at his disciplinary hearing, plaintiff does not plausibly allege any

liberty interest was implicated by his cursory and scripted hearing. According to plaintiff, Lt. Calvitti sentenced him to time served. (Am. Compl. at ECF 8). Because plaintiff does not allege he was subject to any discipline following the hearing, he does not plausibly allege a liberty interest was implicated by the hearing. See, e.g., Durran v. Selsky, 251 F. Supp. 2d 1208, 1214 (W.D.N.Y. 2003) (dismissing prisoner's due-process claim based "on the alleged due process violations in connection with the disciplinary hearing" when he did not show his sentence "was in any way atypical or a significant hardship in relation to the ordinary incidents of prison life").

*7 Third, with respect to being placed in the SHU following his alleged refusal to continue to sell drugs, plaintiff does not allege any facts regarding the length of his confinement in the SHU or its conditions. Thus, he has again not sufficiently "allege[d] the existence of a liberty interest warranting due process protection" implicated by this incident. Jones v. Tompkins, 715 F. App'x at 102.

Accordingly, plaintiff's due-process claim must be dismissed.

## VII. Access to Courts

Liberally construed, plaintiff attempts to assert an access-to-courts claim against C.O. Small, C.O. Makel, and C.O. Ortiz arising from their alleged destruction of his legal papers.

### A. Legal Standard

"The Supreme Court has grounded the right of access to the courts in the Privileges and Immunities Clause of Article IV, the Petition Clause of the First Amendment, the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Equal Protection Clause of the Fourteenth Amendment." Raffaele v. City of New York, 144 F. Supp. 3d 365, 374 (E.D.N.Y. 2015). There are two types of claims arising from denial of this right: "forward-looking" claims and "backward-looking" claims. Sousa v. Marquez, 702 F.3d 124, 127–28 (2d Cir. 2012).

"Forward-looking" claims include claims "that systemic official action frustrated [a plaintiff's] ability to file a suit." Sousa v. Marquez, 702 F.3d at 127. In contrast, "backward-looking" claims are claims that a lawsuit "cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." Id. at 127–28.

To state a backward-looking claim, a plaintiff must plausibly allege a defendant, acting deliberately and with malice, "took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim," Davis v. Goord, 320 F.3d at 351, and that those actions caused the plaintiff to suffer "actual injury." Lewis v. Casey, 518 U.S. 343, 349 (1996).

To establish "actual injury," a plaintiff must allege defendants hindered his efforts to pursue a nonfrivolous legal claim. See Amaker v. Haponik, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999). For example, a plaintiff might allege "the loss or inadequate settlement of a meritorious case, or the loss of an opportunity to seek some particular order of relief." Christopher v. Harbury, 536 U.S. 403, 413–14 (2002).

### B. Application

Here, plaintiff has not plausibly alleged an access-to-courts claim.

The Court liberally construes plaintiff's allegations as a backward-looking claim; in other words, that C.O. Small, C.O. Makel, and C.O. Ortiz intentionally destroyed plaintiff's legal papers and that this destruction hindered plaintiff's efforts to pursue some legal claim.

However, plaintiff does not adequately allege any actual injury arising from the destruction of his papers. He does not identify what legal claim the destruction of his legal papers hindered, such as, for example, this litigation, any appeal of his criminal conviction, or any habeas corpus proceeding he has commenced. He also does not allege how any of those cases were harmed by the loss of his legal papers.

Accordingly, plaintiff's access-to-courts claim must be dismissed.

### VIII. Qualified Immunity

Defendants have also not demonstrated they are protected by qualified immunity.

Qualified immunity shields government officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad, and protects "all

but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

**\*8** "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996). "Defendants bear the burden of establishing qualified immunity." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015).

"[U]sually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion. Hyman v. Abrams, 630 F. App'x 40, 42 (2d Cir. 2015) (summary order). However, "a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if the facts supporting the defense appear on the face of the complaint." Id.

Here, defendants argue they are entitled to qualified immunity because plaintiff does not plausibly allege his constitutional rights were violated. As explained above, plaintiff plausibly alleges Sgt. Petrie, C.O. Allen, and C.O. Hamilton violated his well-established constitutional rights. Specifically, plaintiff plausibly alleges that Sgt. Petrie, C.O. Allen, and C.O. Hamilton conspired to force plaintiff to sell illegal drugs in prison in violation of plaintiff's Eighth Amendment right to have reasonable measures taken on his behalf by prison officials to guarantee his safety when incarcerated; and that Sgt. Petrie retaliated against plaintiff for voicing a complaint about the purported scheme in violation of plaintiff's First Amendment right to petition the government for redress of his grievances.

Accordingly, the remaining defendants—Sgt. Petrie, C.O. Allen, and C.O. Hamilton—are not entitled to qualified immunity at this stage of the case.

### CONCLUSION

Defendants' motion to dismiss the amended complaint is GRANTED IN PART and DENIED IN PART.

Specifically, the following claims may proceed:

- Failure-to-protect claim against Sgt. Petrie and C.O. Allen;

• Conspiracy claim against Sgt. Petrie, C.O. Allen, and C.O. Hamilton; and

• Retaliation claim against Sgt. Petrie.

All other claims are dismissed.

Sgt. Petrie, C.O. Allen, and C.O. Hamilton shall answer the amended complaint by May 30, 2022.

By separate Order, the Court will schedule an initial conference.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk is instructed to terminate from the docket defendants Lt. Calvitti (herein sued as Kailvetti), Edward Burnett, Correction Officer Travis Small, Correction Officer James Makel, Superintendent Robert Morton, and Correction Officer Raymond Ortiz.

The Clerk is further instructed to terminate the motion. (Doc. #38).

**All Citations**

Slip Copy, 2022 WL 1556404

## Footnotes

1    Plaintiff spells Lt. Calvitti's name as "Kailvetti" in his complaint.

2    "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

3    Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

4    Plaintiff will be provided copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009) (per curiam).

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 18402299
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ederick FABRIZIO, also known
as Ederick Fabricio, Plaintiff,

v.

C.O. RIELLY; [1] C.O. Oliver;
and C.O. Laster, Defendants.

9:20-CV-0011 (GTS/ML)
|
Signed December 15, 2022

**Attorneys and Law Firms**

EDERICK FABRIZIO, Pro se Plaintiff, Calle 13-A DD7, Villa del Rey IV, Caguas, PR 00727.

LETITIA A. JAMES, New York State Attorney General, STEVE NGUYEN, ESQ., Assistant Attorney General, Counsel for Defendants, The Capitol, Albany, New York 12224.

**ORDER and REPORT-RECOMMENDATION** [2]

MIROSLAV LOVRIC, United States Magistrate Judge

 **\*1** Currently before the Court, in this civil rights action filed by Ederick Fabrizio ("Plaintiff") against C.O. Rielly, C.O. Oliver, and C.O. Laster (collectively "Defendants"), is Defendants' motion for summary judgement pursuant to Fed. R. Civ. P. 56. (Dkt. No. 60.) For the reasons set forth below, I recommend that Defendants' motion for summary judgement be granted in part and denied in part.

**I. RELEVANT BACKGROUND**

 **A. Plaintiff's Complaint**
At this juncture, Plaintiff alleges the following four claims: (1) one claim of excessive force in violation of the Eighth Amendment and 42 U.S.C. § 1983 against Defendants Rielly and Oliver based on an incident that occurred on December 9, 2017; (2) a claim of retaliation in violation of the First Amendment and 42 U.S.C. § 1983 against Defendant Laster based on an incident that occurred on

February 16, 2018; (3) a claim of retaliation in violation of the First Amendment and 42 U.S.C. § 1983 against Defendant Oliver based on an incident that occurred on April 5, 2018; and (4) a claim of retaliation in violation of the First Amendment and 42 U.S.C. § 1983 against Defendant Rielly based on an incident that occurred on April 6, 2018. (*See generally* Dkt. Nos. 42, 46.)

 **B. Defendants' Statement of Undisputed Facts**
Unless otherwise noted, the following facts were asserted and supported by Defendants in their Statement of Material Facts and not denied by Plaintiff in his response. (*Compare* Dkt. No. 60, Attach. 1 [Defs.' Statement of Material Facts], *with* Dkt. No. 66 [Pl.'s Resp.].) [3]

1. At all relevant times, Plaintiff was an incarcerated individual in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").

2. On January 6, 2020, Plaintiff commenced this action against DOCCS employees, pursuant to 42 U.S.C. § 1983.

3. Plaintiff's remaining claims include (a) one excessive force claim against Defendants Rielly and Oliver, and (b) three retaliation claims against Defendants.

4. At all relevant times, Defendants were corrections officers employed by DOCCS who worked at the Greene Correctional Facility ("Greene CF"). [4]

 **\*2** 5. Plaintiff's excessive force claim against Defendants Rielly and Oliver relates to an incident that occurred on December 9, 2017.

6. On December 9, 2017, around 5 p.m., Defendant Rielly observed Plaintiff stop movement to speak with another incarcerated individual.

7. Defendant Rielly gave Plaintiff several direct orders to keep moving, but Plaintiff did not comply. [5]

8. To restore order, Defendant Rielly pulled Plaintiff aside and conducted a pat frisk. [6]

9. For safety purposes, Defendant Oliver observed Defendant Rielly's pat frisk. [7]

**\*3**  10. The search was compliant with DOCCS policy and Defendant Rielly used no more force than was necessary to detect contraband. [8]

11. The search was completed without incident and Plaintiff returned to his dorm. [9]

12. On December 11, 2017, Plaintiff was examined by medical staff and an inmate injury report was recorded.

13. During that examination, the nurse did not observe any visible injuries on Plaintiff. In addition, Plaintiff denied sustaining any injuries.

14. On December 12, 2017, Plaintiff filed a grievance alleging that Defendants Rielly and Oliver assaulted him.

15. Plaintiff alleges First Amendment retaliation claims against Defendants.

16. Plaintiff's retaliation claim against Defendant Laster pertains to his grievance filed in December 2017, and the alleged confiscation of his notepad on February 16, 2018.

17. Plaintiff testified that before February 16, 2018, he had no issues with Defendant Laster.

18. On February 16, 2018, at 10:30 a.m., Defendant Laster conducted a random search of Plaintiff's cube.

19. Defendant Laster found two items of contraband, which were recorded on a contraband receipt. Defendant Laster gave Plaintiff a copy of the contraband receipt.

20. Defendant Laster avers that at no point on February 16, 2018, did she find, confiscate, or make comments about a notepad.

21. Defendant Laster avers that she was not aware of Plaintiff's grievance activity.

22. Plaintiff's retaliation claim against Defendant Oliver pertains to his grievance filed in December 2017, and an alleged pat frisk on April 5, 2018.

23. On April 5, 2018, Defendant Oliver worked the North Yard.

24. At no point on April 5, 2018, did Defendant Oliver pat frisk Plaintiff or direct him to remove his shoes. [10]

25. Defendant Oliver contends that he was not aware of Plaintiff's grievance activity. [11]

**\*4**  26. Plaintiff's retaliation claims against Defendant Rielly pertains to his grievance filed in December 2017, and an alleged strip search on April 6, 2018.

27. Defendant Rielly contends that at no point on April 6, 2018, did he ride in a van with Plaintiff, conduct a strip search, or confiscate Plaintiff's gloves and scarf. [12]

28. Defendant Rielly contends that he was not aware of Plaintiff's grievance activity. [13]

### C. Parties' Arguments

#### 1. Defendants' Memorandum of Law

Generally, Defendants argue that Plaintiff's remaining claims fail as a matter of law based on the record evidence. (Dkt. No. 60, Attach. 6 at 3.) More specifically, with respect to Plaintiff's excessive force claim against Defendants Rielly and Oliver, Defendants acknowledge that force was used upon Plaintiff, but contend that it was necessary to maintain order in light of Plaintiff's behaviors—that is, "stop[ping] movement" in an "elevated traffic" area and the "suspicious interaction" with another inmate. (*Id.* at 14.) Defendants argue that Plaintiff's alleged injuries are de minimis and thus demonstrate that the use of force was "insufficient to rise to a level of constitutional violation." (*Id.* at 15.) In the alternative, Defendants contend that they are entitled to qualified immunity. (*Id.* at 15-16.)

With respect to Plaintiff's retaliation claim against Defendant Oliver, Defendants argue that (1) Defendant Oliver was not personally involved in the alleged pat frisk on April 5, 2018, (2) a pat frisk is not an adverse action and Plaintiff suffered no more than a "few minutes" of discomfort standing on the cold ground, and (3) there is no evidence of a causal connection between Plaintiff's protected conduct in December 2017, and the incident on April 5, 2018. (Dkt. No. 60, Attach. 6 at 7-10.) With respect to Plaintiff's retaliation claim against Defendant Rielly, Defendants argue that (1) even if true, Defendant Rielly's strip search was not adverse, (2) Defendant Rielly was not involved in Plaintiff's missing gloves and scarf, and (3)

there is no evidence of a causal connection between Plaintiff's protected conduct in December 2017, and the incident on April 6, 2018. (Dkt. No. 60, Attach. 6 at 10-12.) Finally, Defendants argue that Plaintiff has presented no evidence as to why Defendant Laster would retaliate against him based on a grievance he filed against other officers. (*Id.* at 12.)

### 2. Plaintiff's Opposition

In response, Plaintiff argues that his claims are "well supported" by record evidence and that there are material issues of fact precluding summary judgment. (Dkt. No. 66 at 3.) Plaintiff indicates that he has satisfied the both the objective and subjective elements necessary for an Eighth Amendment excessive force claim from December 2017. (*Id.*) Likewise, Plaintiff asserts that his First Amendment claims stemming from February 2018 and April 2018 show that he engaged in protected conduct and that Defendants took adverse action against him in response. [14] (*Id.*)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing A Motion For Summary Judgment

**\*5** Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [15] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).

However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se.* [16] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [17] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [18]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1. What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement [19] – even when the non-movant was proceeding *pro se.* [20]

**\*6** Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3). [21] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as

a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

**B. Legal Standard Governing Excessive Force Claims**

The Eighth Amendment prohibits cruel and unusual punishment, "including the 'unnecessary and wanton infliction of pain' " against prisoners. *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). To succeed on an Eighth Amendment excessive force claim, "an inmate must prove two components, one subjective and the other objective." *Romaine v. Rawson*, 140 F. Supp. 2d 204, 210-11 (N.D.N.Y. 2001) (Kahn, J.) (citing *Hudson v. McMillan*, 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). "The subjective component focuses on the defendant's motive for his conduct [whereas] [t]he objective component focuses on the conduct's effect in light of contemporary standards of decency." *Romaine*, 140 F. Supp. 2d at 211 (citing *Blyden*, 186 F.3d at 262).

More specifically, relative to the subjective test, there must be a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden*, 186 F.3d at 262 (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)). "Wantonness" turns on "whether the force was applied in a good-faith effort to restore discipline, or maliciously and sadistically to cause harm." *Sims*, 230 F.3d at 20 (quoting *Hudson*, 503 U.S. at 7); *see also Boddie v. Schneider*, 105 F.3d 857, 861 (2d Cir. 1997) (stating that where "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may ... be sufficient evidence of a culpable state of mind."). Additionally, the court must "evaluate the need for the application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.' "

*Hudson*, 503 U.S. at 8 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

Furthermore, the objective component of the test is "context specific, turning on contemporary standards of decency." *Blyden*, 186 F.3d at 263 (quoting *McMillian*, 503 U.S. at 8). The focus is "on the harm done; but the amount of harm that must be shown depends on the nature of the claim." *Sims*, 230 F.3d at 21 (citing *Hudson*, 503 U.S. at 8). Indeed, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Sims*, 230 F.3d at 22 (citations and internal quotations omitted); *see also Romaine*, 140 F. Supp. 2d at 212 (quoting *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993)); *Hudson*, 503 U.S. at 10 ("[A]n allegation that indicates only a de minimis use of force will 'rarely suffice to state a constitutional claim' ... unless the force is the 'sort repugnant to the conscience of mankind[.]' ").

**C. Legal Standard Governing Retaliation Claims**

**\*7**  "To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (cleaned up). As the Second Circuit has repeatedly cautioned, "[c]ourts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)); *see also Phelps v. Kapnolas*, 308 F.3d 180, 187 n. 6 (2d Cir. 2002).

"[T]he use of the prison grievance system" is constitutionally protected conduct under the First Amendment. *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004); *see*

*Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (holding that "retaliation against a prisoner for pursuing a grievance violates the right to petition the government for redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983."). Furthermore, "adverse action" for the purposes of a retaliation claim has been defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights ... [o]therwise the retaliatory act is simply de minimis and therefore outside the ambit of constitutional protection." *Davis*, 320 F.3d at 353 (citing *Dawes*, 239 F.3d at 493).

To establish a causal connection between protected activities and the adverse action, the court may consider a number of factors, including "(1) the outcome of any hearing concerning the allegedly retaliatory charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and[ ] (4) the temporal proximity between the protected activity and the defendant's adverse action." *Williams v. Muller*, 98-CV-5204, 2001 WL 936297, at *3 (S.D.N.Y. Aug. 17, 2001) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) *abrogated, in part, on other grounds by* *Tangreti v. Bachmann*, 983 F.3d 609 (2d 2020)). However, with respect to temporal proximity at the summary judgment stage, the Second Circuit has "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017).

## III. ANALYSIS

### A. Plaintiff's Excessive Force Claims Against Defendants Rielly and Oliver

After carefully considering the matter, I recommend that the Court grant Defendants' motion for summary judgment with respect to Plaintiff's excessive force claims against Defendants Rielly and Oliver for the reasons stated in Defendants' memorandum of law. (Dkt. No. 60, Attach. 6 at 13-16.) The Court has considered the record evidence, not only in a light most favorable to Plaintiff as the non-moving party, but also in consideration of the special solicitude afforded to *pro se* litigants. *See* *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (citations omitted). Nonetheless, even a non-moving *pro se* litigant

"must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citations omitted). Plaintiff has failed in this regard.

**\*8** In light of the undisputed facts regarding the incident on December 9, 2017, it would be reasonable for any corrections officer—in this case Defendant Rielly—"charged with directing incarcerated individuals back to their dorms after chow time," to initiate at least a pat frisk of Plaintiff in connection with his suspicious behavior and interaction with another inmate. (Dkt. No. 60, Attach. 2 at ¶ 8); *see e.g.*, *Alcaide v. Smith*, 17-CV-1239, 2019 WL 4621963, at *3 (N.D.N.Y. Sept. 24, 2019) (Suddaby, C.J.) (finding that the defendant "possessed reasonable suspicion to initiate a pat-frisk" where the plaintiff was perceived "to be 'acting suspiciously' while in the line returning from the mess hall.");

*Pizarro v. Bd. of Corrections*, 16-CV-2418, 2018 WL 3462512, at *6 (S.D.N.Y. Jul. 17, 2018) (quoting *Hudson*, 468 U.S. at 529) ("[T]he Supreme Court has held that 'wholly random searches are essential to the effective security of penal institutions[.]' ").

Plaintiff was undisputedly "grabbed," placed against a fence, and forcefully searched for contraband. (Dkt. No. 60, Attach. 1 at ¶ 8; Dkt. No. 60, Attach. 5 at 69; Dkt. No. 1 at ¶ 54.) At this juncture, however, the Court rejects Plaintiff's argument that Defendants lacked "a legal basis to use force against him." (*See* Dkt. No. 1 at ¶ 54.) It is well settled that searching or "frisking" a prisoner necessarily requires using some measure of force and, as a necessary security precaution, courts in this circuit have recognized that corrections officers may conduct "random pat frisks on free movement inmates going to or coming from services and programs[.]" *Houston v. Coveny*, 14-CV-6609, 2020 WL 1151345, at *5 (W.D.N.Y. Mar. 9, 2020) (citing *Tavares v. City of N.Y.*, 08-CV-3782, 2011 WL 5877550, at *6 (S.D.N.Y. Oct. 17, 2011) (record citations omitted)). Nevertheless, the Court must still consider the relationship between Defendants' perceived need to use force and the amount of force actually used on Plaintiff. *See* *Hudson*, 503 U.S. at 8 (citation omitted).

While the lack of serious injury is not dispositive, it is particularly relevant in this case because there is no genuine dispute that force was used during an authorized search. *See* *Hudson*, 503 U.S. at 7 ("The absence of serious injury

is ... relevant to the Eighth Amendment inquiry, but does not end it."). Plaintiff alleges merely that he initially "felt dizzy" and that when he returned to his dorm bathroom, he saw a "laceration" on his forehead, which "fade[d] away" within a day or two. (Dkt. No. 1 at 76; Dkt. No. 60, Attach. 5 at 75-76.) The Court accepts Plaintiff's characterizations that his feet were "kicked" apart, that his head was "pushed" and "rubbed" against the fence, and that he was "smacked" at the bottom of his face during the search; however, considering that Plaintiff was undisputedly interrupting a high traffic area and perceived to be acting suspiciously, and considering the lack of any significant injuries, it cannot be said that the force applied was objectively unreasonable. *See e.g.,*

*Robinson v. Henschel*, 10-CV-6212, 2014 WL 1257287, at *6 (S.D.N.Y. Mar. 26, 2014) ("Accepting [the p]laintiff's description of his hand being 'slammed' repeatedly against the wall, the amount of force [the defendant] applied in doing so was *de minimus*."); *Taylor v. N.Y. Dep't of Corr.*, 10-CV-3819, 2012 WL 2469856, at *5 (S.D.N.Y. Jun. 27, 2012) (quoting *Hudson*, 503 U.S. at 9-10) ("A correction officer's forcing an inmate's face into a prison wall, though clearly unpleasant to endure, would not appear 'repugnant to the conscience of mankind.' "); *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 507 (S.D.N.Y. 2012) (collecting cases) (stating that "where, as here, a plaintiff alleges only a degree of roughness that is common in prison contexts, and has not claimed a lasting or even fleeting injury from the defendant's conduct, courts in this circuit have routinely held that such conduct is insufficiently serious to support an Eighth Amendment claim."); *Espinal v. Goord*, 00-CV-2242, 2001 WL 476070, at *13 n. 46 (S.D.N.Y. May 7, 2001) ("[A]llegations that [officer] hit [inmate] two or three times in the face, causing his face to turn red, but resulting in no other injuries ... are insufficient to state an Eighth Amendment claim."); *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 471 (S.D.N.Y. 1998) ("[A]lthough kicking an inmate's ankles and feet cannot be condoned, this use of force is *de minimus* and insufficient to rise to the level of a constitutional violation.");.

**\*9** To the extent that Plaintiff alleges Defendants stated "I hate that they got all this [sic] cameras around, all this [sic] people looking," such a statement does not elevate an otherwise reasonable use of force to the level of sadistic or malicious conduct in violation of the Eighth Amendment. (*See* Dkt. No. 1 at ¶ 54.) When viewed in a light most favorable to Plaintiff, the statement implies that, but for the cameras and the would-be witnesses walking around in the area, Defendants may have inflicted further punishment upon

Plaintiff for his actions. While I do not condone Defendants' alleged statements, under the circumstances of this case, the conduct falls short of a constitutional violation considering the legitimate penological goal in searching Plaintiff in connection with his suspicious behaviors and maintaining order in a high traffic area.

In the alternative, for the reasons set forth in Defendants' memorandum of law, I recommend that the Court grant Defendants' motion for summary judgment with respect to Plaintiff's excessive force claims against Defendants Rielly and Oliver based on the doctrine of qualified immunity. (*See* Dkt. No. 60, Attach. 6 at 15-16.)

Accordingly, I recommend that Plaintiff's Eighth Amendment excessive force claims against Defendants Rielly and Oliver be dismissed.

### B. Plaintiff's Retaliation Claims Against Defendants Rielly, Oliver, and Laster

After carefully considering the matter, I recommend that the Court grant Defendants' motion for summary judgment with respect to Plaintiff's retaliation claims against Defendants Rielly and Oliver and deny Defendants' motion for summary judgment with respect to Plaintiff's retaliation claim against Defendant Laster.

### 1. February 16, 2018 (Defendant Laster)

For purposes of this Report and Recommendation, it is assumed (without deciding) that the record contains sufficient evidence with respect to the first two prongs of Plaintiff's First Amendment retaliation claim against Defendant Laster because Defendants did not move on those bases. More specifically, Plaintiff's litigation activities and grievances against numerous officials at Greene CF constitute protected conduct. *See Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001) (holding that a grievance is constitutionally protected conduct); *Graham*, 89 F.3d at 80 (holding that the "filing of a grievance and attempt to find inmates to represent [other] grievants—is constitutionally protected."). Moreover, while a cell search generally does not constitute an adverse action in the context of a First Amendment retaliation claim, it is well-established that the unwarranted confiscation of a prisoner's property does; thus, the alleged taking of Plaintiff's notepad is a sufficiently adverse action. *Yunus v.*

*Jones*, 16-CV-1282, 2019 WL 5196982, at *6 (Baxter, M.J.) (N.D.N.Y. Jun. 21, 2019), *report recommendation adopted by* 2019 WL 4010260 (N.D.N.Y. Aug. 26, 2019) (Suddaby, C.J.).

Although Defendant Laster attests that she did not confiscate or make comments about Plaintiff's notepad on February 16, 2018, and that she was unaware of Plaintiff's grievance activity (Dkt. No. 60, Attach. 4 at ¶¶ 13-14), crediting Plaintiff's allegations in their full context, as the Court must, I find that a genuine dispute of material fact exists regarding the causal connection between Plaintiff's protected conduct and Defendant Laster's alleged adverse action on February 16, 2018.

Plaintiff testified to the following events. On February 16, 2018, Defendant Laster read Plaintiff's notepad where Plaintiff stored information regarding his grievances and lawsuits. (Dkt. No. 1 at ¶ 81.) Defendant Laster asked Plaintiff why he kept the notepad and Plaintiff responded that it was for his ongoing lawsuits. (*Id.*) Later in the day on February 16, 2018, Defendant Laster made a speech before Plaintiff's dorm that "everybody was walking on egg shells and that for anything she was going to make sure that they dead the late night." (*Id.* at ¶ 83 [errors in original].) Defendant Laster directed Plaintiff to "put that in your book if you want to." (*Id.* at ¶ 84.) Later, Defendant Laster went to Plaintiff's cube and asked Plaintiff for his notepad, stating that the sergeant wanted to see it. (*Id.* at ¶ 85.) Defendant Laster then took Plaintiff's notepad and did not return with it, a contraband slip, or any document indicating that she had taken the notepad. (*Id.* at ¶ 86.)

**\*10** "The fact that there is no evidence that Defendants made a statement of retaliatory intent is a factor to consider, but that Plaintiff cannot adduce evidence of such a statement is not fatal to his claim." *Young v. Shipman*, 18-CV-0782, 2020 WL 1329159, at *5 (N.D.N.Y. Mar. 23, 2020) (Sannes, J.) (citing Gayle v. Gonyea, 313 F.3d 677, 684 (2d Cir. 2002) (rejecting defendants' argument that plaintiff "failed to meet his evidentiary burden because he has failed to submit direct evidence that the [misbehavior] report was filed as a retaliatory measure"); *see also Vaher v. Town of Orangetown*, 133 F. Supp. 3d 574, 596 (S.D.N.Y. 2015) ("Direct evidence of retaliatory intent is not required" to overcome summary judgment on a First Amendment retaliation claim)).

Moreover, while, as a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant, Plaintiff has adduced evidence that Defendant

Laster reviewed then confiscated his notepad, which contained important information regarding the grievances and lawsuits that Plaintiff filed.

Further, "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (citations omitted). No bright line test has been drawn " 'to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.' " *Espinal*, 558 F.3d at 129 (quoting Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001)). The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Id.* (citing Gorman-Bakos, 252 F.3d at 555 (suggesting the lapse of five months between protected activity and retaliation may show a causal connection)). Here, the alleged adverse action occurred approximately two months after Plaintiff's protected conduct and thus, was within close temporal proximity for purposes of inferring a causal connection.

On this record, I find that Plaintiff has raised a genuine issue of material fact as to whether Plaintiff's protected conduct of, *inter alia*, filing a grievance against Defendants Rielly and Oliver "was a substantial or motivating factor in [Defendant Laster's] decision to" allegedly confiscate Plaintiff's notepad. *See Young v. Shipman*, 2020 WL 1329159, at *5 (finding that the plaintiff had raised a genuine issue of material fact regarding the causal connection where (1) there was close temporal proximity between defendant Shipman's alleged retaliation and plaintiff's grievance against defendant Sawyer, (2) defendant Sawyer endorsed the allegedly false misbehavior report against the plaintiff, and (3) defendants Shipman and Sawyer were allegedly discussing Plaintiff's prior grievance against defendant Sawyer moments before the allegedly retaliatory conduct occurred).

As a result, I recommend that Defendants' motion for summary judgment with respect to Plaintiff's retaliation claim against Defendant Laster be denied.

**2. April 5, 2018 (Defendant Oliver)**

Plaintiff's retaliation claim against Defendant Oliver regarding the April 5, 2018, pat frisk fails because he was not subjected to a sufficiently adverse action, and because Defendant Oliver was not personally involved in the matter. (Dkt. No. 60, Attach. 5 at 45-46, 86.)

First, courts have found that "pat frisks—even if conducted for retaliatory reasons—cannot constitute adverse action for purposes of a First Amendment claim." *Morgan v. Luft*, 15-CV-0024, 2017 WL 4326082, at *5 (N.D.N.Y. Sept. 28, 2017) (Suddaby, C.J.) (citing *Henry v. Annetts*, 08-CV-0286, 2010 WL 3220332, at *2 (S.D.N.Y. July 22, 2010); *Amaker v. Fischer*, 10-CV-0977, 2014 WL 8663246, at *5 (W.D.N.Y. Aug. 27, 2014)). Although Plaintiff alleged that, during the pat frisk, he and another inmate were forced to remove their shoes and stand on "the freezing cold floor" (Dkt. No. 1 at ¶ 94), he testified that the search lasted only "a few minutes" (Dkt. No. 60, Attach. 55 at 47-48) and that, after the search was completed, he and the other incarcerated individual put their shoes on and "continued the night." (*Id.* at 48.) Considering that pat frisks are a recognized part of prison life, Plaintiff provides no evidence as to how such additional, temporary discomfort lasting only a few minutes could reasonably deter an inmate from further engaging in First Amendment protected activities. *See Henry*, 2010 WL 3220332, at *2 ("Cell searches and pat frisks are an ordinary part of prison life and would not (and do not) deter the average inmate from continuing to exercise his First Amendment rights.").

 **\*11** Second, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations and internal quotations omitted). The plaintiff has the burden to demonstrate that the defendant "directly participated[ ] in the alleged constitutional violation." *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005).

During his deposition, Plaintiff testified that, before Defendant Oliver's arrival, "another officer" directed Plaintiff and another incarcerated individual to put their hands on the wall and started to pat frisk them. (Dkt. No. 60, Attach. 5 at 45-46.) Plaintiff testified that when Defendant Oliver approached, he made a comment that he had a "similar situation" with Plaintiff in the past. (*Id.* at 45.) Then the other officer ordered Plaintiff and the other incarcerated individual to take their shoes off and continued searching them. (*Id.*,

pp. 46-48.) Even if a pat frisk conducted on a cold ground constituted a sufficiently adverse action, Defendant Oliver's only involvement was making a comment that he had a similar situation with Plaintiff in the past. Plaintiff testified that the other officer began the pat frisk before Defendant Oliver mentioned anything about his prior interactions with Plaintiff.

As a result, I recommend that Plaintiff's First Amendment retaliation claim against Defendant Oliver be dismissed.

### 3. April 6, 2018 (Defendant Rielly)

"Whether a strip search constitutes an adverse action for purposes of a retaliation claim has not been addressed by many courts in this circuit." *Johnson v. Naqvi*, 18-CV-0694, 2021 WL 1723773, at *7 (D. Conn. Apr. 29, 2021). [22]

Recently, retaliatory strip searches were addressed in *Pizarro v. Bd. of Corr.*, 16-CV-2418, 2018 WL 3462512 (S.D.N.Y. July 17, 2018), where District Judge Richard Sullivan concluded that an officer's strip search of an inmate did not qualify as an adverse action where the inmate's entire housing unit underwent the strip search, and thus, the plaintiff was not singled out and had not presented any evidence demonstrating "why a routine and ordinary lawful strip search would deter a typical prisoner from exercising his or her First Amendment rights." *Pizarro*, 2018 WL 3462512, at *6.

In *Johnson v. Naqvi*, 18-CV-0694, 2021 WL 1723773, at *8-9 (D. Conn. Apr. 29, 2021), Senior District Judge Charles Haight concluded that an officer's strip search of an inmate qualified as an adverse action where windows permitted other officers and inmates to view the plaintiff's exposed body during the search and the search was not ordinary or routine—as in *Pizarro*—but instead singled the plaintiff out. *Johnson v. Naqvi*, 2021 WL 1723773, at *8-9.

 **\*12** Here, Plaintiff testified that during the search other officers watched and laughed while speaking with one another about how Plaintiff "keep[s] going through all of this." (Dkt. No. 60, Attach. 5 at 52, 58.) Further, although Plaintiff was not singled out—because another incarcerated individual was simultaneously searched in an adjacent room—viewing the facts in the light most favorable to Plaintiff, it was not a routine and ordinary strip search. (*Id.* at 54.) In addition, Plaintiff alleges that after the search was completed and he was given his clothes back, his gloves and scarf were

not provided. (*Id.* at 61.) As a result, for purposes of this motion, the Court will assume that there is a genuine dispute of material fact about whether Defendant Rielly's conduct constituted an adverse action.

Nevertheless, I find that Plaintiff fails to present evidence establishing a genuine dispute of material fact causally connecting the incident on April 6, 2018, and his protected conduct in December 2017.

As set forth above in Part III.B.1. of this Order and Report-Recommendation, courts have declined to "define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," and the Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Espinal, 558 F.3d at 129.* Here, approximately four months passed between Plaintiff's protected conduct and Defendant Rielly's alleged adverse action. Assuming—without deciding—that Defendant Rielly's alleged adverse action was close enough in time such that a causal connection could be inferred, the Second Circuit has "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify,* 681 F. App'x 43, 46 (2d Cir. 2017); *see Roseboro v. Gillespie,* 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (collecting cases) ("To be sure, a 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action.' Such circumstantial evidence of retaliation, however, without more, is insufficient to survive summary judgment."); *Ziemba v. Thomas,* 390 F. Supp. 2d 136, 157 (D. Conn. 2005) ("Temporal proximity alone is not sufficient for the plaintiff's claim to survive summary judgment.").

Plaintiff presents no other evidence to support an inference that Defendant Rielly's actions on April 8, 2018, were causally connected to Plaintiff's protected conduct in December 2017. Even construing Plaintiff's testimony that during the search the other officers were laughing and making statements that Plaintiff "keep[s] going through all of this," he does not elaborate on what the officers meant by the term "through all of this." Viewing that allegation in the context of the record before the Court, this statement seems to refer to Plaintiff undergoing frequent searches such as the pat frisk on April 5, 2018, involving another officer and Defendant Oliver

during which, Defendant Oliver allegedly stated that he had a similar experience with Plaintiff previously. The record does not contain evidence, from which a reasonable jury could conclude that Defendant Rielly took any action against Plaintiff on April 6, 2018, causally connected to Plaintiff's protected conduct in December 2017.

As a result, I recommend that the Court grant Defendants' motion for summary judgment with respect to Plaintiff's retaliation claim against Defendant Rielly.

**ACCORDINGLY**, it is

**ORDERED** that the Clerk of the Court is directed to amend the docket such that Defendant "C.O. Riley" is changed to Defendant "C.O. Rielly;" and it is further respectfully

**RECOMMENDED** that Defendants' motion (Dkt. No. 60) be **GRANTED** in part such that Plaintiff's excessive force and retaliation claims against Defendants Oliver and Rielly be dismissed, and **DENIED** in part such that Plaintiff's retaliation claim against Defendant Laster survives; and it is further

**\*13  ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on the parties, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [23] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); FED. R. CIV. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Slip Copy, 2022 WL 18402299

## Footnotes

1    In Defendants' motion for summary judgment (Dkt. No. 60, Attach. 2), Defendants represented to the Court
     that the defendant referred to by Plaintiff as "C.O. Riley" is actually "C.O. Rielly." This representation is
     consistent with counsel's acknowledgment of service and notice of appearance for this defendant. (Dkt. Nos.
     19, 21.) As a result, the Clerk of the Court is directed to amend the docket sheet accordingly. Any reference
     in the Complaint (Dkt. No. 1) to "C.O. Riley" shall be deemed to refer to "C.O. Rielly."

2    This matter has been referred to the undersigned for a Report and Recommendation by the Honorable Glenn
     T. Suddaby, United States District Judge.

3    In accordance with Local Rule 56.1(a), Defendants submitted a Statement of Material Facts ("L.R. 56.1
     Statement"), setting forth concise factual assertions supported by specific record citations in individually
     numbered paragraphs. (See Dkt. No. 60, Attach. 1.) Instead of directly answering the L.R. 56.1 Statement,
     Plaintiff provided responses mirroring the individually numbered paragraphs contained in Defendants'
     supporting declarations. (See Dkt. No. 66, pp. 5-8, 11.) Moreover, Plaintiff's responses to the numbered
     paragraphs in Defendants' supporting declarations failed to provide specific record citations supporting any
     purported factual disputes, as required by Local Rule 56.1(b). (See id.) In light of Plaintiff's pro se status, where
     Defendants cited to a declaration in support of the fact asserted, the Court considered Plaintiff's response
     to the portion of the declaration cited.

4    Although Defendants failed to include a record citation in support of this asserted fact, there is support in the
     record for it. (Dkt. No. 60, Attach. 2 at ¶ 3; Dkt. No. 60, Attach. 3 at ¶ 3; see generally Dkt. No. 60, Attach. 4.)

5    Defendants cite to the affidavit of Defendant Rielly in support of this statement of material fact. (Dkt. No. 60,
     Attach. 1 at ¶ 6 [citing Dkt. No. 60, Attach. 2 at ¶¶ 9-10].) As set forth above in note 3, although Plaintiff
     responds to paragraph 10 of the declaration of Defendant Rielly with the single word, "[d]isagree," he fails to
     include a citation to the record to support his contention that the assertion is in dispute. (Dkt. No. 66 at 7, ¶
     10.) As a result, the fact is deemed admitted. Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact ... is
     genuinely disputed must support the assertion by ... citing to particular parts of the record ... or ... showing
     that the materials cited do not establish the absence ... of a genuine dispute, or that an adverse party cannot
     produce admissible evidence to support the fact."); N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's response shall
     mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions
     in matching numbered paragraphs.") (emphasis added); N.Y. Teamsters v. Express Servs., Inc., 426 F.3d
     640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule
     7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant
     submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual
     assertions and failed to include any record citations"); Prindle v. City of Norwich, 15-CV-1481, 2018 WL
     1582429, at *2 n.2 (N.D.N.Y. Mar. 27, 2018) (Suddaby, C.J.) ("In this portion of his Rule 7.1 Response, Plaintiff
     made a blanket denial of all of the facts in the corresponding paragraph of Defendants' Rule 7.1 Statement
     but cited a portion of the record that disputed only one of the facts asserted by Defendants, in violation of
     the District's Local Rules of Practice."); Jamison v. Metz, 865 F. Supp. 2d 204, 207 n.1 (N.D.N.Y. 2011)
     (Suddaby, J.) ("[W]herever [the pro se] Plaintiff has [wilfully] failed to cite record evidence in support of his
     denials of properly supported facts ... the Court has deemed such facts admitted to the extent they are not
     clearly in dispute."), rev'd in part on other grounds, 541 F. App'x 15, 17-19 (2d Cir. 2013).

6   *See*, *supra*, note 3. Although Plaintiff responds to paragraph numbers 11-12 of the declaration of Defendant Rielly with the word "disagree" (Dkt. No. 66 at 7, ¶¶ 11-12), he fails to include a citation to the record to support his contention that the assertions contained therein are in dispute. As a result, the fact is deemed admitted.

7   *See*, *supra*, note 3. Although Plaintiff responds to paragraph numbers 9-10, 14 of the declaration of Defendant Oliver with the word "disagree" (Dkt. No. 66 at 5, ¶¶ 9-10, 14), he fails to include a citation to the record to support his contention that the assertions therein are in dispute. As a result, the fact is deemed admitted.

8   *See*, *supra*, note 3. Although Plaintiff responds to paragraph number 12 of the declaration of Defendant Oliver and paragraph numbers 12-13 of the declaration of Defendant Rielly with the word "disagree" (Dkt. No. 66 at 5, ¶ 12; Dkt. No. 66 at 7, ¶¶ 12-13), he fails to include a citation to the record to support his contention that the assertions therein are in dispute. As a result, the fact is deemed admitted.

9   *See*, *supra*, note 3. Although Plaintiff responds to paragraph numbers 11 and 13 of the declaration of Defendant Oliver and paragraph number 14 of the declaration of Defendant Rielly with the word "disagree" (Dkt. No. 66 at 5, ¶¶ 11, 13; Dkt. No. 66 at 7, ¶ 14), he fails to include a citation to the record to support his contention that the assertions therein are in dispute. As a result, the fact is deemed admitted.

10   *See*, *supra*, note 3. Although Plaintiff responds to paragraph number 20 of the declaration of Defendant Oliver with the word "disagree" (Dkt. No. 66 at 5, ¶ 20), he fails to include a citation to the record to support his contention that the assertions therein are in dispute. As a result, the fact is deemed admitted.

11   *See*, *supra*, note 3. Although Plaintiff responds to paragraph number 21 of the declaration of Defendant Oliver with the word "disagree" (Dkt. No. 66 at 5, ¶ 21), he fails to include a citation to the record to support his contention that the assertions therein are in dispute. As a result, the fact is deemed admitted.

12   *See*, *supra*, note 3. Although Plaintiff responds to paragraph number 18 of the declaration of Defendant Rielly with the word "disagree" (Dkt. No. 66 at 7, ¶ 18), he fails to include a citation to the record to support his contention that the assertions therein are in dispute. As a result, the fact is deemed admitted.

13   *See*, *supra*, note 3. Although Plaintiff responds to paragraph number 19 of the declaration of Defendant Rielly with the word "disagree" (Dkt. No. 66 at 7, ¶ 19), he fails to include a citation to the record to support his contention that the assertions therein are in dispute. As a result, the fact is deemed admitted.

14   Plaintiff also contends that he has not been able to review certain alleged evidence in connection with this action, specifically "the entire file from the Office of Special Investigations." (Dkt. No. 66 at 3.) However, discovery in this matter closed on January 28, 2022, Plaintiff did not subsequently file a motion to compel production, and Plaintiff has not filed an affidavit or declaration pursuant to *Fed. R. Civ. P 56(d)*. (*See* Dkt. No. 59.)

15   As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

16   *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

17   *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

18   *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

19   Among other things, Local Rule 56.1 (previously Local Rule 7.1[a][3]) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1.

20   *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

21   *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3)) (previously Local Rule 7.1[b][3]); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

22   The term "strip search," as used by the parties, means a search in which the incarcerated individual removes his clothes and an officer visually inspects his body cavities, including the anus. *See* DOCCS Directive No. 4910 at 7. According to DOCCS policy, correction officers can perform a strip search upon determination of probable cause and authorization from a sergeant or higher-ranking officer. *Id.* at 8. By contrast, a "body cavity search" under DOCCS policy means physical examination of an individual's "oral and/or genital cavities"; DOCCS policy requires that such a search be performed by a medical professional and authorized by the "Superintendent, Acting Superintendent, or facility Officer of the Day." *Id.* at 10-11.

23   If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 356204
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ederick FABRIZIO, Plaintiff,

v.

C.O. RIELLY; C.O. Oliver; and C.O. Laster, Defendants.

9:20-CV-0011 (GTS/ML)
|
Signed January 23, 2023

**Attorneys and Law Firms**

EDERICK FABRIZIO, Plaintiff, Pro Se, Calle 13-A-DD7, Villa del Rey IV, Caguas, Puerto Rico 00727.

HON. LETITIA A. JAMES, Attorney General for the State of New York, DAVID C. WHITE, ESQ., Assistant Attorney General, Counsel for Defendants, The Capitol, Albany, New York 12224.

**DECISION and ORDER**

GLENN T. SUDDABY, United States District Judge

 **\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Ederick Fabrizio ("Plaintiff") against the three above-captioned employees of the New York State Department of Corrections and Community Supervision ("Defendants"), is United States Magistrate Judge Miroslav Lovric's Report-Recommendation recommending that Defendants' motion for summary judgment be granted with respect to Plaintiff's excessive force and retaliation claims against Defendants Rielly and Oliver and denied with respect to Plaintiff's retaliation claim against Defendant Laster. (Dkt. No. 69.) Neither party has filed an objection to the Report-Recommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.)

After carefully reviewing the relevant papers herein, including Magistrate Judge Lovric's thorough Report-Recommendation, the Court can find no clear-error in the Report-Recommendation: [1] Magistrate Judge Lovric employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons set forth therein.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Lovric's Report-Recommendation (Dkt. No. 69) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 60) is **GRANTED** with respect to Plaintiff's excessive force and retaliation claims against Defendants Oliver and Rielly (who are terminated from this action), and **DENIED** with respect to Plaintiff's retaliation claim against Defendant Laster.

**All Citations**

Slip Copy, 2023 WL 356204

---

**Footnotes**

1   When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a "clear error" review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**Flood v. Cappelli, Not Reported in Fed. Supp. (2019)**

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 135 of 198

2019 WL 3778736
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joseph V. FLOOD, Plaintiff,
v.
Officer J. CAPPELLI; Officer
Carl E. DuBois, Defendants.

No. 18-CV-3897 (KMK)
|
Signed 08/12/2019

**Attorneys and Law Firms**

Joseph V. Flood, Goshen, NY, Pro Se Plaintiff.

Karen D. Edelman-Reyes, Esq., Orange County District
Attorney's Office, Goshen, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

 **\*1**  Joseph V. Flood ("Plaintiff"), currently incarcerated
at Orange County Jail ("OCJ"), brings this Action under
📑 42 U.S.C. § 1983, against Officer J. Cappelli ("Cappelli")
and Officer Carl E. DuBois ("DuBois") (collectively,
"Defendants"). Plaintiff alleges that Defendants violated
his constitutional rights when they searched and sexually
assaulted him and retaliated against him for filing a grievance.
(Compl. (Dkt. No. 2).) Before the Court is Defendants'
Motion To Dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(6). (See Not. of Mot. (Dkt. No. 17).) For the
reasons stated herein, the Motion is granted.

I. Background

A. Factual Background
The following facts are drawn from Plaintiff's Complaint,
and a letter Plaintiff submitted in opposition to Defendants'
Motion, (see Compl.; Letter from Plaintiff to Court (Nov. 26,
2018) ("Pl.'s Letter") (Dkt. No. 24)), and are taken as true for
the purpose of resolving the instant Motion. [1]

Plaintiff alleges that on April 1, 2018, at 9:15 a.m., he was
sexually assaulted outside the door to his cell by Cappelli
while being pat frisked. (Compl. 2–3.) Cappelli allegedly
swiped his hand between the backside of Plaintiff's rear end.
(Id. at 3) Plaintiff told Cappelli that this conduct was not
necessary and Cappelli smirked and responded that Plaintiff
probably liked it. (Id.; Pl.'s Letter 2.) While he does not
name them individually as Defendants in this Action, Plaintiff
alleges that several of Cappelli's coworkers were present,
specifically Officer Cappelli's brother, who was standing
behind Plaintiff, Officer Mackey, Officer Mendoza, and
Sergeant Berlinski, all of whom Plaintiff lists as part of the
Emergency Response Team. (Compl. 3.) Plaintiff alleges that
Sheriff Dubois is the sheriff in charge of OCJ, so that although
his "involvement [was] not direct," he is responsible for the
conduct of his employees "to a degree." (Pl.'s Letter 3.)

Plaintiff alleges that he filed a grievance, which remains
pending on appeal, and reported the incident to the PREA
hotline, during which he spoke to someone who was supposed
to investigate the alleged incident. (Id. at 2.) [2] Plaintiff alleges
that he was confined to his cell for approximately six days
in retaliation for filing the grievance. (Id. at 2–3; Compl. 3)
Plaintiff alleges that upon explaining his fear of being alone
with Cappelli to the mental health counselor, Plaintiff was
confined by Sergeant Zepplin ("Zepplin") who is a sergeant
of the unit wing where Cappelli also works. (Pl.'s Letter 3.) [3]
Plaintiff believes that, because he expressed his feelings to
the mental health counselor, Zepplin's conduct was an act
of retaliation for "making an issue out of" the matter. (Id.)
Plaintiff further alleges that Cappelli put a "no contact" on
him. (Id.)

 **\*2**  Plaintiff cites a PREA video that all inmates allegedly
view upon intake that states that OCJ has a zero-tolerance
policy for sexual abuse or sexual assault from staff or inmates
alike as the basis for his grievance. (Id. at 2.) Plaintiff
alleges that, as a result of this incident, his mental health
has been disrupted. (Compl. 3.) Specifically, he felt violated
and alleges that the incident has reminded him of the sexual
abuse he experienced as an adolescent in foster care. (Id.)
As a result of this alleged misconduct, Plaintiff alleges that
he has experienced depression, mental anguish, humiliation,
sleepless nights, and mental trauma. (Id.)

Plaintiff noted in his Complaint that he filed a grievance at
OCJ, and that the grievance procedure at the jail covered his
claims. (Id. at 4.) However, Plaintiff also noted that he did
not know if the grievance procedure did not cover some of

his claims, and answered affirmatively to the question "If you did not file a grievance, did you inform any officials of your claim(s)?" (*Id.* at 4–5.) Plaintiff noted that he informed "mental health," which submitted a report, and informed Lieutenant Potter, a Grievance and PREA Coordinator, for whom Plaintiff provided a written statement. (*Id.* at 5.) Finally, Plaintiff asserts that nothing has been sent back to him on "this [r]eport," although it is unclear what report he is specifically referencing. (*Id.*) In response to the question on the Complaint asking Plaintiff to detail all steps he took to grieve his claims, Plaintiff alleges that his initial grievance was denied for lack of merit, his appeal to the Chief Administrative Officer was denied on merit, and he is presently appealing to the Citizens' Policy and Complaint Review Council. (*Id.* at 4.) Plaintiff asserts that the grievance remains pending on appeal, with no response to date. (Pl.'s Letter 2.)

### B. Procedural History

Plaintiff's Complaint and application to proceed in forma pauperis ("IFP") were filed on May 1, 2018. (Dkt. Nos. 1, 2.) The Court granted Plaintiff's IFP application on May 15, 2018. (Dkt. No. 6.) On May 24, 2018, the Court issued an Order directing service on Defendants. (Dkt. No. 8.) On August 6, 2018, Defendants filed a letter requesting a pre-motion conference in anticipation of filing a Motion To Dismiss. (Letter from Karen Edelman-Reyes, Esq. to Court (Dkt. No. 14).) The Court granted the request and set a briefing schedule on August 21, 2018. (Dkt. No. 15.)

On September 12, 2018, Defendants filed the instant Motion To Dismiss and accompanying papers. (Not. Of Mot.; Decl. of Karen Edelman-Reyes, Esq. ("Edelman-Reyes Decl.") (Dkt. No. 18); Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 19); Not. of Mot. to a Pro Se Litigant (the "Notice") (Dkt. No. 20).) [4] On November 5, 2018, Defendants filed a declaration in further support of the Motion To Dismiss. (Decl. of Karen Edelman-Reyes, Esq. in Further Supp. of Mot. To Dismiss ("Edelman-Reyes's Reply Decl.") (Dkt. No. 22).) Plaintiff filed a response in opposition to the Motion on November 26, 2018. (Pl.'s Letter.) On December 6, 2018, Defendants filed a reply. (Letter from Karen Edelman-Reyes, Esq., to Court (Dkt. No. 25).) The Motion was deemed fully submitted on December 7, 2018. (Dkt. No. 26.)

### II. Discussion

Defendants argue that Plaintiff fails to sufficiently allege personal involvement by Dubois, fails to state a claim for violations of his Fourth and Eighth Amendment rights, fails to state a claim for retaliation under the First Amendment, fails to state a claim for due process violations under the Fourteenth Amendment, and that Plaintiff failed to exhaust his administrative remedies. (Defs.' Mem. 1.) County Defendants also argue they are entitled to qualified immunity. (*Id.*) The Court will address each argument to the extent necessary.

### A. Standard of Review

**\*3** The Supreme Court has held that, while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the

doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations...." (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the "complaint[ ] must be construed liberally and interpreted to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including, as relevant here, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted).

### B. Analysis

### 1. Personal Involvement of Defendant Dubois

Defendants argue that the Complaint should be dismissed against Dubois because he was not personally involved in the alleged constitutional violations. (Defs.' Mem. 4–6.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> **\*4** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (italics and internal quotation marks omitted) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). In other words, "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Therefore, Plaintiff must plausibly allege that Defendants' actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Plaintiff has failed to plausibly allege the personal involvement of Dubois. Plaintiff's Complaint alleges that Cappelli sexually assaulted him and describes the events leading up to and following this event. (*See* Compl. 2–3.) The Complaint contains no allegations whatsoever that Dubois was involved in, aware of, or somehow permitted these incidents to take place. Indeed, his name and position appears nowhere in the Complaint, other than in the caption and summarily on page two. (*See* Compl. 1–5.) Plaintiff admits that Dubois was not directly involved but argues he should be held accountable as a supervisor. (Pl.'s Letter 3.) This alone is grounds to dismiss the claims against him. *See Davis v. Cheverko*, No. 16-CV-4034, 2017 WL 6397749, at *4 (S.D.N.Y. Dec. 13, 2017) (collecting cases); *Perkins v. City of New York*, No. 14-CV-3779, 2017 WL 1025987, at *2 (S.D.N.Y. Mar. 15, 2017) ("Where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted." (alteration and internal quotation marks omitted)). That Dubois allegedly held a supervisory role does not change the analysis. *See Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Banks v. Annucci*, 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2014) ("Where a defendant is a supervisory official, a mere 'linkage' to the unlawful conduct through the 'chain of command' (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct." (citations omitted)). There are, in sum, no alleged facts showing that Dubois was personally involved in the alleged unconstitutional deprivation at issue. *See Falls v. Pitt*, No. 16-CV-8863, 2018 WL 3768036, at *6 (S.D.N.Y. Aug. 8, 2018) (holding that personal involvement was not established where the plaintiff failed to allege the defendants were "present" for the alleged violation or "participated directly" in or "somehow permitted" the alleged violation). Accordingly, all claims against DuBois are dismissed.

### 2. Eighth Amendment Sexual Assault Claim

**\*5** Plaintiff also claims that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. Specifically, Plaintiff alleges that on April 1, 2018, Cappelli violated his Eighth Amendment rights by groping him under the guise of conducting a body pat frisk. (Compl. 3.) Cappelli argues that Plaintiff has not plausibly alleged an Eighth Amendment violation. (Defs.' Mem. 6–10.)

The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials. *See Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991).[5] "To state an Eighth Amendment claim, a prisoner must allege two elements, one subjective and one objective." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015). "First, the prisoner must allege that the defendant acted with a subjectively 'sufficiently culpable state of mind.' Second, he must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Id.* (citations and internal quotation marks omitted) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

Here, Plaintiff alleges Cappelli "[l]iterally swiped [h]is [h]and in [b]etween my [b]ackside of my [r]ear end" during a pat down frisk outside his cell door in the presence of other corrections officers. (Compl. 2–3.) When Plaintiff "told [Cappelli] [ ] he didn't need to put his hand in between the crack of my [a]ss" Cappelli told Plaintiff "you probably liked it." (*Id.* at 3.) Even assuming that these allegations are sufficient to satisfy the objective prong, *but see Perez v. Ponte*, 236 F. Supp. 3d 590, 619 (E.D.N.Y. 2017) (collecting cases for proposition that " 'pat frisks' ... typically do not violate the Eighth Amendment's proscription against Cruel and Unusual Punishment"), *adopted by* 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017), they are insufficient to plausibly show that Cappelli acted "to arouse or gratify [himself] or humiliate [Plaintiff]," *Crawford*, 796 F.3d at 257–58. The Second Circuit has held that "[a] corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Id.* at 257; *see also id.* (holding that "a single incident of sexual abuse" can constitute cruel and unusual punishment "if sufficiently severe or serious" (citing *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997)). "In determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Id.*

at 257–58 (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). The only allegation regarding Cappelli's intent or state of mind is his comment to Plaintiff that Plaintiff "probably liked it." (Compl. 3.) This conclusory allegation is not sufficient to state an Eighth Amendment claim for sexual assault. *See Boddie*, 105 F.3d at 859–61 (finding no Eighth Amendment violation from incidents including a female corrections officer making a pass at the plaintiff, squeezing his hand, touching his penis, calling him a "sexy black devil," and bumping into him "with her whole body vagina against penis"); *Grant v. Norfleett*, No. 17-CV-328, 2017 WL 1902150, at *3 (D. Conn. May 9, 2017) ("[T]he Complaint includes only a conclusory allegation that the defendants conducted the search for their own sexual gratification, and an assertion that on occasions after the plaintiff was strip searched, the defendants 'watched him like a piece of meat.' "); *see also Shaw v. Prindle*, 661 F. App'x 16, 19 (2d Cir. 2016) (noting that the court "cannot infer solely from the thoroughness of the search"—described as "excessive searching of [the] crotch area and in between his buttocks and massaging of his rectum and groin area"—that the defendant "intended to search ... with intent to arouse or gratify [his] sexual desires or to humiliate [the plaintiff]" (alterations and internal quotation marks omitted); *cf. Crawford*, 796 F.3d at 257–58 (finding Eighth Amendment violation where the defendant "fondl[ed] and squeeze[ed] [the plaintiff's] penis in order to make sure [he] did not have an erection," because "[t]here is no penological justification for checking to see if an inmate has an erection"); *id.* at 258–59 (noting that "demeaning comments, including the statements 'that doesn't feel like a penis to me,' 'I'll run my hands up the crack of your ass if I want to,' and subsequent taunts about having seen [the plaintiff's] penis," all "suggest[ed] that [the defendant] under took the search in order to arouse himself, humiliate [the plaintiff], or both"). Thus, the Court grants Defendants' Motion To Dismiss the Eighth Amendment claim.

### 3. First Amendment Retaliation Claim

**\*6** Defendants argue that Plaintiff's six-day confinement was not a retaliatory action and that Plaintiff fails to allege a causal connection between the filing of his grievance and the six-day confinement. (Defs.' Mem. 13–16.)[6]

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006) (citing *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)). To state a First Amendment retaliation claim, Plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that ... [D]efendant took adverse action against ... [P]laintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation, alteration, and quotation marks omitted); *see also Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (same). "[B]ecause virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (citation and quotation marks omitted)).

Plaintiff asserts that he filed a grievance at OCJ, specifically a claim of sexual assault and/or abuse with a PREA investigator, (Compl. 4), and that he was subsequently locked in his cell for approximately six days in retaliation for his complaint, (*id.* at 3). Plaintiff asserts that he told a mental health counselor that he was fearful of walking alone within the facility hallways while Cappelli was on hallway detail because he was fearful he would be searched again. (Pl.'s Letter 3.) Plaintiff was subsequently confined by Zepplin in what Plaintiff alleges was an act of retaliation. (*Id.*) Finally, Plaintiff alleges that Cappelli, who works in the same unit as Zepplin, put a "no contact" on him. (*Id.*)

**\*7** Defendants do not contest that filing a grievance is protected speech, as indeed "[i]t is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *4 (S.D.N.Y. July 16, 2013) (citations omitted); *see also Dolan*, 794 F.3d at 294 ("It is well established that retaliation

against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." (citation and quotation marks omitted)).

Defendants do, however, argue that six days of confinement does not constitute an adverse action for purposes of a First Amendment retaliation claim. (Defs.' Mem. 14.) An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir. 2003) (citation omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." *Id.* (citation, quotation marks, and alterations omitted). "[T]he test, however, is not whether [the] plaintiff ... himself was chilled (if that were the standard, no plaintiff likely would prevail, for the very commencement of a lawsuit could be used by [the] defendants to argue that the plaintiff was not chilled)." *Id.* at 354 (citation omitted). Defendants notably do not cite any caselaw for the proposition that being placed in confinement for six days cannot constitute an adverse action, and indeed they cannot because the Second Circuit and lower courts therein have found that being placed in keeplock or being otherwise confined is indeed an adverse action. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir. 2004) (holding that placing plaintiff in keeplock for three weeks was an adverse action); *Hayes v. Dahlke,* No. 16-CV-1368, 2018 WL 7356343, at *15 (N.D.N.Y. Dec. 11, 2018) (assuming that placing plaintiff in keeplock for one day constitutes an adverse action); *Lugo v. Van Orden,* No. 07-CV-879, 2008 WL 2884925, at *4–5 (S.D.N.Y. July 23, 2008) (assuming that placing plaintiff in keeplock for five days constitutes an adverse action, stating that the holding of *Gill* was not that confinement must have lasted for *weeks*, and pointing out that "less adverse" action such as being moved to a different housing unit have been held to be sufficient to state a claim for retaliation); *Keesh v. Goord,* No. 04-CV-271, 2007 WL 2903682, at *10 (W.D.N.Y. Oct. 1, 2007) (holding that placing plaintiff in keeplock for one day during which he may have missed meals constituted an adverse action).[7] Therefore, the Court finds that Plaintiff alleges an adverse action.

*8 Plaintiff must, however, also allege a "causal connection" between the protected conduct and the adverse action. *Garcia v. Watts,* No. 08-CV-7778, 2009 WL 2777085, at *11 (S.D.N.Y. Sept. 1, 2009); *see also Dawes,* 239 F.3d at 492 (holding that in order to satisfy the causation requirement, allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action" (citation, alteration, and quotation marks omitted)). To meet this burden, Plaintiff must allege facts suggesting that the protected conduct was a " 'substantial or motivating factor' in the prison officials' decision to take action against [him]." *Smith v. Christopher,* No. 06-CV-1196, 2008 WL 4283519, at *10 (N.D.N.Y. Sept. 18, 2008) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)); *Van Dunk v. Brower,* No. 11-CV-4564, 2013 WL 5970172, at *8 (S.D.N.Y. Nov. 7, 2013) ("The element of intent [in a First Amendment retaliation claim] requires an assessment of what evidence, if any, demonstrates that Defendants' conduct 'was motivated by or substantially caused by [Plaintiff's] exercise of free speech.' " (ultimately quoting *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir. 1994))); *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals,* 812 F. Supp. 2d 357, 371 (S.D.N.Y. 2011) (same); *cf. Washington v. Afify,* 681 F. App'x 43, 46 (2d Cir. 2017) (reinstating retaliation claim in part because there was evidence of "retaliatory animus" where plaintiff alleged that officers confronted him directly about his practice of filing grievances before they issued the allegedly false misbehavior report against him); *Fann v. Graham,* No. 15-CV-1339, 2018 WL 1399331, at *9 (N.D.N.Y. Jan. 11, 2018) (denying summary judgment motion where there was evidence the correction officer made comments to plaintiff that could be interpreted as threatening before issuing him an allegedly false misbehavior report), *adopted by* 2018 WL 1399340 (N.D.N.Y Mar. 19, 2018). Circumstantial facts suggesting a retaliatory motive include "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Baskerville v. Blot,* 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon,* 58 F.3d at 872–73).

Here, Plaintiff alleges that he filed a grievance alleging sexual assault with a PREA investigator and that he was

subsequently locked in his cell for six days in retaliation for this grievance. (Compl. 2–3.) Plaintiff further alleges that he told a mental health counselor that he was fearful of walking in the hallway while Cappelli was on hallway detail and that he was fearful he would be searched again, and that he was subsequently confined by Zepplin in an act of retaliation. (Pl.'s Letter 3.) Plaintiff also alleges that Cappelli, who works in the same unit as Zepplin, put a "no contact" on him. (*Id.*)

Plaintiff does not, however, allege the dates during which he was confined to his cell or how soon after he filed his grievance his confinement took place. "At most, Plaintiff may have intended to rely on temporal proximity between his complaints and his [confinement to his cell] to demonstrate a causal connection," however, Plaintiff did not specify when he was confined to his cell, and this prevents the Court from inferring retaliation based on temporal proximity alone. *Ahmad v. White Plains City Sch. Dist.*, No. 18-CV-3416, 2019 WL 3202747, at *10 (S.D.N.Y. July 16, 2019) (holding that court could not infer retaliation based on temporal proximity where plaintiff alleged when the adverse action occurred but failed to allege when the protected speech occurred); *see also Feliciano v. City of New York*, No. 14-CV-6751, 2015 WL 4393163, at *9 (S.D.N.Y. July 15, 2015) (holding that where plaintiff did "not provide the date" he engaged in protected activity, it was "impossible for the Court to determine the temporal proximity of the alleged retaliatory acts to the protected conduct"); *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 412 (S.D.N.Y. 2014) (dismissing retaliation claim where the complaint "fails to state with even a modicum of specificity when the relevant events occurred").

Moreover, Plaintiff fails to allege any connection between the individuals with whom he filed his grievances and the individuals who retaliated against him. For example, Plaintiff does not allege that the mental health counselor or the PREA investigator told anyone about Plaintiff's statements or that the officers who ultimately confined Plaintiff had any knowledge of those statements. Nor does Plaintiff allege that Zepplin and Cappelli ever discussed Plaintiff or his grievances or his confinement. Plaintiff merely alleges that Zepplin and Cappelli worked together, (Pl.'s Letter 3), but fails to provide any specifics about how the individuals who received his grievances and the individuals who implemented Plaintiff's confinement were connected. *See Soto v. Iacavino*, No. 01-CV-5850, 2003 WL 21281762, at *1–2 (S.D.N.Y. June 4, 2003) (dismissing First Amendment retaliation claim

where plaintiff alleged he filed a grievance and nursing staff subsequently failed to provide him with medical care because plaintiff failed to allege any causal connection whatsoever); *Jones v. Harris*, 665 F. Supp. 384, 399–400 (S.D.N.Y. 2009) (dismissing First Amendment retaliation claim where plaintiff failed to allege any facts tending to show that one corrections officer destroyed Plaintiff's property at the behest of another CO); *see also Trisvan v. Annucci*, 284 F. Supp. 3d 288, 303 (S.D.N.Y. 2018) (dismissing First Amendment retaliation claim where plaintiff failed to allege "the dates and details of all relevant events as well as any facts that plausibly support the inference that he was subjected to adverse actions in retaliation for having engaged in the protected activity"). Accordingly, Plaintiff's First Amendment retaliation claim must be dismissed.

### 4. Fourth Amendment Unreasonable Search Claim

**\*9** Plaintiff cites the Fourth Amendment in his filings and the Court thus liberally reads his Complaint to allege a Fourth Amendment violation for the invasive pat-frisk. (Compl. 3.) Plaintiff alleges that, in the presence of other prison officials, Cappelli "literally swiped his hand in between the backside of my rear end." (*Id.*) Defendants argue that Plaintiff fails to sufficiently allege a violation of his Fourth Amendment Rights. (Defs.' Mem. 10–13.)

"The Fourth Amendment 'protects individual privacy against certain kinds of governmental intrusion,' and it is well-established that its protections extend to prisoners and pretrial detainees." *Holland v. City of New York*, 197 F. Supp. 3d 529, 542 (S.D.N.Y. 2016) (quoting *Katz v. United States*, 389 U.S. 347, 350 (1967)). Thus, "although the inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether." *Jean-Laurent v. Lawrence*, No. 12-CV-1502, 2013 WL 1129813, at *8 (S.D.N.Y. Mar. 19, 2013) (alteration and quotation marks omitted); *see also Little v. City of New York*, No. 13-CV-3813, 2014 WL 4783006, at *2 (S.D.N.Y. Sept. 25, 2014) ("Although the constitutional rights of prison inmates are restricted because of the institutional needs of imprisonment, the Fourth Amendment still requires that strip searches of inmates be reasonable." (citation omitted)); *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 328 (2012) ("[C]orrectional officials must be permitted to devise

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 142 of 198

Flood v. Cappelli, Not Reported in Fed. Supp. (2019)

reasonable search policies to detect and deter the possession of contraband in their facilities."). "The reasonableness of a strip search, in turn, requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted...." 🚩 *Holland*, 197 F. Supp. 3d at 542 (citations and quotation marks omitted). Additionally, "[t]he presence of other inmates and officers, males and females, does not alter th[e] determination" that strip searches are constitutional. 🚩 *Israel v. City of New York*, No. 11-CV-7726, 2012 WL 4762082, at *3 (S.D.N.Y. Oct. 5, 2012). Finally, "[b]ecause an inmate 'bears the burden of showing that a search was unreasonable,' to survive a motion to dismiss, the plaintiff "must 'plead facts sufficient to give rise to a plausible inference' that the search he challenges was unreasonable under the standards described above." ⚠️ *Little*, 2014 WL 4783006, at *2 (citation and quotation marks omitted).

Plaintiff summarily alleges that he was searched outside his cell and that Cappelli swiped his hand between Plaintiff's backside. (Compl. 2–3.) Plaintiff does not allege why he was searched and offers no detail about the duration of the search or any other facts about the search. Plaintiff's allegation that Cappelli swiped his hand between his backside, without any further detail as to the unreasonableness of the search, is insufficient to allege a violation of the Fourth Amendment.

*See* 🚩 *Green v. Martin*, 224 F. Supp. 3d 154, 166–67 (D. Conn. 2016) (dismissing Fourth Amendment claim where prisoner alleged he was strip searched in his cell while his cellmate was present, but failed to allege any facts that the search was unreasonable); *Friedman v. Young*, 702 F. Supp. 433, 438 (S.D.N.Y. 1988) (dismissing Fourth Amendment claim because even "[a]ssuming [officer's] pat-down included touching [the plaintiff's] genitalia while conducting the search, such conduct is not unreasonable in the absence of any showing of excessive force"). Here, Plaintiff has not pled any facts to suggest that the alleged search was unreasonable or unrelated to legitimate penological interests. Moreover, even accepting Plaintiff's allegation that Cappelli told him he probably "[l]iked it," (Compl. 3; Pl.'s Letter 2),"verbal harassment during the [strip] search does not cause the search to become unconstitutional." ⚠️ *Bowden v. Duffy*, No. 13-CV-717, 2014 WL 338786, at *4 (S.D.N.Y. Jan. 30, 2014); *see also* 🚩 *Vaughn v. Strickland*, Nos. 12-CV-2696, 12-CV-3335, 12-CV-2995, No. 12-CV-3333, 2013 WL

3481413, at *6–7 (S.D.N.Y. July 11, 2013) (dismissing Fourth Amendment claim where a prisoner alleged verbal abuse during an intrusive strip search). Accordingly, Plaintiff's Fourth Amendment claim is dismissed.

### 5. Fourteenth Amendment Procedural Due Process Claim

**\*10** Plaintiff cites the Fourteenth Amendment in his filings and the Court thus liberally reads his Complaint to allege a Fourteenth Amendment violation. (Compl. 3.) Defendants argue that Plaintiff fails to state a Fourteenth Amendment Claim "presumably regarding" a disciplinary hearing against him. (Defs.' Mem. 16–18.) "To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." 🚩 *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (alterations and quotation marks omitted). The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings. *See* 🚩 *Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment). However, the Supreme Court has clarified that "[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " 🚩 *Ortiz*, 380 F.3d at 654 (quoting 🚩 *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). The Second Circuit has further explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying *Sandin*'s atypical and significant hardship test." ⚠️ *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003) (citation and quotation marks omitted). The duration of disciplinary confinement, however, is "not the only relevant factor," and the Second Circuit has "explicitly avoided a bright line rule that a certain period of ... confinement automatically fails to implicate due process rights." ⚠️ *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (citations and quotation marks omitted). Indeed, "[t]he conditions of confinement are a distinct and equally important consideration in determining whether a confinement ... rises to the level of atypical and severe hardship," and, therefore, courts should consider "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions." *Id.* (citations and quotation marks omitted); *see also* 🚩 *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) ("Both the conditions and their duration must be considered,

since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." (citation omitted)).

As a guidepost to determine whether due process protections are required in the prison context, the Second Circuit has instructed that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer*, 364 F.3d at 64–65 (citation and quotation marks omitted); *see also Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *5 (S.D.N.Y. Feb. 17, 2015) (same). Indeed, the Second Circuit has cautioned that "[i]n the absence of a detailed factual record, [it has] affirmed dismissal of due process claims only in cases where the period of time spent in [confinement] was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual ... conditions." *Palmer*, 364 F.3d at 65–66.

Regarding the process an inmate is due, a disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted). "In the context of prison disciplinary hearings, the Second Circuit has said that its 'conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say, with ... utter certainty ..., how he would assess evidence he has not yet seen.' " *Rahman v. Acevedo*, No. 08-CV-4368, 2011 WL 6028212, at *7 (S.D.N.Y. Dec. 5, 2011) (italics omitted) (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)).

"[E]ven if an inmate is segregated for fewer than 101 days, his liberty interest may still be implicated if 'the conditions were more severe than the normal punitive segregation conditions ... or a more fully developed record showed that even relatively brief confinements under normal punitive segregation conditions were, in fact, atypical.' " *Samuels v. Davis*, No. 14-CV-7204, 2015 WL 4653238, at *2 (S.D.N.Y. July 28, 2015) (alterations omitted) (quoting *Palmer*, 364 F.3d at 65). However, Plaintiff's due process claim

must be dismissed nonetheless because Plaintiff has asserted *no* facts whatsoever that would allow the Court to assess whether the "regime to which [he] was subjected" constituted a significant and atypical hardship compared with ordinary prison conditions. *Brooks*, 1997 WL 436750, at *4. Plaintiff alleges that he "was confined by a Sergeant Zepplin for [ ] expressing [his] feelings to the mental health counselor in what [he] believed was a re[tal]iation for me making an issue out of [t]his matter;" specifically, Plaintiff alleges that he "was subjected to cell confinement for a period of six days." (Pl.'s Letter 2–3.) Plaintiff does not, however, allege that any type of disciplinary hearing was held, let alone that there were any shortcomings with respect to that disciplinary hearing. Plaintiff also does not allege any factual details about the specifics of his six-day confinement. *See Samuels*, 2015 WL 4653238, at *3 (dismissing due process claim where "the complaint does not allege *any* facts about the conditions [of confinement], including whether they were atypical or unusually harsh"); *Landron v. City of New York*, No. 14-CV-1046, 2014 WL 6433313, at *5 (S.D.N.Y. Nov. 7, 2014) (holding that plaintiff who was held in disciplinary confinement for 18 days but did not indicate "that he endured any unusual conditions during his confinement ... ha[d] not stated a claim for deprivation of a liberty interest cognizable under [§] 1983"); *Torres v. Logan*, No. 10-CV-6951, 2011 WL 1811003, at *4 (S.D.N.Y. May 11, 2011) (dismissing due process claim based on confinement of "a little over two-thirds" of his 90-day sentence where the plaintiff "fail[ed] to allege any facts regarding the conditions of his confinement, including whether they were abnormal or unusual" (alteration omitted)), *adopted by* 2011 WL 3894386 (S.D.N.Y. June 13, 2011); *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 607 (S.D.N.Y. 2009) (finding that a plaintiff failed to plead "a cognizable liberty interest" based on 280 days of disciplinary confinement because the plaintiff "failed to make any allegations detailing the conditions of his confinement ..., and because the duration of his confinement was shorter than confinements that courts in this Circuit have deemed sufficient to impose per se atypical or significant hardship"). Therefore, because Plaintiff has not alleged facts suggesting that he was deprived of a liberty interest, his procedural due process claim fails. *See Palmer*, 364 F.3d at 64 (noting that there is "no right to due process at [a disciplinary] hearing *unless* a liberty interest was infringed as a result" (citations, quotation marks, and original alterations omitted)). [8]

Case 9:22-cv-00362-AMN-ML    Document 30    Filed 05/30/23    Page 144 of 198

Flood v. Cappelli, Not Reported in Fed. Supp. (2019)

### III. Conclusion

**\*11**  For the reasons stated above, Defendants' Motion To Dismiss is granted. Because this is the first adjudication of Plaintiff's claims, the dismissal is without prejudice. If Plaintiff wishes to file an amended complaint, Plaintiff must do so within 30 days of the date of this Opinion. Plaintiff should include within that amended complaint all changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. Plaintiff is advised that the amended complaint will replace, not supplement, the instant Complaint. The amended complaint must contain *all* of the claims, factual allegations, and exhibits that Plaintiff wishes

the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

The Clerk is respectfully directed to terminate the pending Motion, (*see* Dkt. No. 17), the Notice to Plaintiff that also appears as a motion, (Dkt. No. 16), and mail a copy of this Opinion to Plaintiff.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3778736

---

## Footnotes

1    Plaintiff's filings do not have consistent pagination. To avoid confusion, the Court cites to the ECF-generated page numbers at the top right corner of the relevant page.

2    Plaintiff does not define "PREA" in his Letter, but he is likely referring to an inmate education video sponsored by the National Prison Rape Elimination Act ("PREA") Resource Center. National PREA Resource Center, https://www.prearesourcecenter.org/ (last visited July 17, 2019).

3    Plaintiff does not clarify whether the confinement by Zepplin mentioned in Plaintiff's Letter is the same as the six-day period of confinement mention in his Complaint, or if Plaintiff is alleging separate additional confinements.

4    The Notice to Plaintiff was filed twice on the docket, the first time as Dkt. No. 16, and the second time as Dkt. No. 20.

5    Because Plaintiff was a convicted prisoner at the time of the events underlying the Complaint, (*see* Edelman-Reyes Decl., Ex. B (Certificate of Disposition as to Indictment 696-2017), Ex. C (Certificate of Disposition as to Information 118S-2018)), his conditions of confinement claim arises under the Eighth Amendment. *See Delacruz v. City of New York*, No. 15-CV-3030, 2017 WL 2377984, at \*3 (S.D.N.Y. May 31, 2017) ("Conditions of confinement claims brought by convicted prisoners are governed by the Cruel and Unusual Punishments Clause of the Eighth Amendment, whereas claims brought by pre-trial detainees are governed by the Due Process Clause of the Fourteenth Amendment." (citing 🚩 *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017))), *adopted by*, 2017 WL 2963490 (S.D.N.Y. July 11, 2017), *appeal dismissed*, No. 17-2542, 2018 WL 6267098 (2d Cir. 2018).

     The Court is entitled to take notice of matters of public records, such as Plaintiff's convictions, and therefore considers that he was a convicted inmate at all times relevant to this Motion. *See Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 321 (S.D.N.Y. 2015) ("In considering a motion to dismiss, a court is permitted to take judicial notice of public records...."); 🚩 *Wims v. New York City Police Dep't*, No. 10-CV-6128, 2011 WL 2946369, at \*2 (S.D.N.Y. July 20, 2011) (noting that " 'a district court may rely on matters of public record in deciding a motion to dismiss ... including arrest reports, criminal complaints, indictments and criminal disposition data"); 🚩 *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, No. 98-CV-3099, 2001 WL

Flood v. Cappelli, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 145 of 198

300735, at *9 n.7 (S.D.N.Y. Mar. 27, 2001) ("With respect to materials from the [s]tate [c]ourt [a]ction, the [c]ourt may take judicial notice of the relevant pleadings, motion papers, orders, and judgments in the [s]tate [c]ourt [a]ction without converting [the defendant's] motion to one for summary judgment.").

6       Defendants improperly submit Plaintiff's disciplinary record and attempt to interject arguments based on documents that the Court may not consider at the pleading stage. (*See* Defs.' Mem. 15 (citing Edelman-Reyes's Decl. Ex. E (Plaintiff's Disciplinary Record ("Pl.'s Disciplinary Hearing Record")))). As noted, the Court "must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F.*, 199 F.3d at 107. Defendants argue that Plaintiff's Prison Disciplinary Hearing Record is incorporated by reference, (Defs.' Mem. 4), but Plaintiff's Complaint does not reference any disciplinary hearing, and it is not at all clear to the Court that Plaintiff possessed or knew about the records that Defendants now submit when he brought this Action. The Court therefore does not consider Defendants' arguments based on Plaintiff's disciplinary record.

7       Defendants also argue that there was no retaliation here because Plaintiff was able to and ultimately did file grievances and this lawsuit after the allegedly retaliatory conduct occurred. (Defs.' Mem. 14.) This argument fails because in *Gill*, the Second Circuit explained that although "subjective chilling is a general requirement, where a plaintiff alleges that the protected conduct at issue is the prior filing of a *grievance* or *lawsuit* against the defendant, it would be unfair in the extreme to rule that plaintiff's bringing of the subsequent claim in itself defeated his claim of retaliation." *Gill*, 389 F.3d at 383–84. Thus, it is not dispositive that Plaintiff filed grievances even after the alleged adverse action.

8       Because the Court dismisses the Complaint on other grounds it need not separately decide whether Plaintiff failed to exhaust his administrative remedies. (*See* Defs.' Mem. 18–21.) The Court notes, however, that although the Prison Litigation Reform Act's ("PLRA") exhaustion requirement is mandatory, *see* *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016), and "requires proper exhaustion, which means using all steps that the prison grievance system holds out," *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (citations, alterations, and quotation marks omitted), failure to exhaust is an affirmative defense, not a pleading requirement, *see* *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013) (citations omitted). As such, Defendants bear the burden of proving failure to exhaust, *see* *McCoy v. Goord*, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003), and "inmates are not required to specially plead or demonstrate exhaustion in their complaints," *Jones v. Bock*, 549 U.S. 199, 216 (2007). Therefore, "dismissal is appropriate on a motion to dismiss where failure to exhaust is clear on the face of the complaint." *Brinson v. Kirby Forensic Psych. Ctr.*, No. 16-CV-1625, 2018 WL 4680021, at *6 (S.D.N.Y. Sept. 28, 2018) (citations omitted).

Here, Plaintiff alleges several specific facts regarding his attempts to exhaust his administrative remedies. Plaintiff alleges he filed a grievance at the OCJ; informed mental health, who submitted a report; and informed Lieutenant Potter, a Grievance Coordinator, for whom he provided a written statement. (Compl. 4–5.) Plaintiff detailed the steps he took to file his grievance, specifically, Plaintiff noted that his initial grievance was denied for lack of merit, his appeal to the Chief Administrative Officer was denied on merit, and he is presently appealing to the Citizens Policy and Complaint Review Council. (*Id.* at 4.) Plaintiff asserts that the grievance remains pending on appeal, with no response to date. (Pl.'s Letter 2.) Defendants correctly point out that according to Plaintiff's own submissions he has not yet received a final determination as to his appeal, and thus he may not have gone through all the required steps of New York's three-tiered grievance process. (Defs.' Mem. 19–20.) *See* *Colon v. Annucci*, No. 17-CV-4445, 2018 WL 4757972, at *17 (S.D.N.Y. Sept. 28, 2018); *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *6 (S.D.N.Y. Sept. 28, 2018). However,

Flood v. Cappelli, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 146 of 198

Defendants do not and cannot at this stage submit documentation or other proof that the Court may consider detailing what the status of Plaintiff's appeal is. In support of their Motion To Dismiss, Defendants include Plaintiff's Complaint, certificates of disposition, Plaintiff's grievance attached to his Complaint, and Plaintiff's disciplinary record at OCJ during the time period at issue. (*See* Edelman-Reyes's Decl.) This information does not clarify the grievance process available to Plaintiff nor elucidate whether Plaintiff failed to complete the grievance process. *See Madison v. Wright*, No. 02-CV-10299, 2004 WL 816429, at *1 (S.D.N.Y. Apr. 13, 2004) (noting that "the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss," and that "the defendants must present proof of non-exhaustion" (citation and quotation marks omitted)). If Plaintiff choses to amend his Complaint, the Parties should address these concerns. Also because the Court concludes that Plaintiff fails to plausibly allege any violation of his constitutional rights, it need not at this stage consider Defendants' argument that they are entitled to qualified immunity. (Defs. Mem. 21–22.)

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1556404
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Chad S. JOHNSON, Plaintiff,

v.

Superintendent Robert MORTON; Edward Burnett,
Deputy of Security; Sergeant S. Petrie; Lt. Calvitti
(sued herein as Kailvetti); Correction Officer D.
Allen; Correction Officer Mason Hamilton; Correction
Officer Travis Small; Correction Officer James Makel;
and Correction Officer Raymond Ortiz, Defendants.

21 CV 986 (VB)
|
Signed 05/16/2022
|
Filed 05/17/2022

**Attorneys and Law Firms**

Chad S. Johnson, Napanoch, NY, Pro Se.

John Roach Doran, New York State Office of the Attorney
General, New York, NY, for Defendants Sergeant S. Petrie, Lt.
Kailvetti, Corr. Officer D. Allen, Edward Burnett, Correction
Officer Mason Hamilton, Correction Officer Travis Small,
Correction Officer James Makel, Robert Morton, Correction
Officer Raymond Ortiz.

**OPINION AND ORDER**

Briccetti, United States District Judge:

 **\*1** Plaintiff Chad S. Johnson, proceeding pro se and in forma
pauperis, brings this Section 1983 action against defendants
Superintendent Robert Morton ("Superintendent Morton"),
Deputy of Security Edward Burnett ("Deputy Burnett"),
Sergeant S. Petrie ("Sgt. Petrie"), Lt. Calvitti,[1] Correction
Officer D. Allen ("C.O. Allen"), Correction Officer Mason
Hamilton ("C.O. Hamilton"), Correction Officer Travis Small
("C.O. Small"), Correction Officer James Makel ("C.O.
Makel"), and Correction Officer Raymond Ortiz ("C.O.
Ortiz"). Plaintiff contends that, when he was incarcerated
at Downstate Correctional Facility ("Downstate"), he was
forced by defendants to sell illegal drugs to other inmates and
was punished when he stopped selling them.

Now pending is defendants' motion to dismiss the amended
complaint. (Doc. #38).

Plaintiff did not oppose the motion, despite having been
granted multiple extensions of time to do so. (Docs. ##42–
43).

For the reasons set forth below, the motion is GRANTED IN
PART and DENIED IN PART.

The Court has subject-matter jurisdiction pursuant to 28
U.S.C. § 1331.

**BACKGROUND**

For the purpose of ruling on the motion to dismiss, the Court
accepts as true all well-pleaded factual allegations in the
amended complaint and draws all reasonable inferences in
plaintiff's favor, as summarized below.

During the complained-of events, plaintiff was incarcerated
at Downstate, located in Fishkill, New York. (Doc. #29 ("Am.
Compl.") at ECF 6).[2]

Plaintiff alleges that, "[s]ometime in 2019," C.O. Hamilton
planted contraband in plaintiff's cell at Sgt. Petrie's direction,
and plaintiff was then placed in keeplock. (Am. Compl. at
ECF 8).

Plaintiff alleges his disciplinary hearing was conducted two
days later by Lt. Calvitti. (Am. Compl. at ECF 8). According
to plaintiff, Lt. Calvitti explained to him before the hearing
began that "someone called on [plaintiff's] behalf" and
plaintiff would be given time served. (Id.). Lt. Calvitti then
allegedly told plaintiff what to say on the record. (Id.).

Plaintiff alleges that, after the disciplinary hearing, Sgt. Petrie
gave plaintiff a cell phone and drugs and warned plaintiff
that, if he did not cooperate, Sgt. Petrie would "set [him] up
again" and send plaintiff "further up north." (Am. Compl. at
ECF 8). According to plaintiff, Sgt. Petrie directed plaintiff to
sell drugs and remit the proceeds to him in Bitcoin using the
provided cellphone. (See id. at ECF 8–9).

Plaintiff alleges that "[s]ometime towards the end of 2020,"
C.O. Allen informed plaintiff he knew about what Sgt.
Petrie "[wa]s forcing [plaintiff] to do." (Am. Compl. at ECF
9). Plaintiff contends that, sometime thereafter, C.O. Allen

informed plaintiff he was going to smuggle heroin into the facility and plaintiff "was going to sell it for him." (Id.). According to plaintiff, another inmate subsequently died of a heroin overdose in October 2020. (Id.).

**\*2** Plaintiff alleges he stopped selling drugs for Sgt. Petrie and C.O. Allen in January 2021, after making recordings of the officers directing him to do so and preserving those recordings in emails. (Am. Compl. at ECF 10–11). According to plaintiff, on January 9, 2021, he observed Sgt. Petrie and C.O. Allen having "a heated discussion," after which Sgt. Petrie visited his cell and asked plaintiff why he had stopped remitting proceeds from the drug sales. (Id. at ECF 11). When plaintiff informed Sgt. Petrie he no longer wished to do anything illegal, Sgt. Petrie moved him to the Special Housing Unit ("SHU") and ticketed him for possessing a cellphone. (Id.). Plaintiff further alleges Sgt. Petrie admitted at plaintiff's subsequent disciplinary hearing that he set plaintiff up. (Id. at ECF 12).

Plaintiff alleges that he was subsequently moved from Downstate, and C.O. Small, Makel, and Ortiz intentionally destroyed his legal papers. (Am. Compl. at ECF 11–12).

## DISCUSSION

### I. Standard of Review

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under "the two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).[3] First, a plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

The Court must liberally construe submissions of pro se litigants and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (collecting cases). Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges civil rights violations. Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). "Even in a pro se case, however, ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010). Nor may the Court "invent factual allegations" a plaintiff has not pleaded. Id.

### II. Lack of Personal Involvement

Superintendent Morton, Deputy Burnett, Lt. Calvitti, C.O. Hamilton, C.O. Makel, C.O. Ortiz, and C.O. Small argue plaintiff has not alleged facts sufficient to show they were personally involved in the alleged constitutional violations.

The Court agrees with respect to Superintendent Morton and Deputy Burnett only.

To state a claim under Section 1983, a plaintiff must allege facts showing a defendant's direct and personal involvement in the alleged constitutional deprivation. See Spavone v. N.Y.S. Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). Further, a defendant may not be held liable under Section 1983 solely because that defendant employs or supervises a person who violated the plaintiff's rights. See Tangreti v. Bachmann, 983 F.3d 609, 619–20 (2d Cir. 2020).

**\*3** Here, plaintiff alleges his constitutional rights were violated when he was forced to sell drugs in prison for Sgt. Petrie and C.O. Allen and was penalized when he stopped doing so. However, plaintiff does not allege any facts to

suggest Superintendent Morton or Deputy Burnett knew or should have known about this alleged scheme. Plaintiff contends these defendants should have known about it "in light of other incidents where inmates had cell phones that could have only been brought in by correctional staff" (Am. Compl. at ECF 13), but, even taking this allegation as true, it does not suggest that either Superintendent Morton or Deputy Burnett knew plaintiff had been given a cellphone, much less that they knew plaintiff was given a cellphone to facilitate drug sales for correction officers.

Accordingly, plaintiff's claims against Superintendent Morton and Deputy Burnett must be dismissed for lack of personal involvement.

III. Failure to Protect

The Court liberally construes plaintiff's allegation that defendants conspired to force him to sell drugs as a failure-to-protect claim; that is, that defendants violated their Eighth Amendment responsibility to guarantee his safety by forcing plaintiff to participate in such a scheme. See, e.g., Cooks v. Guterrez, 2011 WL 832469, at *3 (S.D. Tex. Mar. 3, 2011) (pro se plaintiff stated failure-to-protect claim against prison officials who "condone[d]" and "assist[ed]" drug smuggling in facility where plaintiff was incarcerated). [4]

A. Legal Standard

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Courts have construed the Eighth Amendment to "require[ ] prison officials to take reasonable measures to guarantee the safety of inmates in their custody." Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996). For example, the Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994).

To state a failure-to-protect claim, a prisoner must plausibly allege an objective component and a subjective component. See Hayes v. N.Y.C. Dep't of Corr., 84 F.3d at 620.

To plead the objective component, a plaintiff must plausibly allege a prison official's conduct was sufficiently serious, meaning the conduct "pose[d] an unreasonable risk of serious

damage to his health." Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017).

To plead the subjective component, a plaintiff must plausibly allege a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes v. N.Y.C. Dep't of Corr., 84 F.3d at 620. "Evidence that a risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013).

B. Application

Here, plaintiff plausibly alleges a failure-to-protect claim against Sgt. Petrie and C.O. Allen.

First, plaintiff plausibly alleges Sgt. Petrie and C.O. Allen's conduct posed an unreasonable risk to his safety. Taking plaintiff's allegations as true, Sgt. Petrie and C.O. Allen forced plaintiff to sell illegal drugs to other inmates. Selling illegal drugs in prison to other inmates presents obvious and unreasonable dangers to plaintiff.

Second, plaintiff plausibly alleges Sgt. Petrie and C.O. Allen acted with requisite culpability. According to plaintiff, Sgt. Petrie and C.O. Allen personally supplied him with drugs and directed him to sell those drugs to other inmates, meaning they were personally aware of the substantial risk to plaintiff's safety. Cf. Lane v. Philbin, 2017 WL 4228888, at *8 (M.D. Ga. Sept. 22, 2017) (plaintiff stated failure-to-protect claim against corrections officer who, among other things, cooperated with inmates to smuggle contraband into the facility).

*4 The Court recognizes that in the majority of cases concerning illegal drugs smuggled into prison, courts have rejected failure-to-protect claims brought by inmates "absent facts suggesting that the risk of exposure to drugs was greater inside the facility than outside of the facility." Kern v. St. Charles County, 2022 WL 1262507, at *6 (E.D. Mo. Apr. 28, 2022) (collecting cases). For example, in Nunez v. Salamack, 1989 WL 74940, at *1 (S.D.N.Y. June 26, 1989), the court dismissed plaintiff's claims that drug use inside Edgecombe Correctional Facility interfered with his recovery and thus constituted cruel and unusual punishment, reasoning that plaintiff failed to "allege that the risk of exposure to

drugs, and the deleterious effects of such exposure, were greater inside than outside Edgecombe." Here, in contrast, plaintiff plausibly alleges his exposure to drugs was greater inside Downstate than outside Downstate. That is, plaintiff alleges defendants used their positions as correction officers to force plaintiff to sell illegal drugs to other inmates in the facility, a situation that simply would not exist outside prison.

Accordingly, plaintiff's failure-to-protect claim against Sgt. Petrie and C.O. Allen may proceed.

## IV. Retaliation

Liberally construed, plaintiff attempts to assert Sgt. Petrie retaliated against him for refusing to continue to sell drugs by placing him in the SHU.

### A. Legal Standard

To state a First Amendment retaliation claim, "a plaintiff must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Dolan v. Connolly, 794 F.3d 290, 294 (2d Cir. 2015).

With respect to the first element, a prisoner engages in constitutionally protected activity when he challenges prison conditions by filing a complaint, grievance, or civil-rights lawsuit. See Dolan v. Connolly, 794 F.3d at 294. In certain circumstances, "a prisoner's oral complaint may constitute protected speech." White v. Westchester County, 2018 WL 6726555, at *16 (S.D.N.Y. Dec. 21, 2018) (collecting cases). For example, a prisoner's "clear, specific statement to [an officer]—that he would file a grievance ... if [the officer] did not stop harassing him—is protected speech." Id.

With respect to the second element, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003).

With respect to the third element, "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009).

However, courts "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." Dolan v. Connolly, 794 F.3d at 295. Accordingly, to survive a motion to dismiss, a prisoner asserting a retaliation claim must not rest on "wholly conclusory" allegations, but rather must allege "specific and detailed" supporting facts. Id.

### B. Application

Here, plaintiff plausibly alleges a retaliation claim against Sgt. Petrie.

First, although it is a close question, the Court concludes plaintiff plausibly alleges he engaged in constitutionally protected activity when he told Sgt. Petrie he would no longer sell drugs for him.

Plaintiff alleges he told Sgt. Petrie he "no longer" wanted to "do anything illegal" and asked Sgt. Petrie "to leave [him] alone." (Am. Compl. at ECF 11). But plaintiff's allegations also suggest that, at the time of this conversation, plaintiff was preparing to take further action against Sgt. Petrie and C.O. Allen; for example, plaintiff alleges he made recordings of his conversations with C.O. Allen and preserved them in emails. (Id. at ECF 10). Thus, affording plaintiff special solicitude as a pro se litigant alleging civil rights violations, the Court infers plaintiff could have made a "clear, specific statement" to Sgt. Petrie that he was going to file a grievance or this lawsuit regarding the drug-dealing scheme, and thus that plaintiff has plausibly alleged he engaged in constitutionally protected speech. White v. Westchester County, 2018 WL 6726555, at *16. Sgt. Petrie may, however, renew his arguments on this point either at summary judgment following the close of discovery or at trial.

*5 Second, plaintiff also plausibly alleges the other two elements of a retaliation claim. Plaintiff alleges Sgt. Petrie took adverse action against him by making a false disciplinary report and placing him in the SHU. See, e.g., Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004) (plaintiff plausibly alleged adverse action element of retaliation claim based on the "filing of false misbehavior reports" and "three weeks in keeplock"). Moreover, plaintiff alleges this adverse action was taken against him the same day he engaged in constitutionally protected activity, which is sufficient for the

Court to infer a causal connection. See Espinal v. Goord, 558 F.3d at 129 (six-month gap between protected activity and retaliation sufficient to allege a causal connection).

Accordingly, plaintiff's retaliation claim against Sgt. Petrie may proceed.

V. Conspiracy

Liberally construed, plaintiff attempts to assert a conspiracy claim against Sgt. Petrie, C.O. Allen, Lt. Calvitti, and C.O. Hamilton.

A. Legal Standard

To state a Section 1983 conspiracy claim, a plaintiff must plausibly allege: "(1) an agreement between two or more state actors ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999).

To survive a motion to dismiss, a plaintiff must make something more than "conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights." Ciambriello v. County of Nassau, 292 F.3d 307, 324–25 (2d Cir. 2002). However, "a plaintiff is not required to list the place and date of defendants' meetings and the summary of their conversations when he pleads conspiracy, the pleadings must present facts tending to show agreement and concerted action." Concepcion v. City of New York, 2008 WL 2020363, at *3 (S.D.N.Y. May 7, 2008).

Moreover, "under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together." Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008). However, "[a]n exception to the doctrine exists where a plaintiff alleges facts that tend to show the defendants were pursuing personal interests wholly separate and apart from the entity." Harris v. City of Newburgh, 2017 WL 4334141, at *8 (S.D.N.Y. Sept. 27, 2017).

B. Application

Here, plaintiff plausibly alleges a conspiracy claim against Sgt. Petrie, C.O. Allen, and C.O. Hamilton, but not against Lt. Calvitti.

With respect to Sgt. Petrie, C.O. Allen, and C.O. Hamilton, although plaintiff "does not allege specifically" these defendants "agreed to join a conspiracy," plaintiff's "allegations that the officers worked in tandem ... permits a plausible inference that they formed at least an implicit agreement." Iverson v. Surber, 2014 WL 12908065, at *6 (S.D.N.Y. Mar. 19, 2014). Plaintiff alleges (i) C.O. Hamilton planted contraband in plaintiff's cell at Sgt. Petrie's direction, which laid the groundwork for Sgt. Petrie to force plaintiff to sell drugs for him; (ii) C.O. Allen told plaintiff he was aware Sgt. Petrie was supplying plaintiff with drugs, and then personally started supplying plaintiff with drugs; and (iii) after plaintiff ceased remitting drug proceeds to Sgt. Petrie and C.O. Allen, plaintiff observed them having "a heated discussion," after which Sgt. Petrie visited his cell to question him about why he stopped doing so, and then moved plaintiff to the SHU. (Am. Compl. at ECF 11). These allegations are specific and plausible enough for the Court to infer these defendants agreed to inflict an unconstitutional injury on plaintiff. See, e.g., Pangburn v. Culbertson, 200 F.3d at 72.

*6 Plaintiff does not, however, adequately allege a conspiracy claim against Lt. Calvitti. Plaintiff alleges Lt. Calvitti presided over plaintiff's disciplinary hearing after C.O. Hamilton planted contraband in plaintiff's cell, which plaintiff suggests was part of the ultimate scheme to convince plaintiff to sell drugs for Sgt. Petrie and C.O. Allen. But plaintiff does not allege any facts to suggest Lt. Calvitti had any kind of implicit or explicit agreement with the other defendants to smuggle drugs into Downstate. Thus, plaintiff has failed to state a conspiracy claim against Lt. Calvitti. See, e.g., Kernan v. N.Y.S. Dep't of Fin. Servs., 712 F. App'x 61, 66 (2d Cir. 2017) (summary order).

Lastly, plaintiff's claims are not barred by the intracorporate conspiracy doctrine. Plaintiff alleges defendants conspired to smuggle illegal drugs into Downstate for profit, which is plainly outside the scope of "the normal course of their corporate duties." Harris v. City of Newburgh, 2017 WL 4334141, at *8. Thus, the intracorporate conspiracy doctrine does not apply.

Accordingly, plaintiff's conspiracy claim against Sgt. Petrie, C.O. Allen, and C.O. Hamilton (but not Lt. Calvitti) may proceed.

VI. Due Process

Liberally construed, plaintiff contends his due-process rights were violated when (i) he was placed in keeplock for two days after C.O. Hamilton planted contraband in his cell; (ii) Lt. Calvitti manipulated the disciplinary hearing that followed; and (iii) plaintiff was placed in the SHU by Sgt. Petrie after refusing to continue to sell drugs.

A. Legal Standard

To state a due-process claim, a plaintiff must allege: (i) "he possessed a liberty interest"; and (ii) defendants "deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001). That is, even if a plaintiff plausibly alleges he "did not receive the process that was due, he cannot succeed on his claims if he fails to establish a protected liberty interest." Taylor v. Rodriguez, 238 F.3d 188, 194 (2d Cir. 2001).

A prisoner's liberty interest is "implicated" by prison discipline "if it imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." J.S. v. T'Kach, 714 F.3d 99, 106 (2d Cir. 2013).

In general, "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009) (per curiam).

B. Application

Here, plaintiff does not plausibly allege a liberty interest implicated by these three incidents.

First, with respect to being placed in keeplock for two days after C.O. Hamilton planted contraband in his cell in 2019, plaintiff does not allege the conditions of two-day keeplock were "more onerous than usual." Thus, he has not "allege[d] the existence of a liberty interest warranting due process protection" potentially implicated by this incident. Jones v. Tompkins, 715 F. App'x 101, 102 (2d Cir. 2018) (summary order).

Second, with respect to Lt. Calvitti's conduct at his disciplinary hearing, plaintiff does not plausibly allege any

liberty interest was implicated by his cursory and scripted hearing. According to plaintiff, Lt. Calvitti sentenced him to time served. (Am. Compl. at ECF 8). Because plaintiff does not allege he was subject to any discipline following the hearing, he does not plausibly allege a liberty interest was implicated by the hearing. See, e.g., Durran v. Selsky, 251 F. Supp. 2d 1208, 1214 (W.D.N.Y. 2003) (dismissing prisoner's due-process claim based "on the alleged due process violations in connection with the disciplinary hearing" when he did not show his sentence "was in any way atypical or a significant hardship in relation to the ordinary incidents of prison life").

**\*7** Third, with respect to being placed in the SHU following his alleged refusal to continue to sell drugs, plaintiff does not allege any facts regarding the length of his confinement in the SHU or its conditions. Thus, he has again not sufficiently "allege[d] the existence of a liberty interest warranting due process protection" implicated by this incident. Jones v. Tompkins, 715 F. App'x at 102.

Accordingly, plaintiff's due-process claim must be dismissed.

VII. Access to Courts

Liberally construed, plaintiff attempts to assert an access-to-courts claim against C.O. Small, C.O. Makel, and C.O. Ortiz arising from their alleged destruction of his legal papers.

A. Legal Standard

"The Supreme Court has grounded the right of access to the courts in the Privileges and Immunities Clause of Article IV, the Petition Clause of the First Amendment, the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Equal Protection Clause of the Fourteenth Amendment." Raffaele v. City of New York, 144 F. Supp. 3d 365, 374 (E.D.N.Y. 2015). There are two types of claims arising from denial of this right: "forward-looking" claims and "backward-looking" claims. Sousa v. Marquez, 702 F.3d 124, 127–28 (2d Cir. 2012).

"Forward-looking" claims include claims "that systemic official action frustrated [a plaintiff's] ability to file a suit." Sousa v. Marquez, 702 F.3d at 127. In contrast, "backward-looking" claims are claims that a lawsuit "cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." Id. at 127–28.

To state a backward-looking claim, a plaintiff must plausibly allege a defendant, acting deliberately and with malice, "took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim," Davis v. Goord, 320 F.3d at 351, and that those actions caused the plaintiff to suffer "actual injury." Lewis v. Casey, 518 U.S. 343, 349 (1996).

To establish "actual injury," a plaintiff must allege defendants hindered his efforts to pursue a nonfrivolous legal claim. See Amaker v. Haponik, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999). For example, a plaintiff might allege "the loss or inadequate settlement of a meritorious case, or the loss of an opportunity to seek some particular order of relief." Christopher v. Harbury, 536 U.S. 403, 413–14 (2002).

### B. Application

Here, plaintiff has not plausibly alleged an access-to-courts claim.

The Court liberally construes plaintiff's allegations as a backward-looking claim; in other words, that C.O. Small, C.O. Makel, and C.O. Ortiz intentionally destroyed plaintiff's legal papers and that this destruction hindered plaintiff's efforts to pursue some legal claim.

However, plaintiff does not adequately allege any actual injury arising from the destruction of his papers. He does not identify what legal claim the destruction of his legal papers hindered, such as, for example, this litigation, any appeal of his criminal conviction, or any habeas corpus proceeding he has commenced. He also does not allege how any of those cases were harmed by the loss of his legal papers.

Accordingly, plaintiff's access-to-courts claim must be dismissed.

### VIII. Qualified Immunity

Defendants have also not demonstrated they are protected by qualified immunity.

Qualified immunity shields government officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad, and protects "all

but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

**\*8** "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996). "Defendants bear the burden of establishing qualified immunity." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015).

"[U]sually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion. Hyman v. Abrams, 630 F. App'x 40, 42 (2d Cir. 2015) (summary order). However, "a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if the facts supporting the defense appear on the face of the complaint." Id.

Here, defendants argue they are entitled to qualified immunity because plaintiff does not plausibly allege his constitutional rights were violated. As explained above, plaintiff plausibly alleges Sgt. Petrie, C.O. Allen, and C.O. Hamilton violated his well-established constitutional rights. Specifically, plaintiff plausibly alleges that Sgt. Petrie, C.O. Allen, and C.O. Hamilton conspired to force plaintiff to sell illegal drugs in prison in violation of plaintiff's Eighth Amendment right to have reasonable measures taken on his behalf by prison officials to guarantee his safety when incarcerated; and that Sgt. Petrie retaliated against plaintiff for voicing a complaint about the purported scheme in violation of plaintiff's First Amendment right to petition the government for redress of his grievances.

Accordingly, the remaining defendants—Sgt. Petrie, C.O. Allen, and C.O. Hamilton—are not entitled to qualified immunity at this stage of the case.

### CONCLUSION

Defendants' motion to dismiss the amended complaint is GRANTED IN PART and DENIED IN PART.

Specifically, the following claims may proceed:

- Failure-to-protect claim against Sgt. Petrie and C.O. Allen;

• Conspiracy claim against Sgt. Petrie, C.O. Allen, and C.O. Hamilton; and

• Retaliation claim against Sgt. Petrie.

All other claims are dismissed.

Sgt. Petrie, C.O. Allen, and C.O. Hamilton shall answer the amended complaint by May 30, 2022.

By separate Order, the Court will schedule an initial conference.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk is instructed to terminate from the docket defendants Lt. Calviti (herein sued as Kailvetti), Edward Burnett, Correction Officer Travis Small, Correction Officer James Makel, Superintendent Robert Morton, and Correction Officer Raymond Ortiz.

The Clerk is further instructed to terminate the motion. (Doc. #38).

**All Citations**

Slip Copy, 2022 WL 1556404

## Footnotes

1    Plaintiff spells Lt. Calvitti's name as "Kailvetti" in his complaint.

2    "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

3    Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

4    Plaintiff will be provided copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009) (per curiam).

---

**End of Document**                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1101547

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Sayvion D. BLOUNT, Plaintiff,

v.

APPLES, et al., Defendants.

5:22-cv-216 (GTS/TWD)

|

Signed 04/13/2022

**Attorneys and Law Firms**

SAYVION D. BLOUNT, Plaintiff, pro se, 11001632, Onondaga County Justice Center, 555 South State Street, Syracuse, NY 13202.

## ORDER AND REPORT-RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** Sayvion D. Blount ("Plaintiff") initiated this action *pro se* on March 7, 2022, asserting claims under ⚑ 42 U.S.C. § 1983 against individuals employed by the Syracuse Police Department ("SPD"), the Onondaga County Sheriff's Office, and the Onondaga County Justice Center (the "Justice Center"). (Dkt. No. 1.) On March 9, 2022, Chief Judge Glenn T. Suddaby denied Plaintiff's *in forma pauperis* ("IFP") application as incomplete, ordered the administrative closure of the matter, and permitted Plaintiff to reopen the matter by timely filing a complete IFP application. (Dkt. No. 4.) Plaintiff timely filed a complete IFP application, and the case was reopened. (Dkt. Nos. 5, 6.) The Clerk sent Plaintiff's IFP application and Complaint to the undersigned for initial review. Plaintiff's IFP application is hereby GRANTED. (Dkt. No. 5.) The undersigned now considers the sufficiency of the allegations set forth in the Complaint under ⚑ 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A.

## I. SUMMARY OF THE COMPLAINT [1]

Plaintiff advances several causes of action against SPD officers, Sheriff's Office employees, and Justice Center employees (collectively "Defendants"). (Dkt. No. 1.[2]) Through his first cause of action, Plaintiff claims SPD

Officers Voggel and Linnertz used excessive force during his arrest. *See id.* at 5-7, 18, 20. Around 1:52 p.m. on December 6, 2021, Officers Voggel and Linnertz arrested Plaintiff on Holland Street in Syracuse, New York. *Id.* at 6. Plaintiff claims he was on the ground, not resisting, and "in a position to be handcuffed" when the officers unnecessarily dragged him into nearby mud where Officer Linnertz kicked his abdomen and torso. *Id.* at 6-7. As they dragged Plaintiff through the mud, Officer Voggel pulled, twisted, and forcefully yanked his arms. *Id.* Plaintiff "nearly lost consciousness due the force of the kick and the pain," he "sustained injuries to [his] right shoulder, right arm, and right hand," and "received an injury to [his] abdomen/torso." *Id.* Plaintiff suffered mental anguish, emotional distress, and costly damages to his clothes. *Id.* at 7.

**\*2** Through his second cause of action, Plaintiff claims Nurse Robert Taylor, Physician Assistant ("PA") Marie Parker, and Nurse Thomas Maloney were deliberately indifferent to his medical needs. *Id.* at 5-9. Following his arrest, Plaintiff met with Nurse Taylor for intake at the Justice Center. *Id.* at 5. Plaintiff requested medical attention for his injuries, but Nurse Taylor denied his request. *Id.* at 5-6. Nurse Taylor told Plaintiff he would receive medical attention once he was transferred to a housing unit within the Justice Center, but that never came to pass. *Id.* at 6-7. Plaintiff was repeatedly denied adequate medical care for his shoulder injury. *Id.* at 7. Plaintiff requested additional medical care, but on December 30, 2021, PA Parker refused his request to see a medical doctor, opining his shoulder injury was not severe enough for further attention and would heal itself. *Id.* at 7-8. Following this rejection, Plaintiff requested an MRI to help diagnose his injuries on January 9, 2022. *Id.* at 8. On January 12, 2022, Nurse Maloney told Plaintiff his request had been rejected. *Id.* Plaintiff told Nurse Maloney he was in severe pain and "that the pain relievers [he] was receiving so far had been inadequate." *Id.* Plaintiff was denied additional medical care and received no diagnosis for his shoulder injuries. *Id.* Plaintiff believes he suffered ligament damage, joint damage, and nerve damage. *Id.* at 9. Due to the injuries, he continues to experience numbness and tingling in his shoulder, arm, hand, and fingers. *Id.* Plaintiff has also experienced severe mental anguish and emotional distress. *Id.* at 8.

Through his third cause of action, Plaintiff claims Deputy Daughton failed to intervene and protect him when another inmate came into Plaintiff's cell and assaulted him. *Id.* at 8-9. On January 4, 2022, Deputy Daughton overheard inmate Stridiron threaten to physically beat Plaintiff. *Id.* at 9. When

Deputy Daughton asked Plaintiff if he was okay, Plaintiff said "[n]o, you need to lock him in or something, I feel like he's going to try to do something to me." *Id.* Deputy Daughton "laughed and waived his hand ... stating, 'who him, no, you['re] good Blount.' " *Id.* Minutes later, inmate Stridiron came into Plaintiff's cell and assaulted him. *Id.* In addition to his physical injuries, Plaintiff suffered severe mental anguish and emotional distress. *Id.*

Through his fourth cause of action, Plaintiff claims Deputies Campaneo and Sullivan failed to forward his Inmate Complaint Forms in violation of his First, Eighth, and Fourteenth Amendment rights. *Id.* at 9-10. On January 7, 2022, Plaintiff gave both Deputies a grievance. *Id.* at 9. Neither one of them forwarded his grievance to the appropriate authorities. *Id.* Plaintiff accordingly never received a response—his complaints went unresolved. *Id.* Plaintiff claims this was a violation of his First Amendment right to petition the government for redress of grievances, his Eighth and Fourteenth Amendment rights, and "a violation of the Onondaga County Sheriff's office policy and procedure, the New York Codes, Rules and Regulations, the New York State Constitution, and the New York Minimum Standards; Title 9, Subtitle AA; Chapter A; Subchapter A; Part 7032 Sections 1-12." *Id.* at 10. Plaintiff claims these violations caused him severe mental anguish and emotional distress. *Id.*

Through his fifth cause of action, Plaintiff claims Deputies Apples and Daughton failed to forward his Inmate Complaint Forms in violation of his First, Eighth, and Fourteenth Amendment rights. *Id.* at 10. On January 17, 2022, Plaintiff gave both Deputies a grievance. *Id.* Neither one of them forwarded his grievance to the appropriate authorities. *Id.* Plaintiff accordingly never received a response—his complaints went unresolved. *Id.* On January 20, 2022, Plaintiff asked why he received no response and Deputy Apples said "you ain't getting shit Blount, I didn't give your complaint to the Sergeant." *Id.* Both Deputies told Plaintiff nobody cared about his grievances. *Id.* at 11. Plaintiff therefore asked for a formal grievance form on January 20, 2022, but the Deputies refused. *Id.* Plaintiff claims this conduct violated his First Amendment right to petition the government for redress of grievances, his Eighth and Fourteenth Amendment rights, and "a violation of the NYS minimum standards section 7032; 1-12, the O.C.S.O. policy and procedure the NYCRR and the NYS Constitution." *Id.* at 10. Plaintiff further avers that because the grievance concerned Deputy Daughton, the Deputy's refusal to forward his Inmate Complaint Form as required by policy and procedure constitutes retaliation under the First Amendment. *Id.* Plaintiff complains of severe mental anguish and emotional distress. *Id.*

**\*3** Through his sixth cause of action, Plaintiff claims Deputy O'Connell and Sergeant Kenney violated his First, Eighth, and Fourteenth Amendment rights by refusing to accept a grievance form. *Id.* at 11. On January 20, 2022, Plaintiff submitted a grievance to Deputy O'Connell concerning the whereabouts of his grievances from January 17, 2022. *Id.* However, Sergeant Kenney refused to accept the grievance, indicating she would only accept a formal grievance. *Id.* Plaintiff never received a formal grievance form, so he was never able to submit a grievance concerning the whereabouts of his grievances from January 17, 2022. *Id.* Plaintiff claims this caused him severe mental anguish and emotional distress. *Id.*

Through his seventh cause of action, Plaintiff claims Sergeant Williams violated his First, Eighth, and Fourteenth Amendment rights by deliberately taking actions to prevent him from receiving a response to a formal grievance submitted on January 21, 2022. *Id.* at 12. On January 21, 2022, Plaintiff gave Deputy Passino a formal grievance concerning the whereabouts of his grievances from January 7th and 17th. *Id.* at 11-12. Deputy Passino followed procedure by submitting the grievance to Sergeant Williams. *Id.* at 12. Sergeant Williams "deliberately assigned a grievance [number] to the formal grievance form" that was the same grievance number assigned to another grievance form Plaintiff had submitted on January 20, 2022. *Id.* The grievance from January 21, 2022, was originally given a separate grievance number, but Sergeant Williams deliberately "crossed out" that number. *Id.* Plaintiff avers this made it appear as though his grievance from January 21, 2022, had been resolved. *Id.* Plaintiff claims Deputies Dober and Guilliame were complicit in this violation because "they both did not correct this error." *Id.* at 13. Plaintiff claims this has caused severe mental anguish and emotional distress. *Id.* at 12.

Through his eighth cause of action, Plaintiff claims Deputy McDonald and Deputy Lieutenant Lang retaliated against him for submitting a grievance. *Id.* at 14-15. On February 2, 2022, Deputies McDonald and Sherwood did not let Plaintiff out of his cell during his scheduled recreation time because they wanted to let another inmate out, who was under a no-contact order with Plaintiff. *Id.* Plaintiff complained and Deputy McDonald let him out for his scheduled morning

recreation time. *Id.* at 15. However, Deputy McDonald "fabricated a report that stated a reason as to why he had to cancel" Plaintiff's scheduled afternoon recreation time. *Id.* Plaintiff submitted a grievance concerning this report. *Id.* The following day, Deputy McDonald told Plaintiff "I got good news and I got bad news." *Id.* The good news was Plaintiff's grievance had been received, but the bad news was that Plaintiff was placed under protective custody. *Id.* When Plaintiff asked why, Deputy McDonald responded, "you should stop making complaints, you complained about your rec, now you only get 2 hours out [of] your cell." *Id.* Plaintiff asked for a formal explanation for this treatment but received none. *Id.* at 16. Plaintiff claims Deputy McDonald and Lieutenant Lang retaliated against him for submitting a grievance and placing him in protective custody against his will. *Id.* at 15-16. Plaintiff complains, "[t]his feels like torture, and is a violation of my 8th amendment rights due to the fact that this is unconstitutional confinement, cruel and unusual punishment, and denial of due process which is a violation of my 14th Amendment and excessive force all stemming from a retaliation for the exercise of first amendment right." *Id.* at 16.

Through his ninth cause of action, Plaintiff claims Deputy McDonald and Sergeant Peterson failed to timely respond to a formal grievance. *Id.* at 17-18. On February 21, 2022, Plaintiff submitted a formal grievance to Deputy McDonald and Sergeant Peterson concerning Sergeant Williams' treatment of Plaintiff's grievance on January 21, 2022. *Id.* at 17. Both grievances have gone unanswered. *Id.* at 18. Plaintiff claims this violates his First, Eighth, and Fourteenth Amendment rights. *Id.* at 17-18.

**\*4** In what appears to be his tenth and final cause of action, Plaintiff claims his court-appointed attorneys violated his Sixth and Fourteenth Amendment rights. *Id.* at 19. Plaintiff claims these attorneys "refused" to intervene to stop the grievance-related violations at the Justice Center. *Id.* Plaintiff further argues the attorneys refused to show him body-camera footage of his arrest on December 6, 2021. *Id.*

## II. STANDARD OF REVIEW

This Court must conduct an initial review of complaints filed *in forma pauperis*, and "complaints in which a prisoner[3] seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915(e) (2)(B) (governing complaints filed *in forma pauperis*); 28 U.S.C. § 1915A (governing complaints filed by prisoners against the government). When reviewing these types of

complaints, this Court must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; 28 U.S.C. § 1915(e)(2)(B); *see also Allen v. Stringer*, No. 20-3953, 2021 WL 4472667, at \*1 (2d Cir. Sept. 30, 2021) (applying Section 1915(e)(2)(B)); *Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (applying Section 1915A).[4]

This Court must exercise caution when determining whether to *sua sponte* dismiss a *pro se* complaint on the grounds that it is frivolous. *See Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991); *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). "A claim is based on an indisputably meritless legal theory when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Id.*

When undertaking this initial review, the Court must construe *pro se* pleadings with the utmost leniency. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding that a *pro se* litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers"); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Iqbal*, 556 U.S. 662, 678. It must "give the defendant fair notice of what the claim is and the

grounds upon which it rests." *Twombly*, 550 U.S. 544, 555; *see also* Fed. R. Civ. P. 8(a)(2).

**\*5** In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## III. DISCUSSION

Plaintiff's claims fit into six categories: (A) excessive force, (B) deliberate indifference, (C) failure to intervene and protect, (D) failure to follow inmate grievance procedures, (E) retaliation, and (F) failure to provide adequate representation and due process of law. *See generally id.* The Court will address each category of claims, in turn.

### A. Excessive Force

Plaintiff claims SPD Officers Voggel and Linnertz used unconstitutionally excessive force when arresting him on December 6, 2021. (Dkt. No. 1 at 5-7, 18, 20.) Plaintiff offers specific details about when and where the arrest occurred, how he conducted himself during the arrest, what each officer did to him, and the injuries he suffered. *See id.* Plaintiff alleges the unlawful conduct occurred during his arrest on a residential street in Syracuse, New York. *See id.*

Construing Plaintiff's *pro se* pleading liberally, *Sealed Plaintiff*, 537 F.3d at 191, the Court views Plaintiff's excessive force claim as one arising under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 394 (1989) ("Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment."); *see generally Young v. Cabrera*, No. 18-CV-3028 (RPK) (ST), 2020 WL 7042759, at *4 (E.D.N.Y. Nov. 30, 2020) (dismissing plaintiff's Eighth and Fourteenth Amendment excessive force claims because "all claims that law enforcement officers have used excessive force in the course of an arrest are analyzed under the Fourth Amendment and its reasonableness standard, rather than

the Eighth Amendment or the Fourteenth Amendment."). Construing Plaintiff's allegations liberally and taking his factual allegations as true, the undersigned concludes Plaintiff Plaintiff's Fourth Amendment excessive force claim against SPD Officer Voggel and Linnertz survives initial review. *See McClendon v. Cty. of Nassau*, No. 11-CV-0190 (SJF) (ETB), 2012 WL 4849144, at *9 (E.D.N.Y. Oct. 11, 2012) ("Unnecessary blows inflicted while an arrestee is in handcuffs may be sufficient to sustain an excessive force claim.") (collecting cases); *see, e.g., Young*, 2020 WL 7042759, at *7-9, 11 (concluding plaintiff's excessive force claim survived summary judgment where evidence indicated the officers "used excessive force in kicking and stomping Mr. Young before and after he was handcuffed."); *Johnson v. City of New York*, No. 05 CIV. 2357 (SHS), 2006 WL 2354815, at *5 (S.D.N.Y. Aug. 14, 2006) (explaining an excessive force claim "would be actionable under the case law" against an officer who stomped or kicked "an individual already under police control").

The undersigned accordingly recommends that the District Court conclude Plaintiff's excessive force claim against SPD Officers Voggel and Linnertz survives initial review under 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A and requires a response. In so recommending, the undersigned expresses no opinion regarding whether the claim could survive a properly filed motion to dismiss or motion for summary judgment.

### B. Deliberate Indifference

**\*6** Plaintiff claims Nurse Taylor, PA Parker, and Nurse Maloney were deliberately indifferent to his post-arrest medical needs. (Dkt. No. 1 at 5-9.) Plaintiff complains of severe pain that was not alleviated with Tylenol or ibuprofen. *See id.* at 8. He further avers he suffered ligament damage, joint damage, and nerve damage causing numbness and tingling in his shoulder, arm, hand, and fingers. *Id.* at 9. Despite his repeated requests for medical attention, Nurse Taylor, PA Parker, and Nurse Malone refused to offer him stronger pain medications, grant him access to a medical doctor, or examine his injuries with an MRI. *Id.* at 5-9.

Because Plaintiff was a pretrial detainee at the time of the events in question, the Court construes his medical deliberate indifference claim as one arising out of the Fourteenth Amendment. *See id.* at 2; *compare Sims v. City of New York*, 788 F. App'x 62, 63 n.3 (2d Cir. 2019) ("Although *Darnell* involved a challenge to conditions of confinement, we have applied that decision's holding to medical deliberate-

indifference claims."), *with* *Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment."). In the Second Circuit, the Fourteenth Amendment standard for challenging confinement conditions is used to test a pretrial detainee's medical deliberate indifference claim. *See, e.g.,* *Yancey v. Robertson,* 828 F. App'x 801, 803 (2d Cir. 2020) (using the Fourteenth Amendment standard for challenging confinement conditions to a pretrial detainee's medical deliberate inference claim); *Sims,* 788 F. App'x at 63 (same); *Charles v. Orange Cty.,* 925 F.3d 73, 87 (2d Cir. 2019) (same).

This standard has two prongs, and claimants must satisfy both. *Yancey,* 828 F. App'x at 803. First, the claimant must show a sufficiently serious medical need. *Id.* Second, the claimant must show the defendant acted with deliberate indifference to the medical need. *Id.; see generally* *Charles,* 925 F.3d at 87 ("Thus, a detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants knew that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants should have known that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health.").

Construing Plaintiff's *pro se* pleading liberally, *Sealed Plaintiff,* 537 F.3d at 191, the Court concludes his medical indifference claim against Nurse Taylor, PA Parker, and Nurse Maloney survives initial review. Plaintiff claims he experienced severe pain, complained about his severe pain to these individuals, was give inadequate medical treatment, and now experiences numbness and tingling from his shoulder to his fingers. (Dkt. No. 1. at 5-9.) The undersigned accordingly recommends the District Court conclude that Plaintiff's medical indifference claim against Nurse Taylor, PA Parker, and Nurse Maloney survives initial review and requires a response. In so recommending, the undersigned expresses no opinion regarding whether the claim could survive a properly filed motion to dismiss or motion for summary judgment.

**C. Failure to Protect**

"Prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994). Although "not every injury that a prisoner suffers at the hands of another results in constitutional liability for the officials responsible for that prisoner's safety," "allowing an attack on an inmate to proceed without intervening is a constitutional violation in certain circumstances." *Taylor v. City of New York,* No. 16-CIV-7857 (NRB), 2018 WL 1737626, at *11 (S.D.N.Y. Mar. 27, 2018); *see also* *Leckie v. City of New York,* No. 18-CV-3917 (RRM) (LB), 2021 WL 84234, at *5 (E.D.N.Y. Jan. 11, 2021).

**\*7** When an officer acts with deliberate indifference to a substantial risk of serious harm to a pretrial detainee, a Fourteenth Amendment violation occurs. *See* *Taylor,* 2018 WL 1737626, at *11; *see also Charles v. Rockland Cty. Off. of the Sheriff,* No. 16 CV 166 (VB), 2019 WL 1299804, at *3 (S.D.N.Y. Mar. 21, 2019) (addressing failure to protect claims); *Rosen v. City of New York,* 667 F. Supp. 2d 355, 359–60 (S.D.N.Y. 2009) (addressing failure to intervene claims). To prove such a violation occurred, pretrial detainees must satisfy "(1) an objective prong showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process; and (2) a *mens rea* prong that shows that the officer acted with at least deliberate indifference to the challenged conditions." *House v. City of New York,* No. 18-CIV-6693 (PAE) (KNF), 2020 WL 6891830, at *11 (S.D.N.Y. Nov. 24, 2020) (citing *Darnell,* 849 F.3d at 29); *see also* *Taylor,* 2018 WL 1737626, at *12 ("Although *Darnell* involved a Fourteenth Amendment challenge to a prisoner's conditions of confinement, its holding applies with equal measure to failure to protect claims.").

Plaintiff was a pretrial detainee at the time of the events in question. (*See* Dkt. No. 1 at 2.) Reading his *pro se* pleading leniently, the Court construes his third cause of action as a failure to protect claim arising out of the Fourteenth Amendment. *See* *Sealed Plaintiff,* 537 F.3d at 191. Plaintiff alleges Deputy Daughton was aware that an inmate had threatened to attack him. (Dkt. No. 1 at 9.) He further alleges he asked Deputy Daughton for help, but Deputy Daughton refused to offer protection. *Id.* Minutes after that refusal, the inmate attacked Plaintiff. *Id.* These allegations appear to make out the fundamental elements of a Fourteenth

Amendment failure to protect claim. *See* House, 2020 WL 6891830, at *11; Taylor, 2018 WL 1737626, at *11-12. The undersigned accordingly recommends that the District Court conclude Plaintiff's failure to protect claim against Deputy Daughton survives initial review under 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A and requires a response. In so recommending, the undersigned expresses no opinion regarding whether the claim could survive a properly filed motion to dismiss or motion for summary judgment.

### D. Inmate Grievance Procedure Claims

Plaintiff claims Defendants violated his First, Eighth, and Fourteenth Amendment rights by failing to follow grievance procedures. (Dkt. No. 1 at 9-18.) He claims Deputies Campaneo and Sullivan failed to forward a grievance he filed on January 7, 2022 (the fourth cause of action), Deputies Apples and Daughton failed to forward a grievance he filed on January 17, 2022, and refused to give him another grievance form on January 20, 2022 (the fifth cause of action), Deputy O'Connell and Sergeant Kenney refused to accept a grievance he completed on January 20, 2022 (the sixth cause of action), Sergeant Williams and Deputies Dober and Guilliame prevented him from receiving a response to a grievance he filed on January 21, 2022 (the seventh cause of action), and Deputy McDonald and Sergeant Peterson failed to timely respond to a grievance filed on February 21, 2022 (the ninth cause of action). *See id.*

These alleged grievance procedure violations do not give rise to actionable claims under 42 U.S.C. § 1983. *See Matthews v. Barq*, No. 9:18-CV-0855 (TJM) (CFH), 2019 WL 1025828, at *13 (N.D.N.Y. Mar. 4, 2019); *Harris v. Westchester Cty. Dep't of Corr.*, No. 06-CIV-2011 (RJS), 2008 WL 953616, at *5 (S.D.N.Y. Apr. 3, 2008) (collecting cases); *Cancel v. Goord*, No. 00-CIV-2042 (LMM), 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). "[T]he Fourteenth Amendment does not provide a constitutionally protected right to file a grievance or receive process with respect to a filed grievance." *Williams v. City of New York*, No. 19-CV-3347 (LJL) (JLC), 2022 WL 130409, at *21 (S.D.N.Y. Jan. 14, 2022), *report and recommendation adopted*, No. 19-CV-3347 (LJL), 2022 WL 446041 (S.D.N.Y. Feb. 14, 2022); *see also Animashaun v. Fischer*, No. 9:19-CV-0820 (LEK) (DJS), 2020 WL 374578, at *9 (N.D.N.Y. Jan. 23, 2020) ("As an initial matter, inmates do not have a constitutional right to state grievance programs") (collecting cases). "Access to

administrative remedies is therefore not a constitutionally-protected right, and a violation of prison grievance procedure is not a cognizable Section 1983 claim." *Williams*, 2022 WL 130409, at *21 (citing *George v. Cty. of Westchester*, No. 20-CV-1723 (KMK), 2021 WL 4392485, at *4 (S.D.N.Y. Sept. 24, 2021) (collecting cases)). "Rather, in the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is directly petitioning the government for redress of his claims." *Williams*, 2022 WL 130409, at *21; *Harris*, 2008 WL 953616, at *5. Despite the alleged grievance procedure violations, Plaintiff has petitioned the government for redress in this Court by filing his Complaint. (*See generally* Dkt. No. 1.) Any claim that Plaintiff was denied his First Amendment right to petition the government for redress is "belied by the fact of his bringing this lawsuit." *Williams*, 2022 WL 130409, at *21.

**\*8** The alleged grievance procedure violations accordingly do not give rise to First or Fourteenth Amendment claims that could be brought under 42 U.S.C. § 1983. *See id.* Moreover, Plaintiff has failed to make out a cognizable Eighth Amendment claim stemming from these alleged grievance procedure violations. (*See generally* Dkt. No. 1 at 9-18.) The undersigned therefore recommends that the District Court dismiss Plaintiff's grievance procedure claims against Deputy Campaneo, Deputy Sullivan, Deputy Apples, Deputy Daughton, Deputy O'Connell, Sergeant Kenney, Sergeant Williams, Deputy Dober, Deputy Guilliame, Deputy McDonald, and Sergeant Peterson. *See, e.g., George*, 2021 WL 4392485, at *4; *Harris*, 2008 WL 953616, at *5.

### E. Retaliation Claims

Plaintiff advances two retaliation claims—one through his fifth cause of action, and one through his eighth cause of action. (*See* Dkt. No. 1 at 10, 14-16.) Through his fifth cause of action, Plaintiff claims Deputy Daughton retaliated against him by preventing him from filing a grievance after he had already filed a grievance about Deputy Daughton. *Id.* Through his eighth cause of action, Plaintiff claims Deputy McDonald and Lieutenant Lang retaliated against him by issuing a false report about him and placing him in protective custody on February 3, 2022, after Plaintiff had complained on February 2, 2022, and filed a grievance on February 3, 2022. *Id.* at 14-16.

"To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, a prisoner must demonstrate: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Vidal v. Valentin*, No. 16-CV-5745 (CS), 2019 WL 3219442, at *6 (S.D.N.Y. July 17, 2019); *see also Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003). A claimant meets the first element by demonstrating that he filed a grievance, which is a "constitutionally protected activity." *Davis*, 320 F.3d at 352-53; *see also Vidal*, 2019 WL 3219442, at *6 (explaining it "is well supported by case law" that the submission of a grievance constitutes a protected activity) (collecting cases); *Smith v. Hash*, No. 904-CV-0074 (LEK) (DRH), 2006 WL 2806464, at *6 (N.D.N.Y. Sept. 28, 2006) ("Smith's filing of a grievance was clearly an assertion of a constitutional right protected by the First Amendment"). A claimant can meet the second element by demonstrating that he was subject to "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004); *see also Williams*, 2022 WL 130409, at *22. Finally, "[i]n considering whether a causal connection exists, a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Williams*, 2022 WL 130409, at *24; *see also Speaks v. Saeed*, No. 14-CV-06826 (JMA) (AYS), 2022 WL 541767, at *8 (E.D.N.Y. Feb. 23, 2022).

Reading Plaintiff's *pro se* Complaint leniently, *Sealed Plaintiff*, 537 F.3d at 191, the undersigned concludes Plaintiff has alleged facts in support of both retaliation claims. (*See* Dkt. No. 1 at 10, 14-16.) First, he alleges he filed two grievances—one on January 17, 2022, and the other on February 3, 2022. *See id.* at 10, 15-16; *see also Davis*, 320 F.3d at 352-53. Second, Plaintiff alleges that after he filed each grievance, he suffered adverse actions. (Dkt. No. 1 at 10, 14-16.) After he filed the grievance on January 17, 2022, Plaintiff was prevented from filing further grievances—he was prevented from engaging in further constitutionally protected activity. *See id.* at 10; *see generally Vidal*, 2019 WL 3219442, at *6. Additionally, after he filed the grievance on February 3, 2022, Plaintiff was placed in protective custody

against his will. (Dkt. No. 1 at 15-16; *see, e.g., Vidal*, 2019 WL 3219442, at *8 ("Confinement in the SHU is an adverse action."); *Smith*, 2006 WL 2806464, at *6 (same).) Plaintiff further alleges that around the time he filed that grievance, Deputy McDonald created a false misbehavior report about him. (Dkt. No. 1 at 15; *see, e.g., Speaks*, 2022 WL 541767, at *8 (concluding "plaintiff's claim that he received a false disciplinary report resulting in his lock down for seventeen days constitutes adverse action"); *Vidal*, 2019 WL 3219442, at *8 ("Plaintiff is correct that a plaintiff's allegation that a defendant issued a false misbehavior report in response to the plaintiff's protected activity can support a claim of unlawful retaliation.").) Third, Plaintiff advances allegations relevant to the causation inquiry. (*See* Dkt. No. 1 at 10, 14-16; *see generally Williams*, 2022 WL 130409, at *24.) The retaliatory actions came just after he filed grievances. (Dkt. No. 1 at 10, 14-16.) Furthermore, after Plaintiff submitted the grievance on January 17, 2022, Deputies Apples and Daughton told him nobody cared about his grievances, and Deputy Apples said "you ain't getting shit Blount, I didn't give your complaint to the Sergeant." (Dkt. No. 1 at 10.) Plaintiff further claims that after he submitted the grievance on February 3, 2022, Deputy McDonald told him that he "should stop making complaints, you complained about your rec, now you only get 2 hours out [of] your cell." *Id.* at 15. These factual allegations are relevant to two considerations under the causation inquiry: temporal proximity and relevant statements made by Defendants. *Williams*, 2022 WL 130409, at *24.

**\*9** Based on the foregoing, the undersigned recommends that the District Court conclude Plaintiff's retaliation claims against Deputy Daughton, Deputy McDonald, and Lieutenant Lang survive initial review under 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A and require a response. In so recommending, the undersigned expresses no opinion regarding whether the claim could survive a properly filed motion to dismiss or motion for summary judgment.

### F. Representation and Due Process

Plaintiff's tenth and final claim is frivolous and should be dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(i); 28 U.S.C. § 1915A(b)(1). Plaintiff claims his court-appointed attorneys violated his Sixth and Fourteenth Amendment rights by failing to sue to prevent numerous constitutional violations and by failing to disclose body-camera footage from his arrest on December 6, 2021. (Dkt. No. 1 at 19-20.) Plaintiff

brought this civil action under 42 U.S.C. § 1983. *Id.* at 1. However, Plaintiff's court-appointed attorneys cannot be sued under Section 1983 because they are not state actors, and therefore did not act under color of state law. *See Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981) ("[A] public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding."); *see also Tapp v. Champagne,* 164 F. App'x 106, 108 (2d Cir. 2006) (upholding initial review dismissal of Section 1983 claim against public defenders); *see generally Hardy-Graham v. Southampton Just. Ct.*, No. 20-CV-0981 (JS) (SIL), 2021 WL 260102, at *7 (E.D.N.Y. Jan. 25, 2021) (dismissing Section 1983 claims against public defender on initial review) (collecting cases). The undersigned accordingly recommends that the District Court dismiss this claim. *See, e.g., Johnson v. Bieling*, No. 5:20-CV-1124 (GTS) (ML), 2021 WL 1841470, at *12 (N.D.N.Y. Jan. 6, 2021), *report and recommendation adopted*, No. 5:20-CV-1124 (GTS) (ML), 2021 WL 1840591 (N.D.N.Y. May 7, 2021).

## IV. CONCLUSION

For the foregoing reasons, the undersigned recommends the District Court conclude the following claims survive *sue sponte* review: (i) the first cause of action, claiming a Fourth Amendment excessive force violation by Syracuse Police Department Officers Voggel and Linnertz; (ii) the second cause of action, claiming a Fourteenth Amendment medical indifference violation by Nurse Taylor, PA Parker, and Nurse Maloney; (iii) the third cause of action, claiming a Fourteenth Amendment failure to protect violation by Deputy Daughton; (iv) the fifth cause of action, claiming a First Amendment retaliation violation by Deputy Daughton; and (v) the eighth cause of action, claiming a First Amendment retaliation violation by Deputy McDonald and Lieutenant Lang. *See generally* 28 U.S.C. § 1915(e)(2)(b); 28 U.S.C. § 1915A(b).

The undersigned further recommends the District Court dismiss all remaining claims against all other Defendants. *See id.* This would result in the dismissal of Plaintiff's grievance procedure claims against Deputy Campaneo, Deputy Sullivan, Deputy Apples, Deputy Daughton, Deputy O'Connell, Sergeant Kenney, Sergeant Williams, Deputy Dober, Deputy Guilliame, Deputy McDonald, and Sergeant Peterson. This would also result in the dismissal of

Plaintiff's Sixth and Fourteenth Amendment claims against his court-appointed attorneys: Jordan McQuillan, Keith Young, Lawrence Sunser, and Sarah Hansen.

**\*10  WHEREFORE**, based on the above, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 5) is **GRANTED;** [5] and it is further

**RECOMMENDED** that Plaintiff's Fourth Amendment excessive force claim against Defendants Voggel and Linnertz **survive *sua sponte* review**; and it is further

**RECOMMENDED** that Plaintiff's Fourteenth Amendment medical indifference claim against Defendants Taylor, Parker, and Maloney **survive *sua sponte* review**; and it is further

**RECOMMENDED** that Plaintiff's Fourteenth Amendment failure to protect claim against Defendant Daughton **survive *sua sponte* review**; and it is further

**RECOMMENDED** that Plaintiff's First Amendment retaliation claim against Defendant Daughton **survive *sua sponte* review**; and it is further

**RECOMMENDED** that Plaintiff's First Amendment retaliation claim against Defendants by McDonald and Lang **survive *sua sponte* review**; and it is further

**RECOMMENDED** that pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Plaintiff's grievance procedure claims be **DISMISSED** as against Defendants Campaneo, Sullivan, Apples, Daughton, O'Connell, Kenney, Williams, Dober, Guilliame, McDonald, and Peterson; and it is further

**RECOMMENDED** that pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Plaintiff's Sixth and Fourteenth Amendment claims be **DISMISSED** as against Defendants McQuillan, Young, Sunser, and Hansen; and it is further

**RECOMMENDED** that if the District Court adopts this Report-Recommendation, the Clerk be directed to: (1) provide the superintendent of the facility that Plaintiff designated as his current location with a copy of Plaintiff's inmate authorization form (Dkt. No. 3) and notify that official that this action has been filed and that Plaintiff is required to

pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915 through periodic withdrawals from his inmate accounts; (2) provide a copy of Plaintiff's authorization form (Dkt. No. 3) to the Financial Deputy of the Clerk's Office; and (3) issue summonses and forward them, along with a copy of the Complaint (Dkt. No. 1), to the United States Marshal for service upon Defendants Voggel, Linnertz, Taylor, Parker, Maloney, Daughton, McDonald, and Lang; and it is further

**RECOMMENDED** that Defendants Voggel, Linnertz, Taylor, Parker, Maloney, Daughton, McDonald, and Lang be **ORDERED** to file a formal response to Plaintiff's Complaint (Dkt. No. 1) as provided for in the Federal Rules of Civil Procedure subsequent to service of process; and it is further

**ORDERED** that all pleadings, motions, and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket. Plaintiff must comply with all requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action**; and it is further

\*11 **ORDERED** that the Clerk serve a copy of this Order and Report-Recommendation on Plaintiff, along with a copy of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[6] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

**All Citations**

Slip Copy, 2022 WL 1101547

---

## Footnotes

1    The following recitation of facts is drawn from the Complaint, which the Court accepts as true for purposes of initial review. *See, e.g.*, *LaTouche v. Rockland County*, No. 22-CV-1437 (LTS), 2022 WL 953111, at \*1 (S.D.N.Y. Mar. 29, 2022); *Walker v. City of New York*, No. 20-CV-5240 (PKC) (LB), 2021 WL 1838277, at \*1 n.1 (E.D.N.Y. May 7, 2021).

2    Plaintiff named the following individuals in the caption of his *pro se* Complaint: Ettinger, SPD Officer; Linnertz, SPD Officer; Voggel, SPD Officer; Campaneo, Sheriff's Deputy; Sullivan, Sheriff's Deputy; Apples, Sheriff's Deputy; Daughton, Thomas Maloney, Justice Center Nurse; Sheriff's Deputy; K. Williams, Sheriff's Sergeant; Dober, Sheriff's Deputy; Guilliame, Sheriff's Captain; Lang, Sheriff's Lieutenant; Passino, Sheriff's Deputy; McDonald, Sheriff's Deputy; Robert Taylor, Justice Center Nurse; Anne Marie Parker, Justice Center Physician Assistant; Peterson, Sheriff's Sergeant (collectively "Defendants"). (Dkt. No. 1 at 1-4.) Parties not included in the caption are not parties to the action. *See* Fed. R. Civ. P. 10(a); *see also Bloodywone v. Bellnier*, No. 9:18-CV-0615 (GTS/DJS), 2018 WL 10550308, at 5 n.8 (N.D.N.Y. Oct. 17, 2018) ("A party not named in the caption of the complaint is not a party to the action.") (collecting cases).

3    Plaintiff is a "prisoner" as that term is used in 28 U.S.C. § 1915A(a). (*See* Dkt. No. 1 at 2; *see also* 28 U.S.C. § 1915A(c) (defining "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.").)

4    Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted. *See, e.g.,* Sczepanski v. Saul, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

5    Plaintiff should note that although his IFP Application has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

6    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 165 of 198

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joseph VIDAL, Plaintiff,

v.

Jackeline VALENTIN, Defendant.

16-CV-5745 (CS)
|
Signed 07/02/2019
|
Filed 07/17/2019

**Attorneys and Law Firms**

Benjamin J.A. Sauter, Sara Gribbon, Kobre & Kim LLP, New York, New York, Counsel for Plaintiff. [1]

Neil Shevlin, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, Counsel for Defendant.

**OPINION & ORDER**

Seibel, District Judge

*\*1* Before the Court is Defendant's motion for summary judgment. (Doc. 61.)

**I. BACKGROUND**

The following facts are based on the parties' Local Civil Rule 56.1 statements, replies, and supporting materials, and are undisputed except as noted.

New York State Department of Corrections and Community Supervision ("DOCCS") Directive 4422 ("Offender Correspondence Program") contains the following relevant provisions:

- "The sending and receiving of mail by offenders will be restricted only to the extent necessary to prevent a threat to the safety, security, and good order of the facility or the safety or well being of any person, and to prevent unsolicited and unwanted mail." (Doc. 65 ("Russo Decl.") Ex. A ¶ II(C).)

- "Except for oversize envelopes and parcels, offender-to-offender correspondence and correspondence specified in ... [Directive 4421], ... outgoing correspondence may be sealed by the offender." (*Id.* ¶ III(B)(7).)

- "Oversize correspondence, defined as mail which cannot be enclosed in a standard business envelope, shall be inspected in the presence of the offender by a designated security staff person for the presence of contraband." (*Id.* ¶ (B)(8).)

- [O]utgoing mail purporting to be privileged correspondence will not be considered to be privileged correspondence until it has been placed in the control of the administration [2] for processing. (*Id.* ¶ III(A).)

*\*2* Further, DOCCS Directive 4421 ("Privileged Correspondence") provides that once outgoing privileged correspondence has been sealed by an inmate, it "shall not be opened, inspected, or read without express written authorization from the facility Superintendent." (*Id.* Ex. B ¶ 721.3(A)(2).)

Plaintiff Joseph Vidal is an inmate currently incarcerated by DOCCS at the Elmira Correctional Facility. (P's 56.1 Resp. ¶ 1.) From October 2014 to March 2015, Plaintiff was incarcerated at Green Haven. (*Id.*) Defendant Jackeline Valentin has been employed as a Correction Officer ("CO") by DOCCS since January 7, 2013. (*Id.* ¶ 2.) Defendant was assigned to Green Haven in April or May 2013, but she is no longer working there because she has been "out on medical" leave as of September 2017. (*Id.*; Valentin Tr. at 8:14-21.)

On October 12, 2014, Defendant worked at Green Haven as the A officer on E Block during the 7:00 a.m. to 3:00 p.m. shift. (P's 56.1 Resp. ¶ 3.) That day, Plaintiff approached Defendant and asked her to sign a disbursement form for a sealed 8.5″ × 11″ envelope marked "legal mail" that Plaintiff stated he wanted to send to his attorney. (P's 56.1 Resp. ¶ 4; Sauter Decl. Ex. B ("Vidal Decl.") ¶ 7.) Because a standard business envelope is approximately 9″ × 4″, Plaintiff's envelope was oversized under the applicable regulation, and thus subject to inspection. (*See* Russo Decl. Ex. A ¶ III(B)(7)-(8).) Defendant advised Plaintiff that she could not sign the disbursement form unless he agreed to open the envelope to allow Defendant to inspect the contents. (P's 56.1 Resp. ¶ 5.) Defendant claims that she told Plaintiff she needed to inspect his envelope for contraband and gang paraphernalia, (Doc. 66 ("Valentin Decl.") ¶ 4), but Plaintiff

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 166 of 198

disputes that Defendant told him why she needed to inspect the envelope, (Vidal Decl. ¶ 4; P's 56.1 Resp. ¶ 5). Plaintiff refused to open his envelope and left. (P's 56.1 Resp. ¶ 6.)

That same day, Plaintiff submitted a letter to the facility Superintendent. (*Id.* ¶ 7; Valentin Decl. Ex. A (the "Letter").) [3] On October 14, 2014, Plaintiff filed a grievance with Green Haven. (P's 56.1 Resp. ¶ 8; Valentin Decl. Ex. B (the "Grievance").) In both his Letter and Grievance, Plaintiff complained that Defendant had acted improperly on October 12, 2014, when she informed Plaintiff she would not sign the disbursement form unless he opened the envelope so that she could review its contents. (P's 56.1 Resp. ¶ 9.) The Letter also asserted that Defendant had acted improperly by sharing her personal information with inmates. (*Id.* ¶ 10.) Specifically, Plaintiff alleged:

> [T]he fact that [Defendant] has problems with her black [A]merican husband, has either a cousin or cousin-in-law, if not in the block, in the facility, and that she shares her business or that she is from 190th Street, Washington Height[s], should not be affairs she should discuss. Employee Rule Manual, section 7.18, if I am not mistaken states that an officer should not display any familiarity with offenders.

(Letter at 2; *see* P's 56.1 Resp. ¶ 10.) Plaintiff testified that he included Defendant's personal information in his Letter to the Superintendent

> [b]ecause [Defendant] feels that she knows all the rules and regulations. Obviously, she doesn't because if somebody else knew her address on the block, she had to share it with somebody if somebody knows her and she hasn't told the superintendent that there's somebody here that knows her. That's why I did that. I have a right to do that. If an officer is acting – is out of place and not following his own

rules and employee manual, I have a right to complain. That's what 139 says, Correctional 139. Find me guilty.

**\*3** (Doc. 64 ("Shevlin Decl.") Ex. A at 113:14-114:2; P's 56.1 Resp. ¶ 11.) Defendant does not have a black American husband or a relative in the facility. (Valentin Decl. ¶ 11.) She does not live on 190th Street [Redacted]. (*Id.* ¶¶ 11-12.)

A supervisor shared copies of Plaintiff's Letter and Grievance with Defendant "[a]t some point in time following" the October 12 mail-related interaction between Plaintiff and Defendant. (*Id.* ¶ 7.) Defendant does not remember when she received the documents, whether she received them at the same or different times, the identity of the supervisor who gave the Letter to her, or whether she was interviewed by a supervisor about them. (*Id.*) Defendant testified that she would have received the October 14 Grievance by the time she discussed the matter with another officer (Sergeant Malark), although she does not remember precisely when that discussion occurred either. (*Id.*; Valentin Tr. at 117:13-118:24, 133:25-134:25.)

Defendant testified that the filing of Plaintiff's October 14 Grievance did not bother her because inmate complaints are part of her job. (Doc. 71 Ex. A at 121:23-122:8.) [4] But she did testify that she became "upset" that Plaintiff [Redacted] because she perceived Plaintiff's allegations to be an "attack on [her] character" insofar as they accused her of improperly "fraternizing with inmates" and made "a false statement about [her] sharing [her] personal information with other people." (Valentin Tr. at 122:5-8, 151:7-153:5, 200:13-22.) She also stated that she was [Redacted] (*Id.* at 123:8-12, 162:5-11.)

On October 20, 2014, Plaintiff sent a note to civilian employee Alfia Alioto concerning her October 16, 2014 review of Plaintiff's inmate chart. (P's 56.1 Resp. ¶ 18.) In the note, Plaintiff commented, "I must admit you are a pretty down to Earth lady. Thank you. P.S. Keep it simple. I will try." (*Id.*) The note contained a written smiley face. (*Id.*) The next day (October 21), Sergeant Dragoon issued Plaintiff an Inmate Misbehavior Report charging him with violating Rule 107.11 ("Inmates shall not communicate messages of a personal nature to any employee."). (*Id.* ¶ 17.) That same day, Plaintiff was placed on keeplock status in his cell on E Block pending resolution of the charge against him. (*Id.* ¶ 19.) [5] The paperwork relating to Sergeant Dragoon's Report asks,

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00362-AMN-ML    Document 30    Filed 05/30/23    Page 167 of 198

"Inmate confined/restricted for this report?" and the option "Yes" is selected, with the date "10/20/14" specified. (Russo Decl. Ex. C at 9.) [6] On October 29, 2014, Captain Carey conducted a disciplinary hearing in connection with Sergeant Dragoon's Report and Plaintiff's punishment was keeplock status for thirty days (with a start date of October 20) and loss of privileges. (*Id.* Ex. C at 1.) Plaintiff describes the punishment he received as "disproportionate" – although he provides no facts as to the typical punishment for such an offense by an inmate with his history – and claims it is disputed whether there were other factors that led to his keeplock status aside from Sergeant Dragoon's Inmate Misbehavior Report. (P's 56.1 Resp. ¶ 19.) Plaintiff also disputes whether he actually violated Rule 107.11 and claims the issuance of the Inmate Misbehavior Report was part of a retaliatory scheme. (*Id.* ¶¶ 17-19.)

**\*4** On October 23, 2014, Plaintiff was issued two additional Inmate Misbehavior Reports for his alleged continuing improper interactions with Alioto. (P's 56.1 Resp. ¶ 20.) The first Report, issued by Alioto for an incident occurring on October 23, 2014, at approximately 9:15 a.m., charged Plaintiff with violating Rules 101.22 ("stalking") and 107.11 ("harassment"). (*Id.* ¶ 21.) According to the Report, that morning Alioto had received a thank-you note from Plaintiff attached to Plaintiff's yellow copy of the October 21, 2014 Inmate Misbehavior Report written by Sergeant Dragoon. (*Id.*) Alioto said she feared for her safety. (*Id.*) Plaintiff disputes that he violated Rules 101.22 and 107.11 and whether the alleged thank you note was the true or sole reason for the cited Inmate Misbehavior Report. (*Id.*)

Later that day, at approximately 5:00 p.m., Sergeant Kutz issued an additional Inmate Misbehavior Report to Plaintiff for allegedly having sent inappropriate correspondence to Alioto. (*Id.* ¶ 22.) That ticket charged Plaintiff with violating Rules 107.11 ("harassment") and 180.11 ("Facility Correspondence Guidelines"). (*Id.*) Plaintiff again disputes that he violated those rules and whether the alleged correspondence was the true or sole reason for the cited Inmate Misbehavior Report. (*Id.*)

On October 23, 2014, Defendant issued an Inmate Misbehavior Report, stating that Plaintiff's "grievance/ complaint" "discussed my personal information and stated my address (cross street) and town. I have never; nor will I ever discuss or provide my personal/physical address or information with any inmate." (Russo Decl. Ex. E at 5 ("Defendant's Report").) Defendant's Report cites Plaintiff for

violating Rule 113.26 ("Personal information of a current or former employee"), which provides:

> An inmate shall not, without written authorization of the superintendent, solicit, possess or exchange personal identifying information (*e.g.* social security number, home address, private e-mail address or home telephone number) belonging to a person who is a present or former employee of the department or presently or formerly employed in a department facility, or to any member of the person's household, unless the inmate is an immediate family member of such person.

(P's 56.1 Resp. ¶¶ 23-24.) Defendant's Report says that Plaintiff's housing location at the time was "SHU 1," (Defendant's Report), which I understand to be the Special Housing Unit.

Plaintiff disputes that he violated Rule 113.26 and disputes that the alleged Rule violation was the true or sole reason for Valentin's Inmate Misbehavior Report. (P's 56.1 Resp. ¶ 23.) Specifically, the parties dispute whether "190th Street, Washington Height[s]" amounts to "personal identifying information" as contemplated by Rule 113.26, and whether the mere "possession" of such information is sufficient to violate Rule 113.26. (*Id.*; Doc. 69 ("P's Opp.") at 17-19.) On October 27, 2014, Defendant provided a memorandum to Sergeant Malark responding to Plaintiff's Grievance and denying any wrongdoing. (Valentin Decl. Ex. E.)

On October 23, 2014, Plaintiff was sent to SHU where he stayed until March 3, 2015. (Vidal Decl. ¶ 16.) Plaintiff claims that before he was sent to SHU, Defendant stopped by Plaintiff's cell and said, "You are going to SHU." (*Id.* ¶ 17.) [7] The day after Plaintiff was sent to SHU, Plaintiff says Defendant appeared in SHU and said, "Look at you now" and "Pendejo yo no soy de 190th y Washington Heights," (*id.*), which I understand to mean, "Idiot, I'm not from 190th and Washington Heights." Plaintiff also attests that on March 6, three days after he was released from SHU, he was beaten by COs and sent back to SHU. (*Id.* ¶ 18.) Plaintiff says that on the

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00362-AMN-ML Document 30 Filed 05/30/23 Page 168 of 198

same day, Defendant visited Plaintiff in SHU and "mock[ed] and taunt[ed]" him. (*Id.*)

**\*5** On December 31, 2014, Captain Carey conducted two disciplinary hearings involving Plaintiff. (P's 56.1 Resp. ¶ 27.) One concerned the October 23, 2014 Inmate Misbehavior Report issued by Defendant, and the other concerned the two October 23, 2014 Inmate Misbehavior Reports issued to Plaintiff in connection with his interactions with staff member Alioto. (*Id.*) Following the first hearing Defendant's Inmate Misbehavior Report was dismissed. (*Id.* ¶ 28; Russo Decl. Ex. E at 1.)

Following the hearing on the two Alioto-related Reports, Plaintiff was found guilty of the two charges of harassment (Rule 107.11) and the charge of a facility correspondence violation (Rule 180.11), and the allegation of stalking (Rule 101.22) was dismissed. (P's 56.1 Resp. ¶ 29; Russo Decl. Ex. D at 1.) Plaintiff's punishment was "six months (with two months suspended) in SHU (commencing October 23, 2014 to February 23, 2015), and six months loss of packages, phones, and commissary (commencing October 23, 2014 to April 23, 2015)." (P's 56.1 Resp. ¶ 30.)

On June 17, November 26, and September 28, 2013, pursuant to a practice whereby staff are to notify a supervisor if the staff member knows an inmate from the outside, (*see* Russo Decl. ¶ 29), Defendant submitted a total of four memoranda (submitting two on June 17) to the Deputy Superintendent of Security for Green Haven informing him that she recognized certain inmates from her life outside of DOCCS. (*Id.* ¶ 31; Sauter Decl. Ex. O.) In addition, Defendant learned that Plaintiff had obtained the personal information in the Letter from an inmate in J-block, nicknamed "Monstro," and tracked down his real name, Jose Padilla. (Valentin Tr. at 168:6-17.) Valentin testified that, having learned that Padilla, who she knew [Redacted] (*id.* at 164:12), was in the facility, she submitted a "to/from," which is a memo, "explain[ing] the situation," (*id.* at 169:20-24), *i.e.*, that Padilla knew Defendant from her life outside of DOCCS, (*id.* at 164:12-15). DOCCS has no record of it, (P's 56.1 Resp. ¶ 31), but Defendant notes that Padilla was transferred to another jail, and there would be no other reason to move him except that she had submitted a to/from stating she knew him, (Valentin Tr. at 169:24-170:12).

On July 19, 2016, Plaintiff initiated this action. (Doc. 2.) He filed an amended complaint on March 23, 2017. (AC.)

Following discovery, Defendant filed the instant motion for summary judgment. (Doc. 61.)

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

**\*6** "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials...." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated." *Id.* 56(c)(4); *see*

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 169 of 198

🚩 *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

### III. DISCUSSION

#### A. First Amendment Retaliation

Plaintiff's Amended Complaint alleges that Defendant, in her individual capacity, [8] retaliated against him in violation of 🚩 42 U.S.C. § 1983 for exercising his right under the First Amendment to submit grievances and complaints. (AC ¶¶ 1-2.) [9] The Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks omitted); *see* 🚩 *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike.") (internal quotation marks omitted); 🚩 *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (skepticism warranted by "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated").

To prevail on a First Amendment retaliation claim under 🚩 42 U.S.C. § 1983, a prisoner must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." 🚩 *Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) (summary order) (alteration and internal quotation marks omitted). Once a plaintiff has "carrie[d] that burden, the defendants must show by a preponderance of the evidence that they would have [taken the allegedly retaliatory action] even in the absence of the protected conduct." 🚩 *Graham*, 89 F.3d

at 79 (internal quotation marks omitted). If the defendant meets this burden, summary judgment is appropriate. *See* 🚩 *Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999). In other words, "[r]egardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred." 🚩 *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing 🚩 *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see* 🚩 *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (affirming dismissal on summary judgment because correction officer's actions were of mixed motives and "would have been issued on proper grounds alone"); *see also* 🚩 *Sher v. Coughlin*, 739 F.2d 77, 81-82 (2d Cir. 1984) (affirming summary judgment dismissal of prisoner's retaliation claim where dual motivation existed for prisoner's transfer to another facility).

**\*7** For purposes of this motion, Defendant does not contest that Plaintiff's Letter and Grievance constitute protected activity. (Doc. 63 ("D's Mem.") at 17 n.2.) That concession is well supported by case law. *See* 🚩 *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[Plaintiff] has sufficiently alleged ... participation in protected activity: the use of the prison grievance system...."); 🚩 *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ("[I]ntentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that 🚩 section 1983 is intended to remedy.") (alterations and internal quotation marks omitted); *Morgan v. Dzurenda*, No. 14-CV-966, 2017 WL 1217092, at \*12 (D. Conn. Mar. 31, 2017) ("The filing of grievances is a constitutionally protected activity....") (internal quotation marks omitted); 🚩 *Pledger v. Hudson*, No. 99-CV-2167, 2005 WL 736228, at \*4 (S.D.N.Y. Mar. 31, 2005) ("A prisoner's filing of an internal prison complaint against an officer is protected by the First Amendment...."). Thus, Plaintiff has satisfied the first element of his First Amendment retaliation claim.

Additionally, Defendant does not contest that Plaintiff meets the causation prong of the First Amendment retaliation standard, because Defendant concedes that she issued the Inmate Misbehavior Report to Plaintiff in response to the Letter to the Superintendent. (D's Mem. at 17 n.2.)

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 170 of 198

Accordingly, the only hurdle Plaintiff must clear to establish his *prima facie* case of retaliation is whether he suffered an adverse action. The Second Circuit "define[s] adverse action objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill*, 389 F.3d at 381 (alterations, internal quotation marks, emphasis omitted). If the retaliatory conduct does not rise to that level, "the retaliatory act is simply *de minimis*, and therefore outside the ambit of constitutional protection." *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (internal quotation marks omitted). Defendant argues that Plaintiff's stay in SHU cannot satisfy the adverse action element, because Plaintiff was transferred to SHU because of the Inmate Misbehavior Reports issued by Sergeant Kutz and Alioto, and not Defendant's Report. (D's Mem. at 17-18.)

In response, Plaintiff argues that Defendant's filing of an Inmate Misbehavior Report constituted an adverse action in itself. (P's Opp. at 15.) Plaintiff is correct that "a plaintiff's allegation that a defendant issued a false misbehavior report in response to the plaintiff's protected activity can support a claim of unlawful retaliation," *Ward v. Lee*, No. 16-CV-1224, 2018 WL 4610682, at *6 (N.D.N.Y. July 3, 2018), *report and recommendation adopted*, 2018 WL 3574872 (N.D.N.Y. July 25, 2018); *see Franco*, 854 F.2d at 589 (false disciplinary charges as adverse actions); *Reed v. Doe No. 1*, No. 11-CV-250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (same), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012). But Plaintiff offers no evidence that Defendant's Report was actually false. Defendant's Report cites Plaintiff for violating Rule 113.26 and states that Plaintiff's Grievance "discussed my personal information and stated my address (cross street) and town" and wrongly accused her of sharing that information with an inmate. (Defendant's Report.) Plaintiff does not dispute that Defendant in her Report accurately described his Letter. [10] Plaintiff now disputes that the information regarding 190th Street constituted "personal information," but he plainly and concededly included it in his Letter to accuse Defendant of sharing personal information with inmates. (P's 56.1 Resp. ¶ 11; Letter at 2.) This hardly amounts to Defendant's Report being "false." Because Plaintiff offers no evidence that Defendant's misbehavior report was actually false and does not otherwise contest the accuracy of Defendant's Report's contents, Defendant's motion for summary judgment is granted to the extent Plaintiff's theory is that the adverse action was a false

misbehavior report. *See Bilal v. White*, 494 F. App'x 143, 147 (2d Cir. 2012) (summary order) ("[Plaintiff's] failure to adduce any evidence that the disciplinary charges were in fact false supports summary judgment for defendant on the merits of that claim."); *Charles v. Rockland Cty. Office of the Sheriff*, No. 16-CV-166, 2019 WL 1299804, at *5 (S.D.N.Y. Mar. 21, 2019) ("[A]lthough the filing of false misbehavior reports can constitute an adverse action, plaintiff offers no evidence these misbehavior reports were actually false.") (emphasis omitted), *appeal docketed*, No. 19-1041 (2d Cir. Apr. 22, 2019); *Pledger* 2005 WL 736228, at *5 (declining to find adverse action where plaintiff "admitted to the content of the [misbehavior] report and plead guilty to one of the charges in it").

**\*8** Plaintiff next argues that Defendant's Report constituted an adverse action regardless of its truthfulness and "regardless of the actual penalty imposed." (P's Opp. at 16-17.) But Plaintiff points to no cases – and I know of none – in which a court found that the filing of a non-falsified misbehavior report alone, without evidence of other repercussions, amounted to an adverse action. In fact, courts have held that misbehavior reports do not constitute adverse actions because they are "*de minimis*: they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights." *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) (finding misbehavior report that resulted in plaintiff's temporary loss of privileges did not amount to adverse action but misbehavior report that resulted in keeplock confinement for ten days did). Typically, courts require a showing of additional punishment above the filing of a misbehavior report to find an adverse action. *Gill*, 389 F.3d at 383 ("[A] plaintiff asserting First Amendment retaliation must allege some sort of harm...."); *see Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *10 (S.D.N.Y. Mar. 30, 2015) ("The filing of the misbehavior report and the disciplinary sanction of 65 days in the S.H.U. constitute adverse actions that satisfy the second element of a retaliation claim."); *cf. Bilal*, 494 F. App'x at 147 (in standing context, fabricated misbehavior report insufficient to show adverse action because "the petitioning prisoner must adduce evidence of some other harm"); *McFadden v. Friedman*, No. 12-CV-685, 2015 WL 5603433, at *13 (N.D.N.Y. Sept. 23, 2015) ("even if plaintiff were issued a false contraband receipt, the injury is *de minimis* and insufficient to show that he suffered an adverse action" where "plaintiff fail[ed] to allege that he received any punishment or reprimand arising

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00362-AMN-ML    Document 30    Filed 05/30/23    Page 171 of 198

out of the seizure of contraband"); 🚩 *Pledger,* 2005 WL 736228, at *5 (correction officer's issuance of unfavorable evaluation of prisoner and threat to place him in SHU was not an adverse action).

Plaintiff argues that "[a] retaliatory misbehavior report would deter an inmate's use of the grievance system irrespective of the punishment that is eventually meted out." (P's Opp. at 16.) But the only case Plaintiff cites in support of this argument is 🚩 *Brown v. Crowley,* 312 F.3d 782 (6th Cir. 2002). There, fact issues precluded a finding that the issuance of a "major misconduct charge," by itself, was not an adverse action because "the risk of such severe sanctions for raising a legitimate complaint would deter a person of ordinary firmness from continuing to engage in that [protected] conduct." 🚩 *Id.* at 789 (internal quotation marks omitted) (alteration in original). But there the charge of misconduct was plainly unjustified. *See* 🚩 *id.* at 783-84 (prisoner charged with filing false report that prison officials embezzled his funds when they docked his inmate account for a debt he did not owe). In any event, the Sixth Circuit's decision is not binding here, and as discussed, no cases in this Circuit hold that the filing of a misbehavior report is, without additional punishment, sufficient to find an adverse action. Further, were an accurate misbehavior report alone a proper basis for a retaliation claim, one can readily imagine the interference with legitimate prison administration. *See* 🚩 *Graham,* 89 F.3d at 79 ("A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority."). Accordingly, I reject Plaintiff's theory that the filing of a misbehavior report alone is sufficient to establish an adverse action. [11]

Confinement in the SHU is an adverse action. *See, e.g., Smith v. Hash,* No. 904-CV-74, 2006 WL 2806464, at *6 (N.D.N.Y. Sept. 28, 2006). But the paperwork associated with the three Inmate Misbehavior Reports Plaintiff received on October 23, 2014, makes clear that Plaintiff was transferred to SHU as a result of Inmate Misbehavior Reports associated with Plaintiff's inappropriate communication with Alioto, not Defendant's Report. (Russo Decl. Ex. D at 1.) [12] In fact, when Defendant filled out the Inmate Misbehavior Report, Plaintiff's housing location was listed as "SHU 1," indicating that Plaintiff was already in SHU at the time she filed her Report. And the record is equally clear that

Plaintiff's continued stay in SHU occurred because of the Alioto-related Reports. On December 31, 2014, following the hearing, Defendant's Report was dismissed. (P's 56.1 Resp. ¶ 28; Russo Decl. Ex. E at 1.) But following the hearing on the two Alioto-related Reports, Plaintiff was found guilty of two counts of harassment (Rule 107.11) and one count of facility correspondence violation (Rule 180.11), but not guilty of stalking (Rule 101.22). (P's 56.1 Resp. ¶ 29; Russo Decl. Ex. D at 1.) Plaintiff's punishment was six months (with two months suspended) in SHU (commencing October 23, 2014, to February 23, 2015), and six months loss of packages, phones, and commissary (commencing October 23, 2014, to April 23, 2015). (P's 56.1 Resp. ¶ 30; Russo Decl. Ex. D at 1.) Thus, the evidence shows that Plaintiff's stay in SHU was because of the two incidents related to his inappropriate communication with Alioto, not because of Defendant's Report. Without a showing of facts from which a jury could conclude that Plaintiff was sent to SHU because of Defendant's actions, Plaintiff has not satisfied the adverse action element of his *prima facie* case, and Defendant's motion for summary judgment must be granted.

**\*9** Even if Plaintiff had established his *prima facie* First Amendment retaliation claim, Defendant would still be entitled to summary judgment. Once a plaintiff carries his *prima facie* burden, the burden shifts to the defendant to show by a preponderance of the evidence on the undisputed facts that the plaintiff "would have been disciplined even in the absence of the protected conduct." *Harnage v. Brighthaupt,* 168 F. Supp. 3d 400, 414 (D. Conn. 2016), *aff'd,* 720 F. App'x 79 (2d Cir. 2018) (summary order); *see* 🚩 *Graham,* 89 F.3d at 81. To satisfy her burden, "it is not enough that [Defendant] allege[s] that the allegedly retaliatory actions could have been taken absent a retaliatory animus − *i.e.,* that there was a possible legitimate basis for the challenged actions. Rather, [Defendant] must establish that the actions would have been taken, even absent impermissible motives." *Davis v. Rhoomes,* No. 07-CV-6592, 2010 WL 3825728, at *7 (S.D.N.Y. Sept. 30, 2010) (emphasis omitted).

Here, there is ample undisputed evidence that Plaintiff was sentenced to the SHU because of his inappropriate communications with Alioto. (*See* pages 17-18 above.) Defendant played no part in issuing the Inmate Misbehavior Reports related to these communications or at the disciplinary hearing as a result of which Plaintiff was punished with six months in SHU. In other words, even absent Defendant's retaliatory motive, Plaintiff would have served the time in

Case 9:22-cv-00362-AMN-ML   Document 30   Filed 05/30/23   Page 172 of 198

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

the SHU anyway. *See* 🚩 *Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007) ("[W]e have repeatedly held that a prisoner fails to state a claim for retaliatory discipline when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform, *i.e.*, for violations of prison rules.") (internal quotation marks omitted); 🚩 *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994) ("[I]f the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline was retaliatory in nature must fail.") (internal quotation marks omitted). And Plaintiff has provided no evidence of a broader retaliatory scheme such that any other prison employees had retaliatory intent toward Plaintiff.[13]

Plaintiff spends much time arguing that Defendant had a retaliatory motive for writing her Report. But even if she did, that does not undermine the showing that the adverse action Plaintiff experienced was based on the Alioto misbehavior reports. So "the actions would have been taken, even absent the impermissible motives." *Davis*, 2010 WL 3825728, at *7 (emphasis added) Plaintiff also spends much time arguing that he did not violate Rule 113.26. Again, even if true, Defendant has still shown that Plaintiff would have been sent to SHU anyway. Further, even if Plaintiff's interpretation of Rule 113.26 is correct, Defendant's interpretation was not unreasonable, as discussed in the next section.

Accordingly, Defendant has established by a preponderance of the undisputed evidence that Plaintiff would have been disciplined even in the absence of any retaliatory motive, entitling her to summary judgment.[14]

### B. Qualified Immunity

**\*10** Finally, Defendant argues that at the very least she is entitled to qualified immunity. Government officials exercising discretionary functions are entitled to qualified immunity shielding them from damages in a 🚩 § 1983 suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," 🚩 *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), or insofar as it was objectively reasonable for them to believe that their conduct did not violate such rights, *see* 🚩 *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). " ' 'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,'

and 'protects all but the plainly incompetent or those who knowingly violate the law.' " 🚩 *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (quoting 🚩 *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). A government official sued in his individual capacity is entitled to qualified immunity

> (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.

🚩 *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002) (internal quotation marks, citations, and alterations omitted); *see* 🚩 *Creighton*, 483 U.S. at 639 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken.") (internal quotation marks and citation omitted). Summary judgment should be granted where "the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." 🚩 *Husain v. Springer*, 494 F.3d 108, 131 (2d Cir. 2007) (internal quotation marks omitted).

Had Plaintiff's claims survived, Defendant would be entitled to qualified immunity. While case law establishes that retaliation for the exercise of the right to petition prison officials is improper, *see* 🚩 *Farid v. Goord*, 200 F. Supp. 2d 220, 245 (W.D.N.Y. 2002), "[e]ven if the right at issue was clearly established in certain respects, ... an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context," 🚩 *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007). No case reads Rule 113.26 as

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00362-AMN-ML    Document 30    Filed 05/30/23    Page 173 of 198

Plaintiff claims it ought to be read. Plaintiff argues that he did not violate Rule 113.26 because the information about Defendant that he possessed was not "personal identifying information" within the meaning of the Rule and because mere possession of information should not constitute a violation. But Defendant's interpretation was objectively reasonable: [Redacted], or at least reasonable minds could differ on the point, and whether Plaintiff finds it fair or not, the regulation penalizes mere possession. [15] At the very least, there was no clearly established law stating that what Plaintiff did – which Defendant accurately described in her Report – was *not* a violation of Rule 113.26.

Claims of retaliatory arrest and prosecution provide useful comparisons. The Supreme Court recently declared that a "plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019). A similar rule applies in the context of retaliatory prosecutions. *See Reichle v. Howards*, 566 U.S. 658, 666 (2012) ("[A] plaintiff cannot state a claim of retaliatory prosecution in violation of the First Amendment if the charges were supported by probable cause."). Although the retaliatory act here is not an arrest or prosecution, the import of the rules is that where retaliation is alleged, if the allegedly retaliatory actor can show probable cause, the retaliation claim cannot stand, or if "arguable probable cause" is shown, the defendant is entitled to qualified immunity. *See, e.g., Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) ("Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest."). Here, in the absence of clearly established law that Plaintiff's conduct did not violate Rule 113.26, Plaintiff cannot show the equivalent of the absence of probable cause, or at least arguable probable cause, for Defendant's Report. Defendant would thus be entitled to qualified immunity had summary judgment otherwise been denied. *See Rodriguez v. Phillips*, 66 F.3d 470, 479 (2d Cir. 1995) (reversing denial of summary judgment where plaintiff had no clearly established First Amendment right to speak to officer).

### IV. CONCLUSION

**\*11** For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 61), enter judgment for Defendant, and close the case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3219442

---

### Footnotes

1   The Court thanks Plaintiff's counsel for taking on Plaintiff's representation *pro bono*.

2   The term "administration" is not defined in DOCCS Directive 4422. Anthony Russo, currently employed by DOCCS as the Deputy Superintendent for Security at the Green Haven Correctional Facility ("Green Haven"), averred that the term "administration" refers to mail room staff. (Russo Decl. ¶ 8.) Plaintiff disputes this fact, pointing to Defendant's deposition testimony during which she explained that the term "administration" refers to "civilian employees," which means "somebody who's not in uniform." (Doc. 67 ("Sauter Decl.") Ex. A ("Valentin Tr.") at 102:19-25.) But the testimony continues in a vein consistent with Russo's position:

> Q: So your interpretation of [DOCCS Directive 4422 ¶ III(A) ] is that outgoing mail is not privileged until it's in the control of those persons in that building?

> A (Valentin): The mailroom personnel, yes.

(*Id.* at 103:15-19.) Plaintiff also points to Defendant's October 27, 2014 memorandum where she wrote: "[P]er directive, legal mail (oversized) is not considered privileged until it reaches the facility administrator." (Sauter Decl. Ex. T.) Plaintiff claims that the "facility administrator" does not refer only to mail room personnel. (Doc.

68 ("P's 56.1 Resp.") ¶ 15.) (Citations to Plaintiff's 56.1 Response refer to the paragraphs under the heading "Plaintiff's Responses to Defendant's Statements of Material Facts," which begins on page two of Document 68.)

Neither side explains why the definition of the term "administration" affects the outcome of the instant motion, and I do not consider the term's definition material to this case. *See* 🚩 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (fact is material when it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment).

3       The Letter is incorrectly dated October 12, 2012.

4       Doc. 71 Ex. A contains transcript excerpts from the same deposition as the Valentin Tr.

5       An inmate on keeplock status is confined to his cell for twenty-three hours per day, and is allowed one hour of recreation per day. (P's 56.1 Resp. ¶ 19.)

6       All page citations to exhibits attached to the Russo Declaration refer to the pagination generated by the Court's Electronic Case Filing System.

7       Plaintiff's Amended Complaint says that Defendant told Plaintiff "You are going to SHU" at 9:55 a.m., (Doc. 26 ("AC") ¶ 29), but there is no evidence in the record – including Plaintiff's Declaration – as to what time this occurred, and I cannot consider Plaintiff's unsworn, unverified complaint on a motion for summary judgment.

        *See* 🚩 *Trinidad v. N.Y.C. Dep't of Corr.*, 423 F. Supp. 2d 151, 161 (S.D.N.Y. 2006) (unsworn materials are "an insufficient basis for opposing a motion for summary judgment") (internal quotation marks omitted); 🚩 *Dukes v. City of N.Y.*, 879 F. Supp. 335, 343 (S.D.N.Y. 1995) ("[U]nsworn statements are not admissible to controvert a summary judgment motion."). The time of the remark is not material in any event.

8       Plaintiff's AC alleges that Defendant was acting "in her individual and/or official capacity." (AC ¶ 62.) Plaintiff's counsel clarified that Plaintiff's AC – which Plaintiff drafted before he acquired *pro bono* counsel – intended to assert a claim for damages against Defendant in her individual capacity and not her official capacity. (P's Opp. at 24.) Complaints made by *pro se* plaintiffs are to be examined with "special solicitude," interpreted "to raise the strongest arguments that they suggest," *Shibeshi v. City of N.Y.*, 475 F. App'x 807, 808 (2d Cir. 2012) (summary order) (emphasis and internal quotation marks omitted), and "held to less stringent standards than formal pleadings drafted by lawyers," 🚩 *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (internal quotation marks omitted). Accordingly, I interpret Plaintiff's Amended Complaint to allege a claim against Defendant in her individual capacity.

9       Plaintiff's Amended Complaint also alleges violations under the Ninth and Fourteenth Amendments. (AC ¶ 1.) Plaintiff has offered no evidence to support this claim except to say that the First Amendment is incorporated against the States by the Fourteenth Amendment. (P's Opp. at 22.) Accordingly, to the extent Plaintiff alleges independent causes of action under the Ninth and Fourteenth Amendments, those claims are dismissed.

10      Plaintiff admits that he heard from another inmate that Defendant lived on 190th Street in Washington Heights and does not purport to have been present when that inmate obtained the information. (Vidal Decl. ¶ 11.)

11      Nor do the alleged inappropriate comments by Defendant rise to the level of adverse action. *See* 🚩 *Roseboro*, 791 F. Supp. 2d at 375 (collecting cases).

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00362-AMN-ML    Document 30    Filed 05/30/23    Page 175 of 198

12    Alioto's report indicates that Plaintiff was moved from keeplock status to the SHU due to the incident. (Russo Decl. Ex. D at 6.) The records of the disciplinary hearing confirm the same. (*Id.* Ex. D at 2.) Defendant's Report indicates that Plaintiff was not restricted as a result of the incident, (*id.* Ex. E at 5), and the hearing records confirm the same, (*id.* Ex. E at 1).

13    Indeed, had such a scheme existed, it is highly unlikely that Defendant's Report would have been dismissed.

Defendant's comment to Plaintiff, "You are going to SHU," shows that Defendant knew that Plaintiff was going to SHU, but reflects nothing about why. Likewise, her alleged comments "Look at you now" and "Pendejo yo no soy de 190th y Washington Heights," while unprofessional, do not constitute evidence that Defendant had Plaintiff sent to the SHU.

14    Plaintiff argues in part that the Court should deny summary judgment because Defendant's inconsistent testimony regarding the scope of Rule 113.26 "undermines her credibility and stated basis for filing the [Inmate Misbehavior Report]." (P's Opp. at 20-21.) I do not regard Defendant's testimony about the Rule to be necessarily inconsistent, but I will assume for the sake of argument that it is. Plaintiff cites to no cases in which a court used a defendant's shifting explanations as evidence of retaliatory conduct in the prison context. *Cf.* 🚩 *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846-47 (2d Cir. 2013) (reversing denial of summary judgment on plaintiff's Title VII retaliation claim, finding that the defendant's shifting explanations for why it fired plaintiff, combined with other evidence, precluded summary judgment). But even if inconsistent testimony about the scope of the Rule showed retaliatory animus, for reasons already discussed, Plaintiff would have been sent to SHU anyway. *See* 🚩 *Coughlin*, 344 F.3d at 287-88.

15    Further, Plaintiff did not merely possess the information. He used it to make false accusations of misconduct against a court officer. (P's 56.1 Resp. ¶ 11; Letter at 2.)

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2806464
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Bryant SMITH, Plaintiff,

v.

Sgt. HASH, Corrections Officer at Oneida
Correctional Facility, et al., Defendant.

No. 904-CV-0074 LEK/DRH.
|
Sept. 28, 2006.

**Attorneys and Law Firms**

Bryant Smith, Brooklyn, NY, Plaintiff Pro Se.

Hon. Eliot Spitzer, Attorney General for the State of New York, Attorney for Defendants, Roger W. Kinsey, ESQ. Assistant Attorney General, The Capitol, Albany, NY, for Defendant.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on September 6, 2006, by the Honorable David R. Homer, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 21).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," Fed.R.Civ.P. 72(b), in compliance with L.R. 72.1. In the interval of at least fifteen days since the Magistrate Judge filed the subject Report-Recommendation, no objections to it have been raised. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.[1]

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 21) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 17) is **GRANTED** as to Defendants Hash, Sipley, and Noble on all claims; and it is further

**ORDERED,** that the Complaint is **DISMISSED WITHOUT PREJUDICE** as to Defendant Metzler; and it is further

**ORDERED,** that this matter is **TERMINATED IN ITS ENTIRETY** as to all Defendants and all claims; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

DAVID R. HOMER, Magistrate Judge.

**REPORT-RECOMMENDATION AND ORDER**[1]

Plaintiff pro se Bryant Smith ("Smith"), formerly an inmate in the custody of the New York State Department of Correctional Services (DOCS), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, four DOCS employees, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Compl. (Docket No. 1). Presently pending is the motion of three defendants[2] for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 17. Smith has not responded to the motion. *See* subsections I and VI *infra.* For the following reasons, it is recommended that defendants' motion be granted as to all causes of action and it is further recommended that the complaint be dismissed without prejudice as to the fourth defendant.

### I. Failure to Respond

By Order dated December 1, 2005, this Court warned Smith that his failure to respond to defendants' motion by setting forth specific facts demonstrating a genuine issue of fact would result in this Court treating the facts asserted by defendants as true and that the motion might be granted absent

a response from Smith. Docket No. 19. Smith was given additional time to respond. *Id.* Despite this notice, Smith has failed to respond to the motion.

"The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.; Fed.R.Civ.P. 56(c).* Because Smith has not responded to raise any question of material fact, however, the facts as set forth in defendants' Rule 7.1 Statement of Facts (Docket No. 17) are accepted as true. *Adirondack Cycle & Marine, Inc. v. American Honda Motor Co.,* No. 00-CV-1619, 2002 WL 449757, at *1 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) (citing *Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997)).

## II. Background

**\*2** The facts are presented in the light most favorable to Smith as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

At all relevant times, Smith was incarcerated at Oneida Correctional Facility ("Oneida"). In March 2003, after allegedly being verbally abused by defendant Metzler, Smith filed a grievance. Compl. at ¶ 9. On March 27, 2003, Smith was escorted to the Special Housing Unit ("SHU").[3] *Id.* at ¶ 10. Smith alleges that defendant Hash, the escort officer, asked him about his feeling concerning the war in Iraq, and that Smith was verbally abused by Hash at his office before entering SHU. *Id.* at ¶ 10-11. Smith also alleges that while in SHU, he was verbally abused, kicked, punched, and violently pushed into a wall without provocation by defendants Sipley and Noble. *Id.* at ¶ 13.

Shortly after his admission to SHU, Smith alleges that defendants denied him his arthritis medicine. *Id.* at ¶ 16. On March 28, 2003, Nurse Zuchowski physically examined Smith in accordance with SHU procedure but noted no bruises or other evidence of an assault. Defs. Statement of Material Facts (Docket No. 17) at ¶ 17. Smith's medical records also indicate that, contrary to his allegation, his medication was refilled on March 28. *Id.* at ¶ 32.

On March 31, 2003, Smith complained that he was assaulted by defendants upon his admission to SHU. *Id.* at ¶ 21. In response, Smith was thoroughly examined and statements and photographs were taken of the alleged injuries. *Id.* at ¶¶ 22-27. Smith received a response asserting that his claims were unsubstantiated. Compl. at ¶ 20. This action followed.

## III. Summary Judgment Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.* However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U .S. at 247-48.

## IV. Discussion

**\*3** Smith asserts three causes of action in his complaint. The first alleges that defendants used excessive force and caused him serious physical injury, the second that defendants subjected him to cruel and unusual punishment, and the third that defendants retaliated against him for exercising his First Amendment rights. The moving defendants seek summary judgment on all claims.

### A. Excessive Force

Smith contends in his first cause of action that defendants physically assaulted him without provocation causing him serious physical injury in violation of his constitutional rights under the Eighth and Fourteenth Amendments. Defendants contend this claim is without merit.

The Eighth Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Cooper Indus. Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 433-34 (2001). It prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII.

The Supreme Court has established that inmates enjoy the Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9-10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir .2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). The objective element requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Id.* However, "the malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation *per se*" regardless of the seriousness of the injuries. *Id.* at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10

(citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 262 (citing *Wilson v. Seiter,* 501 U.S. 294, 298-99 (1991)). "[T]he 'wantonness' inquiry turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id* . (quoting *Hudson,* 503 U.S. at 7).

**\*4** Here, a physical examination of Smith by Nurse Zuchowski less than eleven hours after his admission to SHU failed to show any injuries, either old or new. Smith also denied any medical concerns or needs. On March 31, 2003, four days after his admission to SHU, Smith filed a complaint regarding the alleged assault. Smith gave no response when asked why he did not report the alleged assault immediately. Smith was again examined by medical staff. The examination revealed a minor bruise to the inner arm, a small "resolving bruise" to his lower left back and one superficial scrape to the right ankle. The medical examination on March 31, the examination photographs, the medical report on March 28, and admission photographs on March 27 all failed to reveal any injury that would support Smith's allegations.

Further, Hash was not present when the alleged assault occurred. Hash, who was in charge of transporting Smith to SHU, did not enter SHU and was not present during the strip frisk of Smith. Smith's own statements in his complaint and in his grievance fail to place Hash in any area where the alleged assault happened. Thus, in addition, Smith has failed to show that Hash was personally involved in any alleged deprivation of rights. *See Wright v. Smith,* 21 F .3d 496, 501 (2d Cir.1994).

Therefore, defendants' motion should be granted as to the first cause of action.

### B. Medical Care

Smith contends in his second cause of action that defendants deprived him of his constitutional rights under the Eighth Amendment when they denied him his medication. Defendants contend that this claim is without merit.

A prisoner advancing an Eighth Amendment claim for denial of medical care must allege deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). More than negligence is required but less than "conduct undertaken for the purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there is a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998); *Hathaway,* 37 F.3d at 66. Next, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of the substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

### 1. Serious Medical Need

A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Cameros v. Branstad,* 73 F.3d 174, 176 (8th Cir.1995) (citing *Johnson v. Busby,* 953 F.2d 349, 351 (8th Cir.1991)); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001). " '[A]n injury that a reasonable doctor or patient would find important and worthy of ... treatment ..., a medical condition that significantly affects an individual's daily activities, or the existence of chronic and substantial pain' " are all factors that are relevant in the consideration of whether a medical condition is serious. *Chance,* 143 F.3d at 702-03 (quotation marks and citation omitted). The ailment may be considered serious if the prisoner has multiple complaints of pain. *Williams v. M.C.C. Inst.,* No. 99-Civ.-5352, 1999 WL 179604, at *5 (S.D.N.Y. Mar. 31, 1999).

*5 Here, Smith was being treated for arthritis pain and was given a prescription for Ultram. Janicki Aff. (Docket No. 17) at ¶ 4. Smith was to take Ultram only as needed. *Id.* at ¶ 5. Further, in his complaint, Smith did not allege that he suffered any pain associated with the arthritis. Compl. at ¶ 16. Smith only alleged that he inquired about receiving his medication. *Id.* Thus, there is insufficient evidence to establish that Smith suffered a serious medical need or that the alleged deprivation was "sufficiently serious." Cf. *Veloz v. New York,* 35 F.Supp.2d 305 (S.D.N.Y.1999) (holding that a foot condition involving fracture fragment, bone cyst, and degenerative arthritis did not constitute a serious medical need).

### 2. Deliberate Indifference

Defendants also contend that the alleged acts by defendants did not demonstrate the culpable state of mind necessary to satisfy the subjective element of deliberate indifference.

Deliberate indifference requires the prisoner to prove that the prison official knew of and disregarded the prisoner's serious medical needs. *Chance,* 143 F.3d at 702. "[M]ere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Id.* at 703. Allegations of negligent malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998); *Hathaway,* 99 F.3d at 553..

Here, Smith was being treated for his arthritis pain. Janicki Aff. at ¶ 4. Although he alleges that he requested his medication, Smith did not complain about any pain or any serious medical need. *See* Compl. at ¶ 16; Zuchowski Aff. (Docket No. 17) at ¶ 8. Therefore, even accepting Smith's allegations as true, defendants could not have been aware that a substantial risk of serious harm existed and, thus, Smith's Eighth Amendment claim fails to demonstrate defendants' deliberate indifference to a serious medical need.

Therefore, defendants' motion should be granted as to the second cause of action.

### C. Retaliation

In the third cause of action, Smith contends that defendants placed him in SHU after questioning him about his feelings toward the war in Iraq. Defendants contend that this claim is without merit.

In order to prevail on a retaliation claim, a plaintiff must first assert that the plaintiff's conduct was constitutionally protected and that this conduct was a "substantial factor" that caused the adverse action against plaintiff. The burden then shifts to the defendant to show that by a preponderance of the evidence, the adverse action would have resulted even in the absence of the protected conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001). Retaliation claims are actionable because they may tend to chill an individual's exercise of constitutional rights. *Dawes,* 239 F.3d at 491. However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.*

**\*6** Smith's freedom to express his feeling toward the war was a constitutionally protected right. However, Hash escorted Smith to SHU on the orders of his superior for an investigation of a disturbance. The alleged conversation between Hash and Smith happened while Hash was carrying out his duty to escort Smith to SHU. Therefore, Smith would have been escorted to SHU regardless of exercising his constitutionally protected right and the alleged retaliatory action was thus (1) ordered by someone other than a defendant, and (2) taken prior, not subsequent, to the discussion on the Iraq war. Accordingly, Smith has failed to show that any defendant was motivated by retaliation.

Liberally construed, Smith may also base his retaliation claim on his filing a grievance against Metzler, whom Smith alleges verbally abused him six days before Smith went to SHU. Defendants contend that this claim should be dismissed because Smith could not demonstrate that this was a substantial reason for his transfer to SHU. Smith's filing of a grievance is clearly an assertion of a constitutional right protected by the First Amendment. *Morales v. Macklam,* 278 F.3d 126, 131 (2d Cir.2002). Smith claims that the adverse action which resulted from filing grievances was his transfer to SHU. In order for any action to constitute adverse action, a plaintiff must establish that the adverse action would deter a similarly situated individual from exercising his or her constitutional rights. *Dawes,* 239 F.3d at 491. It is

reasonably possible that other inmates would fail to exercise their constitutional right to file grievances for fear that they would be transferred to SHU. Thus, Smith's alleged transfer to SHU in retaliation for filing a grievance could be considered an adverse action.

However, Smith fails to show a causal connection between his filing of the grievance and his placement in SHU because he only offers conclusory statements to support this claim. Smith alleges that Metzler verbally abused him and he subsequently filed a grievance because of this alleged abuse. However, Smith's transfer to SHU was not until six days later after he filed the grievance and he was there for less than twenty-four hours. The uncontradicted record also showed that Smith's transfer to SHU was due to an investigation of a disturbance. Thus, Smith cannot prove that improper motive played a substantial role in his transfer to SHU.

Therefore, defendants' motion should be granted as to the third cause of action.

### D. Qualified Immunity

Defendant Hash contends that he is entitled to qualified immunity with respect to Smith's claim that Hash placed him in SHU without following the requisite DOCS rules.

Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002). Even if plaintiff's allegations, being accepted as true, would constitute a violation of a clearly established constitutional right, the "contour of the right" must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

**\*7** Here, it is undisputed that Hash was ordered by his superior, Lt. Matte, to supervise the escort of Smith to SHU due to a disturbance. Even if the allegation that Smith's confinement at SHU was a constitutional violation, it could not be said that Hash knowingly violated Smith's rights because he reasonably relied on his superior's order to transport Smith to SHU.

Therefore, in the alternative, defendant Hash's motion on this ground should be granted.

### E. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100.

A suit brought against a person in his or her official capacity is to be treated as a suit against the entity represented by that person, provided that the public entity received notice and an opportunity to respond. *Brandon v. Holt,* 469 U.S. 464, 471-72 (1985). In an official capacity action, a governmental entity is liable under § 1983 only when the entity itself is the "moving force" behind the deprivation. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). In other words, "the entity's 'policy or custom' must have played a part in the violation of federal law" for liability to attach. *Id.* at 166 (citations omitted); *Hafer v. Melo,* 502 U.S. 21, 25 (1991).

Here, the entity represented by defendants, DOCS, cannot be found liable under § 1983 for the acts of which Smith complains. Smith fails to allege or prove that a policy or custom of DOCS contributed in any way to the alleged constitutional deprivations.

Accordingly, in the alternative, defendants' motion should be granted as to all defendants in their official capacities.

### V. Failure to Serve Defendant Metzler

Smith's complaint asserts a claim against Metzler, who has not been served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See* N.D.N.Y.L.R. 4.1(b). A summons was issued for Metzler on February 6, 2004. Docket entry dated 2/6/04. Because Metzler has not been timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

### Vi. Failure to Prosecute

It appears from the docket of this case that in addition to failing to file any response to defendants' instant motion, Smith has taken no action in this case since May 6, 2004 when he notified the Court of his address following his release from incarceration. Docket No. 7. Since that date, Smith has been mailed various orders and other communications from the Court which have not been returned as undeliverable and, therefore, presumably were received by him. *See, e.g.,* Docket Nos. 15, 16, 18, 19, 20. Nevertheless, Smith still has taken no action.

**\*8** Under Fed.R.Civ.P. 41(b), a court may dismiss an action for a plaintiff's sustained failure to prosecute the action. *See West v. City of New York,* 130 F.R.D. 522, 524 (S.D.N.Y.1990); *see also* N.D.N.Y.L.R. 41.2(a) ( "Whenever it appears that the plaintiff has failed to prosecute an action or proceeding diligently, the assigned judge shall order it dismissed...."). In determining whether to dismiss an action on this ground, a court should consider the duration of a plaintiff's failures, whether the plaintiff has received notice that further delays would result in dismissal, whether the defendant was likely to be prejudiced by further delay, a balancing of the court's need to alleviate calendar congestion with a party's right to due process, and the efficacy of lesser sanctions. *See Patterson v. Newspaper & Mail Deliverers' Union of N.Y. & Vicinity,* 884 F.Supp. 869, 872 (S.D.N.Y.1995); *Stoenescu v. Jablonski,* 162 F.R.D. 268, 270 (S.D.N.Y.1995).

Here, Smith's unexplained failure to take any action despite numerous communications from the Court and opposing counsel appears to reveal an abandonment of the action.

Accordingly, it is recommended in the alternative that this action be dismissed for Smith's failure to prosecute.

## VII. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 17) be **GRANTED** as to defendants Hash, Sipley, and Noble as to all claims.

2. The complaint be **DISMISSED** without prejudice as to Metzler; and

3. This action be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2006 WL 2806464

## Footnotes

1   The Court, however, notes several things, which do not otherwise have a material impact upon the Report-Recommendation. First, on page 6 of the Report citation is made to *Sims v. Artuz* (where the Report cites to "*Id.* at 262"). Report-Rec. (Dkt. No. 21) at 6. However, the citation is actually to *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999), which is cited earlier on page 6 of the Report. Second, the cases of *Dawes v. Walker,* 239 F.3d 489 (2d Cir.2001), Report-Rec. (Dkt. No. 21) at 10, and *Morales v. Mackalm,* 278 F.3d 126 (2d Cir.2002), Report-Rec. (Dkt. No. 21) at 11, were overruled on grounds other than those for which they were cited by Judge Homer.

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   Hash, Noble, and Sipley. Defs. Mem. Of Law (Docket No. 17) at 1.

3   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (1995). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 832708
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Theodore HUDSON, Plaintiff,

v.

Christopher ARTUZ, Warden Philip
Coombe, Commissioner Sergeant
Ambrosino Doctor Manion Defendants.

No. 95 CIV. 4768(JSR).
|
Nov. 30, 1998.

**Attorneys and Law Firms**

Mr. Theodore Hudson, Great Meadow Correctional Facility, Comstock.

Alfred A. Delicata, Esq., Assistant Attorney General, New York.

MEMORANDUM AND ORDER

BUCHWALD, Magistrate J.

**\*1** Plaintiff Theodore Hudson filed this *pro se* action pursuant to 🚩42 U.S.C. § 1983 on April 26, 1995. Plaintiff's complaint alleges defendants violated his constitutional rights while he was an inmate at Green Haven Correctional Facility. [1] Plaintiff's complaint was dismissed *sua sponte* by Judge Thomas P. Griesa on June 26, 1995 pursuant to 🚩28 U.S.C. § 1915(d). On September 26, 1995, the Second Circuit Court of Appeals vacated the judgment and remanded the case to the district court for further proceedings.

The case was reassigned to Judge Barbara S. Jones on January 31, 1996. Defendants moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(c) on November 25, 1996. Thereafter, the case was reassigned to Judge Jed S. Rakoff on February 26, 1997. On February 26, 1998, Judge Rakoff granted defendants' motion to dismiss, but vacated the judgment on April 10, 1998 in response to plaintiff's motion for reconsideration in which plaintiff claimed that he never received defendants' motion to dismiss.

By Judge Rakoff's Order dated April 14, 1998, this case was referred to me for general pretrial purposes and for a Report and Recommendation on any dispositive motion. Presently pending is defendants' renewed motion to dismiss. Plaintiff filed a reply on July 6, 1998. For the reasons discussed below, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this order.

FACTS

Plaintiff alleges that he was assaulted by four inmates in the Green Haven Correctional Facility mess hall on March 14, 1995. (Complaint at 4.) He alleges that he was struck with a pipe and a fork while in the "pop room" between 6:00 p.m. and 6:30 p.m. (Complaint at 4–5.) Plaintiff contends that the attack left him with 11 stitches in his head, chronic headaches, nightmares, and pain in his arm, shoulder, and back. (*Id.*) Plaintiff also states that Sergeant Ambrosino "failed to secure [the] area and separate" him from his attackers. (Reply at 5.) Plaintiff's claim against Warden Artuz is that he "fail [sic] to qualify as warden." (Complaint at 4.) Plaintiff names Commissioner Coombes as a defendant, alleging Coombes "fail [sic] to appoint a qualified warden over security." (Amended Complaint at 5.) Plaintiff further alleges that Dr. Manion refused to give him pain medication. (Complaint at 5.) Plaintiff seeks to "prevent violent crimes" and demands $6,000,000 in damages. (Amended Complaint at 5.)

Defendants moved to dismiss the complaint, arguing that: (1) the Eleventh Amendment bars suit against state defendants for money damages; (2) the plaintiff's allegations fail to state a claim for a constitutional violation; (3) the defendants are qualifiedly immune from damages; and (4) plaintiff must exhaust his administrative remedies before bringing this suit.

DISCUSSION

I find that plaintiff's complaint runs afoul of Rules 8 and 10 of the Federal Rules of Civil Procedure and dismiss the complaint without prejudice and with leave to amend. Federal Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The purpose of this Rule "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive

answer [and] prepare an adequate defense." *Powell v. Marine Midland Bank,* 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v. Califano,* 75 F.R.D. 497, 498 (D.D.C.1977));

*see* *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (stating that the "principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial").

 **\*2** Rule 10 of the Federal Rules of Civil Procedure requires, *inter alia,* that the allegations in a plaintiff's complaint be made in numbered paragraphs, each of which should recite, as far as practicable, only a single set of circumstances. *Moore's Federal Practice,* Vol. 2A, ¶ 10.03 (1996). Rule 10 also requires that each claim upon which plaintiff seeks relief be founded upon a separate transaction or occurrence. *Id.* [2] The purpose of Rule 10 is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading." *Sandler v. Capanna,* 92 Civ. 4838, 1992 WL 392597, \*3 (E.D.Pa. Dec.17, 1992) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1323 at 735 (1990)).

A complaint that fails to comply with these pleading rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of" a plaintiff's claims. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996). It may therefore be dismissed by the court. *Id.; see also* *Salahuddin v. Cuomo,* 861 F.2d at 42 ("When a complaint does not comply with the requirement that it be short and plain, the court has the power to, on its own initiative, ... dismiss the complaint"). Dismissal, however, is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* In those cases in which the court dismisses a *pro se* complaint for failure to comply with Rule 8, it should give the plaintiff leave to amend when the complaint states a claim that is on its face nonfrivolous. *Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d Cir.1995).

In determining whether a nonfrivolous claim is stated, the complaint's allegations are taken as true, and the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief." *Conley v.. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint of a *pro se* litigant is to be liberally construed in his favor when determining whether he has stated a meritorious claim. *See* *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Even if it is difficult to determine the actual substance of the plaintiff's complaint, outright dismissal without leave to amend the complaint is generally disfavored as an abuse of discretion. *See* *Salahuddin,* 861 F.2d at 42–42; *see also* *Doe v. City of New York,* No. 97 Civ. 420, 1997 WL 124214, at \*2 (E.D.N.Y. Mar.12, 1997).

Here, plaintiff's *pro se* complaint fails to satisfy the requirements of Federal Rules 8 and 10. The complaint is often illegible and largely incomprehensible, scattering what appear to be allegations specific to plaintiff within a forest of headnotes copied from prior opinions. Defendants have answered with a boilerplate brief, which is perhaps all a defendant can do when faced with such a complaint. The Court is left with an insurmountable burden in attempting to make a reasoned ruling on such muddled pleadings.

 **\*3**    Although plaintiff's complaint is substantially incomprehensible, it appears to plead at least some claims that cannot be termed frivolous on their face. For example, plaintiff clearly alleges that inmates assaulted him and that Dr. Manion refused to provide him medical attention. He also appears to assert that Sergeant Ambrosino failed to protect him from the attack or take steps to prevent future attacks. (Plaintiff's Reply at 5). It is well established that an inmate's constitutional rights are violated when prison officials act with deliberate indifference to his safety or with intent to cause him harm. *Hendricks v. Coughlin,* 942 F.2d 109 (2d Cir.1991). It is similarly well established that an inmate's constitutional rights are violated when a prison doctor denies his request for medical care with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Although plaintiff provides few facts to support his allegations, I disagree with defendants' assertion that outright dismissal is appropriate because it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Defendant's Memorandum at 5 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Because plaintiff's complaint does not comply with Rules 8 and 10, it is hereby dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order. In drafting his second amended complaint, plaintiff is directed to number each paragraph and order the paragraphs chronologically, so that each incident in which he alleges a constitutional violation is described in the order that it occurred. Plaintiff is also directed to specifically describe the actions of each defendant that caused plaintiff harm, and to do so in separate paragraphs for each defendant. Plaintiff's complaint shall contain the facts specific to the incidents plaintiff alleges occurred, and not any facts relating to any case that has been decided previously by a court of law. Plaintiff's complaint shall also contain a clear statement of the relief he seeks in addition to monetary damages.

CONCLUSION

For the reasons set forth above, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 832708

---

**Footnotes**

1    Plaintiff is presently incarcerated at Sullivan Correctional Facility.

2    Rule 10 states:

   (b) Paragraphs; Separate Statements. All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1129887
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Andrew HENDRICKS, Plaintiff,

v.

Shelley M. MALLOZZI, Director of the Inmate
Grievance Program for DOCCS; Earl Bell,
Superintendent, Clinton Correctional Facility; D.
Holdridge, Deputy Superintendent for Security, Clinton
Correctional Facility; and C. DeLutis, Captain of
Security, Clinton Correctional Facility, Defendants.

9:20-CV-1035 (MAD/ML)
|
Signed 01/14/2022

**Attorneys and Law Firms**

Andrew Hendricks, Pro Se Plaintiff, Eastern New York
Correctional Facility, Box 338, Napanoch, New York 12458.

BRENDA BADDAM, ESQ., Assistant Attorney General,
LETITIA A. JAMES, Attorney General for the State of New
York Counsel for Defendants, The Capitol, Albany, New York
12224.

## REPORT and RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** Currently before the Court, in this civil rights action filed
by Andrew Hendricks ("Plaintiff") against Shelley Mallozzi,
Earl Bell, D. Holdridge, and C. DeLutis (collectively
"Defendants"), is Defendants' motion to dismiss for failure
to state a claim upon which relief may be granted pursuant
to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 17.) For the reasons set
forth below, I recommend that Defendants' motion be granted
in part and denied in part.

## I. RELEVANT BACKGROUND

### A. Procedural History

On September 3, 2020, Plaintiff commenced this action by
the filing of a Complaint, accompanied by a motion for
leave to proceed *in forma pauperis* ("IFP"). (Dkt. Nos. 1, 2.)
On October 29, 2020, United States District Judge Mae A.

D'Agostino granted Plaintiff's IFP application and dismissed
the Complaint without prejudice pursuant to 🚩 28 U.S.C. §§
1915(e)(2)(B) and 1915A(b)(1). (Dkt. No. 5.)

On November 18, 2020, Plaintiff filed an Amended
Complaint. (Dkt. No. 8.) On December 23, 2020, Judge
D'Agostino reviewed Plaintiff's Amended Complaint and set
forth the factual allegations therein. (Dkt. No. 9 at 2-4.) Judge
D'Agostino ordered that (1) Plaintiff's Amended Complaint
was accepted for filing with respect to a claim for retaliation
pursuant to the First Amendment and 🚩 42 U.S.C. § 1983,
against Defendants, and (2) any other causes of action in the
Amended Complaint were dismissed. (*See generally* Dkt. No.
9.)

On March 1, 2021, in lieu of an answer, Defendants filed the
pending motion to dismiss pursuant to Fed. R. Civ. P. 12(b)
(6). (Dkt. No. 17.)

### B. Parties' Briefing on Defendants' Motion to Dismiss

#### 1. Defendants' Memorandum of Law

Generally, in support of their motion to dismiss, Defendants
assert the following two arguments: (1) Plaintiff's retaliation
claim fails as a matter of law, and (2) Plaintiff failed to allege
the personal involvement of Defendants Holdridge, Bell, and
Mallozzi. (Dkt. No. 17, Attach. 1 at 6-16.)

More specifically, Defendants first argue that Plaintiff's
retaliation claim fails as a matter of law because the Amended
Complaint fails to allege facts plausibly suggesting that
Defendants took an adverse action against Plaintiff or that
a causal connection existed between his protected speech
and the alleged adverse action. (*Id.* at 8-15.) Defendants
argue that Plaintiff's claim against Defendant DeLutis—
which is premised on grievance that Plaintiff filed against
Correction Officer Ayotte (an unnamed party to this action)
—fails because (a) Plaintiff's conclusory allegation (that
Defendant DeLutis was "sympathetic" towards C.O. Ayotte
for an unknown reason) is insufficient to overcome the
heightened burden of establishing a causal connection of
retaliation by one officer (Defendant DeLutis) on behalf of
another officer (C.O. Ayotte), (b) inmates do not have any
constitutional right to a particular prison job, (c) temporal
proximity alone is insufficient to establish an inference of
retaliation, and (d) Defendant DeLutis's actions were taken

for legitimate, non-retaliatory reasons unrelated to Plaintiff's protected activity—namely, a security concern. (*Id.* at 8-11.) Defendants argue that Plaintiff's claim against Defendant Holdridge—which is premised on his alleged approval of Defendant DeLutis's decision to remove Plaintiff from his job, a lie that he reviewed confidential documents supporting Plaintiff's removal from his job, and failure to follow DOCCS policies and procedures when removing Plaintiff from his job —fails because (a) inmates do not have any constitutional right to a particular prison job, (b) temporal proximity alone is insufficient to establish an inference of retaliation, (c) Plaintiff's conclusory allegation (that Defendant Holdridge acted out of sympathy towards C.O. Ayotte for an unknown reason) is insufficient to overcome the heightened burden of establishing a causal connection of retaliation by one officer (Defendant Holdridge) on behalf of another officer (C.O. Ayotte), and (d) Defendant Holdridge's alleged lie (that he reviewed security documents that do not exist) and failure to follow DOCCS policy for removal of an inmate from his job, are not constitutional violations and thus do not give rise to liability pursuant to 🔖 42 U.S.C. § 1983. (*Id.* at 11-13.) Defendants argue that Plaintiff's claim against Defendants Bell and Mallozzi—which is premised on their denial of his grievance appeal, failure to properly investigate his claims, and assertion that Defendant Bell was "deceptive and misleading" about DOCCS policy—fails because (a) Plaintiff's conclusory allegation that Defendants Bell and Mallozzi retaliated against him for filing a grievance against C.O. Ayotte is insufficient to overcome the heightened burden of establishing a causal connection of retaliation by one officer (Defendant Bell or Defendant Mallozzi) on behalf of another officer (C.O. Ayotte), (b) prisoners do not have a due process right to a thorough investigation of grievances and thus, Defendants Bell and Mallozzi's alleged incomplete investigations are not adverse actions, (c) there is no temporal proximity between the filing of Plaintiff's grievance against C.O. Ayotte on October 12, 2017, and the affirmations of Plaintiff's grievance appeals by Defendants Bell and Mallozzi on January 18, 2018, and May 8, 2019, respectively. (*Id.* at 14-15.)

**\*2** Second, Defendants argue that based on the Second Circuit decision set forth in *Tangretti*, Plaintiff must allege facts plausibly suggesting that Defendants Holdridge, Bell, and Mallozzi violated his First Amendment rights with their own individual actions. (*Id.* at 15-17.) Defendants argue that the Amended Complaint fails to allege that Defendants Holdridge, Bell, and Mallozzi were (a) aware of Plaintiff's protected speech (i.e., the grievance he filed

against C.O. Ayotte), (b) knew the extent of the investigation into the first grievance filed by Plaintiff, or (c) acted with retaliatory animus towards Plaintiff because of the grievance filed against C.O. Ayotte. (*Id.*) Further, Defendants argue that Plaintiff's allegations regarding Defendants Bell and Mallozzi—that they were involved in the affirmation of Plaintiff's grievance denial—are insufficient to allege personal involvement. (*Id.*)

### 2. Plaintiff's Opposition

Generally, in opposition to Defendants' motion, Plaintiff argues that (1) the Amended Complaint alleges facts plausibly suggesting a claim of retaliation; and (2) the Amended Complaint plausibly alleges the personal involvement of Defendants Holdridge, Bell, and Mallozzi. (Dkt. No. 22.)

First, Plaintiff argues that he plausibly alleged a claim of retaliation against (1) Defendant DeLutis because (a) he alleged that Defendant DeLutis e-mailed Ms. Hicks telling her to remove Plaintiff from the tailor shop for no reason other than to punish Plaintiff for filing a grievance, which was an adverse action, and (b) there is a causal connection between Plaintiff's grievance and his removal from the tailor shop which can be inferred from (i) the temporal proximity of the two incidents, (ii) Defendant DeLutis's removal of Plaintiff from the tailor shop before conducting an investigation into Plaintiff's grievance, and (iii) the fact that DOCCS' policies and procedures regarding removal of inmates from a program were not followed when removing Plaintiff from the tailor shop, (2) he alleged that Defendant Holdridge became personally involved in the constitutional violation (a) when he lied about reviewing confidential documents that did not exist, and (b) with his support of Defendant DeLutis's decision to remove Plaintiff from the tailor shop, which "showed gross negligence and demonstrated deliberate indifference," (3) he alleged that Defendants Bell and Mallozzi became personally involved in the constitutional violation when they chose "not to do what was right" and "remedy the wrong and in doing so[,] showed gross negligence and demonstrated deliberate indifference to [Plaintiff's] constitutional rights." (Dkt. No 22 at 4-7.)

Second, Plaintiff argues that (1) as supervisors, Defendants Bell and Mallozzi were personally involved because they learned of the constitutional violation through Plaintiff's grievance appeal and failed to rectify the situation, and (2) Defendant Holdridge was personally involved because

Hendricks v. Mallozzi, Slip Copy (2022)

Plaintiff sent him a letter requesting information about Plaintiff's removal from the tailor shop and Defendant Holdridge stated that he reviewed confidential documentation supporting Plaintiff's removal and that he supported Plaintiff's removal. (*Id.*)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 211, nn.15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

 **\*3**  On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added). [1]

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal"

notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak*, 629 F. Supp. 2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*,

it "does not impose a probability requirement." *Twombly, 550 U.S. at 556.*

**\*4** Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal, 129 S. Ct. at 1949.* Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal, 129 S. Ct. at 1949* (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

However, "in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007)* (Sharpe, M.J.) (quoting *Haines v. Kerner, 404 U.S. 519, 520 (1972)*) (other citations omitted). The Second Circuit has opined that the court is obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 475 (2d Cir. 2006)* (quoting *Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983)*). As a result, *Twombly* and *Iqbal* notwithstanding, the court must continue to "construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests." *Weixel v. Bd. of Educ.*, 287 F.3d 139, 146 (2d Cir. 2002).

### III. ANALYSIS

### A. Whether Plaintiff Sufficiently Alleged a First Amendment Retaliation Claim Against Defendant DeLutis

After carefully considering the matter, I answer this question in the affirmative for the reasons set forth below.

A cognizable claim of retaliation pursuant to 42 U.S.C. § 1983 lies when prison officials take an adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of

the First Amendment. *See Friedl v. City of N.Y., 210 F.3d 79, 85 (2d Cir. 2000)* ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002); accord, Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003).*

To state a *prima facie* claim pursuant to 42 U.S.C. § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action–in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Dillon v. Morano, 497 F.3d 247, 251 (2d Cir. 2007); Garrett v. Reynolds, No. 99-CV-2065, 2003 WL 22299359, at \*4 (N.D.N.Y. Oct. 3, 2003)* (Sharpe, M.J.).

For purposes of this motion, it is undisputed that Plaintiff engaged in constitutionally protected speech by the filing of a grievance. (Dkt. No. 17, Attach. 1 at 8); *see Davis v. Goord, 320 F.3d at 352-53* ("[T]he filing of prison grievances is a constitutionally protected activity."); *Flood v. Cappelli*, 18-CV-3897, *2019 WL 3778736, at \*7 (S.D.N.Y. Aug. 2, 2019)* (collecting cases) (holding that the filing of a grievance is protected speech).

**\*5** I reject Defendants' argument that the Amended Complaint fails to allege facts plausibly suggesting that they took an adverse action against Plaintiff. Although courts in the Second Circuit have held that "inmates in the DOC[C]S system do not have any constitutional, statutory, regulatory, or precedential right to a particular prison job," *Muhammad v. Warithu-Deen Umar, 98 F. Supp. 2d 337, 345 (W.D.N.Y. 2000)* (citing *Gill v. Mooney, 824 F.2d 192,*

194 (2d Cir. 1987)), courts have also held that terminating a prisoner's employment is an "adverse action" for purposes of a First Amendment retaliation claim. *Casey v. Pallito*, 12-CV-0284, 2016 WL 96157, at *7 (D. Vt. Jan. 7, 2016); *see Logan v. Graham*, 18-CV-0291, 2019 WL 8015209, at *13, n.19 (N.D.N.Y. Nov. 26, 2019) (Lovric, M.J.) (finding that the firing of the plaintiff from his job as a feed-up porter constituted an adverse action for purposes of a First Amendment retaliation claim); *Henderson v. Vanderwerff*, 13-CV-1537, 2016 WL 660921, at *4 (N.D.N.Y. Feb. 18, 2016) (D'Agostino, J.) (holding that the "[p]laintiff's complaint plausibly alleges that Officer Chuttey was involved in the adverse action of terminating [the p]laintiff from his prison job in retaliation for his filing of the grievance against Officer Richardson."); *Chavis v. Struebel*, 317 F. Supp. 2d 232, 238 (W.D.N.Y. 2004) (noting that "assigning the inmate [to] less desirable work assignments satisfies the adverse action requirement" for purposes of a prisoner's First Amendment retaliation claim); *Van Pelt v. Finn*, 92-CV-2977, 1993 WL 465297, at *4 (S.D.N.Y. Nov. 12, 1993) (holding that reassignment of an inmate to a less desirable job with lower pay constitutes an adverse action).

In considering whether there is a "causal connection between the protected speech and the adverse action, a court may consider a number of factors, including any statements made by the defendant concerning his motivation and the temporal proximity between the protected activity and the defendant's adverse action." *Roseboro v. Gillespie*, 719 F. Supp. 2d 353, 366 (S.D.N.Y. 2011). The Second Circuit has "held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation," but, at the summary judgment stage, has also "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017); *see Ziemba v. Thomas*, 390 F. Supp. 2d 136, 157 (D. Conn. 2005) ("Temporal proximity alone is not sufficient for the plaintiff's claim to survive summary judgment.").

I also reject Defendants' argument that the Amended Complaint fails to allege facts plausibly suggesting a causal connection between Plaintiff's protected speech on October 12, 2017 (Dkt. No. 8 at ¶ 11), and Defendant DeLutis's alleged e-mail to Ms. Hicks on October 26, 2017, telling her to remove Plaintiff from his position in the tailor shop (Dkt. No. 8 at ¶ 27).

First, the Second Circuit has made clear that "temporal proximity of an allegedly retaliatory [action] to a grievance may serve as circumstantial evidence of retaliation." *Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (holding that, within the context of an employment discrimination claim, "[a] retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action."). Although there is significant case law to support the contention that temporal proximity alone is insufficient to survive a motion for summary judgment, *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017), the same is not true at the motion to dismiss stage. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (collecting cases) ("To be sure, a 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action.' Such circumstantial evidence of retaliation, however, without more, is insufficient to survive summary judgment."). Defendants cite to *Thomas v. Waugh*, 13-CV-0321, 2015 WL 5750945, at *4 (N.D.N.Y. Sept. 30, 2015) (D'Agostino, J. adopting Report-Recommendation on *de novo* review) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)), which held that "temporal proximity alone is insufficient to establish an inference of retaliation." However, the Second Circuit case relied on by the Court in *Thomas*, did not draw such a conclusion. *Slattery*, 248 F.3d at 95. Instead, the Second Circuit in *Slattery*, held that, in the context of an employment case, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery*, 248 F.3d at 95. Here, unlike the facts presented in *Slattery*, the Amended Complaint does not allege facts plausibly suggesting that gradual adverse job actions began before Plaintiff was removed from his position in the tailor shop. (*See generally* Dkt. No. 8.) As a result, I find that temporal proximity alone is sufficient to infer a causal connection at the motion to dismiss stage.

**\*6** Second, the Amended Complaint alleges more than mere temporal proximity from which, a causal connection could be inferred. As set forth by Plaintiff in his memorandum of law, a causal connection could also be inferred based

on Defendants' alleged failure to follow "DOCCS's policies and procedures regarding requests for removal and removal of inmates from program." (Dkt. No. 22 at 4; *accord* Dkt. No. 8 at ¶ 34.) While Defendants' alleged failure to follow DOCCS' policies and procedures does not "explicitly state an intent to retaliate, [it] is consistent with and impl[ies] a retaliatory motive." *Burton v. Lynch*, 664 F. Supp. 2d 349, 368 (S.D.N.Y. 2009).

Third, although Plaintiff alleges that Defendant DeLutis took an adverse action against him on behalf of C.O. Ayotte and "it is difficult to establish one defendant's retaliation for complaints against another defendant," *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011), I find that the Amended Complaint alleges facts plausibly suggesting a causal connection. More specifically, Plaintiff alleges that Defendant DeLutis was "in charge of the investigation" regarding the grievance that Plaintiff filed against C.O. Ayotte. (Dkt. No. 8 at ¶ 26.) In addition, the Amended Complaint alleges that (1) Plaintiff filed the grievance on October 20, 2017, [2] (2) on October 26, 2017, Defendant DeLutis sent an e-mail to Ms. Hicks directing her to remove Plaintiff from the tailor shop for "security reasons," and (3) on October 27, 2017, Defendant DeLutis directed Sergeant Stuart to interview Plaintiff and C.O. Ayotte about Plaintiff's grievance. (Dkt. No. 8 at ¶¶ 26-27.) Thus, the Amended Complaint alleges that Defendant DeLutis was aware of Plaintiff's protected speech (the grievance against C.O. Ayotte) at the time he took the adverse action against Plaintiff (directing his removal from the tailor shop) and that those events occurred in close temporal proximity to each other. *See Young v. Shipman*, 18-CV-0782, 2020 WL 1329159, at *4-5 (N.D.N.Y. Mar. 23, 2020) (Sannes, J.) (finding that the plaintiff alleged facts plausibly suggesting a causal connection between the plaintiff's protected speech (a grievance that the plaintiff filed against Defendant Sawyer) and the adverse action (taken by Defendant Shipman) where Defendant Shipman was allegedly aware of the plaintiff's grievance against Defendant Sawyer and the events occurred in close temporal proximity).

As a result, I recommend that Defendants' motion to dismiss the Amended Complaint, arguing that Plaintiff's retaliation claim fails as a matter of law against Defendant DeLutis, be denied. [3]

**B. Whether Plaintiff Alleged Facts Plausibly Suggesting a Retaliation Claim Against Defendants Holdridge, Bell, and Mallozzi**

For the reasons stated in Defendants' memorandum of law, I recommend that Plaintiff's retaliation claim against Defendants Holdridge, Bell, and Mallozzi be dismissed for failure to state a claim upon which relief may be granted. The following is intended to supplement, but not supplant those reasons.

**\*7** "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

Courts in this circuit routinely hold that "the doctrine of respondeat superior cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz*, 97-CV-2419, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Thus, supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority.

*See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Colon*, 58 F.3d at 874 (holding that the fact that the defendant occupied a high-ranking position in the New York prison hierarchy, without more, was insufficient to establish personal involvement). Before deciding *Ashcroft v. Iqbal*, 556 U.S. 62 (2009), the Second Circuit held that supervisory personnel could be considered "personally involved" if

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

🚩 *Colon*, 58 F.3d at 873 (citing 🚩 *Wright*, 21 F.3d at 501 (additional citation omitted)).

In 🚩 *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. Consistent with other circuits, the Second Circuit concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " 🚩 *Tangreti*, 983 F.3d at 618. The Second Circuit explained that, " 'the factors necessary to establish a [🚩 § 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary. The violation must be established against the supervisory official directly." *Id.* (quoting 🚩 *Iqbal*, 556 U.S. at 676). "District courts discussing *Tangreti* agree that the decision invalidated the *Colon* test and mandates that a plaintiff must establish a violation against the supervisory official directly." *Fabrizio v. Smith*, 20-CV-0011, 2021 WL 2211206, at *10 (N.D.N.Y. Mar. 10, 2021) (Lovric, M.J.) (collecting cases), *report and recommendation adopted by* 2021 WL 2211023 (N.D.N.Y. June 1, 2021) (Suddaby, C.J.).

**\*8** "In light of *Tangreti,* [a] plaintiff cannot establish [a supervisor's] personal involvement based upon the denial of grievance and/or appeals because it does not plausibly suggest '[t]he factors necessary to establish' a First Amendment ... claim." *Bryant v. Miller*, 18-CV-0494, 2021 WL 5095284, at

*20 (N.D.N.Y. July 22, 2021) (Hummel, M.J.), *report and recommendation adopted by* 2021 WL 4272396 (N.D.N.Y. Sept. 21, 2021) (Suddaby, C.J.); *see Fabrizio*, 2021 WL 2211206, at *10 (holding that the plaintiff's "attempt to plead personal involvement based upon the denial of a grievance and/or appeals, lacks merit because it does not plausibly suggest '[t]he factors necessary to establish' a First Amendment retaliation claim."); *Zielinski v. Annucci*, 17-CV-1087, 2019 WL 2479616, at *12 (N.D.N.Y. Jan. 8, 2019) (Hummel, M.J.), *report and recommendation adopted by* 2019 WL 1305826 (N.D.N.Y. Mar. 22, 2019) ("[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement."); *Gomez v. Sepiol*, 11-CV-1017SR, 2014 WL 1575872, at *10 (W.D.N.Y. Apr. 11, 2014) ("[T]he investigation of a grievance alone, is not sufficient to allege personal involvement in the underlying constitutional violation."); *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 649 (W.D.N.Y. 2010) (holding that the plaintiff failed to establish the defendant's personal involvement based on allegations that the defendant investigated the plaintiff's grievance and concluded that there was no evidence that the other defendants had retaliated against the plaintiff).

Plaintiff's allegations against Defendants Holdridge, Bell, and Mallozzi, relate solely to their (a) denial of Plaintiff's grievance, (b) affirmation of Plaintiff's grievance denial, and/or (c) affirmation of Defendant DeLutis's removal of Plaintiff from the tailor shop. (*See generally* Dkt. Nos. 1, 22.) After the Second Circuit's ruling in *Tangreti*, these allegations are insufficient to plausibly suggest the personal involvement of Defendants Holdridge, Bell, and Mallozzi. As a result, I recommend that Defendants' motion to dismiss with respect to Defendants Holdridge, Bell, and Mallozzi, be granted.

**ACCORDINGLY**, it is hereby respectfully

**RECOMMENDED** that Plaintiff's Amended Complaint (Dkt. No. 8) be **DISMISSED** with respect to Defendants Holdridge, Bell, and Mallozzi for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6); and it is further respectfully

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 17) be **GRANTED** to the extent that it sought dismissal of Defendants Holdridge, Bell, and Mallozzi because the Amended Complaint failed to state a claim upon which relief may be granted, and **DENIED** to the extent that

it sought dismissal of the Amended Complaint with respect to Defendant DeLutis; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [4]

Pursuant to 🚩 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** 🚩 *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing 🚩 *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 🚩 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Slip Copy, 2022 WL 1129887

## Footnotes

1   *Accord, Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.).

2   Plaintiff also alleges that this grievance was filed on October 12, 2017. (*Compare* Dkt. No. 8 at ¶ 11, *with* Dkt. No. 8 at ¶ 26.) For purposes of this motion, the Court need not resolve whether Plaintiff's grievance was filed on October 12, 2017, or October 20, 2017.

3   To the extent that Defendants claim that they would have taken the same action against Plaintiff absent the protected conduct, at this stage of the litigation, the Court is unable, on a motion to dismiss, to resolve such factual disputes. *See Carl v. Dirie,* 09-CV-0724, 2010 WL 3338566, at *6 (N.D.N.Y. March 29, 2010) (Treece, M.J.) (denying the defendant's motion to dismiss retaliation claim due to factual issues surrounding whether the defendants would have taken the same actions in the absence of retaliatory motives).

4   The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with 🚩 *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 856885

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Andrew HENDRICKS, Plaintiff,

v.

Shelley M. MALLOZZI, Director of the Inmate
Grievance Program for DOCCS; Earl Bell,
Superintendent, Clinton Correctional Facility; D.
Holdridge, Deputy Superintendent for Security, Clinton
Correctional Facility; and C. Delutis, Captain of
Security, Clinton Correctional Facility, Defendants.

9:20-CV-1035 (MAD/ML)
|
Signed 03/23/2022

**Attorneys and Law Firms**

ANDREW HENDRICKS, 07-B-0269, Eastern New York
Correctional Facility, Box 338, Napanoch, New York 12458,
Plaintiff, Pro Se.

BRENDA BADDAM, AAG, NEW YORK STATE
ATTORNEY GENERAL, The Capitol, Albany, New York
12224, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

 **\*1** Plaintiff commenced this civil rights action on September
3, 2020, alleging violations of his constitutional rights while
he was incarcerated at Clinton Correctional Facility. *See*
Dkt. No. 1. On October 29, 2020, this Court dismissed the
complaint without prejudice pursuant to 🔖 28 U.S.C. §§
1915(e)(2)(B) and 1915A(b)(1). *See* Dkt. No. 5. Plaintiff filed
a proposed amended complaint on November 18, 2020. *See*
Dkt. No. 8. In his amended complaint, Plaintiff asserted that
Defendants C. DeLutis, K. Hicks, D. Holdridge, Earl Bell,
and Shelley M. Mallozzi violated his First and Fourteenth
Amendment rights when they removed him from his prison
job in retaliation for filing a grievance against a correctional
officer. *See id.* at ¶¶ 24-57. On December 23, 2020, this
Court accepted the amended complaint for filing only to the
extent that it asserted First Amendment retaliation claims
against Defendants DeLutis, Holdridge, Bell, and Mallozzi,
and dismissed the remaining claims without prejudice. *See*
Dkt. No. 9.

On March 1, 2021, in lieu of an answer, Defendants filed
a motion to dismiss the amended complaint pursuant to
Rule 12(b)(6) of the Federal Rules of Civil Procedure.
*See* Dkt. No. 17. On January 14, 2022, Magistrate Judge
Lovric issued a Report and Recommendation recommending
that Defendants' motion to dismiss be granted with respect
to Defendants Holdridge, Bell, and Mallozzi, and denied
with respect to Defendant DeLutis. *See* Dkt. No. 28. On
January 31, 2021, Plaintiff objected to the Report and
Recommendation to the extent it recommended granting
Defendants' motion to dismiss with respect to Defendants
Holdridge, Bell, and Mallozzi. *See* Dkt. No. 29. Currently
before the Court is Magistrate Judge Lovric's Report and
Recommendation and Plaintiff's objection thereto.

**II. BACKGROUND**

The amended complaint alleges that, on October 11, 2017,
Plaintiff was given an "Inmate Counseling Notification" by a
nonparty civilian employee of the tailor shop where Plaintiff
worked. *See* Dkt. No. 8 at ¶ 10. Two days later, Plaintiff
submitted a grievance to the Inmate Grievance Resolution
Committee ("IGRC") alleging that nonparty Corrections
Officer ("C.O.") Ayotte was harassing him in connection with
the Inmate Counseling Notification. *See id.* at ¶ 11. Defendant
DeLutis "was in charge of the investigation[ and] directed
[a nonparty C.O.] to interview [Plaintiff] and C.O. Ayotte
about the incident, which he did, separately, on 10/27/17." *Id.*
at ¶ 26. On November 1, 2017, at the request of Defendant
DeLutis, Plaintiff was removed from his position at the tailor
shop for confidential "security reasons." *Id.* at ¶ 29.

On December 11, 2017, Plaintiff filed a second grievance
complaining that his removal from his tailor shop job was
done in retaliation for the prior grievance he had filed against
C.O. Ayotte. *See id.* at ¶ 30. The IGRC denied the second
grievance, stating that Plaintiff was removed from the tailor
shop for legitimate security concerns. *See id.* at ¶ 47. The
IGRC told Plaintiff he was not allowed to know what those
security reasons were because "it might jeopardize the safety
and security of the facility." *Id.*

**\*2** Plaintiff appealed the IGRC's decision to the Superintendent, Defendant Bell, on December 27, 2017. *Id.* Defendant Bell ultimately denied the appeal and found Plaintiff's retaliation claim to be "unsubstantiated" because Plaintiff was removed from the tailor shop for legitimate security concerns. *Id.* at ¶ 48. In rendering this decision, Defendant Bell allegedly quoted the "Policy, Procedures and Standards for Programing Inmates manual" and stated that "[a] change in program can be made at anytime, 'in person or in writing ....' " *Id.* at ¶ 49. The amended complaint claims that this quote was "nothing less than a shameless and unattractive attempt to be deceptive and misleading" because the manual "clearly <u>does not say</u> 'in person or in writing' in that particular section." *Id.*

Plaintiff appealed Defendant Bell's determination to the DOCCS Central Office Review Committee ("CORC"), where Defendant Mallozzi was serving as Director. *Id.* CORC upheld Defendant Bell's determination, finding that Plaintiff was removed from his position at the tailor shop for security reasons. *See id.* at ¶ 53.

Meanwhile, on November 27, 2017, Plaintiff sent a letter to Defendant Holdridge requesting information about his removal from the tailor shop. *See id.* at ¶ 43. Defendant Holdridge replied the same day, "stating that he had reviewed the 'confidential documentation supporting [Plaintiff's] removal' and that he ... also support[ed] the removal" because it was "in the best interest of the facility." *Id.* The complaint asserts that Defendant Holdridge's statement that he reviewed confidential documentation is a "deliberate and deceptive untruth" because Plaintiff "F.O.I.L. requested <u>any and all</u> documents" related to his removal and the only thing he received was a copy of an email from Defendant DeLutis requesting the removal. *Id.* at ¶¶ 44-45.

On March 1, 2021, Defendants DeLutis, Holdridge, Bell, and Mallozzi filed a motion to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6). *See* Dkt. No. 17. On January 14, 2022, Magistrate Judge Lovric issued a Report and Recommendation recommending, as relevant here, that the motion to dismiss be granted as to Defendants Holdridge, Bell, and Mallozzi. *See* Dkt. No. 28. Magistrate Judge Lovric found that—after the Second Circuit's recent ruling in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)— a " 'plaintiff cannot establish [a supervisor's] personal involvement based upon the denial of grievance and/or appeals because it does not plausibly suggest "[t]he factors necessary to establish" a First Amendment ... claim.' " Dkt.

No. 28 at 17 (quotation omitted). Noting that "Plaintiff's allegations against Defendants Holdridge, Bell, and Mallozzi, relate[d] solely to their (a) denial of Plaintiff's grievance, (b) affirmation of Plaintiff's grievance denial, and/or (c) affirmation of Defendant DeLutis's removal of Plaintiff from the tailor shop," Magistrate Judge Lovric concluded that Plaintiff's "allegations are insufficient to plausibly suggest the personal involvement of Defendants Holdridge, Bell, and Mallozi." *Id.*

Plaintiff's raises two objections to Magistrate Judge Lovric's Report and Recommendation. First, Plaintiff argues that the amended complaint alleged facts beyond the denial or affirmation of the denial of a grievance that plausibly support the personal involvement of Defendants Holdridge, Bell, and Mallozzi in Plaintiff's retaliation claim. *See* Dkt. No. 29 at ¶¶ 1-4. Second, Plaintiff argues that it was unfair for Magistrate Judge Lovric to rely on *Tangreti* in rejecting his retaliation claims because *Tangreti* was decided after Plaintiff filed his amended complaint. *See id.* at ¶¶ 5-7. Plaintiff also asks for permission to file a second amended complaint should the Court choose to adopt the Report and Recommendation. *See id.* at ¶ 7.

## III. DISCUSSION

### A. Standard of Review

**\*3** A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting [*Twombly,* 550 U.S.] at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly,* 550 U.S. at 558, or where a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.* at 570.

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir. 1983)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08-CV-322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. Plaintiff's Objections**

Plaintiff's first objection is that his amended complaint has alleged facts that plausibly suggest the personal involvement of Defendants Holdridge, Bell, and Mallozzi in the events that form the basis of his retaliation claim. *See* Dkt. No. 29 at ¶ 1. Specifically, Plaintiff asserts that the amended complaint states that Defendant Holdridge "took it upon himself to get personally involved" by responding to a letter written by Plaintiff and "stating that he [had] reviewed the confidential documentation supporting [Plaintiff's] removal from the Tailor Shop ... knowing full well that no such documentation even existed." *Id.* at ¶ 2 (citing Dkt. No. 8 at ¶¶ 42-45). Plaintiff also asserts that Defendant Bell did more than "merely deny [his] grievance on appeal"; claiming that he "reconfigur[ed] and manipulat[ed] the wording of DOCCS policy," showing "blatant disregard for and deliberate indifference to [Plaintiff's] First Amendment rights." *Id.* at ¶ 4 (citing Dkt. No. 8 at ¶¶ 46-51). Finally, Plaintiff argues that the amended complaint states that Defendant Mallozzi "just rubber stamped [D]efendant Bell's decision," making him "just as liable as [D]efendant Bell." *Id.*

**\*4** The Court finds that Defendants' motion to dismiss should be granted with respect to Defendants Holdridge, Bell, and Mallozzi. As Magistrate Judge Lovric found, "[i]t is well settled that affirming the outcome of a disciplinary hearing does not in itself constitute personal involvement in any potential due process violation," or other alleged underlying unconstitutional conduct. *Abdul-Halim v. Bruyere,* No. 9:19-CV-740, 2021 WL 3783087, *3 (N.D.N.Y. Aug. 26, 2021); *see also Smart v. Annucci,* No. 19-CV-7908, 2021 WL 260105, *5 (S.D.N.Y. Jan. 26, 2021) ("Failing to correct another officer's violation does not suffice"); *Gomez v. Sepiol,* No. 11-CV-1017, 2014 WL 1575872, *10 (W.D.N.Y. Apr. 11, 2014) ("[T]he investigation of a grievance alone, is not sufficient to allege personal involvement in the underlying constitutional violation"); *Rosales v. Kikendall,* 677 F. Supp. 2d 643, 649 (W.D.N.Y. 2010) (holding that the plaintiff failed to establish the defendant's personal involvement based on allegations that the defendant investigated the plaintiff's grievance and concluded that there was no evidence that the other defendants had retaliated against the plaintiff). Contrary to Plaintiff's argument, Defendant Holdridge's reliance on confidential documentation and Defendant Bell's alleged error when quoting DOCCS policy do not transform their

review of his second grievance into personal involvement in the underlying constitutional violation (the allegedly retaliatory removal of Plaintiff from his job); nor do these alleged actions amount to separate constitutional violations.

Plaintiff next objects to the application of the Second Circuit's holding in 📙 *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), [1] to this case. *See* Dkt. No. 29 at ¶¶ 5-7. Specifically, Plaintiff notes that the amended complaint was filed before the decision in *Tangreti* was issued, and argues that it would be "unfair" for the Court to apply *Tangreti* where he "obviously had no knowledge that the [prior] test would soon be invalidated" at the time he wrote the amended complaint. *Id.* at ¶ 7. The Court finds that *Tangreti* is properly applied to this case. "[T]he general rule [is] that a court must apply the law as it exists at the time it renders its decision." 🔺 *Walsche v. First Inv'rs Corp.*, 981 F.2d 649, 653 (2d Cir. 1992) (citations omitted); *see also* 📙 *Kremer v. Chem. Const. Corp.*, 623 F.2d 786, 788-89 (2d Cir. 1980), *aff'd*, 📙 456 U.S. 461 (1982) ("The general rule of long standing is that judicial precedents normally have retroactive as well as prospective effect"). The narrow exception to this general principle identified in 🚩 *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971), does not apply here. [2]

Accordingly, the Court adopts Magistrate Judge Lovric's Report and Recommendation in its entirety.

### C. Leave to Amend

Finally, Plaintiff requests leave to file a second amended complaint should the Court choose to adopt Magistrate Judge Lovric's Report and Recommendation. *See* Dkt. No. 29 at ¶ 7. In general, a court should not dismiss a *pro se* litigant's complaint without granting leave to amend at least once " 'when a liberal reading of the complaint gives any indication that a valid claim might be stated.' " 📙 *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (quoting 📙 *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). However, an opportunity to amend is not required where the

plaintiff has previously been afforded such an opportunity. *See Coleman v. brokersXpress, LLC*, 375 Fed. Appx. 136, 137 (2d Cir. 2010); *see also Bivona v. McLean*, No. 9:19-CV-0303, 2019 WL 2250553, *5 (N.D.N.Y. May 24, 2019); *Abascal v. Hilton*, No. 04-CV-1401, 2008 WL 268366, *8 (N.D.N.Y. Jan. 13, 2008), *aff'd*, 357 Fed. Appx. 388 (2d Cir. 2009).

 **\*5** Here, Plaintiff has already been afforded one opportunity to amend the complaint and has not made any specific showing as to how he would cure the defects that have persisted if given a second opportunity to amend. Accordingly, Plaintiff's request for leave to file a second amended complaint is denied.

## IV. CONCLUSION

After carefully reviewing the Report and Recommendation, the entire record in this matter, and the applicable law, the Court hereby

**ORDERS** that Magistrate Judge Lovric's Report and Recommendation (Dkt. No. 28) is **ADOPTED** in its entirety for the reasons set forth herein; and the Court further

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 17) is **GRANTED in part** and **DENIED in part**; [3] and the Court further

**ORDERS** that Defendants Holdridge, Bell, and Mallozzi are terminated as Defendants in this action; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 856885

## Footnotes

1    In *Tangreti*, the Second Circuit addressed how the Supreme Court's decision in *Iqbal* affected the standards for establishing supervisory liability. Ultimately, the Second Circuit held that, to establish a constitutional violation against a supervisor, a plaintiff "must plead and prove that [the supervisor-]defendant, through [his or her] own individual actions, has violated the constitution." 🚩 *Tangreti,* 983 F.3d at 618 (internal quotation marks omitted).

2    "To qualify for purely prospective application, a decision 'must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed' " and "the court must then 'weigh' the issue of whether retroactive application would conflict with or further the purposes of the new rule and whether it would produce inequitable results." 🔺 *Walsche,* 981 F.2d at 653 (quoting 🚩 *Chevron Oil Co.,* 404 U.S. at 106-07).

3    Plaintiff's First Amendment retaliation claim remains against Defendant DeLutis.

---

**End of Document**                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.